SCOTT M. PEARSON (State Bar No. 173880)
E-mail: spearson@manatt.com
BRAD W. SEILING (State Bar No. 143515)
E-mail: bseiling@manatt.com
MISA EIRITZ (State Bar No. 307513)
E-mail: meiritz@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East
Suite 1700
Los Angeles, California 90067
Telephone:   310.312.4000
Facsimile:   310.312.4224

*Attorneys for Plaintiff*
SMALL BUSINESS FINANCE
ASSOCIATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SMALL BUSINESS FINANCE ASSOCIATION,<br><br>               Plaintiff,<br><br>     v.<br><br>CLOTHILDE HEWLETT, solely in her official capacity as Commissioner of the California Department of Financial Protection and Innovation,<br><br>               Defendant. | No. 2:22-cv-08775<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Small Business Finance Association ("SBFA") brings this action for declaratory and injunctive relief against defendant Clothilde V. Hewlett (the "Commissioner"), solely in her official capacity as Commissioner of the California Department of Financial Protection and Innovation ("DFPI"), and alleges as follows:

1.     This action seeks to enjoin regulations that violate the First Amendment rights of companies that provide capital to small and medium-sized businesses.  DFPI adopted these regulations – 10 Cal. Code Regs., tit. 10, ch. 3 (the "Regulations") – as required by a statute enacted by the California Legislature in 2018.  *See* S.B. 1235, 2017-2018 Sess. (Cal. 2018) (codified at Cal. Fin. Code §§ 22800-22805) ("SB 1235").  The purpose of the Regulations is to provide businesses seeking financing with disclosures that would allow the businesses to compare the costs and terms of different types of financing arrangements.  However, commercial financing takes many forms with unique attributes.  While the Regulations attempt to facilitate comparison shopping, they do not require the disclosure of purely factual and uncontroversial information.

2.     The compelled inaccurate disclosures do not provide meaningful information to businesses seeking financing.  To the contrary, they will provide businesses with inaccurate information that misstates the costs of financing and prevents business owners from making informed decisions regarding available financing options.  In addition to requiring false and/or misleading disclosures, the Regulations also purport to prohibit additional disclosures and statements that correct, clarify, or supplement the misleading and confusing messages the Regulations compel.  Under threat of criminal and civil sanctions, *see* Cal. Fin. Code §§ 22713, 22780, 22805, the Regulations compel providers of commercial financing to speak messages that are false, misleading, and controversial.  By compelling commercial speech that is neither factual nor uncontroversial, the Regulations violate the First Amendment.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -                    COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

3.     In addition to violating the First Amendment, the Regulations are preempted in part by the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*

## THE PARTIES

4.     Plaintiff SBFA is a non-profit advocacy organization whose mission is to educate policymakers and regulators about the technology-driven platforms emerging in the small business financing market.  Such platforms are used to offer financing solutions to traditionally underserved small businesses.  SBFA supports efforts across the country to enact meaningful disclosure laws and believes small businesses are entitled to disclosures that are simple, clear, and provide valuable information to allow small businesses to compare the price and terms of different products across the commercial finance industry.  SBFA opposes disclosure requirements, like those set forth in the Regulations, that compel its members to make statements that are false, misleading, and confusing.

5.     SBFA's members (referred to as "Members") are technology-driven financial services companies specifically focused on providing efficient and responsible capital to small and medium-sized businesses across America.  Many of the providers' customers are "mom and pop shops" that form the backbone of California's economy.  The decisions these businesses make about raising capital and incurring debt have significant impacts on California as a whole.  For this reason, it is particularly important that they receive accurate disclosures regarding the costs of various financing options available.  Banks and other traditional lenders typically are not willing to lend to these small businesses because the amount of financing sought is ordinarily too small for banks or the businesses have insufficient operating history or assets.  SBFA's Members are "providers" under SB 1235 – meaning a person who extends a specific offer of "commercial financing" as defined in California Financial Code section 22800(d).  For that reason, SBFA's

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Members are subject to the Regulations and the compelled speech described in this complaint.

6.      Defendant Commissioner is the Commissioner of DFPI and is named solely in her official capacity.  Under the California Financial Code, the Commissioner has the power to enforce SB 1235 and its implementing Regulations, including by determining violations and seeking, among other things, civil penalties and other relief – including injunctions, disgorgement, restitution, and damages – for claimed violations of the statute and Regulations.  Cal. Fin. Code §§ 22713, 22780, 22780.1.  DFPI is an agency of the State of California which maintains an office in this judicial district located at 300 S. Spring Street, Suite 15513, Los Angeles, California, 90013-1259.  By statute, this action may be commenced in any judicial district where the California Attorney General maintains an office.  The California Attorney General maintains an office in this judicial district located at 300 S. Spring Street, Los Angeles, California, 90013-1230.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the First Amendment of the United States Constitution and under TILA, a federal statute.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2).  The Commissioner has an office in this judicial district, where she performs her official duties.  The California Attorney General also maintains an office in this judicial district.  Moreover, a substantial part of the events giving rise to SBFA's claims have occurred or will occur in this judicial district.  SBFA's Members frequently enter into financing transactions that fall within the scope of the Regulations with businesses in this district, and have previously entered into these financings with such businesses.  Absent injunctive relief, SBFA's Members will be compelled to deliver messages that are factually inaccurate, and will be

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1  prevented from speaking in the manner they see fit, to businesses in this district and
2  throughout the state.

3

4                          **FACTUAL ALLEGATIONS**

5      *Financing Offered by SBFA's Members*

6      9.      SBFA's Members provide alternative financing options that differ in

material respects from traditional commercial loans and from consumer credit

governed by TILA.  These financing options include:

9              (i)      Sales-Based Financing ("SBF") – SBF is a form of financing

10             whereby the provider purchases a portion of a business's future receivables at

11             a discount and collects those receivables as they are generated by the

12             business in the ordinary course.[1]  The generation of receivables by these

13             businesses fluctuates based on a wide variety of factors, such as seasonality

14             and economic conditions.  The receivables in many cases are transferred to

15             the provider by the businesses' card processor each day the business batches

16             out its credit card terminal.  In other cases, the provider will agree to set a

17             fixed daily amount it will debit from the business's checking account that is

18             based on an estimate of the daily receivables the business will generate.  The

19             business can then notify the provider when its daily receivables change and

20             the provider will then adjust the estimated daily amount debited from the

21             business's bank account or reconcile the amount debited based on the

22             business's actual revenue during the relevant time period.  The amount of

23             receivables purchased by the provider is generally referred to as the "Amount

24             Sold."  The purchase price for the Amount Sold is generally referred to as the

25             "Purchase Price."  The difference between the Amount Sold and Purchase

26  ───────────────

27  [1] SBF as defined by the Regulations also includes loans with payment requirements
based on a percentage of sales or income.  In this Complaint, however, SBF refers
28  only to purchases of future receivables.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 5 -

Price is the "Discount."  The percentage of receivables collected each day is commonly referred to as the "Split Percentage."  For transactions where the business's card processor is not used to "split" the receivables between the provider and the recipient, the daily amount debited from the business checking account is commonly referred to the "ACH Amount."  In those instances, where the business must notify the provider of changes in revenue, any change that results in a modification of the ACH Amount or a reconciliation is referred to as a "True-Up."  The receivables sold in connection with an SBF transaction can be credit card receivables, other payment card receivables, the gross revenue of the business, or any combination of the three.  An example of a transaction would be:  an Amount Sold of $12,000, a Purchase Price of $10,000, and a Split Percentage of 10%.  What this means is a business has agreed to deliver 10% of its receivables generated each day to the provider until the provider receives $12,000 in exchange for an upfront payment of $10,000.  There is no term, no interest, rate, no fixed periodic payment, no accruing rate, and no absolute obligation to repay – all of which are core features of traditional loan products.

(ii)    Open-end Credit – Open-end Credit is a credit transaction whereby the business is given a credit limit and may draw against that credit limit from time to time.  As the balance is paid down, additional "open to buy" is created, offering the business a renewing stream of credit to use to finance its business needs.  Open-end credit may have a fixed cost or an accruing rate.  Open-end credit products offered by many SBFA Members differ from traditional open-end credit lines (like credit cards) in that many of them have a fixed fee per draw rather than an accruing rate.

(iii)    Closed-end Credit – Closed-end credit is a loan of money to a business that must be repaid on specific terms and by a specific date.  In this regard, the closed-end loans offered by SBFA Members are similar to

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

traditional closed-end loans.  However, the closed-end loans offered by many SBFA Members have two distinct differences from traditional loans.  First, the periodic payments are typically required daily or weekly instead of monthly.  Second, the cost of the loan is typically structured as a fixed fee rather than an accruing rate.

10.     All three of the products offered by SBFA Members are innovations in small business financing born out of necessity.  Small businesses have faced challenges obtaining financing from banks and other traditional lenders because they have been viewed as too risky and because traditional underwriting costs have been high.  When banks and other traditional lenders have been willing to provide financing to small businesses, they often take many days or months to underwrite a loan, require significant business and/or personal collateral, and/or require guarantees from spouses or other family members in addition to the small business owner.  SBFA Members offer the above products to the businesses who cannot obtain financing from banks and traditional lenders.  SBFA Members have become efficient in underwriting small businesses by looking at their cash flow and can, in many cases, provide the needed financing in hours.  Accordingly, many small businesses are turning to SBFA Member companies not because they would not qualify for a bank or other traditional loan, but because many small businesses value the speed and efficiency of the process and the lack of collateral or additional guarantors over the cumbersome and time-consuming traditional loan application and approval process.

*SB 1235 And The Regulations*

11.     In 2018, the California Legislature enacted and the Governor signed SB 1235.  The stated purpose of the law was to protect small businesses by providing them with accurate disclosures regarding the costs of various financing options.  SB 1235, codified at California Financial Code sections 22800-22805, requires a "provider" – meaning a person who extends a specific offer of

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

"commercial financing" to a recipient – to disclose specified information relating to that transaction at the time of extending a specific offer of commercial financing, and to obtain the recipient's signature on that disclosure before consummating the commercial financing transaction.  SB 1235 does not apply to an offer of commercial financing of more than $500,000, so it is intended to apply to financing extended to small and medium-sized businesses.  Disclosures required by the law include the: (1) total amount of funds provided, (2) total dollar cost of the financing, (3) term or estimated term length, (4) method, frequency, and amount of payments, (5) description of prepayment policies, and (6) the "total cost of the financing expressed as an annualized rate."  Cal. Fin. Code §§ 22802(b)(6), 22803(a)(6).  SB 1235 did not itself prescribe specific disclosures or define how providers were to express the costs of financing as an annualized rate.  Instead, DFPI was tasked with issuing regulations implementing SB 1235's disclosure requirements.

12.    The Regulations do not regulate economic conduct or prohibit or restrict the types of financing options that SBFA's Members offer to small businesses.  Instead, the Regulations prescribe and restrict the content of SBFA Members' communications with their customers and potential customers, compelling Members to describe their products in ways that are false and misleading.

13.    The approach of the Regulations was unique in the context of financing disclosure laws in two material respects.  First, the Regulations seek to create a single disclosure form and uniform terms used for a wide variety of products.  So unlike other financing disclosure laws, products are forced into one set of parameters.  For example, a purchase transaction (*e.g.*, SBF) must include essentially the same disclosures as a loan transaction despite the fact that the terms of the products are entirely different.  Second, the Regulations adopted certain terms specifically defined in TILA – including, by way of example, the annual

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

percentage rate ("APR") and finance charge.  TILA applies to loans, lines of credit and retail installment sales.  However, unlike SB 1235, TILA does not apply a "one size fits all" approach to all consumer financing transactions.  Instead, it expressly excludes leases, factoring transactions, and asset sales.  In fact, leases are so unique that Congress passed a separate law to require lease-specific disclosures and the law adopts a lease-specific cost disclosure – it does not adopt APR for leases.  15 U.S.C. § 1667a.  By treating non-loan transactions (such as leases and sales transactions) and open-end credit like closed-end loans, the speech compelled by the Regulations is inaccurate and does not translate into meaningful disclosures regarding the costs and characteristics of the transactions governed by SB 1235.  That means the disclosures required under the Regulations, far from providing accurate information that would allow businesses to compare the terms and costs of different financing options, actually require providers to give inaccurate disclosures that will confuse the recipients that rely on financing provided by SBFA's Members.

14.  The Regulations are unduly burdensome.  The Commissioner may have an interest in adopting regulations that promote truthful disclosures regarding the cost of commercial financing.  But the Regulations go beyond that interest and impose disclosure obligations that are neither factual nor uncontroversial.

15.  On June 9, 2022, the California Office of Administrative Law approved DFPI's final version of the Regulations.  The Regulations will take effect on December 9, 2022.  SBFA's Members have been forced to develop internal procedures and disclosures to attempt to comply with the Regulations despite the fact that they do not believe the disclosures accurately describe the Members' products.  Beginning on December 9, 2022, SBFA's Members will be required to modify their speech and conduct in order to comply with the Regulations.

16.  Failure to comply with the Regulations will subject SBFA's Members to DFPI's extensive enforcement powers, which may include administrative orders

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1    to stop alleged violations and civil injunctive actions in the name of the People of

2    the State of California to enjoin violations, appoint receivers, and obtain equitable

3    relief, including recission, restitution and civil penalties.  SBFA's Members also

4    may face criminal liability for failing to comply with the Regulations.

5              *Compelled Inaccurate Disclosures Regarding SBF Transactions*

6              17.    The Regulations require providers to make disclosures regarding sales-

7    based financing transactions.  SBFA's Members provide sales-based financing

8    transactions.  Sales-based financing differs from traditional commercial loans in

9    many important respects.  In a sales-based financing, the capital provider purchases

10   a certain amount of receivables or payment intangibles from the business at a

11   discount, and the purchased receivables are delivered to the provider through a

12   fixed percentage of a business's future receivables until the Amount Sold is

13   delivered to the provider.  For example, the provider might pay a business $10,000

14   (Purchase Price) in exchange for $12,000 in future receipts (Amount Sold), to be

15   delivered on a periodic basis in an amount equal to 10% of the business's card

16   receivables (Split Percentage) until the full $12,000 in receivables has been

17   collected by the provider.  If the business grows and creates more receivables, the

18   $12,000 is received faster by the provider.  If the business slows down, the $12,000

19   in receivables is received more slowly by the provider.  If the business fails and no

20   receivables are produced, the transaction is complete with the business not having

21   any further obligations or liability as it is a true purchase-and-sale transaction.

22             18.    SBF transactions are purchase-and-sale transactions, not loans, as

23   implicitly recognized by the Regulations.  Not only are the legal formalities

24   between the products substantially different, but the basic financial terms are very

25   different.  In a typical commercial loan, the borrower must pay regular installments

26   of principal and interest of a fixed amount over a fixed term.  If a borrower pays

27   less than the full amount due, the shortfall will typically be added to the loan's

28   balance, and the borrower's interest payments will increase accordingly.  And if the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 10 -                                    COMPLAINT FOR DECLARATORY AND
                                                      INJUNCTIVE RELIEF

borrower fails to make a scheduled payment – for example, because its business takes an unexpected downturn – the lender may have a variety of options for recovering its investment, including accelerating the full amount of the loan, liquidating collateral, forcing the business into bankruptcy, or enforcing personal guarantees.  A key feature of a loan is that it represents an absolute obligation to repay, with a failure to repay the loan resulting in damages being owed to the lender.

19.     By contrast, in a sales-based financing transaction a business sells the Amount Sold at a discount for the Purchase Price, and agrees to deliver to the provider the Split Percentage of the applicable receivables generated each day until the full Amount Sold is delivered to the provider.  There is no fixed periodic payment, no fixed payment schedule, no term, no accruing rate, and no absolute obligation to repay.  The amounts remitted to the provider are entirely dependent on the business generating the applicable receivables.  If the business's revenues are in line with initial expectations, the provider will receive the future receipts it purchased consistent with those expectations.  But if revenues lag, the provider will receive the Amount Sold over a longer time period.  If the business fails, receivables will no longer be generated and the provider will never receive the full Amount Sold.  Additionally, the business will not owe any more or have any other obligations to the provider in this instance absent a breach of the agreement (*e.g.* fraud, breach of warranty, etc.).  Indeed, because the business's financing obligation is entirely contingent on generating the applicable receivables, the provider lacks many of the tools a commercial lender could use to force a business to repay its loan.  If a customer's business falters or fails, the provider bears the risk of loss on its investment with no recourse unless there was a breach of a warranty or representation.

20.     Notwithstanding these material differences between sales-based financing transactions and traditional loans, the Regulations mandate a series of

Manatt, Phelps &
Phillips, LLP
Attorneys at Law
Los Angeles

- 11 -                     COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

disclosures that erroneously assume that sales-based financing transactions operate just like traditional loans.  These mandated disclosures require SBFA's Members to describe their sales-based financing arrangements in ways that misstate the costs and features of the financing.

21.    For example, the Regulations require providers to disclose an Estimated Payment and Estimated Term.  However, there is no required payment amount given the transaction is a purchase and sale.  A recipient may be in full compliance with their agreement but has made no "payments" for weeks.  Estimating the payment amount gives the impression that a specific payment amount or some amount around the disclosed estimated amount is required.  Likewise, estimating a term where there is no term gives the false impression that there is some term.  Two of the key features of SBF transactions are that there is no fixed payment amount and no term.  Yet the Regulations compel providers to disclose these figures when doing so materially undercuts the value proposition of the transactions (no fixed payment amount or term is a key differentiator of these products from traditional financing options businesses use).

22.    In addition to the fact that the terms Estimated Payment and Estimated Term are by themselves misleading when it comes to SBF transactions, the manner in which the Regulations require the figures to be calculated will result in false and misleading figures being disclosed.  Specifically, the Regulations require providers to calculate both of these figures based on estimates of the recipient's historical average monthly "sales, income or receipts" using methodologies that may conflict with the provider's internal underwriting methodology, resulting in conflicting and misleading disclosures.  Section 914(a)(3)(C) of the Regulations gives two methods for providers of sales-based financing to calculate the projected monthly "sales, income or receipts" of its business customers for purposes of disclosing Estimated Payment and Estimated Term:  the "historical method" (Section 930) or the "underwriting method" (Section 931).  Both Section 930 and Section 931 force

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

providers to make numerous assumptions regarding monthly "sales, income or receipts" that are not accurate.  For example, Section 930(b)(1) prescribes how providers must use historical monthly averages to estimate future monthly "sales, income or receipts," even though historical averages often are not representative of future monthly "sales, income or receipts" (*e.g.,* seasonal businesses, businesses with recurring sales cycles, businesses that have recently engaged in significant marketing efforts, etc.).  Accordingly, even where a provider's internal underwriting methodologies calculate future "sales, income or receipts" based on factors outside of simply historical numbers, the Regulations nonetheless demand that every provider use the government-dictated method of calculating future "sales, income or receipts," even when the provider believes it will result in grossly understated or overstated averages for the coming months.  Making matters worse, the Regulations mandate that this misstated "sales, income or receipts" average then be used to calculate the Estimated Payment and Estimated Term, which necessarily will likewise be false.  The Regulations thereby compel providers to make written statements that are false and in many cases contradicting other information provided to the customer.  For example, a customer agreement using ACH debits rather than splitting might set an initial ACH Amount that was calculated based on the provider's specific and detailed underwriting calculations, but the Estimated Payment disclosure separately provided to the recipient under the Regulations may provide a different amount given the erroneous assumptions the Regulations require providers to make.  In other words, while the Regulations require the figures *on the required disclosure form* (which is to be provided when the offer is initially extended) to be calculated in accordance with either Section 930 or Section 931, providers are free to continue to use their own internal methodologies to underwrite and price transactions and use that information in customer communications outside of the required disclosure.  This scenario will inevitably result in complete

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

confusion for recipients, who are now receiving two separate documents, each with conflicting information.

23.     The issue with Estimated Payment and Estimated Term being wrong due to faulty assumptions is then compounded as the Estimated APR is a calculation done using these figures, so the Estimated APR will be materially wrong to the extent the Estimated Payment and/or Estimated Term is wrong. Accordingly, the disclosures required under Sections 914(a)(3), 914(a)(6) and 914(a)(8) will compel providers to give materially false and misleading information to recipients when the offer is extended.

24.     Section 914(a)(6)'s requirements for disclosure of "the date and amount of any irregular payments listed in chronological order" and "the date and amount of any reasonably anticipated true-ups" also compel disclosure of inaccurate and misleading information.  In a sales-based financing transaction, it is not possible to determine in advance either a schedule of "irregular payments" or the date and amount of "reasonably anticipated true-ups," since true-ups and the resulting "irregular payments" are by definition unanticipated.  In the context of a sales-based financing transaction with a pre-set periodic remittance amount, a "true-up" is either an adjustment to that periodic remittance amount based upon the actual receivables that the business is generating or a reconciliation of prior remittances against actual revenue to match the percentage of the receipts purchased.  For example, if the recipient's business generates fewer receivables than the parties expected at the outset of the transaction, the contract may provide for a reduction in the periodic remittances via bank debits.  However, it is impossible for the provider to anticipate at the outset of the transaction whether any true-ups will be made under the contract.  The provider simply cannot anticipate whether and how the recipient's revenue will fluctuate throughout the term of the agreement.  If the provider could anticipate such fluctuations, it would simply use that information to accurately set the periodic payment amount, and no true-ups would be required.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -                    COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1   Accordingly, Section 914(a)(6) requires providers to falsely state that they can
2   reasonably anticipate something that cannot be anticipated.

3       25.   In addition, when a recipient's revenue drops unexpectedly, the related
4   but unanticipated true-up will cause the Estimated Term of the SBF to be extended.
5   That is, when a small business's revenues take an unexpected downturn, the daily
6   remittance amount is lowered, causing the amount of time it takes for the provider
7   to collect the full Amount Sold to be extended – often by many months.
8   Immediately, the originally disclosed APR is now misleadingly high (because the
9   provider was forced to use an artificial Estimated Term to calculate it).  The small
10  business, however, has benefitted immensely by being able to lower its daily
11  obligation during a troubling time for the business.  Yet it might have been
12  dissuaded from originally entering the transaction due to the misleading disclosures
13  the provider was forced to make pursuant to the Regulations.  Accordingly, forcing
14  providers to disclose an APR that implies it provides an "apples to apples"
15  comparison to other financing products is by no means purely factual and is
16  certainly controversial.

17      26.   The Regulations' required disclosures regarding a recipient's supposed
18  "prepayment rights" misstate the true nature of a sales-based financing transaction.
19  The Regulations require providers to falsely state that the recipient may "prepay"
20  their balance and that there is a "required" timeframe for the recipient to "pay off"
21  the financing.  Section 914(a)(10) requires the provider to make one of two
22  disclosures.  The first provides that if "prepayment" will require the recipient to pay
23  finance charges other than interest accrued, the provider must make the following
24  disclosure:  "If you pay off the financing faster than required, you still must pay all
25  or a portion of the finance charge, up to $[maximum non-interest finance charge]
26  based upon our estimates."  *See* Section 914(a)(10)(A).  This completely misstates
27  the nature of sales-based financing transactions.  There is no required repayment
28  term for such a transaction, so the phrase "faster than required" is in and of itself

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 15 -                    COMPLAINT FOR DECLARATORY AND
                                     INJUNCTIVE RELIEF

materially misleading.  In fact, there is no requirement to make "payments" on any schedule, and for this reason "prepayment" is a concept that is foreign to the product given its fundamental nature.  Sales-based financing is the purchase of future receivables at a discount in which the recipient's obligation is to permit the provider to collect receivables as they are generated by the business, with no "payment" requirements.  This required disclosure is therefore false and materially misleading to recipients because it suggests that a "prepayment" right exists or that there is a required term – neither of which is true for sales-based financing.

27.     The second option for the prepayment disclosure is even worse.  If the first option is not applicable, Section 914(a)(10)(B) requires the following disclosure:  "If you pay off the financing faster than required, you will not be required to pay any portion of the finance charge **other than unpaid interest accrued**."  (emphasis added).  This disclosure repeats the same error from the first option – forcing purchasers of small business receipts to make the false disclosures that there is a required payment and a term.  Additionally, the second line of the disclosure refers to "unpaid interest accrued."  This is also false and misleading to recipients because there is no interest accrual on SBFs.  Again, sales-based financing is the purchase of business receivables at a discount.  In essence, this portion of the Regulations compels providers to state there is a required term when there is none, and that there is an accruing rate when there is no rate at all.  These are materially false and misleading statements as they undercut the value proposition of sales-based financing – there is no term, no rate, and no absolute obligation to pay a sum certain because the transaction *is not a loan*.  Yet the Regulations force providers to contradict these key features.

28.     As another example of how the Regulations compel untruthful speech which misstates the nature of sales-based financing transactions, the Regulations require providers to falsely state that the recipient "owes" money.  Section 914(a)(4)(C) of the Regulations requires sales-based financing providers to state

"Your finance charge will not increase if you take longer to pay off **what you owe**." (emphasis added).  This language misstates the nature of sales-based financing transactions by implying that the recipient of such financing has an absolute payment obligation and thereby "owes" an amount to the provider.  In a sales-based financing transaction, the recipient sells to the provider a set amount of future receivables, which the recipient may or may not ultimately generate.  If the recipient does not generate the receivables the provider purchased, then the recipient does not "owe" the provider *anything*.  Section 914(a)(4)(C) therefore requires providers to mislead recipients by falsely stating that they "owe" the provider money.  This also harms providers of sales-based financing transactions (and small businesses who may be confused by the difference between that product and a loan due to the one-size-fits-all disclosure regime) because the absence of an absolute obligation to repay is the most important benefit of sales-based financing compared to loans or lines of credit.  When business revenue slows down, or if a business fails, a business would much rather have a sales-based financing transaction than a loan because it does not risk default by failing to make a "payment" that is "owed."  By suggesting that something is owed, the Regulations undermine the ability of sales-based financing providers to market their product as a better option than a loan and confuses small businesses who may be encountering a new product for the first time.

29.     The Regulations require providers to falsely state that the cost of sales-based financing is based on fees.  Section 914(a)(3)(D) of the Regulations requires providers of sales-based financing to make the following disclosure where no interest rate is used in the financing:  "APR is not an interest rate.  The cost of this financing is based upon **fees charged by [Financer]** rather than interest that accrues over time." (emphasis added).  The cost of sales-based financing is based almost entirely on the difference between the Purchase Price and the Amount Sold (the receipts to be delivered) and only secondarily, if at all, on fees.  For example, a

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

provider might purchase $12,000 of future receivables for the purchase price of $10,000, resulting in a discount of $2,000. The $2,000 is not a "fee" under the law, but rather a discount. As such, this provision requires providers to mislead recipients by stating that the cost of the financing is based upon fees, even if this is not the case. Fees in these contracts, if charged at all, typically are charged at origination, and therefore are certain to be paid. A discount, however, will be paid only if the contract is fully performed (*i.e.*, all sold receivables are generated and delivered).

30.    Section 914(a)(5) of the Regulations requires SBF providers to disclose the "Estimated Total Payment Amount." However, in an SBF transaction, the total amount of future receivables the recipient is to deliver (Amount Sold) is a fixed amount. It does not fluctuate and is not an estimate. The provider of a sales-based financing transaction purchases a set amount of future receivables. Assuming the recipient's business actually generates those receivables, the recipient must deliver the Split Percentage until it delivers the Amount Sold. For example, if the provider buys $12,000 of the recipient's future receivables and the recipient's business actually generates that dollar amount of receivables, the recipient will deliver $12,000. Accordingly, the dollar amount of "payments" (more accurately, remittances) the recipient will make is not an "estimate." There is, of course, a chance that the recipient's business will not actually generate the receivables the provider purchased. In such a case, the recipient is not required to remit to the provider the full $12,000. However, at the outset of a transaction, the provider will never "estimate" that the recipient will remit less than the full $12,000, because if the provider has reason to believe that the recipient's business will not actually generate the receivables the provider intends to purchase, the provider will simply refuse to consummate the purchase. The disclosure required under Section 914(a)(5) is therefore misleading because it requires providers to state that the total "payment" amount is an "estimate" when in fact it is not an estimate.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -                COMPLAINT FOR DECLARATORY AND
                                INJUNCTIVE RELIEF

31.     In addition to compelling false and misleading speech, the Regulations also prohibit speech.  Specifically, Section 901 provides the general rules for each disclosure and mandates the exact wording to be used in many places, and various other requirements.  No modifications are permitted to be made to the disclosure form by a provider, and providers are prohibited from clarifying misleading or inaccurate information required by the Regulations or providing additional information except in limited circumstances that are not sufficient to correct false and misleading statements required by the Regulations.  This Section 901 significantly restricts important commercial free speech – speech that is vitally needed to prevent false and misleading disclosures otherwise required by the Regulations.

32.     The mandated disclosures related to SBF transactions are not purely factual or uncontroversial.  To the contrary, as detailed above, the Regulations require SBFA's Members to provide information that does not accurately describe the costs and characteristics of SBF transactions.  Additionally, the Regulations prevent SBFA Members from providing prospective customers with additional information that clarifies or corrects the erroneous statements required by the Regulations.

*Compelled Inaccurate Speech Regarding Open-End Financing*

33.     The compelled disclosure of inaccurate information is not limited to SBF transactions.  Mandated disclosures related to open-end financing also compel SBFA's Members to make inaccurate disclosures that substantially overstate the cost of their open-end financing products.

34.     Open-end financing, also called a line of credit or a revolving line of credit, gives the recipient a specific limit of credit and the ability to borrow as much or as little of that money as the recipient needs at a given time.  Open-end financing arrangements can be beneficial for small businesses because the businesses have more control over when and how much they borrow.  And because interest

ordinarily is not charged on the unused portion of the line of credit, businesses can save money in interest compared to using a closed-end installment loan.  SBFA's Members provide open-end financing to small businesses and thus are subject to the Regulations' mandated disclosures for open-end financing.

35.     The Regulations require providers of open-end credit to disclose misleading terms of the financing that in most cases will substantially exceed the actual cost of the financing.  Sections 911(a)(2) and 940(c) of the Regulations require providers of open-end credit to assume that the recipient will make an initial draw of their full approved credit limit, that the recipient will choose to make only minimum monthly payments, and that the recipient will not make any subsequent draws.  These assumptions effectively destroy the value of offering an open-end product and do not reflect reality.  The main differentiating feature of an open-end credit product is the ability to make multiple draws and repay as the recipient deems appropriate.  However, the disclosures required by the Regulations eviscerate these features and convert all open-end products into closed-end products for disclosure purposes.  This approach to disclosures was explicitly rejected in connection with TILA's open-end rules and for good reason.  Making open-end disclosures as if the product is closed-end is simply misleading and hides the value proposition of open-end products.  Few if any recipients will make an initial draw of their full approved credit limit.  And, if some recipients were to make such an initial draw, many of them would not choose to make only the minimum required payments, since that would increase the amount of interest they pay.  And it is highly unlikely any recipient would ever choose to make one draw and no others. If they were inclined to do so, they would apply for a closed-end product instead.

36.     The Regulations' required erroneous assumptions regarding open-end financing render various portions of the open-end disclosure requirements – including the Estimated Finance Charge, Estimated Total Payments, Estimated Payment, and APR – materially misleading by requiring providers to disclose

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 20 -                    COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

amounts that are substantially more than many recipients will actually pay. In essence, the Regulations cram open-end credit into a closed-end credit box, even though they are very different types of financing. This is exactly why TILA provides for different disclosure regimes for open-end credit and closed-end credit and has different APR calculations for each. The Regulations' forced conversion of open-end credit to closed-end credit to compel certain disclosures forces SBFA Members to make highly misleading and inaccurate statements. The upshot is that the Regulations require disclosure of the highest possible cost of open-end financing, not the actual cost the business is likely to incur.

37.    With respect to open-end credit, the Regulations require an APR and a term to be disclosed but all other related disclosures are estimates. Section 911(a)(4) requires the disclosure of an exact APR and not an estimate. Section 911(a)(9) requires the disclosure of an exact term and not an estimate. However, the disclosures of the finance charge and payments are estimates. Specifically, Section 911(a)(5) requires the Estimated Finance Charge to be disclosed and Section 911(a)(7) requires the Estimated Payment to be disclosed. Both the Estimated Finance Charge and Estimated Payment are inputs into the APR calculation. If the two of those items are estimates, the APR must be an estimate due to the mathematical formula used to calculate APR. The term is simply a result of these items as well. So either all these items are estimates or all of these items are not estimates. Therefore the Regulations require false and misleading statements to be made with respect to these disclosures.

38.    The disclosure requirements for open-end credit are not purely factual or uncontroversial. To the contrary, the Regulations compel SBFA's Members to make inaccurate and misleading disclosures regarding their products with which they do not agree. The Regulations compound these problems by prohibiting providers from making additional disclosures that may clarify the inaccuracies and misconceptions created by the Regulations' mandated disclosures.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -                          COMPLAINT FOR DECLARATORY AND
                                              INJUNCTIVE RELIEF

39.     The Regulations cause numerous types of irreparable harm.  First and foremost, by compelling disclosure of inaccurate information and prohibiting additional disclosures to clarify the inaccuracies, the Regulations violate the First Amendment rights of SBFA's Members and all other providers covered by the Regulations.

40.     Absent an injunction, SFBA's Members will face a Hobson's choice: either risk significant civil fines, penalties, and injunctions, as well as potential criminal liability, by not complying with the Regulations, or immediately undertake expensive steps to comply with a statute that violates the First Amendment.  Parties that refuse to follow the Regulations or that provide disclosures that accurately describe their products but are not consistent with the Regulations would be subject to enforcement actions by DFPI.

41.     The compelled disclosure of false and inaccurate information regarding their products would also harm Plaintiff's Members' competitive position in the marketplace.  The purpose of the disclosure requirements is to allow businesses seeking financing to compare "apples to apples" in evaluating the cost of different financing options.  The result of the Regulations is that businesses seeking to obtain financing will be comparing apples to oranges painted red to look like apples.  The compelled disclosures required by the Regulations would make it appear that the products of Plaintiff's Members are more expensive than other financing options, and more similar to other financing options than they actually are, so businesses seeking financing would be discouraged from seeking financing from Plaintiff's Members.

42.     The Regulations also have adverse consequences for the market for commercial financing.  The purpose of SB 1235 is to provide businesses with accurate information so they can assess the cost of various financing options.  The Regulations will accomplish the exact opposite by misleading business owners into believing, based on inapposite metrics, that sales-based financing transactions and

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

- 22 -                    COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

open-end financing are more expensive and less advantageous than more rigid traditional commercial loans offered by banks, which are not subject to the Regulations and their required inaccurate disclosures.  By flooding the market with inaccurate disclosures regarding certain products offered by specific providers, the Regulations will deprive businesses of accurate information regarding the cost of business financing and may lead businesses to unwittingly choose commercial financing products that are more expensive or otherwise less beneficial than the financing options offered by SBFA's Members.  Or worse yet, some businesses may forgo obtaining financing altogether due to misguided concern about their ability to pay the financing provider if their sales lag.

*TILA Preemption*

43.     TILA was enacted for the specific purpose of helping consumers compare the cost of credit for certain consumer credit products.  Prior to TILA, consumers were given various disclosures with various calculations for a multitude of products.  There was no uniformity in the information disclosed, or how it was calculated, between products or states.  In order to provide uniformity in disclosures for consumer products, TILA created a disclosure regime that includes certain carefully defined terms of art so disclosures are uniform and meaningful.  Some of the carefully defined terms created by TILA were identified as particularly important so that when a consumer saw such a term in a disclosure, the consumer would know exactly what it meant and could compare it to the identical term in another disclosure.  The terms "APR" and "finance charge" are two of the most important such terms of art and have specific definitions, calculations, and applications under TILA.

44.     While the Regulations adopt the APR calculations and finance charge definition from TILA, the Regulations make material modifications from TILA to both.

Manatt, Phelps &
Phillips, LLP
Attorneys at Law
Los Angeles

- 23 -                    COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

45.     The Supremacy Clause of the United States Constitution (U.S. Const. art. VI., § 2) establishes that when state law and federal law conflict, federal law preempts state law.  *Hines* v. *Davidowitz,* 312 U.S. 52, 66-67 (1941).  Preemption "may either be expressed or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).  If a state law is not explicitly preempted it can be preempted when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines*, 312 U.S. at 67.  Therefore, in the event a state law is not expressly preempted by a federal law, preemption may be implied.  *Geier v. American Honda Motor Co.*, 529 U.S. 861, 875 (2000).

46.     TILA includes an express preemption provision, which provides that TILA does not preempt state law unless the state law is "inconsistent with the provisions of this subchapter and then only to the extent of the inconsistency."  15 U.S.C. § 1610(a)(1).  Regulation Z expands on TILA's statutory preemption provision as follows:

> . . . State law requirements that are inconsistent with the requirements contained in chapter 1 (General Provisions), chapter 2 (Credit Transactions), or chapter 3 (Credit Advertising) of the Act and the implementing provisions of this part are preempted to the extent of the inconsistency.  A State law is inconsistent if it requires a creditor to make disclosures or take actions that contradict the requirements of the Federal law.  *A State law is contradictory if it requires the use of the same term to represent a different amount or a different meaning* than the Federal law, or if it requires the use of a term different from that required in the Federal law to describe the same item.

12 C.F.R. § 1026.28(a)(1) (emphasis added).

47.     The Official Interpretations to Regulation Z ("Commentary") also explain that a state law is inconsistent with TILA if it contradicts TILA.  State laws that contradict TILA include:

i.      A state law that requires use of the term finance charge but defines the term to include fees that the Federal law excludes.

ii.     A state law that requires a label such as nominal annual interest rate to be used for what the Federal law calls the annual percentage rate.

12 C.F.R. § 1026.28(a), Supp. I, pt. 3, cmt. 2.

48.     TILA holds "APR" and "finance charge" in special regard.  They must be more conspicuous than all other TILA-required disclosures (in most cases) and are recognized as the two key cost comparison terms defined by TILA.  They are, in effect, more important than all other TILA disclosures.  This respected status in TILA for APR and finance charge is not only recognized by the fact that these disclosures must be more conspicuous than all other disclosures, but also by the fact that the preemption rules with respect to these two items are much more expansive than the generic preemption rules.  As Regulation Z provides, a state-specific finance charge definition or APR computation cannot differ from TILA's as that would "contradict the amount computed and disclosed under the federal law.  [If] the same term is used for different amounts, the state disclosure would be preempted."  47 Fed. Reg. 16203 (April 15, 1982).

49.     The Commentary refers to "a state law" broadly, without limitation to certain types of state laws.  The language is intentionally broad, to protect the value of the key terms of art that TILA created:  APR and finance charge.  Accordingly, state laws that impose finance charge or APR disclosures will face more scrutiny in a preemption analysis as these two terms have such significance under TILA.  As the Federal Reserve Board stated when concluding a state law requiring APR and finance charge disclosures was preempted:

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -                    COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

finance charge or annual percentage rate disclosures . . . will be

reviewed more strictly; since these disclosures are particularly

significant, any contradiction of the corresponding federal disclosure

would interfere with the intent of the federal scheme.

47 Fed. Reg. 16202 (April 15, 1982).

50.     The plain wording of TILA and Regulation Z, and the above-referenced determinations, make clear that any state law mandating disclosures for consumer financing covered by TILA is preempted by TILA to the extent:

a.     The term "Annual Percentage Rate" or "APR" is used but references a different amount than what TILA requires, or the law mandates a calculation different than what TILA requires.

b.     The term "finance charge" is used but includes fees not included under TILA's definition of "finance charge," or excludes fees included under TILA's definition of "finance charge."

c.     The law requires a TILA closed-end credit APR calculation for an open-end credit product, instead of using the TILA open-end credit APR calculation.

51.     Absent preemption in the foregoing circumstances, consumers would be confused as the finance charge could be defined in states to mean something other than what TILA mandates and the APR calculation could be different from state to state, negatively impacting the value of TILA's APR calculation.  This would clearly impede the goal of TILA to ensure uniformity in consumer finance disclosures.  In order for TILA to achieve its goals, the terms "APR" and "finance charge" must be used consistently throughout the country.  Additionally, permitting the terms APR and finance charge to be used in products not covered by TILA when the terms are defined differently than they are under TILA, would clearly frustrate the purpose of TILA as APR and finance charge would no longer be reliably consistent and consumers would stop relying on them.  The alternative –

allowing the terms to be used inconsistently for different products – would degrade the purpose of consistent, uniform terms.

52.     The Regulations mandate disclosure of "APR" and "finance charge," but define and calculate those terms differently than is done in TILA.

53.     The Regulations define "finance charge" as "the amount of any and all costs of the financing, represented as a dollar amount, as more specifically described in section 943."  Cal. Code Regs., tit. 10, ch. 3, § 900(a)(13).  Section 943 of the Regulations further defines "finance charge" as "all charges that would be included in the finance charge under 12 C.F.R. Part 1026.4 (1-1-21 Edition) . . . if the transaction were a consumer credit transaction and the financer were a creditor under federal law," plus "the discount taken on the face value of the accounts receivable" for sales-based financing and all broker fees deducted from the "Amount of Financing."  *Id.*, § 943(a)(1)-(2).  Purchase discounts are not included in TILA's definition of finance charge and broker fees are excluded from TILA's definition of finance charge.  Furthermore, for products with variable interest rates where it is "not possible to calculate the interest charges in advance for the entire term of the transaction because" the rate varies, "the provider shall calculate the interest charges for periods of time when the interest charge cannot be calculated in advance based upon the benchmark rate in effect at the time of disclosure and the margin."  *Id.*, § 943(b).

54.     The Regulations adopt the definition of finance charge from TILA but then amend it.  There is little doubt this is not permitted for consumer credit transactions, as TILA and Regulation Z make it clear the definition may not be amended by any state law.  The fact that the Regulations apply to commercial transactions and not consumer transactions does not preclude the preemption analysis as the Regulations still amend the definition of finance charge.  This will cause confusion and frustrate TILA's purpose.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 27 -                    COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

55.     The Regulations require the APR to be "determined in accordance with either the United States Rule method or the actuarial method, as both are set forth in Appendix J, 12 C.F.R. Part 1026 (1-1-21 Edition)," with the calculation to "include all finance charges" as defined in Section 943 of the Regulations."  Id., § 940(a)-(b).  This is the method TILA prescribes for closed-end credit transactions. TILA's implementing Regulation Z adds numerous details that conflict with the California Regulations.  For example, the California Regulations require the APR to be calculated at the time of disclosure, which must be when an offer is made. This is before consummation and in many cases long before consummation. Regulation Z, however, requires the APR calculation to be based on the actual term of the transaction, and the term starts on the date of consummation – not the date an offer is made.  12 C.F.R. § Part 1026, Appendix J(b)(2).  So California requires the term to be used for APR calculations to start when the offer is made, while TILA requires the term to be used for APR calculations to start on the date of consummation.  This difference may result in different APRs for the exact same product.

56.     For open-end credit plans, the modifications of TILA's APR are even more egregious.  Rather than use the method TILA prescribes for open-end transactions under 12 C.F.R. § Part 1026.14(b), the Regulations require the provider to use the closed-end APR under TILA.  However, because closed-end and open-end products are materially different, the Regulations require providers to convert every open-end product into a closed-end product so that the closed-end APR calculations can be used.  The Regulations make this clear by stating: "the provider shall assume that the recipient borrows the approved credit limit at origination and makes no subsequent draws and that minimum on-time payments are made pursuant to the contract."  Section 940(c).  Notably, in the Final Statement of Reasons accompanying the Regulations, DFPI acknowledged that the Regulations require a different APR calculation for open-end credit than called for by TILA,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

and that the required calculation incorporates costs associated with the financing that would not be included in the open-end calculation prescribed by TILA.  Final Statement of Reasons, PRO 1/18, Commercial Financing Disclosures, available at https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/06/PRO-01-18-Commercial-Financing-Disclosure-Regulation-FSOR.pdf?emrc=0f3440 (last visited Nov. 13, 2022), Responses to Comment 1.15 at 27-28, Comment 1.4.11 at 49, Comment 1.34.7 at 100.

57.     While commercial finance products are not governed by TILA cost-of-credit disclosure rules, small business owners often finance their businesses through a combination of commercial finance products and consumer finance products available to them individually (*e.g.,* consumer loans, home equity loans, credit cards).  Consequently, when such business owners shop for financing, they routinely compare products that are subject to TILA with products that are not subject to TILA.  A state law mandating disclosure of two essential TILA-defined terms for non-TILA products, but defining or calculating those terms differently from TILA, will create significant confusion among consumers considering TILA products.  This inconsistency will result in misleading disclosures of credit choices, thwarting Congress' primary objective in enacting TILA.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**For Declaratory Relief and Injunctive Relief**
**Based Upon Violations of the First Amendment—Compelled Speech**

**(U.S. Const. amend. I, 42 U.S.C. § 1983)**

58.     SBFA incorporates and realleges Paragraphs 1 through 57 as if fully set forth herein.

Manatt, Phelps &
Phillips, LLP
Attorneys at Law
Los Angeles

- 29 -

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

59.     Under the First Amendment, a law "compel[ling] individuals to speak a particular message . . . alter[s] the content of their speech" and is thus a content-based speech regulation that is subject to strict scrutiny and presumptively invalid. *See NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quotation marks omitted and alterations adopted).  Because the APR disclosure requirement is not narrowly tailored, and because the State lacks a compelling interest in providing businesses with information to facilitate misleading comparisons of dissimilar financing products, this requirement fails strict scrutiny.

60.     Nor can the disclosure requirement withstand the scrutiny the Supreme Court has held applies to compelled commercial disclosures.  Under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), a government may compel disclosure only of "purely factual and uncontroversial information about the terms under which [goods or] services will be offered."  *Id.* at 651.

61.     The Regulations mandate that SBFA Members make disclosures that do not involve purely factual and uncontroversial information.  The Regulations instead require SBFA's Members to mischaracterize the financing they provide using language dictated by the government – terms that are inaccurate and misleading.

62.     The Regulations compel SBFA Members to make controversial statements that are inaccurate and with which they disagree.  They also compel disclosures that are not substantially or reasonably related to any substantial government interest.  There is no indication that the State of California considered less speech-restrictive means, such as educational programs, online bulletins, or public announcements to educate businesses on financing options.  DFPI did request third parties to submit a proposal to conduct a study on what disclosures would be meaningful to small and medium-sized businesses, but did not proceed with the study prior to issuing the Regulations.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 30 -

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

63.     The Regulations not only compel SBFA Members to make controversial statements that are inaccurate, but also prohibit any speech that the Members would use to clarify or correct false or misleading information.  In this regard, the Regulations are a direct suppression of commercial speech that cannot withstand U.S. Supreme Court precedent.

64.     Moreover, a disconnect exists between the purported aims of the Regulations – to ensure that businesses receive complete and accurate information regarding the terms of offered financing – and their actual operation.  As discussed above, the Regulations force SBFA Members to provide inaccurate and misleading disclosures to their prospective business customers.

<u>SECOND CLAIM FOR RELIEF</u>
**For Declaratory Relief and Injunctive Relief**
**Based Upon TILA Preemption**

**(15 U.S.C. § 1610)**

65.     SBFA incorporates and realleges Paragraphs 1 through 64 as if fully set forth herein.

66.     An actual controversy has arisen and now exists between SBFA and its Members, on the one hand, and the Commissioner, on the other.  As described above, SBFA contends that the Regulations are preempted by TILA because the Regulations' requirements with respect to disclosure of an APR and finance charge are inconsistent with TILA's requirements.  SBFA contends that these inconsistent requirements will confuse businesses considering financing offered by SBFA Members, undermine Congress's primary objective in enacting TILA, and harm SBFA Members' businesses by forcing them to make disclosures that inaccurately describe the terms and cost of the financing they offer.  DFPI and the Commissioner rejected this preemption argument during the rulemaking process, contending that there is no preemption because TILA does not apply to commercial financing.

67.     DFPI and the Commissioner have indicated their intent to enforce the Regulations, including their APR and finance charge disclosure requirements, thereby subjecting SBFA Members to actions seeking criminal and civil remedies if they do not comply with the Regulations' requirements.  Accordingly, there exists a ripe, actual controversy related to the legal rights and duties of the parties which this Court can adjudicate.

68.     For the foregoing reasons, a judicial determination of whether and to what extent the Regulations are preempted by TILA is appropriate at this time.

69.     In addition, an injunction, including temporary and preliminary relief, should issue prohibiting the Commissioner from enforcing the Regulations' disclosure requirements with respect to an APR and finance charge.

## **PRAYER FOR RELIEF**

WHEREFORE, SBFA respectfully prays for relief as follows:

1.     Issue an order granting injunctive relief in favor of SBFA and against the Commissioner that prohibits the Commissioner from enforcing the Regulations;

2.     Declare that the Regulations violate the First Amendment as applied to SBFA's Members and may not be enforced;

3.     Declare that the Regulations' disclosure requirements concerning an APR and finance charge are preempted by TILA and may not be enforced;

4.     Award SBFA its costs and expenses; and

//
//
//
//
//
//
//

Manatt, Phelps &
Phillips, LLP
Attorneys at Law
Los Angeles

- 32 -                    COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1         5.    Award such further relief as the Court deems just and proper.

2    Dated:     December 2, 2022     MANATT, PHELPS & PHILLIPS, LLP

3

4         By: */s/ Scott M. Pearson*

5         Scott M. Pearson
          Brad W. Seiling

6         Misa Eiritz

7         *Attorneys for Plaintiff*
          SMALL BUSINESS FINANCE

8         ASSOCIATION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Manatt, Phelps &
Phillips, LLP
Attorneys at Law
Los Angeles

- 33 -    COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF