1  ROB BONTA
    Attorney General of California
2  CRAIG D. RUST (SBN: 273774)
    Supervising Deputy Attorney General
3  RACHEL J. YOO (SBN: 293598)
    Deputy Attorney General
4   1300 I Street
     Sacramento, CA 95814
5   Telephone: (916) 210-7359
     E-mail: Craig.Rust@doj.ca.gov
6          Rachel.Yoo@doj.ca.gov
    *Attorneys for Defendant*
7  *Clothilde Hewlett, solely in her official capacity as*
    *Commissioner of the California Department of*
8  *Financial Protection and Innovation*

9

         IN THE UNITED STATES DISTRICT COURT

10

      FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

            WESTERN DIVISION

12

13

| | |
|---|---|
| **SMALL BUSINESS FINANCE ASSOCIATION,** | Case No.: 22-cv-08775-RGK-PLA |
| Plaintiff, | **NOTICE OF MOTION AND MOTION TO DISMISS BY DEFENDANT CLOTHILDE HEWLETT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| **CLOTHILDE HEWLETT, solely in her official capacity as commissioner of the California Department of Financial Protection and Innovation,** | [Concurrently filed herewith (Proposed) Order and Unopposed Request for Judicial Notice] |
| Defendant. | Date:      March 27, 2023<br>Time:     9:00 a.m.<br>Courtroom: 850<br>Judge:    Hon. R. Gary Klausner<br>Trial Date:  Not set<br>Action Filed: December 2, 2022 |

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

      PLEASE TAKE NOTICE that on March 27, 2023, at 9:00 a.m., or as soon

thereafter as the matter may be heard in Courtroom 850 of the above-entitled court

located at 255 East Temple Street, Los Angeles, CA 90012, defendant Clothilde

Hewlett, solely in her official capacity as Commissioner of the California Department of Financial Protection and Innovation (Department) will, and hereby does, move this Court for an order dismissing the complaint of plaintiff Small Business Finance Association (Association), under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

The Department brings this motion on the following grounds:

1.     The disclosures required by the Department's final regulations promulgated under the California Commercial Financing Disclosures Law do not violate the First Amendment as applied to the Association's members because the regulations require factual, uncontroversial, and justifiable commercial disclosures. Specifically, the Complaint's allegations that the disclosures are misleading because they overstate the cost of certain financial products fail because the disclosed costs are clearly labeled as estimates and are transparent about the assumptions used to develop those estimates. In some instances, the Association's allegations on this point misread the regulations' requirements altogether. Additionally, the disclosures are not controversial because they do not require the Association's members to take sides on a heated political issue or a matter of rigorous scientific debate. Finally, the compelled disclosures are not unduly burdensome and have a reasonable relationship with California's interest in promoting truthful disclosures regarding the cost of commercial financing. For these reasons, Count I should be dismissed.

2.     The Regulations are not preempted by the Truth in Lending Act (TILA) because TILA unambiguously applies to consumer credit transactions whereas the Regulations apply only to commercial credit transactions. For this reason, Count II should be dismissed.

This motion is made upon this Notice, the attached Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, and all pleadings,

1   records, and other documents on file with the Court in this action, and upon such

2   oral argument as may be presented at the hearing of this motion.

3       This motion is made following the conference of counsel pursuant to Local

4   Rule 7-3, which took place on February 14, 2023.

5   Dated: February 21, 2023

ROB BONTA
Attorney General of California

6

7                                        /s/ Craig D. Rust

8                                        Craig D. Rust
                                         Supervising Deputy Attorney General
                                         Rachel J. Yoo
9                                        Deputy Attorney General

10                                       *Attorneys for Defendant Clothilde
                                         Hewlett, solely in her official
11                                       capacity as Commissioner of the
                                         California Department of Financial
12                                       Protection and Innovation*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

I.    Introduction ................................................................................................ 1

II.   Statement of Facts ..................................................................................... 2
      A.    California's Commercial Financing Disclosures Law. ............. 2
      B.    The Association's Complaint. ..................................................... 3
            1.    First Amendment allegations. ........................................ 5
            2.    Preemption allegations. .................................................. 5

III.  Legal Standard .......................................................................................... 6

IV.   Argument ................................................................................................... 6
      A.    The Regulations Do Not Violate the First Amendment as
            a Matter of Law. ......................................................................... 6
            1.    The required disclosures are purely factual. .................. 7
                  a.    The Association's sales-based financing
                        allegations fail. .................................................... 9
                  b.    The Association's open-end credit
                        allegations fail. .................................................. 13
            2.    The required disclosures are noncontroversial............... 14
            3.    The required disclosures are not unjustified or
                  unduly burdensome. ....................................................... 15
      B.    The Regulations Are Not Preempted by TILA......................... 16

V.    Conclusion .............................................................................................. 20

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*
916 F.3d 749 (9th Cir. 2019) (en banc) ..................................................7, 14, 15

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*
33 F.4th 1107 (9th Cir. 2022) .............................................................. 16

*Balistreri v. Pacifica Police Dept.*
901 F.2d 696 (9th Cir. 1990) ................................................................ 6

*Barke v. Banks*
25 F.4th 714 (9th Cir. 2022) ................................................................ 6

*BNSF Ry. Co. v. California Dep't of Tax & Fee Admin.*
904 F.3d 755 (9th Cir. 2018) ............................................................... 20

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*
29 F.4th 468 (9th Cir. 2022)................................................................. 14

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*
467 U.S. 837 (1984) ......................................................................19, 20

*CTIA - The Wireless Ass'n v. City of Berkeley, California*
928 F.3d 832 (9th Cir. 2019)............................................................7, 8, 14, 15

*In re Tracht Gut, LLC*
836 F.3d 1146 (9th Cir. 2016)............................................................... 3

*Jones v. Google LLC*
56 F.4th 735 (9th Cir. 2022) ................................................................ 17

*Jordan v. Paul Fin., LLC*
745 F. Supp. 2d 1084 (N.D. Cal. 2010).................................................... 18

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
272 F.3d 104 (2d Cir. 2001) ................................................................. 9

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*
138 S. Ct. 2361 (2018) ....................................................................... 14

1
2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3
4

*Nationwide Biweekly Admin., Inc. v. Owen*
   873 F.3d 716 (9th Cir. 2017) ................................................................. 7

5
6

*Pharm. Care Mgmt. Ass'n v. Rowe*
   429 F.3d 294 (1st Cir. 2005) ................................................................. 9

7
8

*Puerto Rico v. Franklin California Tax-Free Tr.* (*Franklin*)
   579 U.S. 115 (2016) ................................................................. 17, 19

9

*Silvas v. E*Trade Mortg. Corp.*
   514 F.3d 1001 (9th Cir. 2008) ................................................................. 17

10
11

*Zauderer v. Office of Disciplinary Counsel*
   471 U.S. 626 (1985) ................................................................. *passim*

12
13

**STATUTES**

14

15 U.S.C.
   § 1601(a) ................................................................. 17
   § 1602(i) ................................................................. 17
15

   § 1603(1) ................................................................. 5, 18, 19
16

   § 1610(a)(1) ................................................................. 17, 19
17

   § 1637(a) ................................................................. 17
   § 1638(a) ................................................................. 17
18

   § 1638a(a) ................................................................. 17

19
20

Cal. Fin. Code
   §§ 22800–22805 ................................................................. 2
21

   § 22800 ................................................................. 3, 18
22

   § 22802 ................................................................. 3, 18
   §§ 22802–22803 ................................................................. 2
23

   § 22803(a) ................................................................. 18
24

   § 22804 ................................................................. 3

25

**FEDERAL RULES OF CIVIL PROCEDURE**

26

Rule 12(b)(6) ................................................................. 6

27
28

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

### REGULATIONS

10 C.C.R.
   § 900 ............................................................................................ 3
   § 900(a)(13) ................................................................................... 5
   § 901(a)(9) ..................................................................................... 13
   § 911(a)(2) ................................................................................ 13, 14
   § 911(a)(4) ..................................................................................... 13
   § 911(a)(9) ..................................................................................... 13
   § 914(a)(3)(C) ............................................................................. 8, 10
   § 914(a)(3)(D) ............................................................................... 12
   § 914(a)(4)(C) ............................................................................... 12
   § 914(a)(5) ..................................................................................... 13
   § 914(a)(6) ............................................................................ 9, 10, 11
   § 914(a)(8) ............................................................................. 9, 10, 11
   § 914(a)(10) ................................................................................... 11
   § 922 ............................................................................................. 18
   § 931(a)(3) ..................................................................................... 10
   § 940 ............................................................................................. 13
   § 940(a) .......................................................................................... 6
   § 943(a)(1) ....................................................................................... 5

12 C.F.R.
   § 1026.1 ........................................................................................ 17
   § 1026.1(iv) ................................................................................... 18
   § 1026.1(c)(1)(i) ........................................................................... 18
   § 1026.28(a)(1) .......................................................................... 5, 18

### OTHER AUTHORITIES

87 FR 76551-01 ................................................................................. 3

Black's Law Dictionary (11th ed. 2019) ......................................... 12

Meriam Webster Dictionary Online ............................................... 12

S.B. 1235, 2017-2018 Reg. Sess., (Aug. 28, 2018) ......................... 3

S.B. 1235, 2017-2018 Reg. Sess., (June 27, 2018) ......................... 2

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

California enacted the Commercial Financing Disclosures Law (Disclosures Law) to require providers of commercial financing to explain the cost of using their financial products to their customers in a standardized manner. The legislation was motivated in large part by concern that the terms of certain types of non-traditional commercial financing—like sales-based financing—were difficult for customers to understand. The customers for these non-traditional products are generally vulnerable small business owners who lack access to traditional bank loans.

To protect these business owners, the Disclosures Law directed the California Department of Financial Protection and Innovation to develop regulations requiring providers of these products to disclose their costs in familiar terms, like those typically used in the context of traditional bank loans (e.g., a home or auto loan), to the extent possible. Given the variety of non-traditional financing products available in the market, this was no easy task; it required years of work and the input of many different stakeholders. Ultimately, the Department promulgated final regulations that use estimates and assumptions to express the cost of these different products in a standardized way, and also require the disclosure of the assumptions and methodology used to arrive at these estimates.

Having unsuccessfully advocated for changes to the methodology during the rulemaking process, the Small Business Finance Association (Association) now challenges these regulations, contending that the disclosure regime violates the First Amendment by compelling disclosure of false and misleading information. Alternatively, the Association contends the regulations are preempted in certain respects by the federal Truth in Lending Act (TILA).

The Complaint fails to state a claim under either theory. The regulations are both clear that the disclosed costs are estimates, and transparent about the assumptions and calculations that generate those estimates. Thus, the disclosures

are factually accurate and do not violate the First Amendment. And the regulations are not preempted by TILA, which does not address or govern commercial financing. For these reasons, and because there is no indication that the Association can allege additional facts that would render the disclosed cost estimates unconstitutionally misleading or preempted, the Court should dismiss the Complaint with prejudice.

## II.   STATEMENT OF FACTS

### A.   California's Commercial Financing Disclosures Law.

The Disclosures Law (referred to as SB 1235 in the Complaint) requires commercial financing providers to provide a set of uniform disclosures that allows potential customers to compare different types of financing products. Cal. Fin. Code §§ 22800–22805; Req. for Judicial Notice ("RJN"), Ex. A (Cal. Assemb. Floor Analysis of S.B. 1235, 2017-2018 Reg. Sess., (June 27, 2018) at 3–4). The Disclosures Law's primary goal is to protect vulnerable small business owners who, often lacking access to traditional bank loans, turn to the Internet to find non-traditional and complex financing products to help keep their businesses afloat. These products include, as relevant here, open-end credit lines and sales-based financing. (RJN, Ex. A at 3–4.)

The Disclosures Law accomplishes this goal by giving customers of these products, referred to as "recipients" under the statute, standardized information about the cost of financing to help them understand the products' terms and compare them to traditional bank loans. (*Id.* at 4; Cal. Fin. Code §§ 22802–22803.) Specifically, providers are required to disclose: (1) the total funds provided; (2) the total cost of the financing; (3) the "term or estimated term"; (4) the "method, frequency, and amount of payments"; (5) a "description of the prepayment policies"; and (6) the "total cost of the financing expressed as an annualized rate."

Cal. Fin. Code § 22802(b).[1] In keeping with its purpose to aid small business owners, the disclosures only apply to commercial financing offers of $500,000 or less. Cal. Fin. Code § 22800(n).

The Disclosures Law directed the Department to develop implementing regulations with specific disclosure requirements. Cal. Fin. Code § 22804. After years of soliciting comments, holding public hearings, and issuing revised proposals, the Department promulgated the final version of the regulations, which became effective in December 2022 (the Regulations). (Compl. ¶ 15; RJN, Ex. D (Final Stmt. of Reasons) at 26, 91, 102, 135, 161, 180; 10 C.C.R. § 900.)

**B.    The Association's Complaint.**

The Association describes itself as a "non-profit advocacy organization" whose members "are technology-driven financial services companies" providing commercial financing to "small and medium-sized businesses." (Compl. ¶ 4–5.)[2] The Association has previously resisted these new disclosure requirements. It opposed the initial enactment of the Disclosures Law (RJN, Ex. B (Cal. Assemb. Floor Analysis of S.B. 1235, 2017-2018 Reg. Sess., (Aug. 28, 2018) at 4), filed comments opposing the draft regulations (RJN, Ex. D (Final Stmt. of Reasons) at 42–51), and asked the federal Consumer Financial Protection Bureau (CFPB) to issue a determination that materially identical New York legislation is preempted by federal law. (RJN, Ex. C (CFPB's Notice of Intent to Make Preemption Determination under the Truth in Lending Act, 87 FR 76551-01 (Dec. 15, 2022)) at 5 n.17.)

---

[1] Starting January 1, 2024, providers will no longer be required to disclose the total cost of financing expressed as an annualized rate. Cal. Fin. Code § 22802.

[2] For purposes of this motion, the Department accepts the well-pleaded facts alleged in the Complaint as true. *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016).

The Complaint is the Association's latest challenge to disclosure requirements. As relevant here, the Complaint alleges that the Association's members offer two types of non-traditional commercial financing products. (Compl. ¶ 9.)[3] The first is sales-based financing, in which the financing provider "purchases a portion of a business's future receivables at a discount and collects those receivables as they are generated by the business." (Compl. ¶ 9(i).) To illustrate, the Association gives an example in which a provider pays a small business $10,000 up front in return for the right to collect $12,000 of the business's accounts receivable. The provider then collects a certain percentage of those accounts receivable as they are paid until the provider has received $12,000. (Compl. ¶ 9(i).)

The second product at issue is open-end credit, which provides the business with a line of credit that the business can draw against. (Compl. ¶ 9(ii).) This is functionally similar to a credit card, although the Association contends it is distinguishable from "traditional credit lines" because some of the Association's members charge the borrower a "fixed fee per draw rather than an accruing rate." (Compl. ¶ 9(ii).)

The Complaint asserts two claims for relief. First, the Association seeks a declaration that the Regulations violate the First Amendment as applied to the Association's members because the Regulations allegedly require them to make false or misleading disclosures with respect to these products. (Compl. ¶¶ 58–64, Prayer ¶ 2.) Second, the Association seeks a declaration that the Regulations' requirements with respect to how providers disclose an annual percentage rate ("APR") and finance charges for their products are preempted by TILA. (Compl. ¶¶ 65–69, Prayer ¶ 3.) Both of these allegations are described in more detail below.

---

[3] The Association's members offer a third product, closed-end credit, which has fixed repayment terms and is generally similar to a traditional bank loan (Compl. ¶ 9(iii)), but the Complaint does not allege that the disclosures required for this product violate federal law.

### 1.    First Amendment Allegations.

The Complaint asserts that the Regulations violate the First Amendment because they are content-based speech regulations that cannot survive strict scrutiny. (Compl. ¶ 59.) While compelled commercial disclosures are subject to more lenient review, the Association contends that lower standard does not apply where the compelled disclosures are false or misleading. (Compl. ¶ 60–61 (citing *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)).) More specifically, the Association argues the Regulations require false or misleading commercial disclosures with respect to (1) sales-based financing products (Compl. ¶¶ 17–32), and (2) open-end credit products (Compl. ¶¶ 33–42).

The bulk of the Complaint consists of lengthy and highly technical allegations relating to sales-based financing products and open-end lines of credit. These contentions are more fully addressed in the argument below.

### 2.    Preemption Allegations.

Count II of the Complaint asserts that the Regulations define "finance charge" and "APR" differently than TILA defines them, and as a result TILA expressly preempts those disclosure requirements. (Compl. ¶¶ 43–57, 65–69, Prayer ¶ 3.) The Association notes that federal Regulation Z, which interprets TILA, provides that state laws that use "the same term" that appears in TILA "to represent a . . . different meaning" are inconsistent with TILA and are thus preempted. 12 C.F.R. § 1026.28(a)(1).

The Regulations start by defining "finance charge" by reference to Regulation Z's definition, 10 C.C.R. §§ 900(a)(13), 943(a)(1) (citing 12 C.F.R. § 1026.4), but then modify that definition slightly to include "the discount taken on the face value of the accounts receivable" for sales-based financing, *id.* § 943(a)(2). (Compl. ¶¶ 53–54.) TILA, which applies only to consumer financing and not to accounts receivable transactions, 15 U.S.C. § 1603(1), does not include this additional language in its definition. As for APR, the Regulations require that the

rate be calculated in accordance with Appendix J to Regulation Z, which governs closed-end transactions. 10 C.C.R. § 940(a) (citing 12 C.F.R. § 1026, App'x J). The Association argues that because the Regulations use this closed-end APR calculation in the context of open-end credit transactions, the Regulations effectively use the term differently. (Compl. ¶ 56.) The Association also alleges that the Regulations require that the term be used for APR calculations starting when the provider makes a financing offer, whereas under TILA the calculation starts on the date the transaction is consummated. (Compl. ¶ 55.) These differences, the Association contends, render the State's definitions inconsistent with, and thus preempted by, TILA.

## III. LEGAL STANDARD

A court may dismiss an action under Rule 12(b)(6) where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). When it is clear that amendment would be futile, dismissal with prejudice is proper. *Barke v. Banks*, 25 F.4th 714, 721 (9th Cir. 2022).

## IV. ARGUMENT

### A. The Regulations Do Not Violate the First Amendment as a Matter of Law.

The Regulations do not violate the First Amendment because they compel factual disclosures designed to protect vulnerable small business owners by allowing them to assess the cost of esoteric commercial financing products in terms they are likely to understand. The Association does not, and cannot, plausibly allege that the Disclosures Law and Regulations require the Association's members to disclose false or misleading information, and therefore Count One of the Complaint should be dismissed with prejudice.

The Supreme Court's decision in *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626 (1985), "provides the appropriate framework to analyze a First

Amendment claim involving compelled commercial speech." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc). The *Zauderer* test "contains three inquiries: whether the notice is (1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome." *Id.* (citing *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2372 (2018)); *see also Zauderer*, 471 U.S. at 651 (noting that an individual's "constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal"). The Regulations satisfy this deferential standard.

### 1.    The required disclosures are purely factual.

A compelled commercial disclosure is factual if it is true and not misleading. *CTIA - The Wireless Ass'n v. City of Berkeley, California* (*CTIA*), 928 F.3d 832, 847 (9th Cir. 2019). "The mere fact that a corporation can conjure up a possibly negative connotation of a word in a disclosure does not make the disclosure nonfactual." *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 733 (9th Cir. 2017).

In *CTIA*, the City of Berkeley required retailers to provide a notice to prospective cell phone purchasers stating:

> To assure safety, the Federal Government requires that cell phones meet radio-frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

*CTIA*, 928 F.3d at 846 (citation omitted). A trade association sued to stop enforcement of the notice requirement, arguing that it was misleading because it required "an inflammatory warning about unfounded safety risks," falsely implied that RF energy above the referenced exposure guidelines created "a safety hazard," and its use of the term "RF radiation" was "fraught with negative associations." *Id.* at 847 (quotations omitted).

The panel rejected these arguments. *Id.* at 846–48. The court held that each sentence of the disclosure was "literally true" because the statements accurately characterized the federal guidelines they cited. *Id.* at 846–47. While recognizing that a statement could be literally true yet still misleading, the panel determined that the notice was not misleading because it accurately indicated that "maintaining a certain separation between a cell phone and the user's body" is one way to protect the user from exceeding federal radiation exposure guidelines and thus "assure" the user's safety. *Id.* at 847. The court held that this warning, combined with the instruction to refer to user manuals for more guidance, was not misleading for First Amendment purposes even if it happened to err on the side of caution. *Id.* at 846–48.

Each of the Association's allegations that the Regulations require false or misleading disclosures similarly fail. The Regulations' purpose is to translate the costs of non-traditional financing into standardized terminology that small business owners are likely to understand. (RJN, Ex. A at 3–4.) Because traditional and non-traditional financing products are different—and these differences are what make the non-traditional products so difficult to understand in the first place—creating a set of standardized cost calculations that allows for cross-product comparisons requires the use of estimates to account for these differences. But the estimates are purely factual because the disclosures also require providers to explain the underlying calculations and assumptions. *See, e.g.*, 10 C.C.R. § 914(a)(3)(C) (requiring disclosure of how APR is calculated, that the APR is an estimate, and that the recipient's "effective APR" may vary). Just as the warnings in *CTIA* were factual because they disclosed that they were based on federal guidelines, the disclosures here are factual because they clearly disclose that they are based on estimates and assumptions (which are themselves also disclosed). Because these estimates and their underlying assumptions are clearly disclosed and do not purport to be anything other than estimates, they cannot be misleading under *Zauderer*,

1  even if the Association would prefer that those estimates were calculated

2  differently.

3      It is also worth considering the ramifications of the Association's argument

4  that the First Amendment requires that any disclosure requirement be rigorously

5  scrutinized for any hint that it may be perceived as misleading by a hypothetical

6  reader. "Innumerable federal and state regulatory programs require the disclosure of

7  product and other commercial information," *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272

8  F.3d 104, 116 (2d Cir. 2001), and "[t]he idea that these thousands of routine

9  regulations require an extensive First Amendment analysis is mistaken." *Pharm.*

10 *Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (Boudin, J. & Dyk,

11 J., concurring). Excessive scrutiny in this context, where the Association's First

12 Amendment interests are "minimal," *Zauderer*, 471 U.S. at 651, unduly infringes

13 on the state legislature's ability to protect its citizens and is not "constitutionally

14 required." *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 116.

15     The Association makes a number of additional and often highly technical

16 allegations with respect to specific aspects of the Regulations governing sales-based

17 financing and open-end credit products. These lack merit and are addressed below

18 by reference to the paragraph numbers of the Complaint in which they appear.

19                    **a.   The Association's sales-based financing allegations
20                           fail.**

21     Disclosures of estimated payments and terms (¶ 21). The Association

22 contends the mandated disclosure of estimated payments and estimated terms in

23 sales-based financing transactions are misleading because the recipient is required

24 to pay the provider a percentage of its accounts receivable as they are collected, not

25 a set payment amount, and there is no set payment term (payments continue

26 indefinitely until the contracted amount of receivables is paid). 10 C.C.R.

27 § 914(a)(6), (8). The Association is wrong because where "the financing does not

28 have a fixed payment schedule or minimum payments," the Regulations require the

provider to disclose that fact. *Id.* § 914(a)(7)(B)(ii).[4] Additionally, the estimated term is based on specified assumptions about the recipient's income. *Id.* § 914(a)(8)(C). Further, the disclosures clearly state that all the challenged terms are estimates and provide details about how they are calculated. *Id.* § 914(a)(6), (8).[5] The Association posits hypothetical scenarios in which the recipient's payment schedule may be different than the parties initially reasonably estimated, but where the underlying assumptions are disclosed, that possibility does not render the original estimate misleading.

Use of historical averages and calculation of APR (¶¶ 22–23). The Association alleges that providers must use the recipient's historical monthly sales averages to calculate estimated payment terms and the estimated APR, even where the provider believes it has developed a better methodology that more accurately forecasts the recipient's revenue. This claim misreads the Regulations, which permit providers to use either historical averages *or* the "underwriting method," which allows for calculations "using the best information reasonably available to the provider." 10 C.C.R. § 931(a)(3). But even if the provider were required to use the historical average method, that disclosure would not be misleading because it is clearly labeled as an estimate and the assumptions and methodology are also disclosed. *See id.* § 914(a)(3)(C) (requiring disclosure of the fact that APR is just an estimate, how APR is calculated, and notice that the "effective APR may vary" if the recipients actual income differs from projections).

Disclosure of irregular payments and reasonably anticipated true-ups (¶¶ 24–25). True-ups are adjustments to a recipient's payments that become necessary

---

[4] To illustrate, section 914(a)(7)(B)(ii) provides the following sample disclosure: "Each business day, your credit card processer will remit 15% of your gross receipts to us, and send any remaining amounts to you. This financing does not have a fixed payment schedule and there is no minimum payment amount."

[5] Section 914(a)(8)(C) provides an illustration of the disclosure required by this provision: "This is our estimate of how long it will take to collect amounts due to us under the contract based upon the assumption that you will receive $6,000 in monthly income through your BrownPay account."

when those payments do not match the parties' prior estimates due to fluctuations in the recipient's revenue. The Association asserts that it is misleading to require providers to disclose reasonably anticipated true-ups and irregular payments because "true-ups and the resulting 'irregular payments' are by definition unanticipated." This misreads the Regulations in at least two ways. First, the Regulations make it clear that any such disclosures are merely estimates. 10 C.C.R. § 914(a)(6)(A). Second, if such payments cannot be reasonably anticipated, they do not have to be disclosed at all. *Id.* § 914(a)(6)(B)(i)–(ii) (requiring disclosure "of any" irregular payments or reasonably anticipated true-ups; if there are not "any" such payments required, they need not be disclosed).

The Association further contends that when a recipient's revenue falls, "the related but unanticipated true-up"—which in this context means that the provider is lowering the required periodic payments to reflect the fact that the recipient's revenue was lower than the parties' initially anticipated—"will cause the Estimated Term" to be extended. This, in turn will thus render the actual APR on the transaction lower than the originally estimated APR (because the cost of the transaction is spread over a longer time). But the fact that the Association can posit a hypothetical in which the estimated APR does not match the exact APR does not render the original estimate unconstitutionally misleading. Indeed, the Regulations' formulas are neutral with respect to income estimates and do not require providers to bias their income projections one way or the other—in other words, nothing in the Regulations requires providers to overestimate recipients' income in a way that will result in the systemic overestimation of APR.

Prepayment rights (¶ 26–27). The Complaint alleges that section 914(a)(10) requires a false statement that recipients may "prepay" their balance and implies that there is a required timeframe for paying off the financing. But nothing in the cited regulation requires those statements, and the Association does not allege that its members' contracts prohibit prepayment. Any suggestion that a provider would

refuse an opportunity to recoup their investments more quickly in this context (where there is no accruing interest) is unsupported and implausible.

Further, the Regulations' reference to prepayment does not imply that the recipient is being charged interest that is accruing over time. To the contrary, the Regulations specifically *require* a provider to inform a recipient when the financing charge does not include interest. 10 C.C.R. § 914(a)(3)(D).

<u>Use of the words "owes" and "fees" (¶¶ 28–29)</u>. The Association claims the Regulations' use of the word "owes," 10 C.C.R. § 914(a)(4)(C), is misleading because a recipient of sales-based financing does not have an "absolute payment obligation" and thus does not "owe" money. First, the disclosure required by this section is optional, so the provider is not compelled to provide it. *Id.* (stating that the provider "may include" this statement in the disclosure).

Second, the Association is simply wrong that the word "owe" implies an "absolute" payment obligation; the word simply means "to be under obligation to pay."[6] Recipients of sales-based financing "owe" a certain amount of their future receivables to their providers until the recipients' contractual obligations are satisfied. While the providers' payment is contingent on the recipients' collection of receivables, the existence of a condition precedent does not mean that a payment obligation does not exist at all.

The Association also alleges that characterizing the difference between the purchase price and the value of the accounts receivable sold in a sales-based financing transaction as a "fee" is inherently misleading. But "fee" is commonly understood to mean "[a] charge or payment for labor or services." *Fee*, Black's Law Dictionary (11th ed. 2019). It is not misleading to characterize the money the providers are making on this transaction in exchange for their services as a "fee." The Regulations' use of these terms is consistent with their plain meaning.

---

[6] *Owe*, Meriam Webster Dictionary Online, https://www.merriam-webster.com/dictionary/owe (last visited Feb. 17, 2023).

1        Disclosure of Estimated Total Payment Amount (¶ 30). The Association

2    contends that the disclosure of an "estimated" total payment amount, 10 C.C.R.

3    § 914(a)(5), is misleading because a recipient in a sales-based financing transaction

4    must pay the provider a fixed and certain amount. This allegation is inconsistent

5    with the Complaint's numerous allegations that the recipient does not have an

6    "absolute payment obligation" and may end up paying less than the amount owed

7    under the contract if the business fails. (*See, e.g.*, Compl. ¶¶ 28.) There is nothing

8    misleading about the use of the word "estimated" in this context.

9        Limitation on modifications to disclosures (¶ 31). The Complaint alleges that

10   the Regulations prevent providers from making meaningful modifications to the

11   disclosures to prevent conveying misleading impressions. As discussed above,

12   however, the disclosures do not convey misleading impressions. Instead, the

13   disclosures use estimates and allow providers the flexibility to customize their

14   disclosures to the product being offered. Further, providers may provide a "short

15   explanation" of up to 60 words where written narratives are permitted. 10 C.C.R.

16   § 901(a)(9). And finally, the Regulations only govern what is said on the disclosure

17   forms and do not limit what providers say outside the context of those forms.

18           **b.**    **The Association's open-end credit allegations fail.**

19       Assumptions regarding borrowers' use of credit (¶¶ 35–36). The

20   Association's principal allegation with respect to open-end credit is that disclosures

21   regarding this product are misleading because the estimated costs of credit are

22   based on a hypothetical borrower that makes an initial draw of the entire line of

23   credit and then makes minimum payments. 10 C.C.R. §§ 911(a)(2), 940. This is not

24   misleading because these assumptions are stated very clearly in the disclosures, and

25   borrowers are informed that "[a]ctual costs may differ substantially." *Id.*

26   § 911(a)(2)(A), (B).

27       Disclosure of exact APR and term (¶ 37). The Association alleges that

28   sections 911(a)(4) and 911(a)(9) require the disclosure of an exact APR and term,

1    which is misleading because those figures are computed using estimates, and thus

2    the resulting figures should be labeled as estimates as well. But again, the

3    disclosures are transparent about how these figures are estimated, so the figures

4    could only be understood as estimates. *See id.* § 911(a)(2).

5        Limitation on modifications to disclosures (¶ 38). The Association raises the

6    same concern about the Regulations' restrictions on modifying the disclosure forms

7    in the open-end credit context as it does in the sales-based financing context, and

8    this allegation fails for the same reasons set forth above.

9        For all of these reasons, the Complaint fails to allege that the Regulations

10   compel the Association's members to make false or misleading disclosures.

11                **2.    The required disclosures are noncontroversial.**

12       The second inquiry under *Zauderer* is whether the compelled speech is

13   noncontroversial. *American Beverage*, 916 F.3d at 756. Speech is controversial if it

14   forces a speaker to "take sides in a heated political controversy," *CTIA*, 928 F.3d at

15   848, or in a matter of scientific debate that is subject to "robust disagreement by

16   reputable scientific sources." *California Chamber of Com. v. Council for Educ. &*

17   *Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022). But the Ninth Circuit has also

18   made it clear that a factual statement is not controversial simply because it "can be

19   tied in some way to a controversial issue." *CTIA*, 928 F.3d at 845.

20       For example, in *NIFLA*, the required disclosure addressed the issue of

21   abortion, which is "anything but an 'uncontroversial' topic." *NIFLA*, 138 S. Ct. at

22   2372. In *California Chamber of Commerce*, the Ninth Circuit upheld a district

23   court's exercise of discretion in finding that the issue of whether acrylamide causes

24   cancer in humans to be an issue of scientific debate and thus controversial. 29 F.4th

25   at 478. By contrast, in *CTIA*, the panel held that the required disclosure about cell

26   phone radiation was uncontroversial because it was merely a statement about the

27   "appropriate use of the product." *CTIA*, 928 F.3d at 848.

28

1   The Association states that the disclosures required by the Regulations are
2   controversial because their use of estimated terms like APR that are typically used
3   in the traditional lending context misleadingly implies that recipients are being
4   presented with an "apples to apples" comparison between traditional and non-
5   traditional financing products. (Compl. ¶ 25.) This is wrong for at least two reasons.

6   First, as previously explained, there is nothing misleading about the
7   estimated figures provided in the disclosures because the basis for and assumptions
8   underlying these estimates are explained to the consumer. And second, a statement
9   is not controversial for First Amendment purposes simply because an industry
10   advocacy group believes it casts the industry's products in a bad light. *See CTIA*,
11   928 F.3d at 845. The Regulations do not touch on an area of heated political
12   controversy like abortion or require position statements regarding matters of
13   legitimate scientific debate; they merely require disclosures of estimates based on a
14   transparent set of assumptions. The Association may believe that these estimates
15   create the impression that non-traditional financing products are more costly than
16   the Association's members would prefer to advertise, but that does not render them
17   controversial in this context.

18   **3.    The required disclosures are not unjustified or unduly**
19   **burdensome.**

20   The final inquiry under *Zauderer* is whether the disclosures are "unjustified
21   or unduly burdensome." *American Beverage*, 916 F.3d at 756. This inquiry is
22   satisfied "as long as disclosure requirements are reasonably related to the State's
23   interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651.

24   The Complaint admits that the Department has an interest "in adopting
25   regulations that promote truthful disclosures regarding the cost of commercial
26   financing." (Compl. ¶ 14.) The Association's only argument that Regulations are
27   unduly burdensome is that "they go beyond that interest and impose disclosure
28   obligations that are neither factual nor uncontroversial." (Compl. ¶ 14.) But for all

the reasons stated above, the disclosures at issue are factual and uncontroversial. The Association also alleges that the Department failed to consider "less speech-restrictive means" before promulgating the Regulations (Compl. ¶ 62), but whether the government used the "least restrictive means" to accomplish its goal is part of the intermediate scrutiny standard which applies to restrictions on commercial speech, not the *Zauderer* framework, which applies to compelled commercial disclosures. *Zauderer*, 471 U.S. at 647; *see also id.* at 651 n.14 (expressly rejecting contention that disclosure requirements are subject to least restrictive means analysis). Here, the Department need only show that the mandated disclosures are reasonably related to California's strong and conceded interest in promoting disclosures regarding the cost of financing. Beyond repeating its allegation that the Regulations are misleading, the Complaint offers no argument that such a relationship is absent here.

Because the disclosures required by the Regulations satisfy each of the three *Zauderer* inquiries, and because there is no indication the Complaint can be amended to add plausible allegations to the contrary, the Complaint should be dismissed with prejudice.

## B.   The Regulations Are Not Preempted by TILA.

The Association's claim in Count II of the Complaint that the Regulations are preempted by TILA should be dismissed because TILA unambiguously applies to *consumer* credit transactions, and is thus not inconsistent with the Regulations' *commercial* credit disclosure requirements.

Preemption "comes in three forms: express preemption, field preemption, and conflict preemption." *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1113–14 (9th Cir. 2022). The Complaint raises an express preemption claim based on TILA. (Compl. ¶¶ 46, 66.) "Express preemption arises 'when the text of a federal statute explicitly manifests Congress's intent to displace state law.'" *Id.* at 1114 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022

(9th Cir. 2013)). "Express preemption is a question of statutory construction, requiring a court to look to the plain wording of the statute and surrounding statutory framework to determine whether Congress intended to preempt state law." *Jones v. Google LLC*, 56 F.4th 735, 739–40 (9th Cir. 2022); *see also Puerto Rico v. Franklin California Tax-Free Tr.* (*Franklin*), 579 U.S. 115, 125 (2016) (noting that the "plain wording of the [preemption] clause . . . necessarily contains the best evidence of Congress' pre-emptive intent" (quotations and citation omitted)).

TILA's preemption clause provides that, with certain exceptions inapplicable here, the statute does not "annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency." 15 U.S.C. § 1610(a)(1); *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1007 (9th Cir. 2008) ("TILA does not preempt state law unless the state law is inconsistent with TILA."). The Ninth Circuit has interpreted statutes containing similar references to "inconsistent" state laws as referring "to contradictory state law requirements, or to requirements that stand as obstacles to federal objectives." *Jones*, 56 F.4th at 740. Put another way, "the bar on 'inconsistent' state laws implicitly preserves 'consistent' state substantive laws." *Id.* at 741.

TILA and the Regulations are not inconsistent because, as the Association concedes, they address entirely different types of transactions. (Compl. ¶ 54.) Congress enacted TILA to increase the informed use of "consumer credit," 15 U.S.C. § 1601(a); 12 C.F.R. § 1026.1(b), and did so by mandating certain disclosures in connection with consumer credit transactions. 15 U.S.C. §§ 1637(a), 1638a(a), 1638(a). Congress defined "consumer" credit transactions to mean transactions "in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(i).

By contrast, the Association admits that the Regulations "apply to commercial transactions and not consumer transactions." (Compl. ¶¶ 54, 57.) Indeed, the California statutes the Regulations implement expressly address only "commercial financing," Cal. Fin. Code §§ 22802(a), 22803(a), which California defines as "an accounts receivable purchase transaction . . . intended by the recipient for use primarily for *other than* personal, family, or household purposes." *Id.* § 22800(d)(1) (emphasis added); *see also* 10 C.C.R. § 922 (example of the Regulations referring to only "commercial financings"). Because TILA only applies to consumer transactions and the Regulations only apply to commercial transactions, TILA and the Regulations can coexist and do not contradict each other. *See* 15 U.S.C. § 1603(1) (TILA does not apply to "extensions of credit primarily for business, commercial, or agricultural purposes"); *see also Jordan v. Paul Fin., LLC*, 745 F. Supp. 2d 1084, 1095 (N.D. Cal. 2010) ("TILA preempts state law only to the extent state disclosure requirements are explicitly inconsistent with federal law.").

Even though TILA and the Regulations address fundamentally different types of transactions, the Association argues that the Regulations "undermine Congress's primary objective in enacting TILA" because the Regulations define "Annual Percentage Rate" and "finance charge" differently than TILA does. (Compl. ¶ 66, 69.) The Association contends these different definitions would confuse customers and thus "frustrate the purpose of TILA." (Compl. ¶ 51.) To support this contention, the Association points to TILA's implementing regulation, Regulation Z, which interprets TILA to preempt state laws that "use of the same term to represent a different amount or a different meaning than" TILA does. 12 C.F.R. § 1026.28(a)(1).

This argument has at least two fatal flaws. First, Regulation Z only applies when "credit is offered or extended *to consumers*" and where "[t]he credit is primarily for personal, family, or household purposes." 12 C.F.R. § 1026.1(c)(1)(i),

(iv) (emphasis added). This limitation on the scope of Regulation Z also confines the reach of Regulation Z's interpretation of TILA's preemption provision. Second, and more fundamentally, the Association's preemption argument ignores the best evidence of Congress's intent—TILA's plain language. *Franklin*, 579 U.S. at 125. TILA does not apply to commercial credit transactions, 15 U.S.C. § 1603(1), and preserves consistent state laws, *id.* § 1610(a)(1)—like those that only apply to commercial credit transactions. If Congress wanted to impose universally applicable definitions of "APR" and "finance charge" that states could not change regardless of the context, it would have used far broader language.

CFPB has preliminarily reached the same conclusion. Congress charged CFPB with making determinations regarding whether TILA is inconsistent with a particular state law "upon the request of any creditor, State, or other interested party." 15 U.S.C. § 1610(a)(1). The Association requested that CFPB make such a determination regarding a New York law that is materially identical to California's law for purposes of the preemption analysis. (RJN, Ex. C at 5 & n.17.) CFPB has preliminarily concluded that both the New York and California laws are not preempted "because they do not apply to consumer credit transactions that are within the scope of TILA." (*Id.* at 4.)[7] While CFPB's determination is not final, its preliminary analysis further demonstrates that TILA does not expressly preempt the Regulations.

To be clear, because TILA is unambiguous in this regard, the Court need not rely on CFPB's determination, preliminary or otherwise. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). But if the Court disagrees and finds that TILA's text is ambiguous, the Court should deny the

_____

[7] The CFPB's preliminary determination extends to similar laws enacted in Utah and Virginia as well. (RJN, Ex. C at 3.)

motion without prejudice to revisiting the issue once the CFPB's determination is finalized. This is because the CFPB's final determination of ambiguous statutory language would be entitled to *Chevron* deference, and the appropriate inquiry in that scenario would be whether CFPB's determination "is based on a permissible construction of the statute." *Id.* at 843; *see also BNSF Ry. Co. v. California Dep't of Tax & Fee Admin.*, 904 F.3d 755, 762 (9th Cir. 2018) (noting the court owed deference to the agency's determination regarding the scope of preemption of a statute the agency administers and which expressly permits the agency to make preemption determinations).[8]

But TILA is not ambiguous. The statute's express preemption language is narrow and plainly does not apply to the commercial credit transactions covered by the Regulations. Accordingly, the Court should dismiss Count II of the Complaint with prejudice.

## V.   CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Dated: February 21, 2023

ROB BONTA
Attorney General of California

*/s/ Craig D. Rust*
Craig D. Rust
Supervising Deputy Attorney General
Rachel J. Yoo
Deputy Attorney General

*Attorneys for Defendant Clothilde Hewlett, solely in her official capacity as Commissioner of the California Department of Financial Protection and Innovation*

---

[8] Comments on CFPB's proposed determination were due by January 20, 2023. (RJN, Ex. C, at 1.) It is unclear when CFPB will finalize the determination.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for defendant Clothilde Hewlett, solely in her official capacity as Commissioner of the California Department of Financial Protection and Innovation, certifies that this brief contains 6215 words, which complies with the word limit of L.R. 11-6.1

Dated: February 21, 2023

ROB BONTA
Attorney General of California

*/s/ Craig D. Rust*
Craig D. Rust
Supervising Deputy Attorney General
Rachel J. Yoo
Deputy Attorney General

*Attorneys for Defendant Clothilde Hewlett, solely in her official capacity as Commissioner of the California Department of Financial Protection and Innovation*