# EXHIBIT D

**California Department of Financial Protection and Innovation**
**FINAL STATEMENT OF REASONS**
**PRO 01/18**

## UPDATED INITIAL STATEMENT OF REASONS

The initial language proposed with the notice of rulemaking has changed during this rulemaking action. The Department of Financial Protection and Innovation ("Department" or "DFPI") has revised the text and sought public comment on four occasions. This updated final statement of reasons describes changes made since the initial text was proposed with the notice of rulemaking, and references to amendments in this update refer to changes made to the initial proposed text.

### General Non-substantive or Technical Changes

The amendments make various grammatical changes and made changes to the numbering scheme. The purpose of these changes is to provide clarity to the rules and better fit within the Department's regulatory scheme. These changes are necessary for clarity and greater specificity in the regulations. The amendments also change the name of the Department from "Department of Business Oversight" to "Department of Financial Protection and Innovation," consistent with AB 107 (Stats. 2020, ch. 264). On September 29, 2020, AB 107 was signed into law, changing the name of the Department.

Subchapter 3. Commercial Financing Disclosures. The DFPI added language to the regulation specifying that each of the new sections are part of a new subchapter entitled "Subchapter 3. Commercial Financing Disclosures." This change places the regulations associated with the rulemaking action under a single subchapter for ease of reference in other parts of the regulations. This revision is necessary to provide clarity where the regulations previously referenced "these rules" or similar language. The revision permits the DFPI to reference a specific subchapter in the California Code of Regulations rather than using a construction such as "these rules" which could lead to reader confusion.

General renumbering and changes to cross references. At various points throughout the regulations, paragraphs were added, moved, or removed, which required changes to cross-references and paragraph numbering. These changes were necessary paragraph numbering and ensure that cross references refer to the intended sections and subdivisions.

Sections 900(a), (c); 901(a)(2), (a)(7) (a)(13); 930(b), (c); 931(a)(1); 931(a)(7); 952(f)(2), 953. The DFPI changed references to "these rules" or "chapter" to "subchapter" in these provisions. This change unifies all references to the regulations under the correct reference (subchapter 3). This revision is necessary to provide clarity where the regulations previously referenced "these rules" or similar language.

Section 900(a)(1). The term "amount financed" was added to the regulations, with definitions for different types of transactions listed. The addition of this defined term is necessary to define

the amount that will be disclosed to recipients as the total amount of funds provided. The DFPI added this term because stakeholders observed that the originally proposed language could lead to recipient confusion by disclosing only the net amount provided to recipients on the disclosure form, which could be $0 for refinancing transactions. The DFPI drafted different definitions for different types of financing to provided clarity to providers where the transactions elements differ, while still ensuring that each definition captures the amount provided by the financer for the recipient's benefit. In each case, any prepaid finance charge is deducted since these funds are not advanced to the recipient by the financer (they are either paid directly at origination or withheld from the proceeds).

Sections 900(a)(2), (a)(3). In the definitions of "approved advance limit" and "approved credit limit," the DFPI deleted the language "is required" and replaced this language with "may provide." This change reflects that some factoring or open-end credit agreements make the provision of financing discretionary for the financer. This change is necessary to ensure that the approved advance limit and approved credit limit for these products would not be zero, which could lead to confusing disclosures for recipients.

Section 900(a)(2), (a)(3). The DFPI deleted the word "pay" from both paragraphs. These changes remove a word that would otherwise be redundant due to the revision described above ("may provide"). The changes are necessary because without the deletions, the language of both paragraphs would be grammatically incorrect.

Section 900(a)(2), (3), (35)(D)). The DFPI added "or on the recipient's behalf" to these provisions. This language clarifies that the definitions capture funds that are not paid directly to a recipient, but which are distributed for the recipient's benefit. These changes are necessary because proceeds from financing are often paid out to third parties or used to pay off existing financings with the financer, and these payments should be captured in the definitions because they are made for the recipient's benefit.

Section 900(a)(2). The DFPI changed references to "the purchase" to "assignment." These changes clarify that a recipient assigns claims as consideration for payments from the financers. The changes are necessary, because, without the changes, the language could be read to incorrectly suggest that the recipient purchases legally enforceable claims as consideration for payments made by the financer.

Section 900(a)(2), (a)(3). The DFPI added the following language to the first sentence: "not including any previous distributions advanced to a recipient or on the recipient's behalf under the factoring agreement requires, to the extent those distributions have been repaid." This language clarifies to stakeholders that the "approved advance limit" and "approved credit limit" are intended to capture the maximum amount that can be advanced to a recipient at a specific point in time. This change is necessary because without the additional language, the definitions could be read to capture sequential advances on revolving credit lines. For example, an open-end credit plan with a $1000 advance limit could be read to have an infinite

"approved credit limit," because, theoretically, the recipient could borrow, repay, and re-borrow $1,000 an infinite number of times.

Section 900(a)(2). The DFPI added this language after the first sentence of the definition: "The approved advance limit does not include reserve amounts or any other amount not advanced to the recipient at the time of assignment." This language clarifies that amounts that are not paid at the time of assignment are not considered part of the "approved advance limit." This change is necessary to assist providers in understanding that amounts that may be paid to a recipient after an account debtor fulfills their obligations under a legally enforceable claim are not considered "advanced to a recipient," since these amounts are not paid from the financer's funds.

Section 900(a)(2), (a)(3). The DFPI substantially revised the last sentence of the definitions, deleting certain language and replacing the language with new language. The revisions remove the implication that the "approved advance limit" and "approved credit" definitions do not capture the maximum amounts that may be advanced at any one point in time, when the financing includes multiple lines tied to different legally enforceable claims or categories of advance. These changes are necessary because the previous language created ambiguity as to the treatment of financings with multiple lines, where one line exceeds $500,000, another line is equal to or less than $500,000, and the advance on one line reduces the amount available under the other line. Under this scenario the maximum amount that the provider may advance still exceeds $500,000, but the previous language incorrectly implied that the "approved advance limit" or "approved credit limit" under the agreement would be equal to or less than $500,000.

Section 900(a)(5)(A). This subparagraph was revised in multiple ways. "The" was replaced with "any." This change is necessary to clarify that a provider may present multiple specific commercial financing offers to a recipient.

The reference to "amount, rate or price" was deleted because the elements required to trigger disclosure were moved to the definition of "specific commercial financing offer." This change is necessary to make the regulations more succinct.

A sentence was added to the end of the subparagraph which provides that if a provider presents a recipient with multiple specific commercial financing offers, disclosures are not required until the recipient selects and option. This language is necessary to prevent circumstances in which a recipient would otherwise be presented with numerous disclosures before they have selected an option.

Section 900(a)(5)(B). This subparagraph was revised in multiple ways. The words "subsequent" and "an existing" were deleted and the words "a consummated" were added. These changes are necessary for brevity and because "consummated" clarifies that the paragraph applies to changes to contracts to which parties have already agreed.

"Changed" was added to the first sentence. This is necessary to ensure that the paragraph applies to changes to a consummated contract.

"[F]inance charge, payments, [and] term" were deleted from the paragraph. This change is necessary to limit the circumstances in which disclosures must be provided to recipients because stakeholders indicated that modifications to consummated contracts are common and that the justification for providing disclosures in this context are less compelling. The regulation still requires a disclosure if a change results in an increase to the APR, because an increase to APR could reflect a change to the contract that makes the contract less beneficial to the recipient.

A second sentence was added clarifying that the paragraph does not apply to changes made to resolve a recipient's default. This change is necessary to allow providers to make contractual arrangements to assist recipients in default without concern for having to provide new disclosures.

Section 900(a)(5)(C). This subparagraph was added to clarify treatment of transactions in which disclosure of the required terms for an open-end credit plan is not possible at consummation because rates or price vary based upon what purchases a recipient makes with the financing. This section is necessary to accommodate a model described by a stakeholder that could not provide meaningful disclosures if required to provide those disclosures at the time the agreement is consummated.

Section 900(a)(7). The DFPI changed the definition of "benchmark rate" to remove the London Interbank Offered Rate (LIBOR) and replace this rate with the Secured Overnight Financing Rate (SOFR). Financial institutions are phasing out the LIBOR and the SOFR is a new benchmark rate coming into use. This change is necessary to ensure that the regulation references examples that are easily understood by stakeholders and not outdated.

Section 900(a)(8). The DFPI replaced the definition of "broker" with a definition that captures six activities, which, in the DFPI's experience, describe activities that brokers often engage in. This change is necessary to create a definition of broker that describes brokerage activities, rather than the previous definition that was over-inclusive.

Sections 900(a)(24)(A); 952(a)(1), (a)(3). Language in these provisions was revised to eliminate a lengthy construction that previously described a specific commercial financing offer. The amendments added a definition of specific commercial financing offer and replaced the lengthy construction in each of these paragraphs with the defined term. These changes are necessary for brevity.

Section 900(a)(24)(A). The language "a recipient's agent" was added to this subparagraph to clarify that the disclosure requirements still apply if a provider communicates a specific commercial financing offer to a recipient's agent. This change is necessary to ensure that providers offer disclosures even when a recipient is operating through an agent.

Section 900(a)(22). The DFPI revised the references to "borrowers," "sellers," and "lessees" to make each reference singular. This change is necessary to clarify that where there are multiple borrowers, sellers, or lessees, only a single person who is the primary borrower, seller, or lessee must receive and sign the disclosure.

Section 900(a)(27). The DFPI replaced "annualized rate" with "annual percentage rate." This change is necessary to conform the references to annualized rate in this section with the chosen calculation method for annualized rate—annual percentage rate.

Section 900(a)(29). This paragraph adds a definition of "specific commercial financing offer." The definition is necessary to shorten other sections where the circumstances under which a disclosure is required were previously described by identifying each triggering element of an offer that would trigger a disclosure.

The definition also deviates from the original language previously contained in section 900, subdivision (a)(5)(A) that would have triggered a disclosure any time an "amount, rate, or price" is quoted to the recipient. Now, a disclosure is required if (i) a periodic payment amount, irregular payment amount, or financing amount, and (ii) any rate, price, or cost of financing is quoted to the recipient. This language is necessary to allow discussions involving desired payments or financing amount without triggering a disclosure, as long as providers do not make representations relating to the rate, price, or cost of financing.

Finally, the definition clarifies that information "about the recipient" includes information that informs a provider's quote, but does not include a recipient's name, address, or general interest in financing. This language is necessary to address provider concerns that they might be required to provide a disclosure solely based upon hypothetical information after a recipient indicates interest in a transaction but before the provider has the information necessary to draft a tailored quote.

Section 900(a)(32). The definition of "term" was substantially revised in multiple ways.

First, the modifier "[s]ubject to the rules with respect to term specified in section 922 through 931, 940, and 942, as applicable" was added to the definition. This replaces similar language that previously appeared at the end of subparagraphs (A) through (D) but which referenced old paragraph numbers. This language is necessary to clarify to providers of the aforementioned sections include assumptions and methodology for calculating the term described by this paragraph.

Subdivision (a)(32)(B) was revised so that the term for a factoring disclosure would be the sample term reasonably expected to be within the range of terms expected during the life of the master agreement, rather than maximum length of time a between when a financer will accept a legally enforceable claim and when the legally enforceable claim will become due and payable. This change is necessary to provide more flexibility for providers of factoring disclosures to use a term that they anticipate being reflective of actual performance.

Subdivision (a)(32)(C) was revised to delete "and asset-based lending transactions." This change is necessary because subdivision (a)(32)(D) was added to specifically address the "term" definition for certain asset-based lending transactions.

Under subdivision (a)(32)(C), the word "contracted" was added and "that it is anticipated will be" was deleted. These changes are necessary to reflect that the terms for these transactions are typically set forth in the contract.

Subdivision (a)(32)(D) was added to reflect that the terms for certain asset-based lending disclosures incorporate assumptions set forth in section 950. This change is necessary to ensure that providers disclose a term that complies with section 950's assumptions, because the provider's other disclosures will be based on section 950's assumptions. Former subdivision (a)(32)(D) was renumbered subdivision (a)(32)(E) to accommodate this addition.

Section 900(a)(26). This paragraph defines "recipient funds" as the net amount provided directly to the recipient, with other clarifying language stating what funds are excluded from recipient funds. This language is necessary to enable providers to disclose the amount the recipient will likely receive directly when this amount differs from the amount financed. This will assist recipients in understanding what portion of the amount financed will be available for their use.

The paragraph also states that if the part of the amount financed will be used to pay off other amounts owed by the recipient that may change over time, a provider may use the amounts due at the time the disclosure is provided to calculate the recipient funds. This language is necessary to ensure that providers do not need to provide multiple disclosures as amounts due under the recipient's other obligations change over time.

Section 900(a)(6), (a)(12). The DFPI added a definition of "average monthly cost" and "estimated monthly cost," defining those terms to mean the total amount of payments divided by the term or estimate term (in months) of the contract. A clarifying assumption is also provided so that a provider can calculate the number of months or estimated months in the contract term by dividing the number of days by 30.4. These sections are necessary to eliminate ambiguity and promote uniformity in how providers calculate "average monthly cost" and "estimated monthly cost."

Section 900(b). This subdivision clarifies that references to "average" mean the "arithmetic" mean. The addition of the word arithmetic is necessary because there are multiple statistical mean calculations, so the DFPI added language to clarify to which mean the regulations refer.

Section 901. "Formatting and Content" was deleted from the section title "General Formatting and Content Requirements." This change is necessary for brevity.

Section 901(a)(1). The DFPI revised the language at the top of the disclosure to provide space for a provider to include a one- to five-word description of the type of product offered. This

change is necessary to ensure that providers can include explanatory language so that a recipient understands what type of product a particular disclosure corresponds to. The DFPI limited the product description to one to five words to limit superfluous language in the title of the disclosure.

Section 901(a)(2). The DFPI added, "For any disclosure required to comply with section 920, subdivision (a)" to the beginning of this section to differentiate the formatting for disclosures that are required to be signed from those that are not required to be signed. This language is necessary to ensure that disclosures that a recipient is expected to sign include space for a signature.

The DFPI changed a reference to "California law" to "applicable law" in the explanation provided to recipients. This revision is necessary to ensure that if other states adopt disclosure regimes similar to California's, providers will not need to revise the language of the disclosure for disclosures in those states.

Section 901(a)(3). The DFPI added language clarifying that if a disclosure is provided that is not the disclosure that is required to be signed, a provider should not include a signature line for the recipient. This revision is necessary to limit superfluous language on disclosure forms and prevent recipient confusion.

Section 901(a)(4). This paragraph was revised to clarify how a term should be expressed for terms of less than one year. The previous language required the term be disclosed in units of years and months, with remaining days expressed as a portion of a month to the nearest two decimal points. The revisions are necessary because the DFPI determined that disclosing terms of less than one year using days would be clearer to recipients than a disclosure in months and fractions of months.

Section 901(a)(5). The DFPI added an example to illustrate how an APR should be disclosed pursuant to this section. This example is necessary for clarity.

Section 901(a)(7). This paragraph was revised in multiple ways.

References to "typefaces" were replaced by "fonts" in subparagraph (a)(7)(A). Typeface describes a general style of type while a font reflects other additional characteristics that could affect legibility, such as size, italicization, etc. This change is necessary to provide clarity that subparagraph (a)(7)(A) applies to elements of the font chosen which may affect legibility, not just the typeface.

Subparagraphs (a)(7)(B) and (a)(7)(C) were added to require specific fonts for different parts of the disclosures. Different parts require or allow different font sizes because the DFPI anticipates less information in certain disclosure cells will accommodate larger font and/or in some instances larger fonts are appropriate for disclosure titles or row titles. These changes are necessary to ensure that unscrupulous providers do not chose fonts specifically to make

the disclosures less comprehensible to recipients, while still allowing variations in fonts where such variability will aid in the readability of the disclosures.

Subparagraph (a)(7)(D) allows providers to deviate from the requirements of (a)(7)(B) and (a)(7)(C) when the provider makes a good faith determination that a deviation is necessary to comply with the Americans with Disabilities Act ("ADA") or for clarity based upon the medium in which the disclosure is presented. The allowance for ADA deviations is necessary to encourage providers to make appropriate revisions to standard disclosure requirements to comply with federal law. The allowance of display medium deviations is necessary to accommodate providers who want to issue clear disclosures that a recipient may view on a mobile device such as a phone or tablet.

Section 901(a)(8). This new paragraph requires a provider to ensure that the width of the columns in the required disclosure does not result in the disclosure extending unnecessarily onto multiple pages. The paragraph also provides that a provider that maintains a ratio between the first, second and third columns of 3:3:7 complies with the requirements of the subdivision. These changes are necessary to ensure that providers do not draft columns so narrow as to result in disclosures extending unnecessarily onto multiple pages, while also providing a specific safe harbor ratio for providers who want to avoid ambiguity associated with complying with the requirements of the subdivision.

Section 901(a)(9) and all subdivisions at refer to a "short explanation." This paragraph defines a "short explanation" as an explanation of not more than 60 words. At multiple points throughout the regulation, providers are required to include short explanations relating to the transaction. This paragraph defines the length of a short explanation and is necessary to ensure that unscrupulous providers do not use opportunities to provide explanations to unduly extend the length of the disclosures.

Section 901(a)(10). This paragraph requires each of the cells in the required disclosures to be outlined. Without this requirement, providers could draft the disclosures without outlined cells, which could make the disclosures less legible. This change is necessary to ensure disclosure formatting that is easy for recipients to review.

Section 901(a)(11). The beginning of this paragraph was revised to provide "if disclosures are provided to a recipient electronically" rather than "[i]f the information in this section is provided." Section 901 is one of many sections that governs the required disclosures, and therefore the revision is necessary to reference the disclosures generally rather than to reference section 901 only.

This paragraph was also revised to reference a provision of the Civil Code governing electronic signatures. This section is necessary to ensure that providers understand how to collect electronic signatures that comply with the regulations and California law.

Section 901(a)(12)(B). This subparagraph was revised to clarify that providers are not required to capitalize the word "estimate" when using descriptions that disclose estimates. This change

is necessary to ensure that providers do not need to capitalize estimate in circumstances when doing so would be grammatically incorrect.

Section 901(a)(13). "Of time" was deleted from this paragraph. This change is necessary for brevity.

Section 901(a)(14). This paragraph clarifies that when displaying numerical values, providers should present numbers numerically and not alphabetically. This change is necessary to ensure providers do not unnecessarily extend disclosures and make them harder to read by spelling out number values alphabetically.

Section 901(a)(15). This paragraph clarifies that when the amount financed includes funds used to pay down or pay off other amounts owed by the recipient that may change over time, and the amount due in connection with an amount owed changes prior to consummation of the agreement, a provider is not required to provide a new disclosure solely because the amount due has changed. Stakeholders expressed concern that without this clarification, a provider could be forced to send multiple disclosures solely because time passes between the time a disclosure is signed and the transaction is consummated, even when the terms of the transaction are unchanged. This paragraph is necessary to address this concern.

Section 901(a)(16)(A). This subparagraph clarifies that for the purposes of the calculations and disclosures, a provider can disregard the fact that payments must be collected in whole cents. This change is necessary to ensure that providers can use calculation methods that may assume payments that include fractions of a cent, because such assumptions are likely to be immaterial to the amounts disclosed to recipients and simplify calculation methodology for providers.

Section 901(a)(16)(B). This subparagraph clarifies that for purposes of the calculations and disclosures, a provider can disregard the fact that scheduled payments and advances may be changed because a scheduled date is not a business day. Changes to disbursements or payment schedules due to a date that is not a business day would only result in small changes to the amounts disclosed to recipients, so the DFPI determined that providers need not account for days that are not business days. This change is necessary to simplify calculation methodology for providers.

Section 901(a)(16)(C), (a)(16)(D). The original version of section 901 (section 2060) included a paragraph (a)(4) that read: "For the purposes of these disclosures, a provider shall assume that there are 30 days in every month and 360 days in a year. For example, a term of 400 days would be disclosed as '1 year, 1.33 months.'" The final version of the regulation removed this language and replaced it with sections stating that a "provider may disregard the effects of the following in making calculations and disclosures:" that "months have different numbers of days" and "[t]he occurrence of leap years." These changes are necessary to allow flexibility to providers to draft disclosures based upon more realistic assumptions (e.g., that a year has 365 days, not 300 days) while providing certainty to providers that they will not be held liable sorely because they fail to account for a leap year or a month with 30 days rather than 31 days.

Section 901(a)(17). This paragraph clarifies that notwithstanding section 901, subdivision (a)(16)(A), any dollar amount disclosed to a recipient should not be disclosed in fractions of a cent. This paragraph is necessary to ensure providers do not disclose payment amounts that could confuse recipients.

Sections 910-917. The titles of these sections were revised to conform the titles of the sections describing disclosure formatting and contents. These changes are necessary to promote readability and understanding of the regulations.

Section 910(a). This subdivision was revised to allow certain open-end credit plan providers to use the disclosures otherwise applicable to closed-end transactions. This provision was added to clarify treatment of transactions in which disclosure of the required terms for an open-end credit plan is not possible at consummation because rates or price vary based upon what purchases a recipient makes with the financing. In these cases, a disclosure on a per-advance basis using the closed-end transaction model is more appropriate. This amendment is necessary to accommodate a model described by a stakeholder that could not provide meaningful disclosures if required to provide those disclosures at the time the agreement is consummated.

Sections 910(a)(1), 911(a)(1), 914(a)(1), 915(a)(1), 917(a)(1). These sections were revised to reflect the additional rows added to the disclosures. These changes are necessary to ensure that the formatting descriptions as the top of each section conform to what each section requires below.

Section 910(a)(2)(A) and other sections where "the following language" was deleted. These sections were revised to delete "the following language," which was previously used as a preface to language that is required to be used in disclosures to a recipient. The DFPI determined that the preface was superfluous in certain context. These deletions are necessary to limit extraneous language in the regulations.

Sections 910(a)(2)(A), 911(a)(3)(A); 912(a)(2)(A), 913(a)(3)(A), 914(a)(2)(A), 916(a)(3)(A), 917(a)(2)(A). These subparagraphs were revised so that the title disclosed to the recipient is "Funding Provided" rather than "Funding You Will Receive." The updated language better reflects that that the amount to be disclosed to the recipient is the total amount financed, rather than the amount the recipient will receive directly. These changes are necessary so that recipients better understand the amount being disclosed in this row of the disclosure.

Sections 910(a)(2)(B), 911(a)(3)(B), 912(a)(2)(B), 913(a)(3)(B), 914(a)(2)(B), 915(a)(2)(B), 916(a)(3)(B), 917(a)(2)(B). These subparagraphs were revised so that the amount disclosed is not the amount provided directly to the recipient, but rather the total "amount financed," a defined term under the regulations. This change reflects stakeholder comments that the total amount financed is a more appropriate top-line disclosure for recipients than the net funds provided to recipients, because otherwise recipients may be left with the impression that they are receiving little or no financial benefit from proposed transactions where most or all of the

funds are used to pay off an existing financing (or other recipient obligations). These changes are necessary so that recipients better understand the financial benefit they derive from the financing.

Sections 910(a)(2)(C), 911(a)(3)(C), 912(a)(2)(C), 913(a)(3)(C), 914(a)(2)(C), 915(a)(2)(C), 916(a)(3), 917(a)(3)(C). Language was deleted from the disclosure requirements which would have required an explanation in the third column of amount owed and how the amount disclosed in the second was calculated. This change is necessary for brevity and to conform the contents of the third column with what is disclosed in the second column.

Sections 910(a)(2)(C)(i); 911(a)(3)(C)(i), 912(a)(2)(C)(i); 913(a)(3)(C)(i); 914(a)(2)(C)(i); 915(a)(2)(C); 916(a)(3)(C)(i), 917(a)(2)(C)(i). These provisions require the provider to identify the financer and explain that the amount disclosed in the second column is the amount of funding the financer will provide, maximum amount of funding the financer will provide (for open-end credit plans), or the amount the financer will pay for assignment of a legally enforceable claim (factoring), as applicable. Disclosing the identity of the financer is necessary so that the recipient can understand who is providing funding and, if needed, conduct independent research regarding the financer. The remaining language is necessary to help a recipient understand that the amount disclosed is the amount that will be provided, or in the case of open-end credit and factoring, the amount based upon the assumptions disclosed at the top of the disclosure.

Sections 910(a)(2)(C)(ii), 911(a)(3)(C)(ii), 912(a)(2)(C)(ii), 913(a)(3)(C)(ii), 914(a)(2)(C)(ii), 916(a)(3)(C)(ii), 917(a)(2)(C)(ii). These provisions require a provider to disclose the recipient funds if the recipient funds are less than the amount financed, and to include a reference to the "Itemization of Amount Financed" that will provide further detail as to why the recipient funds are less than the amount financed, including portions of the amount financed that are paid to third parties or used to satisfy the recipient's existing financial obligations. This disclosure is necessary to ensure recipients understand why the funds they ultimately receive are less than the amount disclosed in the second column.

Sections 910(a)(2)(C)(iii), 911(a)(3)(C)(iii), 912(a)(2)(C)(iii), 913(a)(3)(C)(iii), 914(a)(2)(C)(iii), 916(a)(3)(C)(iii), 917(a)(2)(C)(iii). These provisions require the provider to explain that if the amount financed is used to pay down or pay off other amounts owed by the recipient, and those amounts change over time, the amount paid directly to the recipient may change. This disclosure is necessary so that recipients understand the likely reason why the amount disbursed to them directly is ultimately less than the recipient funds disclosed in the third column.

Sections 910(a)(2)(C)(iv), 911(a)(3)(C)(iv), 912(a)(2)(C)(iv), 913(a)(3)(C)(iv), 914(a)(2)(C)(iv), 916(a)(3)(C)(iv), 917(a)(2)(C)(iv). These provisions require the provider to disclose that the amount paid directly to the recipient may change based upon other required disbursements to satisfy other obligations. This disclosure is required if the amounts owed by a recipient to third parties must be paid down or off using funds from the amount financed, but an amount owed is not known by the provider. This disclosure is necessary so that recipients understand the likely

reason why the amount disbursed to them directly is ultimately less than the recipient funds disclosed in the third column.

Section 910(a)(3)(A)(ii). In this section the disclosure description was revised to "Estimated Annual Percentage Rate (APR)" from "Initial Annual Percentage Rate." The change is necessary to help the recipient understand that the APR calculation is an estimate based upon the initial interest rate, as further explained by subdivision (a)(3)(C)(iii).

Sections 910(a)(3)(C)(iii), 910(a)(4)(A)(ii). References to interest accrued were replaced with references to an interest rate. These changes are necessary to reflect that the disclosure language in question is intended to be used if no part of the finance charge is based upon interest based upon a periodic interest rate, because sometimes fixed fees are considered interest even if they are not based upon an interest rate.

Sections 910(a)(3)(C)(iv), 914(a)(3)(D). Language stating that the proposed financing does not have an interest rate was revised to state the cost of the financing is based upon fees charged "rather than interest that accrues over time." The language in question now explains that no part of the finance charge is based upon interest that accrues over time, because sometimes fixed fees are considered interest even if they are not based upon an interest rate. This change is necessary to avoid requiring a provider to make a statement that may be contrary to how fixed fees are sometimes characterized under the law.

Sections 910(a)(4)(C)(i), 911(a)(5)(C)(i), 914(a)(4)(C)(i), 916(a)(5)(C)(i). Language stating that the amount disclosed in the second column reflects the total dollar cost of financing replaced a disclosure of the calculation of the finance charge and a description of each expense included in the finance charge. This change is necessary for brevity.

Sections 910(a)(4)(C)(ii), 911(a)(5)(C)(ii), , 916(a)(5)(C)(ii). A requirement that a provider include an explanation of how the contract's initial interest rate was used to calculate the finance charge was replaced with a simple statement that the interest rate under the contract will adjust over time, so the actual finance charge may vary. This change is necessary so that a recipient is better informed that the finance charge may change.

Sections 910(a)(5), 911(a)(6), 914(a)(5), 915(a)(5), 917(a)(5). These revisions add rows to the required disclosures to show the total payments or total estimated payments (where calculating payments with certainty is not possible) that recipients will make over the term of the contract. Providers will also include language explaining that the amount displayed is the total amount of payments or total amount of estimated payments. The addition of the new row necessitated renumbering of subsequent rows in each section. This change is necessary to assist recipients in understanding the total cost of their financing.

Section 910(a)(5)(B). This subdivision was changed to specify that the required information goes in the second column. This is a non-substantive change because subparagraph (A) specifies that the required information there goes in the first column and subparagraph (C)

specifies that the required information there goes in the third column. So, by default, the information required by subparagraph (B) goes in the second column.

Sections 910(a)(6)(B)(i), 915(a)(6)(B)(i). The abbreviation "e.g." was added to the example language, and the abbreviation "etc." was instead replaced with the phrase "or other period." These changes are necessary to clarify that the language provided are examples of periodic payment frequencies.

Section 910(a)(6)(B)(ii). The word "periodic" was added to the second sentence of this clause. The DFPI determined that a description of when each periodic payment will become due would benefit recipients by informing them of the frequency and timing of payments (ex. on the first business day of every month). Conversely, a description of when each irregular payment will become due would be less useful since there are likely not generally applicable descriptions that a provider could use to describe the timing of irregular payments (and the dates of irregular payments are already disclosed in the second column). This change is necessary to ensure that providers are only required to provide an explanation relating to periodic payments in light of the considerations above.

Section 910(a)(6)(C). This paragraph was revised so that a provider does not need to include "a description of when each" periodic payment will become due, but instead only needs to display when payments will become due. This change is necessary because the DFPI determined that listing periodic payments and the periods during which those payments apply would be useful for recipients, but "a description" of when each amount is due could lead providers to use narrative explanations that would overcomplicate the disclosures.

Section 910(a)(6)(D)(i). The word "plus" was deleted from this section. This change is necessary to make the sentence grammatically correct.

A reference to "reasonably anticipated irregular payments" was replaced with a reference to "the date and amount of any irregular payments." "Reasonably anticipated irregular payments" was not a defined term under the rules so the DFPI removed it and replaced it with language describing what information a provider should give to a recipient with respect to irregular payments. This change is necessary to provide clarity as to what information a provider should disclose and ensure that a recipient understands all parts of their potential financial obligations are not periodic payments.

Section 910(a)(6)(D)(ii). This clause was changed to require a specific statement that the payment amount disclosed is the recipient's initial periodic payment, and that the periodic payment may adjust over time. This replaces a requirement that the provider include a statement of how the periodic payment was calculated and that the periodic payment may adjust over time, and an explanation of any irregular payments. The previous version also included permissive language allowing a provider to disclose when the payment will adjust and how it will be calculated. The DFPI determined that an explanation that the payment disclosed is the initial payment would be more useful in setting expectations for the recipient than the previously required and permitted language. In addition, the DFPI determined that it was

unclear what a provider would need to disclose regarding how the periodic payment was calculated or an explanation of periodic payments. Therefore, these changes are necessary to ensure recipients are provided with useful information and providers have clear disclosure standards.

Sections 910(a)(7), 911(a)(8)-(9), 915(a)(7)(C), 916(a)(8)-(9), 917(a)(7)(C). These provisions were revised to eliminate the requirement that a provider include "an explanation of the term" and, instead the cell in the third column is left blank. This revision was made because a stakeholder observed that it would be difficult for providers to ascertain what is required by this requirement. This change is necessary to ensure clarity for providers by eliminating an ambiguous requirement.

Sections 910(a)(9)(A), 912(a)(7)(B)(i)(a), 913(a)(8)(C)(i), 914(a)(10)(A), 916(a)(10)(A), 917(a)(9)(A). The explanatory language was revised to inform recipients that if they prepay or repurchase a legally enforceable claim early, they will "still" need to pay all or a portion of the finance charge. This change is necessary for clarity.

Sections 910(a)(9)(B), 911(a)(11)(B), 913(a)(8)(C)(ii). This language was revised from "other than interest accrued since your last payment" (or "since disbursement" for factoring) to "other than unpaid interest accrued… if applicable)." This change ensures that providers are not required to incorrectly imply that there will always be accrued interest to pay at the time of early payoff. This change is necessary to ensure accuracy of the disclosures.

Sections 910(a)(10)(A)-(B), 911(a)(12)(A)-(B), 912(a)(7)(B)(i)(d), 913(a)(8)(iii)-(iv), 914(a)(11)(A)-(B), 915(a)(10)(A)-(B), 916(a)(11)(A)-(B), 917(a)(10)(A)-(B). "[N]ot already included in the finance charge" was removed from the explanatory language. This change is necessary for brevity.

Sections 910(a)(11)(C), 911(a)(13)(C). This language was revised to require specific language explaining the average monthly cost disclosure to a recipient, rather than requiring a provider to come up with their own language. The DFPI determined that specific language was appropriate here because the required explanation could be consistent across providers. This change is necessary to provide certainty to providers and promote consistency across multiple disclosures for ease of comparison.

Section 910(a)(12). This language was revised to require specific language explaining that the disclosure is based upon the assumption of minimum monthly payments, rather than requiring a provider to come up with their own language. The DFPI determined that specific language is appropriate here because the required explanation could be consistent across providers. This change is necessary to provide certainty to providers and promote consistency across multiple disclosures for ease of comparison.

Section 911(a). This section was revised to clarify that providers of open-end credit plans described in section 900, subdivision (a)(5)(C), should not use the general disclosure for open-

end credit. This section was added to clarify the treatment of transactions in which disclosure of the required terms for an open-end credit plan is not possible at consummation because rates or price vary based upon what purchases a recipient makes with the financing. In these cases, a disclosure on a per-advance basis using the closed-end transaction model is more appropriate. This section is necessary to accommodate a model described by a stakeholder that could not provide meaningful disclosures if required to provide those disclosures at the time the agreement is consummated.

Section 911(a)(4)(C)(iv). A clause was added to include an APR disclosure explanation for open-end credit products that do not have finance charges based upon an interest rate. This change is necessary to ensure that providers of such products can use APR explanatory language that accurately reflects the products they provide.

Section 911(a)(5)(C)(i). Explanatory language was added to this section to help a recipient understand that the finance charge calculation is based upon assumptions disclosed about open-end credit plans at the top of the disclosure. This revision is necessary to ensure recipients understand that the finance charge calculation is based upon previously disclosed assumptions.

Section 911(a)(7)(B). "Over the term the term of the transaction" was added to the end this paragraph. The change is necessary to reflect that periodic payments may vary over time.

Section 911(a)(7)(B)(i). The phrase "each periodic payment" was replaced with "the periodic payment." This change is necessary to clarify that for transactions with a single periodic payment amount, it is not necessary to list each periodic payment separately in the disclosure.

Section 911(a)(7)(B)(ii). A requirement that a provider disclose an explanation of the payment frequency and irregular payments was removed, and a requirement that the provider explain when each payment will become due was added (this disclosure was previously permitted but not required). The DFPI determined that an explanation of the payment frequency was not necessary because this information will be disclosed in the second column. The DFPI removed the explanation of irregular payments because this requirement was ambiguous. The DFPI made the explanation of when each payment will become due mandatory because this information may assist the recipient if they chose to accept the financing. These changes are necessary for clarity, to avoid duplicative disclosures, and to ensure space on the disclosure form provides the most useful information to the recipient.

Section 911(a)(7)(C). This subparagraph was revised to remove language requiring "a description of when each" periodic payment will become due. Providers are still required to indicate when payments are due, but they do not need to provide a description. This change is necessary to ensure the disclosures are not longer than necessary.

Section 911(a)(7)(D)(ii). The DFPI removed the explanation of irregular payments because this requirement was ambiguous. This change is necessary to provide clarity to providers.

Section 911(a)(12)(A). This subparagraph was revised to include the language "the following" prior to a required disclosure regarding prepayment charges. This change is necessary to enhance recipients' understanding of the disclosures.

Section 912(a)(3)(C)(ii). This clause requires the provider to include a short explanation relating to the payment timing used to calculate the APR estimate. This requirement is necessary so that recipients understand the assumptions underlying the APR calculation.

Section 912(a)(3)(C)(iii). The words "of this section" were deleted from this clause and "(a)" was placed in front of a citation to correct a reference. These changes are necessary for brevity and accuracy, respectively.

Sections 912(a)(5)(B), 913(a)(6)(B). An "N/A" was added to this section because N/A means the same thing as NA or not applicable. This is not a material change and is necessary for clarity.

Section 912(a)(7)(A). The title of this disclosure was renamed "Repurchase Costs" rather than "Prepayment" to reflect that for a factoring transaction, recipients do not typically make payments and instead sell existing receivables to the provider. This change is necessary so that the language of the disclosure more accurately reflects characteristics of factoring transactions.

Section 912(a)(7)(B)(i)(b). Language in the required disclosure was revised from "any portion of the finance charge other than interest earned since disbursement" to "any portion of the finance charge other than unpaid increase accrued since disbursement." This change is necessary to clarify that in the applicable scenario, only unpaid interest needs to be paid if the recipient chooses to repurchase the receivables.

Section 913(a)(4)(C). This subparagraph was revised to remove a reference to an "invoice" and replace it with a description of the legally enforceable claim assigned. This change is necessary to provide flexibility to factoring companies that purchase legally enforceable claims other than invoices.

Section 913(a)(7)(C). The example language for providers was revised to add the following underlined language: "The invoice may be paid sooner or later than the due date." This language is necessary to reflect that factoring companies assume the risk that a legally enforceable claim will not be paid on the due date.

Section 914(a)(3)(C). This subparagraph was revised to clarify in language provided to the recipient that the calculation assumes a specific estimated "average" monthly income and to clarify that the provider will disclose the average monthly income used to calculate the APR estimate. These changes are necessary to allow all providers to use income estimates to disclose a single income number to the recipient, even if their APR calculation is based upon assumptions of changing monthly income over time. Displaying a range of monthly incomes could overwhelm recipients reviewing the disclosure.

An additional sentence was added to the disclosure provided to the recipient: "Since your actual income may vary from our estimate, your effective APR may also vary." This change is necessary to inform recipients that APR is in part a function of how quickly a recipient repays an advance, which is determined by a recipient's income in the context of sales-based financing.

Section 914(a)(3)(D). The disclosure language provided to the recipient was revised to remove a reference to the "amount of the finance charge" and replace it with a reference to "[t]he cost of the financing." This change is necessary because the DFPI determined that the revised explanatory language is more comprehensible for the recipient.

Section 914(a)(4)(A). The word "estimated" was removed from the heading "Finance Charge." This change is necessary to reflect that for sales-based financing, the finance charge typically does not vary based upon performance.

Section 914(a)(5)(B). This subparagraph was changed to specify what the required information goes in the second column. This is a non-substanative change because subparagraph (A) specifies that the required information there goes in the first column and subparagraph (C) specifies that the required information there goes in the third column. So, by default, the information required by subparagraph (B) goes in the second column.

Section 914(a)(6)(B)(i). This provision was revised such that the provider need only disclose an estimate of the average estimated periodic payment, rather than a schedule of estimated periodic payments based upon the provider's income estimates for the recipient. This change is necessary for brevity and to ensure that recipients are not provided with a disclosure that could create the impression that they have a set payment schedule.
f
Section 914(a)(7)(B)(ii). Language was added to this clause to reflect that a financer should disclose if a financing does not have a fixed payment schedule or minimum payments. This change is necessary to enhance recipients' understanding of how payments under the financing agreement are structured.

Section 914(a)(10)(B). The phrase "other than unpaid interest owed since your last payment" was revised to "other than unpaid interest accrued." This change is necessary for brevity.

Seciton 914(a)(9) through (11): References to the "seventh" and "eighth" rows in these paragraphs were changed to the "eight" and "ninth" rows, respectively. This is a non-substantive change because the requirements for the preceding seven rows are outlined in the preceding seven paragraphs. So, by default, the information required by these paragraphs go in the eight and ninth rows.

Section 915(a)(2)(B). The language of this subparagraph was revised to require a disclosure of the defined term "amount financed" rather than specific calculations previously described

under this subparagraph. This revision is necessary for brevity and for consistency across multiple disclosure formats.

Section 915(a)(6)(B)(ii). This section was revised to require a description of the payment and purchase option, rather than an explanation of irregular payments. The DFPI determined that requiring an explanation of irregular payments was open to interpretation by providers and that a description of the payment and purchase option would provide more useful information to recipients. These changes are necessary for clarity and to better assist recipients in understanding elements of their financing.

Section 915(a)(6)(C). This subparagraph was revised to delete a requirement that a provider include "a description of when each amount will become due" in the second column. Instead, the subparagraph now requires the provider to disclose "when each amount will become due." This change is necessary to ensure readability for recipients because the purpose of the payment disclosure in the second column is to list payments, with explanatory language appearing in the third column.

Section 915(a)(9)(A). The following revisions were made to the disclosure language provided to recipients: "[Y]ou will be required to pay all or a portion of the finance <u>charge</u> other than <u>accrued and unpaid</u> interest ~~since your last payment~~…" This change is necessary to ensure clarity of the disclosures.

Section 915(a)(9)(B). The following revisions were made to the disclosure language provided to recipients: "[Y]ou will not be required to pay any portion of the finance charge other than <u>unpaid</u> interest ~~owed since your last payment~~ accrued." This change is necessary for brevity.

Section 916. Language excluding inventory financing from this section was removed because the regulations did not define inventory financing. This change is necessary for clarity.

Section 916(a)(2). This paragraph was revised to provide example language that mirrored revisions to the permissible assumptions for asset-based lending disclosures. This change is necessary to maintain consistency with other sections.

Section 916(a)(4)(A). The term "estimate" was replaced with the word "estimated." This change is necessary to maintain consistency with language used for other estimated disclosures.

Section 916(a)(6)(B), (a)(13). Language requiring disclosures of payment amounts and timing was removed and replaced with a general requirement that the provider include an explanation of how balances on an account are repaid. This change is necessary to reflect that asset-based lending transactions typically involve recurring draws and are repaid through recipients' receipts (not with scheduled periodic payments).

Sections 916(a)(10)(B), 917(a)(9)(B). Disclosure language was modified as follows: "[O]ther than <u>unpaid</u> interest ~~owed since your last payment~~ accrued." This change is necessary for brevity.

Section 917(a)(6). The phrase "the following language" was revised to "the following information." This change is necessary for consistency with other parts of the regulations.

Section 920(c). This subdivision was added to explain that signed disclosures are only required for consummated transactions, especially in a situation where a provider gives multiple disclosures for multiple offers. Based on public comments, stakeholders were uncertain if they needed to obtain signatures on every disclosure and argued to do so would be burdensome on both the provider and recipient. This section is necessary to clarify when a signature is required.

Section 921(a)(2)(A)(iii). This clause was modified, based on public comments, to represent a situation more accurately in an asset-based lending transaction. This modification is necessary to clarify how a provider should evaluate whether a particular transaction is subject to the regulations.

Section 921(a)(3)(A)(iii). This clause was modified, based on public comments, to represent a situation more accurately in a factoring transaction. This modification is necessary to clarify how a provider should evaluate whether a particular transaction is subject to the regulations.

Section 921(a)(4). This paragraph, as originally noticed to the public, was deleted because it is no longer necessary. Due to modifications to the definition sections, the lease financing threshold is covered by the catch-all provision.

Section 921(a)(5). This paragraph, as originally noticed to the public, was renumbered paragraph (a)(4). It was also modified to use a defined term "amount financed" for all other transactions. These changes are necessary to improve clarity and ensure consistency in the regulations.

Section 930(b)(1). This paragraph was changed to identify more clearly what the estimated monthly sales, income, or receipts projection must be based upon. In particular, a provision was added to account for a provider considering other payment channels in calculating the average. This provision is necessary to clarify what information may be included in the calculation.

Section 930(b)(2). This paragraph was changed to clarify that a provider may fix the number of months used to calculate the historical average based on several categories, e.g., the recipient's industry, etc. This section is necessary to provide guidance on how providers should perform their calculation.

Section 930(b)(3). This paragraph, as originally noticed to the public, was deleted because based on the other clarifying revisions to section 930, it was no longer needed.

Section 930(b)(4). This paragraph, as originally noticed to the public, was renumbered as paragraph (b)(3). The provision was also slightly modified for consistency by removing superfluous language. This change is necessary to improve the clarity of the section.

Section 930(b)(4). This paragraph was added to provide additional flexibility in the calculations required under section 930. Specifically, it adds exceptions for providers to exclude certain months from the calculations. The Department learned via comments that it is not uncommon in the sales-based financing industry for outlier months to occur (e.g., during the COVID-19 pandemic) in which sales are greatly reduced from their norm. This provision is necessary because including such an outlier month in the calculation could unfairly bias the average calculation. This section also permits a provider to exclude any months for which a recipient does not provide the requested documentation. This paragraph is necessary to account for that situation which would otherwise be confusing to providers and could result in an inconsistency in how the estimated monthly sales, income, or receipts projection is calculated.

Section 930(b)(5). This paragraph was added to address the situation where a recipient submits to a provider monthly sales, income, or receipts for a time period outside of what was requested by the provider. It is necessary to clarify how providers should handle that situation as well as enable providers to use that information if it would improve the projection.

Section 930(b)(6). This paragraph was added for accountability purposes. It helps to ensure the provider will be consistent in how it calculates its projections and have a record of when the number of months considered changes. This paragraph is necessary to help ensure clear and consistent disclosures by providers.

Section 930(c). This subdivision was slightly modified for consistency by removing superfluous language. This change is necessary to improve the clarity of the subdivision.

Section 931(a)(4)(A). This subparagraph was changed in a few ways. First, it was changed to more clearly explain that the specified situations are exclusions that should not be included in an audit. This clarification is necessary to minimize confusion amongst providers performing audits under this section. Second, it was changed to expressly include transactions with contractually required true-up payments. This change is necessary because payment changes pursuant to the contract reflect performance under the contract terms and therefore are appropriately captured during an audit. Finally, an additional excluded transaction was added: transactions where the provider has modified contract terms pursuant to an agreement with the recipient. This is necessary to address the situation, similar to the first two exclusions, where a payment issue may exist and the provider and recipient agree to a modified agreement to address that issue.

Section 931(a)(4)(B). This subparagraph was changed to refer to the annual percentage rate rather than the annualized rate. This change is necessary to make clear there is no difference between the two terms, and to be consistent throughout the regulations.

Section 931(a)(4)(C). This section was changed to require the calculation of the percentage change between the disclosed APR and the retrospective APR rather than the difference between the two numbers. This change is necessary to calculate the percentage change from the disclosed APR versus the retrospective APR, which provides a more informative metric than a difference when calculating the weighted average of spreads in the following sections.

Section 931(a)(5). This paragraph was changed to require a weighted average for the last seven audits (in addition to the last three and five). This was changed to account for possible aberrations in a shorter term average. Like the original three and five audits, the Department determined this section is necessary in order to ensure that a provider's use of the "internal estimated monthly sales, income or receipts projection" is fair.

Section 931(a)(5)(A). This subparagraph was changed to raise the acceptable weighted average for three audits because of the newly added seven audit average as well as based on commentary that the thresholds were too limiting as previously written. This is necessary to ensure the "internal estimated monthly sales, income or receipts projection" is a useful tool for both providers and recipients.

Section 931(a)(5)(B). This subparagraph was changed to raise the acceptable weighted average for five audits because of the newly added seven audit average as well as based on commentary that the thresholds were too limiting as previously written. This is necessary to ensure the "internal estimated monthly sales, income or receipts projection" is a useful tool for both providers and recipients.

Section 931(a)(5)(C). The subparagraph was added to create the acceptable weighted average for seven audits. Because it is for a longer period of time, it has a lower threshold, similar to the five audits versus three. The Department determined this is necessary to ensure that a provider's use of the "internal estimated monthly sales, income or receipts projection" is fair and less likely to be "gamed" in a way that would be detrimental to a recipient.

Section 931(a)(5)(D). This subparagraph was added because the Department recognizes that the audit process can be slightly burdensome on providers and highly accurate projections by a provider should result in the ability to conduct audits on a less frequent basis. This is necessary to help ensure a provider's use of the "internal estimated monthly sales, income or receipts projection" is fair but also not overly burdensome.

Section 940(b). This subdivision, as originally noticed to the public, was moved to section 955(a)(1).

Section 940(c). This subdivision, as originally noticed to the public, was renumbered as subdivision (b).

Section 940(d). This subdivision, as originally noticed to the public, was deleted. It was necessary to delete this section to ensure there is no confusion with new section 901(a)(16), which addresses similar information.

Section 940(e). This subdivision, as originally noticed to the public, was renumbered as subdivision (c).

Section 942(a)(4), (b)(4). These paragraphs were modified to remove reference to "penalty" and to clarify which/whose payments were being referenced. These changes are necessary to clarify the information required to be accounted for since not all commercial financing agreements call for "penalty" payments but may still require additional payments when a recipient's ordinary timely payments are not made.

Section 943(a). The Department changed the term "commercial credit transaction" to "commercial financing transaction." This change is necessary to ensure consistency in the rules, as commercial credit transaction was not a defined term and was intended to mean "commercial financing transaction," which is already a defined term.

Section 943(a)(3). This paragraph was reworded to make clear the intended calculation to be performed to calculate the finance charge for factoring transactions. This change is necessary to make sure factoring providers are calculating the finance charge correctly, and it was previously worded in a confusing manner.

Section 943(a)(4). This paragraph was modified to use a new defined term "amount financed." This change is necessary for both clarity and brevity.

Section 943(c). This subdivision was added to address a situation where a particular charge meets the definition of more than one subdivision, above. This subdivision helps to ensure a recipient will receive accurate disclosures and is necessary to clarify how providers should address that situation and prevent charges from being counted more than once.

Section 950(a)(2), (3). These paragraphs were changed to use the definition "approved credit limit" (set forth in section 900, subdivision (a)(2)) as well as to establish necessary assumptions for the provider to use in making the required disclosures by way of an example transaction. These changes are necessary to ensure recipients can make meaningful comparisons between different asset-based lending disclosures/offers. By fixing certain assumptions to be made by the provider in making disclosures by way of an example transaction, these changes promote uniformity and prevent assumptions that could have led to vastly different disclosures between different providers.

Section 951(b), (c). These subdivisions were changed to use the definition "approved advance limit" (set forth in section 900, subdivision (a)(1)) rather than a term that was previously undefined (maximum aggregate purchase price). The changes are necessary to clarify the dollar amount to be used in a factoring disclosure by way of example transaction.

Section 952(a)(1). This paragraph was changed to use the new defined term "specific commercial financing offer" for when a financer should provide a broker with a copy of compliant disclosures. This paragraph aids the statutory objective that recipients receive timely

and accurate disclosures. This change is necessary to be consistent with the new defined term
"specific commercial financing offer" and to clarify when a financer should provide compliant
disclosures to a broker.

Section 952(a)(2). This paragraph, as originally noticed to the public, was renumbered as
subdivision (d).

Section 952(a)(3). This paragraph, as originally noticed to the public, was renumbered as
paragraph (a)(2) and is otherwise unchanged.

Section 952(a)(4). This paragraph, as originally noticed to the public, was renumbered as
paragraph (a)(3). In addition, it was updated for clarity in light of the changes to section 952,
subdivision (a)(1). It was also updated to make the procedures a financer should develop to
ensure recipients properly receive their disclosures from a broker suggestive rather than
mandatory. These changes are necessary to provide more flexibility to the financer in
determining what procedures it should use when working with brokers to ensure disclosures
are properly made.

Section 952(b). This subdivision was revised to better identify the circumstances in which a
broker must transmit compliant disclosures to a recipient. A portion of this section was deleted
to avoid conflicting with new section 952, subdivision (c). The changes aid the statutory
objective that recipients receive timely and accurate disclosures. These changes are
necessary to clarify that a broker is obliged to communicate disclosures and to help financers
ensure that their broker-partners are providing disclosures prior to extending a specific offer of
commercial financing.

Section 952(c). This subdivision, as originally noticed to the public, was renumbered as
subdivision (f). The new subdivision (c) incorporates changes made to subdivision (b) as to
when a broker must provide a specific offer of commercial financing. This change is necessary
to help ensure recipients receive accurate and timely disclosures.

Section 952(d). This subdivision was previously numbered as subdivision (a)(2). Other than a
slight rewording, it is unchanged. The slight rewording is necessary to make clear it is in its
own subdivision now (previously it was listed as a paragraph under a general subdivision
identifying the duties of financers).

Section 952(e). This subdivision makes clear that even if a provider works with a broker to
provide offers of commercial financing, it may simply provide the required disclosures directly
to a recipient to avoid having to comply with subdivision (a). This subdivision is necessary to
afford flexibility to how the commercial financing industry conducts itself and ensure that
recipients receive accurate disclosures in a timely manner.

Section 952(f). This subdivision was previously numbered as subdivision (c). No substantive
changes have been made to this subdivision.

Section 954(a). This subdivision is unchanged other than numbering (previously section 3025, subdivision (a)).

Section 954(b). This subdivision was added to help clarify what information a provider may rely upon to make the determination that a recipient's business is "principally directed or managed from California." This subdivision is necessary to help ensure that there is no confusion about to whom disclosures must be made.

Section 955(a)(1). This paragraph was previously under section 940, subdivision (b). It was modified only to update its internal cross-reference.

Section 955(a)(2). This paragraph clarifies that a disclosure of APR is considered accurate for an irregular transaction if it is within a certain range an APR calculated pursuant to section 940. It is necessary in order to afford providers a slightly larger safe harbor in irregular transactions.

Section 955(a)(2). This paragraph had the word "or" added to the end (moved from (a)(1)) since previous subsection (a)(2) was renumbered (a)(3). The change was made for grammatical consistency and clarity because when describing three alternatives, the "or" always precedes the last alternative listed. This is a non-substantive change.

Section 955(a)(3). This paragraph clarifies that a disclosure of APR pursuant to sections 910 through 917 is considered accurate if the difference between the disclosed amount and the APR calculated pursuant to section 940 is less than a certain amount. The paragraph also makes clear how to perform this calculation. This paragraph is necessary to afford providers a small safe harbor in making a calculation that can vary significantly based on small changes in the input data.

Section 955(a)(3). This subdivision was modified to remove the superfluous word "section" after "section 940." This change was grammatical in nature and non-substantive since the second "section" that was removed provided no additional meaning.

Section 955(b). This subdivision clarifies that, in the event an error in disclosure that does not comply with this subchapter occurs, so long as that error was inadvertent and is discovered within a certain amount of time, the provider/financer may avoid liability for the error in the disclosure by making certain corrections and adjustments and notifying the recipient. This subdivision is necessary to afford providers a safe harbor not only for typos or software errors in making the required disclosures but also to acknowledge that the disclosures may be sensitive to slight variations in the input data.

Section 955(c). This subdivision clarifies that, in the event a provider inadvertently makes a disclosure that exceeds the amount required to have been disclosed (e.g., the amount that should have been disclosed is a lower APR, finance charge, etc.), the provider/financer shall have no liability for such disclosure. This subdivision is necessary to afford providers a safe

harbor for inadvertently making a disclosure that does not put the recipient in a worse position than if the disclosure had been made correctly initially.

Section 956(a)(1). This paragraph specifies that the itemization form must state the recipient funds (defined in section 900, subdivision (a)(26)). It is necessary to make clear to the recipient how much they are receiving directly out of the total amount financed after all deductions, payments on the recipient's behalf, etc., have been made.

Section 956(a)(2). This paragraph specifies that the itemization form must state the amount being paid to the recipient's pre-existing account with the financer, if any. This section is necessary because, based on information received by the Department during comment periods, it is common in the commercial financing industry for recipients to enter into subsequent transactions with providers, often using part of a new financing to pay off a previous financing.

Section 956(a)(3). This paragraph specifies that the itemization form must state the amount being paid to third parties on the recipient's behalf, if any. This paragraph is necessary because, based on information received by the Department during comment periods, it is common in the commercial financing industry for recipients to use the financing to pay suppliers or other related entities, as well as enter into new transactions with different providers, often using part of a new financing to pay off a previous financing with a different provider.

Section 956(a)(4). This paragraph specifies that the itemization form must state the dollar amount of the previous line items added together and described as the "Amount Provided to You or on Your Behalf." This paragraph is necessary to show the total amount, minus any finance charge, being provided to the recipient or on the recipient's behalf as a single dollar amount.

Section 956(a)(5). This paragraph specifies that the itemization form must state the prepaid finance charge, if any. This paragraph is necessary to show an accurate and complete breakdown of the total amount financed by the recipient.

Section 956(a)(6). This paragraph specifies that the itemization form must state the total amount financed, as well as how it was calculated. This paragraph is necessary to show an accurate and complete breakdown of the total amount financed by the recipient.

Section 956(b)(1). This paragraph provides an example itemization form where no funds of the amount financed are credited to the recipient's pre-existing account with the financer (under subdivision (a)(2)). It is necessary to show what an itemization form should look like in order to comply with the requirements of section 956.

Section 956(b)(2). This section provides an example itemization form where a portion of the amount financed are credited to the recipient's pre-existing account with the financer (under

subsection (a)(2)). It is necessary to show what an itemization form should look like in order to comply with the requirements of section 956.

Section 956(c). This section provides information on how the itemization form should be included with the other disclosures. This section is necessary to ensure consistency between transactions as to this disclosure.

Section 3000. This section was deleted prior to the renumbering of the regulations. The Department deemed it necessary to delete this section because it was duplicative of existing law and risked confusing both providers and recipients.

**SUMMARY AND RESPONSE TO COMMENTS RECEIVED DURING THE INITIAL 45-DAY COMMENT PERIOD FROM SEPTEMBER 11, 2020 to OCTOBER 28, 2020**

The initially proposed regulations were made available for public comment for at least 45 days from September 11, 2020 to October 28, 2020.

**Comment Letter 1.1 dated October 28, 2020 from Electronic Transactions Association ("ETA")**:

Comment 1.1.1. ETA proposes a lengthy statement of "commercial loan principles" to guide transparency and disclosure. However, ETA does not specify if this statement should be made part of the regulations.

Response to Comment 1.1.1. The Department declines to include the proposed "commercial loan principles" as it believes the regulations already adequately cover much of the information identified by the statement. Furthermore, the principles risk confusing stakeholders and does not cover the numerous potential transactions for which the disclosures are intended to be required.

Comment 1.1.2. ETA argues that any provision requiring the disclosure of APR should be deleted (and replaced with Total Cost of Capital "TCC") for several reasons:

- Mandating the calculation of APR under TILA in a commercial setting would result in different calculations depending on the product, even if the overall repayment amount is the same. For example, TILA does not contemplate loans paid daily. The regulations do not address this issue, which could result in different APRs depending on how a lender chooses to calculate it.
- APR calculations are highly duration-sensitive for loans of less than one year. In other words, APR increases rapidly the shorter the loan term.
- TCC is more useful for comparing the total cost of a loan with a small business's expected return from investing the loan proceeds.
- Certain financing products, such as MCAs, have a fixed cost but no fixed term and are paid through a set percentage of small business's future

sales/receivables. APR is imperfect for this type of transaction.

Response to Comment 1.1.2. The Department acknowledges that providers of certain types of financing are not used to having to calculate APR and that doing so may initially present challenges, however, the Department disagrees that TCC is a reasonable alternative to APR because it does not result in a calculation that represents the total cost of financing expressed as an annualized rate, as required by Financial Code section 22802, subdivision (a)(6).

Comment 1.1.3. ETA argues that for some types of financing products, the proposed regulations may require financers to provide an intricate set of assumptions to generate estimates. ETA worries that this may result in disclosure that is more complicated and difficult to understand than disclosure that explains pricing in "plain English." ETA suggests that the final regulations should provide that calculations based on specified assumptions shall not be used as the basis for any civil claim as long as the assumptions are disclosed in the manner required by the regulations.

Response to Comment 1.1.3. The Department declined to implement this proposed change because it would provide a shield to liability for providers who purposefully mislead recipients by quoting unrealistically low payment and APR estimates.

Comment 1.1.4. ETA argues that mandating the use of the historical method where APR calculations were beyond accepted thresholds using the underwriting method could result in difficult-to-understand scenarios in which the estimated term is longer than a loan's maximum term. ETA further argues that the APR spreads themselves are unnecessarily burdensome since providers are required to use the best information available when making the estimates and ETA fails to see how this will benefit small businesses. ETA recommends making the permitted APR spreads broader, and that there should be no penalty for over-estimating APR since there is no harm to the small business in such a situation.

Response to Comment 1.1.4. The Department partially agrees with ETA's comment and based on its comment and comments from other stakeholders, the Department amended the audit thresholds to make them higher in the short term (15 percent rather than 10 percent for the last three audits, 10 percent rather than 5 percent for the last five audits) and added an additional retrospective review for the last seven audits that's maintains a threshold of 5 percent. This provides more leeway in the rollout of the underwriting method while ensuring that over the long term, providers do not significantly underestimate recipients' future incomes, payments, and APRs. The Department respectfully disagrees that the APR spreads are unnecessary since they provide an important mechanism to help ensure unscrupulous providers do not take advantage of borrowers by using this estimation method. The regulations as drafted do not provide a penalty for over-estimating APR, so no change was made in response to the last part of ETA's comment.

Comment 1.1.5. ETA argues that the final regulations should clarify that finance charge and APR disclosures for open-end credit may be provided in accordance with Regulation Z's provision for prospective disclosures for open-end credit.

Response to Comment 1.1.5. The Department declines to adopt ETA's proposed approach because the proposed approach would undermine a recipient's ability to compare open-end credit products to other financing options. Furthermore, the TILA approach to APR calculation for open-end credit fails to account for finance charges incurred at origination, which can result in APR disclosures that in some cases do not incorporate some or all the costs associated with financing.

Comment Letter # 1.2. Dated October 27, 2020 from the Commercial Finance Coalition (CFC").

Comment 1.2.1. CFC, represented by Katherine Fisher of the law firm Hudson Cook, makes various arguments against the DFPI's decision to require providers to disclose an APR as the annualized rate metric required by Financial Code sections 22802, subdivision (b)(6) and 22803, subdivision (a)(6). (See, e.g., sections 914, 940.)

The CFC states that the DFPI cannot require disclosure of APR for a Merchant Cash Advance (MCA) provider because "[t]he TILA APR disclosure is based on the consumer's *legal obligations* with the creditor. This 'legal obligation' standard means that, in disclosing costs of credit, the creditor is not required to (and in fact, may not) predict the actual timing of a consumer's payments or other factors that would impact the APR that are not legal obligations under the terms of the agreement."

Response to Comment 1.2.1. The DFPI rejects this argument because the CFC provides no citation or support for the proposition that a contractual agreement of an MCA recipient to pay a provider a percentage of the recipient's sales is not a "legal obligation." To the contrary, the DFPI concludes that MCA agreements do involve legal obligations, because the MCA industry could not survive if a merchant's agreement to pay a percentage of their future receivables did not create a binding legal obligation for the merchant.

The DFPI understands that a recipient's legal obligation to pay the MCA provider may be contingent or flexible based upon the recipient's sales. However, requiring a provider to estimate the recipient's future sales to calculate an APR does not appear at odds with the federal Truth in Lending Act (TILA) and its implementing regulation, Regulation Z, for at least two reasons. First, Regulations Z explicitly allows for disclosures based upon estimates using "the best information reasonably available at the time of disclosure." (12 C.F.R. § 1026.17(c)(2)(i).) Second, it is the DFPI's understanding that some merchant cash advance providers, including members of the Innovative Lending Platform Association, already disclose APR to potential MCA funding recipients.[1] If an APR disclosure were fundamentally at odds with TILA, the DFPI would have received some evidence in comments from stakeholders during the comment periods, but the DFPI did not.

---

[1] See ex. Smart Box disclosure. https://innovativelending.org/wp-content/uploads/2019/09/mca_smartbox.pdf.; https://www.prnewswire.com/news-releases/nations-top-online-small-business-lending-platforms-unveil-smart-box-300349495.html.

Comment 1.2.2. The CFC indicates that APR is an inappropriate metric because it requires
MCA providers to rely on predictions about how the recipient will repay, noting that MCA
providers must use an estimated monthly sales, income or receipts projection. CFC states that
this will result in an APR disclosure that is inherently inaccurate and not representative of the
cost to the MCA recipient.

Response to Comment 1.2.2. The DFPI disagrees with these arguments for multiple reasons.

First, just like other types of financing, MCA providers already engage in underwriting to
assess a recipient's likely income over the course of performance of a contract. For example,
other comments indicate that the MCA providers require applicants to provide a certain
number of months of business bank statements, presumably to get some sense of the
recipient's likely future performance. To be financially viable, MCA providers rely upon their
ability to predict a recipient's future income with a least some accuracy.

Second, while estimates based upon information like this are never guaranteed to predict
future performance, the DFPI believes its regulations will nonetheless provide useful
information to small business owners, who will know when APR and other disclosures are
estimates based upon clear disclosures that such numbers are estimates.

Third, the CFC's arguments concerning APR accuracy are unpersuasive, because the CFC's
proposed alternative, annualized cost of capital, does not resolve any of the supposed
accuracy issues that the CFC objects to with APR. As an alternative to APR, the CFC
recommends that the DFPI adopt Annualized Cost of Capital (ACC) which is calculated using
the following formula:

> ACC = ((Total Dollar Cost of Finance / Total Amount of Funds Provided) x
> 365)/(Term or Estimated Term) x 100

To calculate an ACC, a provider must estimate the term of the MCA transaction, which in turn
requires the provider to estimate a recipient's periodic payments and future income. This is
because a typical MCA transaction without a true-up mechanism requires a small business to
pay back a certain total amount in daily or weekly payments that are equal to a percentage of
income. Thus, as with APR, to determine an estimated term for ACC, an MCA provider would
need to estimate a recipient's income to calculate the amount of the recipient's payments,
which are necessary to calculate how quickly the recipient will pay back the amount required
by the contract.

Comment 1.2.3. For sales-based financing transactions such as MCAs, the DFPI proposed in
section 914, subdivision (a)(4)(C), that when disclosing the finance charge, if the finance
charge will not increase under any circumstance where repayment takes longer than
estimated, the provider may include the following statement: "Your finance charge will not
increase if you take longer to pay off what you owe."

The CFC states that though "the proposed regulations recognize that the recipient will not have
to pay more in this case, the proposed regulations require the provider to disclose an APR that
is calculated by assuming a specific term of repayment. APR is not an effective disclosure for
MCA transactions and particularly so when the cost to the recipient will not increase regardless
of how long the recipient takes to repay the provider."

Response to Comment 1.2.3. The DFPI respectfully disagrees with CFC's assertion. APR was
created, and is used to this day in consumer financing, to allow apples-to-apples comparisons
between financing products that have fixed financed charges (e.g., payday loans) and those
that bear interest (e.g., traditional interest-based installment loans).[2] Fixed costs are
incorporated into APR specifically to allow this apple-to-apple comparison. To the extent that
the CFC is objecting to the fact that calculating APR requires the provider to assume a specific
term of repayment, the same is true for ACC.

Comment 1.2.4. The CFC states that allowing providers to use the terminology "what you owe"
is "legally incorrect, and, at best confusing [for MCAs] where the amount owed is wholly
contingent on the merchant's future sales… Including statements such as 'what you owe' will
likely confuse merchants and discourage merchants from receiving the full benefits of their
transactions with MCA providers."

Response to Comment 1.2.4. The CFC has provided no support for the assertion that "what
you owe" is a legal term of art and thus incorrectly used in this context, and the DFPI has no
evidence to support the CFC's claim. In addition, the DFPI disagrees that the word "owe" is
confusing in the MCA context, given that the typical MCA requires a recipient to pay back an
amount certain unless the recipient's business permanently stops operating. In common
parlance, a recipient would describe this amount as an "amount owed," notwithstanding that
the repayment term is indefinite and the recipient may be able to avoid repayment by taking
the drastic step of permanently closing their business.

Comment 1.2.5. The CFC's Objection to Using APR for Products with Absolute or Contingent
Obligations.

The CFC states that "[f]or MCA transactions, the proposed regulations require APR to be
calculated in a manner that is not based on the legal obligation and is not, therefore, calculated
uniformly when viewed against other products (which use the legal obligation as the basis of
disclosure calculations)." The CFC appears to be objecting to the fact that for products with
absolute or fixed obligations, a provider can disclose an unqualified APR, while providers of
sales-based financing will have to disclose an estimated APR. In this way, the APRs will not be
calculated uniformly.

---

[2] National Consumer Law Center, Truth in Lending (10th ed. 2019), Chapter 1.1.1 "The Purpose of the
Truth in Lending Act" updated at www.nclc.org/library (describing transaction with $100 advance, with
$130 to be paid back over one year).

<u>Response to Comment 1.2.5.</u> This argument is unpersuasive for at least two reasons. First, ACC presents the same issue, as a provider of financing with fixed payment obligations can likely provide an unqualified ACC while a sales-based financing provider must provide an estimated ACC, because the term of the transaction is uncertain. Second, the Legislature anticipated this would be the case, which is why it empowered the Department to decide "[w]hen providers shall be permitted to disclose an estimated annualized rate." (Fin. Code § 22804, subd. (b)(2).)

<u>Comment 1.2.6.</u> Finally, the CFC claims that its concerns about the "historical method" "bring into focus the reasons why APR is inappropriate" for an MCA transaction.

<u>Response to Comment 1.2.6.</u> The DFPI disagrees. As with other CFC critiques of APR, had the DFPI proposed ACC as the annualized rate metric for disclosure, this would not have eliminated the need for rules to calculate monthly future sales. (See response to Comment 1.2.2.)

<u>Comment 1.2.7.</u> The CFC notes that in lieu of allowing providers to choose between 4 and 12 months when calculating a sales average for the historical method, the DFPI could fix the number of months that all providers could use. The CFC then critiques this alternative approach because "whatever term the [DFPI] might deem appropriate may not provide an accurate picture of the historical sales, income, or receipts of that recipient."

<u>Response to Comment 1.2.7.</u> The DFPI declines to adopt the proposal to fix the number of months all providers must use with the historical method, because this unduly limits providers' flexibility and could prevent some providers from aligning the number of months of historical sales they review in underwriting with the number of months they use for the historical method. In addition, if a provider believes it can provide a more accurate picture of future sales using an assessment that diverges from the requirements of the historical method, it can do so using the underwriting method permitted by section 931.

<u>Comment 1.2.8.</u> The CFC's critique of the underwriting method of section 931 mirrors its critique of the historical method. Specifically, the CFC notes that by requiring an MCA company to use "the best information reasonably available" to calculate its disclosures, different MCA companies may provide different disclosures based upon different income assumptions, and this will result in "APR disclosures for MCA transactions" having "little value… in comparing APRs among several potential MCA companies."

<u>Response to Comment 1.2.8.</u> The DFPI disagrees that possible discrepancies in estimates among MCA providers using the underwriting method will diminish the value of APR disclosures by MCA providers. The estimates will be based upon "the best information reasonably available" to each provider, which should allow providers to provide more accurate disclosures by accounting for a business's growth trends, seasonal fluctuations in revenue, etc. Furthermore, section 914, subdivision (a)(3)(C), of DFPI's proposed regulations requires sales-based financing providers to disclose the average monthly income used to calculate

disclosed terms, which will help recipients understand why two identical products from different providers come with slightly different estimates.

Comment 1.2.9. The CFC objects to the proposed audit requirements for the underwriting method (Section 931), because these retrospective audits do "not guarantee that any particular recipient of a merchant cash advance received a reliable APR disclosure." The CFC also states that requiring a provider whose audit results in APR spreads outside of the permitted range to use the historical method "does nothing to address the impact of inaccurate disclosures to recipients of MCA transactions prior to the audit."

Response to Comment 1.2.9. The DFPI notes that the audit's purpose is not to guarantee the accuracy of specific APR disclosures, as imposing this requirement on providers would render compliant disclosures impossible. Rather, the audit requirement ensures that providers do not systemically underestimate APR and payment amount disclosures to small businesses by systemically underestimating businesses' future revenues.

Comment 1.2.10. The CFC also notes that with the underwriting method (section 931), recipients may receive disclosures from one provider who has audited their underwriting method for accuracy and another that has not yet done so. The CFC objects that as a result a recipient cannot know if the APR disclosed to the recipient "is likely to be reliable," and that "MCA providers who have audited their Underwriting Method may be at a competitive disadvantage to those who have not done so."

Response to Comment 1.2.10. The DFPI respectfully declines to amend the regulations in response to CFC's objection. Every provider will be on equal footing in that at some point every provider will be in its first months or years of using the underwriting method. Furthermore, the DFPI does not have reason to believe that new entrants that comply with the underwriting method will systemically underestimate APR rather than overestimate APR. Thus, the DFPI cannot conclude that new entrants will have a market advantage when making disclosures using the underwriting method.

Comment 1.2.11. The CFC also objects to requiring providers whose audits find that the underwriting method underestimates APR to use the historical method because the historical method "is not accurate."

Response to Comment 1.2.11. The DFPI disagrees that the historical method is not accurate. Historical method estimates will be based upon past income, which (though not perfect) is likely indicative of future income as suggested by the fact that MCA providers require this information to underwrite MCAs. The DFPI again notes that the purpose of requiring the historical method after a provider's audits find that its underwriting method is not effective is not to guarantee disclosure estimates that perfectly predict future performance, as imposing this requirement on providers would render compliant disclosures impossible. Rather, the audit requirement ensures that providers cannot continue to use a method that audits have established results in systemic underestimates of APR and payment amount.

Additional Response to Comments 1.2.8-1.2.11. In response to all of the CFC's concerns above relating to the underwriting method, the DFPI notes that, as with other CFC critiques of APR, had the DFPI proposed ACC as the annualized rate metric for disclosure, this would not have eliminated the need for rules to calculate monthly future sales.

Comment 1.2.12. The CFC's Objection to Section 942's Requirements Concerning Minimum and Penalty Payments.

Section 942, subdivisions (a)(3) and (4), and (b)(3) and (4), require that when calculating "estimated payments and reasonably anticipated true-ups" or "estimated monthly cost, finance charge, term, and annual percentage rate" for sales-based financing, a provider must account for "contractual provisions requiring a minimum payment amount" and "penalty payments required when a payment or series of payments falls below a contracted threshold." The CFC objects that this is inconsistent with Regulation Z, which excludes from the finance charge "charges for actual unanticipated late payment, for exceeding a credit limit, or for delinquency, default or a similar occurrence." (12 C.F.R. § 1026.4(c)(2).)

Response to Comment 1.2.12. The DFPI did not intend for section 942 to require a provider to account for charges that result from a recipient's unanticipated default on their payment obligations. Rather, the DFPI intended for a provider to account for products that incorporate revenue-based payment provisions but also include provisions requiring additional payments if a recipient's revenue-based payment falls below a certain threshold.  For example, the PayPal Working Capital is repaid through a chosen percentage of a business's PayPal sales, with a minimum payment required every 90 days. (See October 28, 2020 PayPal Comment to the DFPI.) Section 942, subdivisions (a)(3) and (b)(3), would require PayPal to account for minimum payments in the unlikely (but possible) circumstance that it could anticipate that periodic payments would result in invocation of the minimum payment provision based upon PayPal's calculation of the recipient's future income. To clarify this requirement, section 942, subdivisions (a)(4) and (b)(4), have been revised to require the disclosure to account for "[p]ayments required when the recipient's timely payment or series of payments falls below a contracted threshold."

To illustrate how section 942, and subdivisions (a)(4) and (b)(4) operate, consider a contract where a recipient agrees to pay a provider $10,000 in weekly payments equal to 10 percent of the recipient's weekly revenue. The contract provides that if a recipient's weekly payment drops below $300, the recipient must add $50 to recipient's weekly payment. For a provider that has calculated a recipient's anticipated monthly sales income or receipts projection or internal estimated sales, income, or receipts projection as resulting in a weekly income of $2,000, section 942, subdivisions (a)(4) and (b)(4), would require the provider to account for the $50 additional weekly payment that the recipient will likely be required to make each week, because their weekly payment based upon 10 percent of income would be $200. Many sales-based financing providers might decline to offer such a product, but the DFPI cannot assume that such products are not currently offered or will be offered in the future.

Comment 1.2.13. The CFC's Objection to Section 942's True-Up Requirements.

Section 942, subdivision (a) requires an MCA provider to calculate "reasonably anticipated true-ups" for sales-based financing. Section 900, subdivision (a)(27), defines a "true-up" as "any payment made to a recipient, any charge assessed to a recipient, and any adjustment to recipient's periodic payments pursuant to a true-up mechanism." Section 900, subdivision (a)(29), provides:

> "'True-up mechanism' means, with respect to sales-based financing, a contractual arrangement with all the following elements:
> > (A) The financer receives periodic payments based upon a pre-set amount (or amounts) stated in the contract.
> > (B) The contract allows the recipient to request, or the financer to initiate, adjustments to the payment amount, credits to the recipient, or charges to the recipient after execution of the contract, so that the total amount paid by the recipient more closely reflects a split rate listed in the contract.

Section 900, subdivision (a)(28), defines a "reasonably anticipated true-up" as "any true-up that the financing provider has a reasonable basis to expect will be made during the term of the contract, taking into account past performance of similar contracts (both those made to the recipient and other similar recipients) and the policies and procedures of the financer."

The CFC objects that its "unclear how a provider would 'reasonably anticipate' any true-up" because a provider cannot predict with specificity a recipient's future sales.

<u>Response to Comment 1.2.13.</u> The DFPI disagrees that the regulations as written are not clear with respect to the process by which a provider would calculate "reasonably anticipated true-ups." Section 942, subdivision (a), states that a provider should calculate reasonably anticipated true-ups using either the estimated monthly sales, income or receipts projection described in subdivision (b) of section 930, or the internal estimated sales, income, or receipts projection described in subdivision (a)(3) of section 931. Reasonably anticipated true-ups would be calculated using the anticipated future revenue of the recipient using the historical or underwriting methods for calculating future revenue, taking into account past performance of similar contracts (both those made to the recipient and other similar recipients) and the policies and procedures of the financer.

To illustrate the concept of a reasonably anticipated true-up, consider a financing provider who offers a recipient a $5,000 advance, to be repaid in pre-set weekly payments of $400 until the recipient has paid the provider $6,000. The contract includes a true-up mechanism that provides that at the end of each 28-day period after the advance is made, the recipient may request a refund if their payments over that period exceeded 10 percent of their gross revenue. The provider has calculated the recipient's income using the historical method under subdivision (b) of section 930 to be $3,000 per week. Based upon this revenue projection, the provider could reasonably anticipate a true-up payment of $400 to the recipient at the end of each 28-day period during the performance of the contract if the provider has a reasonable basis to expect the true-up payment to occur taking into account past performance of similar

contracts (both those made to the recipient and other similar recipients) and the policies and procedures of the financer. If the provider advertises its true-up feature and regularly initiates true-ups for its customers, then it should account for the $400 true-up payment to the recipient after each 28-day period. Conversely, if the provider's true-up mechanism is not effectively disclosed to customers or difficult to use, such that a true-ups rarely occur, the provider would not account for such true-up payments. The DFPI recognizes that many sales-based financing providers might decline to offer a product structured like the product above, but the DFPI does not assume that such products are not currently offered or could be offered in the future. Further, in the DFPI's experience, many recipients of sales-based financing are never aware of the availability of true-up provisions and providers sometimes impose requirements on true-up requests that can make obtaining a true-up payment from a provider difficult.

Comment 1.2.14. The CFC's Objections to the Costs of APR Disclosures.

The CFC maintains that the costs of the APR disclosures required by the proposed regulation outweigh the benefits to financing recipients. The CFC notes that providers may incur costs to program APR calculations into their computer systems or purchase new systems capable of calculating APR, and that these systems will also have to be capable of maintaining the companies estimated monthly sales, income or receipts projection or internal estimated sales, income, or receipts projection. Finally, the CFC notes that providers will have to periodically test the accuracy of their calculation, and that most MCA companies do not have a loan origination system that could calculate an estimated APR for a transaction. The CFC also objects that disclosing APR will impose unnecessary legal and compliance costs.

Response to Comment 1.2.14. With respect to additional costs necessary to estimate sales, income or receipts, the DFPI notes that as with other CFC critiques of APR, had the DFPI proposed ACC as the annualized rate metric for disclosure, this would not have changed the costs associated with such estimates because such estimates would be necessary to determine an estimated term to calculated ACC. The DFPI also believes that providers can collect much or all of the data necessary to calculate such estimates as part of their underwriting process, which should reduce related costs. While the DFPI recognizes that APR is more difficult to calculate mathematically than ACC, calculating an APR based upon estimated payments is not a complicated task for individuals with minimal training and can be accomplished in widely available spreadsheet programs.[3] Although many MCA companies may decide to acquire APR calculation programs to assist them in complying with the DFPI's proposed regulation, the DFPI believes any addition compliance costs are outweighed by the benefits to recipients who will be better able to comparison shop for financing. The Responsible Business Lending Coalition (RBLC), a coalition that representing an array of groups including for-profit small business financing companies, noted in its October 28, 2020 comment letter to the Department that it believes the cost to providers of complying with this

---

[3] See Appendix A to Responsible Business Lending Coalition Comment Letter dated September 9, 2019 (submitted in response to the DFPI's Second Invitation for Comments on Proposed Rulemaking) and Comment dated November 22, 2021 from the Consumer Federation of California, Responsible Business Lending Coalition, and California Association for Micro Enterprise Opportunity.

regulation will be small and absorbable because most commercial financing providers already provide some type of disclosure, some providers (including MCA providers) already disclose APR, and other MCA providers advertise rates of return to investors. (Comment letter dated October 28, 2020 from RBLC, p. 6.) RBLC further states based upon the experience of its members that providing disclosures with APR does not require a costly third-party vendor. RBLC also maintains that any additional costs imposed by the regulatory requirements will be outweighed substantially by the benefits small business receive when they receive lower-priced financing that disclosures requirements will encourage through healthier price competition among providers (*Id.* at p. 7-8.) RBLC shared examples of multiple fees charged in commercial financing transactions that did not appear to bear any relation to provider costs, and aggressive marketing through brokers who can increase the cost of the financing transactions to increase what they earn, as evidence that the commercial financing market is not currently competitive. (*Id.* at 10-11.)

Comment 1.2.15. The CFC objects that requiring MCA providers to disclose an APR because they believe that doing so will lead "many merchants and some courts" to believe "the MCA company is charging interest on the transaction."

Response to Comment 1.2.15. The DFPI's proposed regulations avoid potential merchant confusion by requiring that if no part of the finance charge is based upon interest, a sales-based financing provider must disclose that "APR is not an interest rate. The cost of this financing is based upon fees charged by [financer] rather than interest that accrues over time." (Section 914, subd. (a)(3)(D).) The DFPI also disagrees with the proposition that disclosing APR as required by the proposed regulation will lead courts to conclude that transactions that would otherwise have been characterized as sales are instead characterized as loans. The DFPI sees no reason why a court would consider a mandatorily required APR disclosure to be evidence that a true sale is a loan when the DFPI has made clear that the proposed regulations apply to loans and non-loans alike.[4]

Comment 1.2.16. Proposed ACC Method. As an alternative to APR, the CFC proposes that the DFPI adopt ACC as the annualized rate disclosure, which it defines as: ((Total Dollar Cost of Financing / Total Amount of Funds Provided) x 365)/(Term or Estimated Term) x 100.

Response to Comment 1.2.16. The DFPI again notes that choosing ACC over APR will do nothing to resolve the alleged difficulties calculating sales, income or receipts estimates for recipients, because such estimates would be necessary for a provider to calculate an estimated term for ACC. (See Response 1.2.2.)

Furthermore, the DFPI does not believe ACC is a reasonable alternative to APR, because it does not accurately reflect the cost of capital expressed as an annualized rate. Specifically, ACC fails to account for the time value of money, resulting in calculations that do not

---

[4] This statement is not intended to imply the DFPI has determined that any particular MCA or MCAs generally are not loans under California law.

distinguish between transactions that have very different real costs for consumers. To illustrate, consider the two examples below:

Example #1: Different Payment Schedules.

The starkest illustration of the deficiencies of ACC (and the advantages of APR) comes when comparing two transactions with identical term, advance and payback amounts, but different payment schedules. Consider two transactions in which a recipient will receive $25,000 on March 1, 2021, with a commitment to pay back $30,000 over a 10-month term. In Transaction A, the recipient will pay back the amount advanced in 10 monthly payments of $3,000. In Transaction B, the recipient will pay back $25,000 after the first month, and $5,000 after the 10th month. The ACCs for these transactions are identical, notwithstanding that in Transaction B, the recipient must pay back the entire amount advanced in the first month, leaving the recipient with substantially less liquid assets for most of the remaining 9 months. By contrast, APR reflects the more advantageous terms of Transaction A with a lower APR as compared to Transaction B's APR.

Example #2: Identical Transactions in First 120 days, Extra Costs Thereafter.

ACC is also a problematic measure because a provider can lower an ACC calculation by increasing costs to the recipient. Suppose in Transaction C, a provider agrees to advance a recipient $5000 on March 1, 2021, with a commitment to pay back $6000 in six monthly payments of $1000. This transaction has an ACC of 39.46 percent. Now suppose that the same provider wants to be able to disclose a lower ACC to potential customers. Counterintuitively and contrary to SB 1235's (Stats. 2018, ch. 1011) purposes, the provider could do this with ACC by tacking additional charges on to the end of the term of the transaction. For example, by adding four additional monthly payments of $100 to the end of the term, the provider could lower the disclosed ACC of the transaction to 33.29 percent. By contrast, addition additional payments would increase the disclosed APR, with the higher APR reflecting that a recipient is not made better off by extending the term with additional payments.

Comment 1.2.17. The CFC's Comment Relating to Disclosure Form Testing. The CFC requests information on the DFPI's previous request for proposal seeking a contractor to assist in testing various versions of commercial disclosure forms.

Response to Comment 1.2.17. This comment does not relate to the form or content of Department's regulation so does not require a response under the Administrative Procedure Act ("APA"). Furthermore, disclosure testing was not mandated by statute. Although a response to this comment is not required, the DFPI has concluded that it will not be pursuing testing at this time.

Comment 1.2.18. The CFC's Comment Regarding the Definition of Sales-Based Financing.

Subdivision (a)(22) of section 900 defines sales-based financing as a "commercial financing transaction that is repaid by a recipient to the financer as a percentage of sales or income, in

which the payment amount increases and decreases according to the volume of sales made or
income received by the recipient. Sales-based financing also includes commercial financing
transactions with a true-up mechanism." The CFC suggests that this definition means that the
recipient's obligation to repay is contingent on the recipient's volume of sales made or income
received. The CFC objects to the proposed definition of closed-end transaction, which includes
a "transaction in which credit is extended only once over a specific term (including contracts
that include an option in which the recipient may extend the term), and is repaid… in the case
of sales-based financing, in payments calculated as a percentage of sales or income but with a
minimum required payment or payments such that the recipient is eventually required to repay
the amount advanced regardless of the sales or income the recipient collects." (Section 900,
subd. (a)(8).)

The CFC claims that acknowledging that some closed-end transactions are also sales-based
financing (and vice-versa) causes confusion, and the CFC asks the DFPI to revise the
regulation to clarify that a sales-based financing transaction excludes a transaction with an
unconditional obligation to repay.

<u>Response to Comment 1.2.18.</u> The CFC's claim appears to arise from the CFC's misreading of
the definition of sales-based financing at section 900, subdivision (a)(22). Contrary to
the CFC's contention, the definition does not say that for a financing to qualify as sales-based
financing, the recipient's obligation to repay is contingent on the recipient's volume of sales
made or income received. Rather, it says that it is a transaction repaid as a percentage of
sales or income, in which the payment amount increases, or decreases based on income.
Thus, a transaction with a minimum required payment that also incorporates a payment
mechanism where payments may adjust based upon sales, income, or receipts, would qualify
as sales-based financing under the proposed definition, as would similar transactions with no
minimum payment mechanism.

The DFPI declines to adopt the CFC's request to change the definition of sales-based
financing to exclude transactions with an unconditional obligation to repay for two reasons.
First, the DFPI believes that attempting to define what disclosures are required based upon the
sometimes difficult (and fact-based) question of whether a transaction includes the equivalent
of an unconditional obligation to repay would introduce undue complexity to the regulations.[5] A
provider should be able to decide which disclosure to provide based upon basic attributes of
the transaction, without concern for whether choosing one disclosure structure over another
amounts to a concession that the transaction involves an unconditional obligation to repay.
Second, the DFPI believes that the regulations for sales-based financing are more appropriate
for closed-end transactions with sales or income-based payment provisions that have
minimum payment requirements than the general regulations for closed-end-transaction
regulations. For example, the closed-end transaction formatting requirements of section 910
do not allow for estimates based upon income- or sales-based payments. Adding such
provisions would unnecessarily complicate section 910 when a provider of such a product can

---

[5] This statement should not be interpreted as the DFPI's agreement with the CFC's contention that an
unconditional obligation to repay is a necessary condition for a legal finding that a product is a loan.

easily use section 914 (for sales-based financing) to create disclosures required by the regulations.

Comment 1.2.19. CFC's Concerns with the DFPI's Proposed "Underwriting Requirements"
As previously discussed, the Department's regulations give providers two options for calculating a recipient's future income, sales, or receipts:

(1) A "historical method" that requires providers to calculate a recipient's future income based upon an average of the recipients' previous monthly income. (Section 930.)
(2) An "underwriting method" that allows providers to calculate a recipient's future income based upon "the best information reasonably available to the provider." (Section 931, subd. (a)(3).)

A provider that chooses to use the underwriting method must perform periodic audits to ensure that it is not systemically underestimating recipients' future sales, which would result in systemic underestimates of APR and payment amount as well. (Section 931, subds. (a)(4)-(6).) A provider who finds that it has systemically underestimated APR by certain thresholds over multiple audits must revert to the historical method unless the provider determines that the historical method would have yielded a higher weighted average.

The CFC objects to these audit requirements, claiming that SB 1235 does not require providers to perform audits or authorize the Department to require underwriting methods.

Response to Comment 1.2.19. The DFPI respectfully disagrees with this contention. The DFPI is generally empowered to adopt regulations concerning the annualized rate disclosure, and the audit requirements as just such a regulation designed to prevent systemic underestimates of annualized rate. (Fin. Code § 22804, subd. (b).) Furthermore, the DFPI is required to adopt the appropriate method to express the annualized rate disclosure (Fin. Code § 22804, subd. (b)(1)), and the accuracy requirements and tolerance allowances for the annualized rate calculation (Fin. Code, § 22804, subd. (b)(2)). The audit requirements relating to APR fall into each of these categories by limiting the ability of providers to systemically underestimate APR. Thus, the DFPI has explicit authority to impose the audit requirements of section 931.

The DFPI also notes that even if SB 1235 did not grant the DFPI explicit authority to impose the appropriate method for disclosing APR and accuracy requirements and tolerance allowances for such disclosures, the audit requirements of section 931 would be nonetheless permissible, because no provider is required to avail itself of the underwriting method. Any provider who wishes to avoid the audit requirements of section 931 can simply use the historical method under section 930, which includes no audit requirement.

Comment 1.2.20. The CFC states that the audit requirement is problematic because under the audit, the provider must calculate a retrospective APR despite the fact that the APR created in TILA is not a retrospective calculation – it is always prospective.

Response to Comment 1.2.20. The DFPI made no change in response to this comment. Although the DFPI is aware that TILA only requires disclosure of a prospective APRs for consumer credit transactions, the DFPI is not aware of any prohibition under TILA that would prevent the calculation of a retrospective APR for internal audit purposes.

Comment 1.2.21. The CFC objects that under section 931, a provider must use the best information reasonably available to the provider. The CFC suggests that because merchant income varies, a provider's estimates may be inaccurate. As an example, the CFC claims that one provider used six different APR calculators for an MCA funding offer and got six different APRs.

Response to Comment 1.2.21. The DFPI cannot examine the veracity of the CFC's claim regarding APR calculators because it was not provided additional information about the assumptions used by the provider or the APR calculators used. Assuming the same inputs and assumptions are used, APR calculators should deliver the same result for a single transaction. That said, it is unclear how the experience of the provider calls into question the requirement of section 931 that a provider must use the best information reasonably available to the provider. The DFPI also notes that this requirement is borrowed directly from TILA regulations regarding estimates, which require disclosures based upon the "best information reasonably available at the time of the disclosure…" (12 C.F.R. § 1026.17(c).) This requirement has worked for consumer transactions, so the DFPI sees no reason why it will present an issue for commercial transactions.

Comment 1.2.22. The CFC proposes removing the audit and "best information" requirements of section 931, and instead creating a safe harbor standard based on a demonstration of the reasonableness of the provider's underwriting that relies primarily on supporting documentation used and maintained by the provider. The CFC presents this option to avoid the legal exposure a retroactive review of a provider's underwriting may create given the unpredictability of MCA transactions.

Response to Comment 1.2.22. The DFPI declines to pursue the CFC's recommendation, because policies and procedures alone—without retroactive testing—would do little to ensure accurate disclosures. Also, the DFPI does not believe that a provider finding that it exceeded the thresholds permitted under section 931, subdivision (a)(5), would necessarily create liability for the provider. This could occur for many reasons despite the provider using the best information reasonably available to the provider. For example, a government stimulus could spur sales among financing recipients or a sector in which a provider provides funding could have an unexpectedly successful quarter. These circumstances could lead to a provider exceeding thresholds for a particular audit, but the provider would nonetheless be compliant with the regulations if its disclosures relied upon the best information reasonably available to the provider.

Comment 1.2.23. The CFC's Objections to the Historical Method for Estimates. The CFC takes issue with the historical method for calculating monthly sales under section 930 for multiple reasons. First, the CFC appears to object to the DFPI's proposal to allow different providers to

use different lookback periods for a recipient's monthly sales when calculating average monthly historical sales. The CFC objects that "two different providers, offering the same MCA terms with the exact same contractual repayment requirements, might have wholly different disclosures depending upon whether the providers use a 4-month term or a 12-month term for purposes of the historical average." The CFC claims that this will render APR ineffective as a disclosure for MCA products.

Response to Comment 1.2.23. The DFPI disagrees that possible discrepancies in estimates among MCA providers using different historical averages will render APR disclosures unreliable or misleading. The estimates will be based upon past income, which (though not perfect), is likely indicative of future income as suggested by the fact that MCA providers require this information to underwrite MCAs. Furthermore, section 914, subdivision (a)(3)(C) of DFPI's proposed regulations requires sales-based financing providers to disclose the average monthly income used to calculate disclosed terms, providing the data necessary (in most cases) to determine why two identical products from different providers come with slightly different estimates.

## Comment 1.3. Letter Dated October 28, 2020 from the American Financial Services Association (AFSA).

Comment 1.3.1. The AFSA requests the Department clarify the definition of lease financing. AFSA notes that under subdivision (j)(1) of Financial Code section 22800, lease financing means a lease that includes a purchase option that creates a security interest in the goods leased, "as defined in paragraph (35) of subdivision (b) of Section 1201 and Section 1203 of the Commercial Code." AFSA also notes that section 1203, subdivision (c)(7) of the Commercial Code states that states that a "transaction in the form of a lease does not create a security interest merely because … the amount of rental payments may be increased or decreased by reference to the amount realized by the lessor upon sale or disposition of" a vehicle or trailer. AFSA explains that what Section 1203, subdivision (c)(7) of the Commercial Code described is known as a terminal rental adjust clause or "TRAC clause." AFSA states that the Legislature intended the reference to section 1203 to clarify that leases with TRAC clauses are not to be deemed security interests, and requests that the DFPI clarify by regulation that TRAC clauses do not constitute a "purchase option" under Section 22800, subdivision (j)(1).

Response to Comment 1.3.1. The DFPI declines to adopt AFSA's requested language, because, to the extent section 1203, subdivision (c)(7) of the Commercial Code addresses TRAC clauses, further clarification is unnecessary by DFPI regulation.

In addition, the DFPI is not persuaded based upon AFSA's comment that section 1203, subdivision (c)(7) of the Commercial Code stands for the proposition that a TRAC clause cannot create a security interest. The statute appears to state that a transaction in the form of a lease "does not create a security interest merely because" one of seven factors are present. (*Id.*) It is unclear from AFSA's comment that this means that none of those factors are probative when considering whether a transaction creates a security interest. Given this

ambiguity, the DFPI defers to the Legislature on any future clarification relating to TRAC clauses.

---

**Comment 1.4. Letter Dated October 28, 2020 from the Small Business Finance Association (SBFA).**

---

Comment 1.4.1. The SBFA requests that the DFPI revise its definition of "at the time of extending a specific commercial financing offer" (Section 900, subd. (a)(4)) to align with the timing requirements of the Truth in Lending Act, which only requires disclosures "before consummation of the transaction." (See, e.g., 12 C.F.R. § 1026.17(b).) SBFA also recommends revising section 900, subdivision (a)(4) to only require disclosure when a "specific amount, term or estimated term, cost, and periodic payment amount" is quoted to the recipient." (Emphasis in the original.)

SBFA objects to the DFPI's draft regulation because it would require disclosures "as soon as one of three terms (amount, rate, or price) is 'quoted.'" SBFA suggests that providers will not be able to provide compliant disclosures early in negotiations with businesses when only one or two terms are known, such as the amount of funds needed by a business. SBFA notes that businesses often quote a financing amount before the provider has the information it needs to formulate a specific offer.

SBFA argues that its recommended changes are necessary because Financial Code section 22802, subdivision (a), states that a provider must disclose the terms required by the DFPI's regulation "at the time of extending a commercial financing offer." SBFA argues that this language implies that disclosure is only required when a provider issues an offer that, if accepted, would form a legally binding contract.

Response to Comment 1.4.1. In response to stakeholder concerns (including SBFA's) relating to practical obstacles to disclosure during the negotiation process, the DFPI amended the timing requirements such that disclosure is no longer required when any "amount, rate or price" is quoted to the recipient. Rather, now disclosure is required when a "(i) periodic payment amount, irregular payment amount, or financing amount, and (ii) any rate, price, or cost of financing" is quoted to a recipient. (Section 900, subd. (a)(23).) This addresses SBFA's concern that a disclosure could be required at the point in negotiations when only the financing amount is being discussed.

The DFPI declines to adopt SBFA's recommendation that disclosure should only be required when a specific amount, term or estimated term, cost, and periodic payment amount are quoted to a recipient, as this could operate to defeat the purposes of the statute. When SB 1235 was first put before the Legislature, the author noted that the bill was designed to address concerns that small businesses "find it difficult to compare and contrast the many offers available" to them, and that the bill will "give small business owners the information they need to make good decisions." (Sen. Com. on Banking and Fin. Insts., Report on Sen. Bill No. 1235 (2017-2018 Reg. Sess.) April 16, 2018.) A subsequent letter to the Department from the author reiterated this point:

The intent of the legislation was to provide information that potential small business borrowers could use to shop among competing offers before deciding which financing worked best for them. To do this, they must have the disclosure at the time an offer is made, while they are still shopping, and not at the end of the process, when they have already made a decision. Allowing the providers to delay the disclosure until they make a "final offer" would result in the disclosure being included among other documents that a borrower reviews at the last minute just before signing to consummate the financing. (*See* Senator Steven Glazer, letter to Department of Business Oversight provided in response to Second Invitation for Comment, Sept. 9, 2019.)

Based upon the above considerations, the DFPI concludes that it is critical the regulations require disclosure earlier than the point at which all the above-described terms are disclosed. If the DFPI agreed to the proposed change, providers could negotiate up to the point when final documents are presented to a recipient without providing disclosures, simply by declining to disclose a term or estimated term or periodic payment amount. This would deprive the recipient of a meaningful disclosure until late in the process, at which point the disclosure may have limited utility in aiding the recipient's ability to comparison shop.

The DFPI also disagrees that the language of Financial Code section 22802, subdivision (a), compels disclosure only at the time that the provider presents an offer that would be legally binding if accepted. If the Legislature had intended this result, it could have stated as much in the legislation, but it did not. For example, it could have copied the TILA language that SBFA cited above, or otherwise included a statement that only offers that are binding if accepted are subject to disclosure. A letter to the Department from SB 1235's author suggests the absence of this language was intentional. In objecting to a previous draft regulation that would have only required disclosure at the time a final offer was presented, the author stated:

> SB 1235 very deliberately required that California's new Truth in Lending disclosure be shared with the recipient whenever a "specific offer" of financing is provided … During the debate over SB 1235 in the Legislature, some opponents of the bill suggested amendments that would have changed the timing of the disclosure so that it would accompany a "final offer" of financing. The Legislature rejected this idea and instead adopted the bill's original language requiring the disclosure at the time of a "specific offer."

> (*See* Senator Steven Glazer, letter to Department of Business Oversight provided in response to Second Invitation for Comment, Sept. 9, 2019.)

This perspective finds further support in the statute's language for three reasons. First, while the Department agrees that in the context of contract law an "offer" means a set of terms sufficiently definite that acceptance forms a binding contract, the Department disagrees this concept captures the "usual and ordinary meaning of" the word "offer." (*See Robertson v. Health Net of California, Inc.* (2005) 132 Cal.App.4th 1419, 1425.) For example, Oxford English Dictionary defines an offer as "an act of offering something for acceptance or refusal; an

expression of intention or willingness to give or do something if desired; a proposal, an invitation." (Oxford English Dict. (3rd ed. 2004) (available at <www.oed.com>).) This description better reflects the ordinary meaning of the term, which is substantially broader than the term in contract law. Second, it would be odd for the Legislature to use the term "specific offer," if the Legislature intended a technical meaning associated with contract law, given that "specific offer" does not appear to be a legal term of art. Third, it would be illogical for the Legislature to cabin the disclosure requirement to "the time of extending" an offer, that if accepted, would form a legally binding contract, while at the same time empowering the Department to prescribe requirements "concerning the time… of the applicable disclosures." (Fin. Code, §§ 22802, subd. (a) & 22804, subd. (a)(2).) If a provider "shall disclose all the information" required at "the time of extending a specific commercial financing" under Financial Code section 22802, subdivision (a), and that time is a specific point in time dictated by contract law, then the Legislature would not have delegated discretion to the Department to draft regulations relating to the timing of the disclosures.

The DFPI understands that the regulations may require a provider to provide multiple disclosures to a recipient during its dealings with a recipient but disagrees that this will lead to recipient confusion or unreasonable delays in the negotiation process. If a provider is prepared to disclose a "periodic payment amount, irregular payment amount, or financing amount," and a "rate, price, or cost of financing" to a recipient, then the provider should have the necessary information to provide a disclosure, and the disclosure will meaningfully inform the recipient's understanding of the disclosed terms. (Section 900, subd. (a)(23).) Also, if the recipient ultimately chooses to accept financing, the recipient will understand which disclosure applies to the financing they have chosen because the recipient will be required to sign a disclosure associated with that financing.

Comment 1.4.2. The SBFA objects that the DFPI's Initial Statement of Reasons did not describe ACC as an alternative to APR or explain the Department's reasons for rejecting ACC. Government Code section 11346.2, subdivision (b)(4)(A), requires "a description of reasonable alternatives to the regulation and the agency's reasons for rejecting those alternatives," which includes alternatives proposed as "less burdensome and equally effective in achieving the purposes of the regulation."

Response to Comment 1.4.2. The DFPI disagrees that ACC is a reasonable alternative to APR, because ACC would still require income or sales estimates for sales-based-financing providers and is susceptible to manipulation because it fails to account for the time-value of money. (See Responses to 1.2.2 and 1.2.16.) Furthermore, ACC appears to have been created by certain stakeholders specifically in response to SB 1235's enactment. For these reasons, it lacks the industry recognition, a track record, or familiarity for ordinary Californians that APR possesses. In short, because ACC is so easily susceptible to manipulation, and ACC is not an established annualized rate metric, it cannot reasonably be considered an acceptable alternative to APR for allowing small businesses to effectively compare their small business financing options.

Comment 1.4.3. SBFA objects to the DFPI's choice of APR because it claims that APR is hard to calculate. SBFA states that the DFPI should either offer its own calculation tool or add additional simplifying assumptions so that providers can use existing APR tools built for products with regular payments.

Response to Comment 1.4.3. The DFPI disagrees that a calculation tool or simplifying assumptions are required so that providers can use existing APR tools built for products with regular payments. As noted in Response to Comment 1.2.14, while APR is more difficult to calculate mathematically than ACC, an APR calculation can be accomplished with minimal training using widely available spreadsheet programs.

Comment 1.4.4. SBFA objects that section 942 is ambiguous and not readily understandable to directly affected providers of commercial financing because the section refers to "reasonably anticipated true-ups," "changes to the split rate over time," and "any other finance charges that may be reasonable anticipated." SBFA objects to requiring providers account for "reasonably anticipated true-ups" because "true-ups by definition are unanticipated," so there are no "reasonably anticipated true-ups." With respect to split rates, SBFA objects that "split rates are not ordinarily changed over time." SBFA did not articulate with specificity its objection to requiring a provider to consider "any other finance charges that may be reasonably anticipated" when making its disclosures.

Response to Comment 1.4.4. With respect to SBFA's objection to the requirement that providers account for reasonably anticipated true-ups, the DFPI incorporates by reference its response to Comment 1.2.13. While the DFPI appreciates that SBFA's members may structure their products such that true-ups typically cannot be anticipated, the DFPI cannot assume that such products are not offered or will not be offered in the future.

With respect to SBFA's objection to requiring a provider to account for "changes to the split rate over time," the DFPI observes that even if most providers structure their products without variable split rates, this does not preclude the possibility that some providers might chose to offer a product with split rates that vary. For example, a provider could choose to include a split rate equal to 10 percent of receivables for the first 12 months, followed by a split rate of 20 percent of any remaining months that a contract is in effect. The regulations would require a provider to account for this change in split rate when making its estimates.

With respect to SBFA's objection to requiring a provider to consider "any other finance charges that may be reasonably anticipated" when making its disclosures, the DFPI disagrees that this terminology is not readily understandable by those affected by the regulation. Finance charge is a defined term under sections 900 and 943, and section 942 clarifies that finance charges should be considered when they can be anticipated based upon the income estimates developed pursuant to sections 930 and 931.

Comment 1.4.5. SBFA objects that the Initial Statement of Reasons does not describe alternative simplifying assumptions that SBFA proposed in a September 9, 2019 comment letter to the DFPI. Government Code section 11346.2, subdivision (b)(4)(A), requires "a

description of reasonable alternatives to the regulation and the agency's reasons for rejecting those alternatives," which includes alternatives proposed as "less burdensome and equally effective in achieving the purposes of the regulation."

As an alternative to sections 930 (Historical Method), 931 (Underwriting Method), and 942 (Estimated Annual Percentage Rate – Sales-based Financing), SBFA offers the following language:

> When calculating and disclosing APR for sales-based financing, a provider may make the following assumptions: (a) loan payments or receivables remittances will be made in generally equal monthly amounts notwithstanding contractual requirements for more frequent payments or remittances, using a 360-day year comprised of twelve months of 30 days each, except that the payment or remittance amounts during the first and last month shall be prorated based on the number of calendar days in such months when the financing is active;
> (b) the term of the financing will be the period of time in which the provider predicted during underwriting that it would take for all payments or remittances to be made, notwithstanding that the contract has no term; and
> (c) the payment or remittance amounts each month shall be calculated based on the provider's projection during underwriting of the recipient's average monthly sales (or other revenue that determines payment or remittance amounts) during the term, notwithstanding that the recipient's actual average monthly sales or other revenue likely will vary from these projections.

Response to Comment 1.4.5. The proposed alternative language is not a reasonable alternative to sections 930, 931, and 942, because the language is not equally effective in achieving the regulation's purposes. Specifically, the approach to the APR calculation metric would result in calculations that in some cases are substantially lower than the actual APR for products with daily or weekly payment frequencies. Furthermore, the approach to estimating term and average monthly sales would allow unscrupulous providers to systemically underestimate payment amounts and APR in their disclosures to small businesses.

Comment 1.4.6. SBFA proposes ACC as an alternative to APR on the grounds that ACC can be calculated by hand or using a commonly available spreadsheet program, "does not require complex assumptions to be made," and is easier for recipients and examiners to double-check.

Response to Comment 1.4.6. The DFPI incorporates by reference its response to Comment 1.2.2. As with APR, ACC requires making assumptions about a recipient's income to calculate a recipient's estimated payments and estimated term. Thus, calculating ACC would still require a provider to make assumptions about a recipient's income. SBFA's proposed alternative does not eliminate the need for assumptions, but rather allows every provider to incorporate any underwriting assumptions it chooses, without accountability, even if those underwriting assumptions systemically underestimate a recipient's income, payments and APR. This does not achieve the objectives of sections 930 and 931, which are designed to prevent such abuses.

The DFPI also incorporates by reference its response to Comment 1.2.14. Although APR cannot typically be calculated by hand, the DFPI does not anticipate that many providers would choose this calculation method for ACC disclosures either. In addition, APR, like ACC, can be calculated using widely available spreadsheet programs. Finally, the DFPI does not have reason to believe that many recipients would desire to double-check an APR calculation, and the few recipients that do could use an estimated payment schedule from their provider to run their own APR calculation.

Comment 1.4.7. SBFA maintains that APR is a confusing metric as compared to ACC and that ACC should be used instead of APR. To support this assertion, the SBFA retained a third-party firm, Kingsley-Kleimann Group ("KKG"), to produce a report which SBFA claims establishes that borrowers "have difficulty understanding APR and question its utility." SBFA makes two points with respect to recipient confusion:

First, APR will cause confusion because it suggests an interest rate for products that do not have one. SBFA claims that KKG's research confirms this point. SBFA says this will lead recipients to assume products without interest rates become more expensive over time when they do not.

Second, because APR requires assumptions about future payments, it will lead recipients to mistakenly assume that their products have fixed payments.

SBFA states that if the DFPI does not replace APR with ACC, the DFPI should include additional disclosures to clarify that assumptions made to calculate APR are only assumptions.

Response to Comment 1.4.7. Without having more information on the data and methodology that formed the basis for the third-party report SBFA references, the DFPI cannot fully assess the merits of the third-party's research. That said, it is unclear the report supports the proposition that ACC would serve as a more comprehensible metric for recipients for at least three reasons.

1) The testing did not appear to incorporate a disclosure of ACC or ask recipients comparable questions to assess the relative efficacy of an ACC disclosure.
2) None of the disclosures tested mirror the form, manner, and content of the disclosures required by the DFPI's proposed regulation, so test participants' reactions to APR in those contexts are not necessarily indicative of recipients' response in the context of the regulation's required disclosure.
3) That some test participants conflated APR with interest rate or could not explain the math underlying APR does not establish that APR does not have utility for comparison purposes. APR can nonetheless serve its intended purpose – to help a recipient better understand the cost of financing over time – because a disclosure can have significant utility even when a recipient cannot fully articulate how it was developed. For example, a consumer may not be able to articulate why two restaurants on a given street have B- and A health ratings, but nonetheless may choose the restaurant that received an A rating based upon a general

understanding that the ratings relate to factors considered during a previous city health inspection.

In response to SBFA's concern that APR will cause recipients to mistakenly assume that the cost of financing without an interest rate will increase over time, the regulations allow the providers of sales-based financing to disclose to recipients that the finance charge will not increase if the recipient takes longer to pay off what is owed and require disclosure that APR is not an interest rate for sales-based financing products where no part of the finance charge is not based upon an interest rate. (See section 914, subdivisions (a)(3)(D) & (a)(4)(C)(ii).) It is unclear that an ACC disclosure would reduce the likelihood of any potential confusion. Notwithstanding the above observations, the DFPI revised the language of the APR disclosure for sales-based financing to clarify that for products without interest rates the cost of financing is not based upon interest that accrues over time. (See section 914, subdivision (a)(3)(D).).

In response to SBFA's concern that APR will lead recipients to mistakenly conclude that a product has fixed payments, because APR requires assumptions about future payments, the DFPI notes that the same is true of ACC. (See response to Comment 1.2.2.) Furthermore, the disclosure form's Payment Terms section (Section 914, subdivision (a)(7)) will provide a clear disclosure when a recipient's payments are not fixed.

For the reasons stated above, the DFPI declines to adopt ACC in lieu of APR and declines to make changes other than the change described to section 914, subdivision (a)(3)(D). The DFPI declines to include additional disclosures that the APR calculation is based upon assumptions because the APR disclosure description already discloses the assumptions upon which the APR calculation is based. (See section 914, subdivision (a)(3)(C).)

Comment 1.4.8. SBFA recommends that recipients be told that for sales-based financing products, revenue may vary in practice, and that actual APR may vary substantially.

Response to Comment 1.4.8. The DFPI has added the requested disclosure to section 914, subdivision (a)(3)(C), so that recipients better understand the effect of a recipient's variable income on the effective APR.

Comment 1.4.9. SBFA recommends that for sales-based financing products, the disclosures should inform recipients that products have no interest rate, payment schedule, or minimum payments, and that the transaction is not a loan.

Response to Comment 1.4.9. The DFPI declines to make the changes requested because the disclosures provided for recipients of sale-based financing are adequate to assist the recipient in fully understanding the transaction terms. Furthermore, the definition of sales-based financing does not categorically exclude products which have an interest rate or minimum payments, or products that are loans under California law. (See response to Comment 1.2.18.)

Comment 1.4.10. SBFA states that for sales-based financing products where the finance charge will not increase if repayment takes longer than expected, disclosing "Your finance

charge will not increase if you take longer to pay off what you owe" is misleading because for MCAs there is no payment obligation, and the disclosure does not state that the finance charge will decrease if remittances take longer than projected.

SBFA references "comprehensive disclosure language that would address these issues for MCAs" that it included in its September 9, 2019 comment letter, states that the Initial Statement of Reasons does not describe these alternatives, and states that "on balance, these issues are better addressed by using ACC instead of APR."

Response to Comment 1.4.10. With respect to SBFA's objections concerning the language, the DFPI refers back to its response to Comment 1.2.4. Furthermore, the DFPI is not aware of MCAs where the finance charge decreases if payments take longer than projected. Finally, the DFPI was not able to identify "comprehensive disclosure language" in SBFA's September 9, 2019 comment letter.

Comment 1.4.11. The proposed regulation requires disclosures, including APR, for open-end credit plans to be calculated using the assumption that the recipient "borrows the approved credit limit at origination and makes no subsequent draws and that minimum on-time payments are made pursuant to the contract." (Section 940, subd. (c).) The regulation also requires the APR calculation to include "all finance charges." (Section 940, subd. (b).) This approach diverges from the approach for open-end credit APR calculation under the Truth in Lending Act and Regulation Z (TILA).

SBFA recommends that the DFPI allow disclosure calculations for open-end credit to follow TILA, which does not provide for disclosures based upon a hypothetical transaction and which does not incorporate any finance charges other than interest into the APR disclosure. SBFA notes that the regulations' proposed approach for open-end credit would not adequately convey to small businesses the cumulative effect of draw fees that a small business may incur after taking multiple draws using an open-end credit line.

Response to Comment 1.4.11. The DFPI declines to adopt SBFA's proposed approach because the proposed approach would undermine a recipient's ability to compare open-end credit products to other financing options. Furthermore, the TILA approach to APR calculation for open-end credit fails to account for finance charges incurred at origination, which can result in APR disclosures that in some cases do not incorporate some or all the costs associated with financing. Although it is true that the proposed APR calculation method would not incorporate assumptions associated with draw fees for multiple draws, the regulations address this by clearly disclosing the assumptions underlying the disclosure.

Comment 1.4.12. SBFA recommends that the proposed regulations have a separate set of disclosures for MCAs due to litigation risk that using the language of the disclosures could result in legal determinations that certain MCA products are loans. SBFA specifically states that MCA disclosures should not reference interest.

Response to Comment 1.4.12. The DFPI declines to make changes to the language of the sales-based financing disclosures because SBFA did not articulate an example of a circumstance in which an MCA disclosure would require a statement that interest is being charged when interest is not being charged.

Comment 1.4.13. SBFA objects to the DFPI's approach to the historical method for recipient income calculations. The text originally required providers to fix the number of past months used to calculate future income at four to twelve months for all recipients. SBFA notes that providers may use different numbers of months to underwrite different types of businesses.

Response to Comment 1.4.13. In response to this comment and others, the DFPI modified the text to allow more flexibility in the number of months a provider can use. Specifically, providers can now vary the number of months used under the historical method by recipient industry or financing amount (or both). (See section 930, subdivision (b)(2).)

Comment 1.4.14. SBFA objects that the historical method does not allow providers to disclose term predictions based upon assumptions such as economic conditions, notes that providers are fully incentivized to offer disclosures based upon accurate assumptions, and that requiring a new historical method calculation method on providers imposes unnecessary costs when providers can simply offer disclosures based upon underwriting assumptions.

SBFA maintains that the audit requirements for the underwriting method (Section 931) are not workable because the returns on MCAs are inherently unpredictable and expecting MCA providers to provide APR estimates that are accurate within a specified range is simply not realistic.

To address the above concerns, SBFA recommends deleting the underwriting method and revising the historical method so that a provider can calculating disclosures based upon its actual predictions from underwriting.

Response to Comment 1.4.14. The DFPI declines to make the SBFA's requested changes based upon the above comment because:

(1) DFPI disagrees that providers have strong incentives to offer disclosures based upon accurate assumptions, since offering disclosures that underestimate payment amounts or APR may make a provider more competitive when a recipient is considering multiple financing offers. Allowing providers to offer disclosures based upon underwriting without the accompanying audit requirements would allow providers to systemically underestimate payment amount or APR without significant accountability.

(2) Since providers already collect historical income data for purposes of underwriting, the DFPI does not anticipate that creating disclosures based upon the historical method will result in substantial additional costs for providers.

Although the DFPI did not adopt SBFA's requested changes, the DFPI increased the underwriting method's weighted average thresholds for a providers' last three and last five audits to give providers more flexibility to calibrate their underwriting methods for accuracy.

Comment 1.4.15. SBFA requests a compliance safe harbor that would prevent a recipient from arguing that terms or phrases used in the disclosures constitute evidence that a product is a loan.

Response to Comment 1.4.15. The DFPI declines to include this safe harbor because SBFA did not articulate why using the terms interest, prepayment, or pay off would be prejudicial to MCA providers. SBFA also did not provide an example of a circumstance in which the regulations would require a provider to use those terms in a way that misrepresents the transaction terms. Furthermore, there may be circumstances when it would be appropriate for a provider's disclosure to be considered as evidence by a trier of fact in determining whether a product is a loan. For example, it is not clear why it would be inappropriate for a trier of fact to consider a sales-based financing disclosure that discloses minimum payments and interest charges when assessing whether a transaction is a loan.

Comment 1.4.16. SBFA requests a compliance safe harbor that would prevent a recipient from bringing a civil action based upon the claim that a provider knew that a disclosure was based upon assumptions that were known to be unrealistic or simplified, provided that the assumptions were disclosed in the manner required by the regulations.

Response to Comment 1.4.16. The DFPI declines to adopt the proposed safe harbor because it would provide a liability shield for providers who purposefully mislead recipients by quoting unrealistically low payment and APR estimates.

**Comment 1.5 Dated October 28, 2020 from PayPal, Inc. (PayPal).**

Comment 1.5.1. PayPal requests a compliance date 12 to18 months after the regulations are final to allow time for research, design, and development associated with the disclosures.

Response to Comment 1.5.1. In accordance with the information contained within the Department's Initial Statement of Reasons, the regulations will not become effective until 6 months after adoption.

Comment 1.5.2. PayPal requests a clarification that for the purposes of determining whether a recipient's business is "principally directed or managed from California," providers should be able to rely upon the business address provided by the applicant in the application for financing.

Response to Comment 1.5.2. The DFPI agrees that the proposed clarification will add greater certainty for providers in deciding whether to provide disclosures. For this reason, the DFPI has revised the regulations to allow providers to use the recipient's business address as

provided by the recipient in the application or to rely upon any written representation from the recipient. (See section 954, subd. (b).)

Comment 1.5.3. PayPal requests that the regulations be revised to allow providers to explain in the disclosure that shorter-term products may show a higher APR or estimated APR and that APR should be viewed in the context of the overall cost of credit.

Response to Comment 1.5.3. The DFPI declines to adopt the proposed change because the proposed disclosures are not necessary. The regulations already disclose that APR is the cost of financing expressed as an annualized rate. APR necessarily accounts for the cost of financing over time and higher APRs for shorter term products reflect the accurate annualization of costs. The regulations further provide for the disclosure of multiple other metrics (including the cost of financing) and do not suggest to the recipient that the recipient should not consider other metrics when making their decision.

Comment 1.5.4. PayPal requests that the regulations allow an explanation that estimated term and APR are estimates and may vary depending on actual time to repay.

Response to Comment 1.5.4. The DFPI agrees that for sales-based financing, it would be helpful when disclosing APR to explain that the actual APR may vary. The DFPI amended the disclosure language at section 914, subdivision (a)(3)(C), to disclose that "[s]ince your actual income may vary from our estimate, your effective APR may also vary." With respect to the disclosure of estimated term, the DFPI did not adopt any changes to the text because providers may explain in their own words under section 914, subdivision (a)(7), that the estimated term is an estimate based upon specific income assumptions and recipients can reasonably conclude from this disclosure that actual term lengths may vary.

Comment 1.5.5. PayPal requests that the DFPI revise the regulations to include a Regulation Z tolerance that would allow providers to cure a violation if, within 60 days of discovery of the violation, the provider notifies the recipient of the inaccuracy in the disclosure and makes any correction necessary so that there is no prejudice the recipient.

Response to Comment 1.5.5. The DFPI added the PayPal safe harbor described, because the provision requires the provider to make corrections to a recipient's account so that the error causes no prejudice to the recipient. The DFPI declines to adopt language from the Regulation Z tolerance that incorporated providers' errors found during regulatory examinations because the provision diminishes providers' incentives to develop and rely upon their own compliance programs.

Comment 1.5.6. PayPal requested that the DFPI revise the regulations to include a Regulation Z tolerance providing for no liability for a violation that was "not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted" to avoid the error.

Response to Comment 1.5.6. The DFPI declines to adopt the proposed tolerance because the tolerance includes no protection for a recipient that would protect the recipient form prejudice arising from a bona fide error. Also, a tolerance based upon the bona fide error concept may be more appropriate for the Legislature's consideration.

Comment 1.5.7. PayPal requests that the DFPI revise the tolerance limits to make them more liberal than those available for consumer transactions under TILA.

Response to Comment 1.5.7. In response to this and other comments, the DFPI revised the tolerances to include a higher tolerance for irregular transactions (Section 955, subd. (a)(2)) and a new tolerance limit for transactions that will typically provide more flexibility for transactions with higher annual percentage rates. (Section 955, subd. (a)(3).) With respect to the latter change, the DFPI's revisions add a tolerance based the size of the APR error in relation to the APR originally disclosed (a percentage calculation).The DFPI decided that this tolerance limit was appropriate for transactions with higher annual percentage rates, because the relative difference between (for example) a 103 percent and 104 percent APR disclosure is substantially lower than the difference between 3 percent and 4 percent APR transaction, even though the absolute differences in both cases are equal.

Comment 1.5.8. PayPal requests that the DFPI revise proposed tolerance limits such that there is no tolerance limit for inadvertent over-disclosures. PayPal states that a provider would never purposefully overstate the costs of its product and that inadvertent over-disclosures are not likely to lead to recipient harm because a business would likely pay less than the disclosure reflected.

Response to Comment 1.5.8. The DFPI agrees with PayPal's reasoning and therefore adopted changes reflecting this recommendation. (See section 955, subdivisions (a) and (c).)

Comment 1.5.9. PayPal recommends that the DFPI revise the proposed disclosure of the funding provided to the recipient to allow explanatory language that the funding provided directly to the recipient may change where amounts owed on other financings may change. (See, e.g., Section 910, subd. (a)(2).)

Response to Comment 1.5.9. The DFPI substantially revised the sections that are the subject of PayPal's comment such that providers are now required to disclose the total amount financed rather than amounts excluding payoffs. (See, e.g., Section 910, subd. (a)(2).) The explanatory section now requires an additional disclosure of the recipient funds, a metric that excludes amounts used for payoffs, and an explanation that the recipient funds may change if the amounts due under the recipient's other obligations change. This last explanation address's PayPal's request. The DFPI decided to make the explanation mandatory for providers so that recipients are always apprised that the amount they are paid directly may change.

Comment 1.5.10. PayPal explains that for products with a single, fixed fee and no interest, it appears that two possible explanations of APR could apply: (1) Explanatory language for

circumstances where the contract provides for "a single, fixed interest rate" (Section 910, subd. (a)(3)(C)(i)), and (2) explanatory language for circumstances where "no part of the finance charge is based upon interest accrued." (Section 910, subd. (a)(3)(C)(iii) (original version of text put out for comment).) PayPal requests that for financing that includes a single, fixed fee that is not based on accrued interest, only the second disclosure would apply.

Response to Comment 1.5.10. The DFPI did not adopt PayPal's requested change but did revise the language that triggers the second disclosure so that the disclosure is required if no part of the finance charge is based upon an "interest rate" rather than "interest accrued." Thus, the section now references the defined term "interest rate" which is a "periodic rate at which interest accrues." (Section 900, subd. (a)(13).) A single, fixed fee earned at origination is not based upon a periodic rate at which interest accrues, and so no further language is necessary to clarify that products with such characteristics would use the second disclosure and not the first disclosure.

Comment 1.5.11. PayPal requests that for the requirement that a provider provide "an explanation describing the term" in the third column of the disclosure, the DFPI clarify what this explanation requires that is different from what would be disclosed in the second column or remove the explanation requirement. (Section 910, subd. (a)(7).)

Response to Comment 1.5.11. The DFPI agrees that an explanation describing the term would not add substantially to the term disclosed in the second column, so the DFPI has revised the disclosure requirements so that no explanation is required in the third column. (Id.)

Comment 1.5.12. PayPal has a product with income-based payments and a minimum periodic payment. PayPal requests clarification whether this product would be considered sales-based financing because its product does not appear to be asset-based lending, but a section of the Initial Statement of Reasons states that "sales-based financing" is a "subset of asset-based lending."

Response to Comment 1.5.12. The Initial Statement of Reasons' statement that "sales-based financing" is a "subset of asset-based lending" was technically incorrect. Transactions with minimum payments like the one PayPal described may still be sales-based financing if a recipient makes income-based payments.

Comment 1.5.13. PayPal notes that the titles of sections 930 and 931 relating to the historical and underwriting methods for calculating estimated terms refers to "Accounts Receivable Purchase Transactions," which creates ambiguity as to whether the sections apply to the product described in Comment 1.5.12. PayPal requests that the DFPI clarify whether the sections would apply to that product.

Response to Comment 1.5.13. In response to this change, the DFPI revised the titles of sections 930 and 931 to clarify that they apply to any type of sales-based financing, and not just accounts receivable purchase transactions.

<u>Comment 1.5.14.</u> With respect to section 930, PayPal requests that the DFPI not require a fixed number of months for a provider to conduct its historical income analysis. Alternatively, PayPal requests clarification that where a recipient does not provide information for certain months or information is otherwise inconsistent with or not indicative of sales trends, a provider should be able to calculate historical sales volume using an average of the months for which the recipient has provided information or the months that the provider deems consistent with sales trends. PayPal explains these changes are necessary because PayPal is not always able to get sales data from recipients for certain periods, there are sometimes outlier months for income (e.g., when a natural disaster occurs), and providers need flexibility to underwrite different types of transactions with different data.

<u>Response to Comment 1.5.14.</u> The DFPI declines to remove the requirement that a provider use a fixed number of months under the historical method, because unrestricted flexibility would allow unscrupulous providers to create income estimates that exclude higher income months solely for the purpose of drafting disclosures with lower APR and payment estimates. That said, the DFPI revised the disclosure requirements to allow providers to exclude outlier months where a recipient experienced lower income than usual, months for which the recipient failed to provide income requested, and months at the beginning of a period set buy the provider if the provider does not require or receive document for those months from the recipient. The DFPI also revised the requirement to fix the number of months used so that a provider can vary the number of months by recipient industry or financing amount (or both). These changes substantially address each of the concerns described by PayPal above while still preventing unscrupulous providers from excluding only a recipient's high-income months from an income calculation in order to disclose lower payment amounts and a lower APR.

<u>Comment 1.5.15.</u> With respect to section 930, PayPal requests that the self-audit be required every year rather than every four months to make the requirement less burdensome on providers. Under PayPal's proposal, there would be a 10 percent threshold for the audited APR spread. PayPal further proposes that if the spread exceeds 10 percent, that more frequent audits can be required, and the provider can work with the DFPI to refine its methodology.

<u>Response to Comment 1.5.15.</u> The DFPI declines to amend the audit requirements as PayPal requested, because the DFPI believes it is appropriate for providers to implement frequent audits early in the rollout of estimates based upon the underwriting method to ensure that those estimates are accurate. However, the DFPI implemented changes such that a providers' obligation to conduct audits quarterly can convert to an annual requirement if the weighted average for the APR spreads for the last three audits is 5 percent or less. This ensures that providers whose estimates prove accurate over time will be able to reduce the frequencies of audits and potentially reduce associated costs. The DFPI declines to adopt PayPal's proposal for the DFPI to consult with providers to assist them in meeting thresholds set by the regulations because providers are best positioned to evaluate the causes for systemic APR underestimates independently.

Comment 1.5.16. PayPal requests that the DFPI revise section 914, subdivision (a)(3)(C), to clarify that the disclosure of the "description of particular payment channel or mechanism" does not require a provider to list each source of income analyzed to calculate the recipient's anticipated income. PayPal requested that the clarification permit a disclosure such as "your PayPal account" in the space for the "description of particular payment channel or mechanism."

Response to Comment 1.5.16. The DFPI declines to implement the requested change because "description of particular payment channel or mechanism" is sufficiently specific. "Particular payment channel or mechanism" is a defined term under section 900, subdivision (a)(17) ("the payment channel(s) or mechanism(s) that will be used to determine the amount of a recipient's payment or true-up"). This definition ensures that the provider informs the recipient as to how the recipient's payments will be calculated. If a product relies solely upon income from a particular account to calculate the recipient's payments under the contract, then an identification of that account would comply with the regulation.

Comment 1.5.17. PayPal requests that the DFPI revise the estimated payment disclosure for sales-based financing such that providers would not be required to disclose different payment amounts for different periods of time where those payment amounts are based upon anticipated changes in income. PayPal explains that providing such a disclosure would be impossible and not helpful or meaningful to small business recipients. PayPal recommends that a provider disclose different payments only if payments change for specific contractual reasons.

Response to Comment 1.5.17. The DFPI generally agrees that for payments that may vary based upon anticipated changes income, the regulation should not require each varied payment to be specified, since a recipient should understand based upon the "Payment Terms" disclosure that payments may vary based upon income. For this reason, the DFPI revised the payment disclosure so that the estimated payment disclosed is the average amount of estimated periodic payments.

Comment 1.5.18. PayPal requests that the proposed rules clarify that "electronic signature" includes an assent by an applicant that satisfies requirements of applicable federal and state laws governing electronic signatures.

Response to Comment 1.5.18. In response to PayPal's request, the DFPI clarified that electronic signatures should comply with state law (Civil Code section 1633.2, subdivision (h)). This revision is sufficiently specific to provide guidance to providers, so the DFPI declines to add an additional reference to federal laws.

Comment 1.5.19. PayPal requests that the proposed rules be revised such that the disclosures are not required based upon oral representations relating to the terms of a transaction, because this could create delays where initial communications about a transaction occur by phone. PayPal suggests the disclosure requirements should only apply when a formal written offer is presented to a recipient.

Response to Comment 1.5.19. In response to PayPal and other stakeholders, the DFPI revised the disclosure timing requirements such that disclosure timing is tied only to "a written communication" and not oral communications. The DFPI declines to adopt PayPal's request to tie timing to presentment of a "formal written offer" because this language does not capture the DFPI's intent to cover written representations that occur before presentment of a final written offer. (See response to Comment 1.4.1.)

**Comment 1.6 dated October 28, 2020 from Wells Fargo.**

Comment 1.6.1. Wells Fargo requests that the definitions of approved credit limit and approved advance limit be amended to capture amounts that that a financer may, but is not required, to pay.

Response to Comment 1.6.1. The DFPI agrees to this proposed change based upon the understanding that some types of commercial financing agreements have credit or advance limits that are discretionary. (Section 900, subds. (a)(1) and (2).)

Comment 1.6.2. Wells Fargo requests that the approved credit limit and approved advance limits apply across multiple agreements in aggregate where a recipient's borrowing under one agreement reduces the credit limit available under all related agreements.

Response to Comment 1.6.2. The DFPI declines to implement this proposed change because Wells Fargo did not offer reasoning for the proposed change and the DFPI is unable to ascertain the potential reasoning by reviewing the proposed revision. Furthermore, the language of Financial Code section 22802 and 22803 refer to individual commercial financing transactions so the DFPI decided not to combine multiple agreements under the definitions of approved credit limit and approved advance limit without a compelling justification.

Comment 1.6.3. Wells Fargo notes that section 916, subdivision (a), references a "definition of inventory financing" but the regulations do not define the term or provide formatting guidance for inventory financing. Wells Fargo recommends deleting the reference to inventory financing.

Response to Comment 1.6.3. The DFPI implemented Wells Fargo's requested change based upon Wells Fargo's reasoning.

Comment 1.6.4. Wells Fargo recommends the DFPI revise section 921 to account for agreements that predate the effective date of the rules by allowing the agreements referenced in subdivisions (a)(2)(iii) and (a)(3)(iii) to be made before any amendment to an agreement executed before the effective date of the rules.

Response to Comment 1.6.4. The DFPI implemented the requested change to ensure that amended agreements for financing that exceed statutory thresholds do not trigger additional disclosures.

**Comment 1.7 dated October 28, 2020 from Strategic Funding Source, Inc. doing business as Kapitus (Kapitus).**

Comment 1.7.1. Kapitus proposes including in the regulations a process by which companies could receive approval for calculating estimates because Kapitus states that disclosing estimated APR and other metrics will be challenging when initially implemented. Kapitus requests that the DFPI pair such regulations with a safe harbor that would protect providers from private lawsuits and enforcement actions by the DFPI for providers that use methods that the DFPI approves.

Response to Comment 1.7.1. The DFPI declines to implement this proposed change because the DFPI is not aware of a precedent for a regulator granting a general approval for a market participant's approach to regulatory compliance without clear direction from the Legislature. That said, the DFPI often provides formal legal opinions in response to discrete legal compliance questions submitted to the DFPI through requests for interpretive opinions or specific rulings.

Comment 1.7.2. Kapitus proposes that the "total cost of the financing be included prominently on the disclosures" (total amount of payments) to allow recipients to accurately compare total costs because this metric is how Kapitus' customers "determine the value and desirability of a particular financing agreement."

Response to Comment 1.7.2. The DFPI agrees that the total payments required would be a useful metric to help recipients compare the cost of financing. For this reason, the DFPI implemented changes to include this disclosure below the Finance Charge disclosure on disclosures for closed-end transactions, open-end credit, sales-based financing, and lease financing. The DFPI did not include the suggested disclosure for factoring or general asset-based lending because these products are repaid differently than the other types of transactions, so a total payment disclosure could be less useful for recipients.

Comment 1.7.3. Kapitus states that its customers often look to the "daily or weekly percentage, referred to as the 'remit rate'" when assessing a product, that this information is critical for comparison purposes, and that the proposed regulations prohibit this information from being included on the disclosure page.

Response to Comment 1.7.3. The DFPI disagrees that the regulations prohibit the remit rate from being disclosed on the disclosure page. Section 914, subdivision (a)(7), requires concepts like the remit rate to be disclosed to recipients.

Comment 1.7.4. Kapitus recommends that providers be required to separately disclose any fees or commissions paid to a broker, rather than including those costs within an APR calculation. Kapitus states this will allow applicants to differentiate between costs imposed by providers and brokers, allow recipients to dispute excessive brokerage charges, and prevent unscrupulous brokers from steering customers to financing based upon what financing pays the highest commission to a broker.

Response to Comment 1.7.4. The DFPI declines to adopt Kapitus' proposed change but notes that this does not indicate that the DFPI disagrees with Kapitus' reasoning. Rather, the DFPI believes further input from stakeholders may be appropriate before the DFPI adopts regulations requiring disclosure of broker fees that are not part of the amount financed.

Comment 1.7.5. Kapitus recommends that assumptions about months and days appear in one place rather than having the assumptions split between two separate sections.

Response to Comment 1.7.5. The DFPI agreed to this proposed change because the change makes understanding permissible assumptions more straightforward. (See section 901, subdivisions (a)(16)(B) and (a)(16)(C).)

Comment 1.7.6. Kapitus recommends that assumptions related to the number of days in a month or year should be disclosed to the consumer, because many customers do not make payments every day, every month does not have 30 days, and every year is not 360 days long.

Response to Comment 1.7.6. These comments were made in reference to a requirement that providers assume there are 30 days in every month and 360 days in a year, and a section that permitted providers to assume they can collect on every calendar day when calculating APR. The DFPI removed these provisions and replaced them with section 901, subdivisions (a)(16)(B) through (D). These provisions allow providers to ignore for all purposes payment dates that are changed because a scheduled date is not a business day, months that have different numbers of days, and leap years. Although these provisions may result in small deviations between numbers disclosed and calculations that accounts for payment dates that are not business days, months with different numbers of days, and leap years, the DFPI believes the deviations will be sufficiently small in most cases that additional disclosures will not be necessary.

Comment 1.7.7. Kapitus requests that the DFPI reconcile "the disconnect between daily and monthly calculations" because estimated monthly cost will be calculated on a 30-day-a-month basis, but APR will be calculated on a 7-day-a-week basis."

Response to Comment 1.7.7. The DFPI declines to make changes based upon the above comment because the conflicting provisions referenced by Kapitus have been removed.

Comment 1.7.8. Kapitus requests that "the regulations reconcile the disconnect between estimated and actual date calculations" because the audits allowed under the underwriting method would utilize date estimates, while the retrospective APR will be based on actual dates.

Response to Comment 1.7.8. The changes referenced in response to Comment 1.7.6 address the concern identified in this comment. Although the provisions in section 901 will likely result in circumstances in which a provider's estimates with respect to payment dates will deviate from actual payment dates, the DFPI does not anticipate that the resulting APR differences for

most transactions will be significant for the purposes of staying below thresholds set under the underwriting method.

Comment 1.7.9. Kapitus requests that the regulations be revised to permit disclosure of a "pre-payment discount" so that recipients can better understand the positive consequences of pre-payment. Kapitus says that disclosures that do not include "pre-payment discounts" are biased toward certain business models and that the Federal Credit Card Accountability and Disclosure (CARD) Act requires similar disclosures by requiring a comparison of costs based upon making minimum payments and paying off the balance within 3 years.

Response to Comment 1.7.9. The DFPI declines to adopt the proposed change because nothing precludes providers from disclosing in a separate document any contract terms that allow recipients to reduce their finance charge through prepayment. The DFPI disagrees that not including "prepayment discounts" in the disclosure biases the disclosure toward any particular product. Interest-based financing providers and fixed-fee financing providers who offer "prepayment discounts" could both disclose to a recipient that early payment may result in a specified reduction in the finance charge, and the regulations do not preclude either type of provider from disclosing this information in a separate document. The DFPI declines to adopt a disclosure standard similar to the CARD Act because it is the Department's understanding that the early payoff terms for fixed fee commercial financing may vary significantly from transaction to transaction. For this reason, it is unclear that a uniform disclosure based upon prepayment within a specified period would provide helpful information for recipients.

Comment 1.7.10. Kapitus requests that the DFPI add a provision shielding financers from liability caused by the wrongdoing caused by broker intermediaries, because section 952 requires financers to use brokers as intermediaries in transmitting and receiving disclosures to and from recipients.

Response to Comment 1.7.10. The DFPI declines to adopt Kapitus' recommendation, because the DFPI is not certain in what circumstances a financer would be liable for the wrongdoing of broker intermediaries and thus is unable to assess whether those circumstances would merit making the requested change.

Comment 1.7.11. Kapitus requests that the DFPI provide an implementation date that is at least twelve months following finalization of the regulation to accommodate a need to make internal technology changes to provide the disclosures.

Response to Comment 1.7.11. See the Department response to Comment 2.3.6. In addition, six months is adequate time to implement the regulations because many of basic aspects of the regulations have remained the same in recent comment periods.

Comment 1.7.11. Kapitus requests that the DFPI amend the regulations to clarify that disclosures are not required when Kapitus temporarily modifies customers' payments at their request ("true-ups") or permanently modifies payments due to a settlement agreement or bankruptcy.

Response to Comment 1.7.11. The DFPI has revised the regulations to limit the circumstances in which a provider must issue a new disclosure when an existing transaction is amended to cover only circumstances when the change to the agreement would result in an APR increase. The DFPI also exempted from the disclosure requirement circumstances in which changes are made to resolve a recipient's default, which should cover most of the circumstances in which a bona fide settlement agreement results in a change to the contract. The DFPI declines to make changes that address Kapitus' concern relating to contractually provided true-ups because it is not clear that a true-up that is permitted or required by the contract would result in an amendment, supplement, or change to the original contract. The DFPI declines to make changes to exempt all changes arising from settlement agreements or bankruptcies because the DFPI believes that the above-described changes adequately limit the circumstances in which providers must issue a new disclosure.

Comment 1.7.12. Kapitus notes that the disclosures call for providing the amount of funds that will be provided to recipient, less deductions for other financing payoffs and payments to third parties. Kapitus notes that this will create problems for the timing of the disclosures when the amount that needs to be paid for other financings or to third-parties changes over time.

Response to Comment 1.7.12. In response to Kapitus and other commenters, the DFPI substantially revised the disclosure requirements such that net payment to recipients is still disclosed, but recipients are also advised that what they are paid directly may change if amounts due under obligations change. (See, e.g., Section 910, subd. (a)(2)(iii).) The DFPI also added a section explaining that new disclosures to a recipient are not required where the amount paid to the recipient changes due to a change in amounts owed by the recipient. (See section 901, subd. (a)(15).)

Comment 1.7.13. Kapitus requests that the DFPI minimize the disclosure of estimates in sales-based financing disclosures and instead highlight information "such as cost of capital or repayment percentages."

Response to Comment 1.7.13. The DFPI declined to adopt Kapitus' requested change to ensure consistency across disclosures and because the disclosures based upon estimated income are likely to assist recipients in understanding the likely costs of their financing and how those costs compare to other offers.

Comment 1.7.14. Kapitus stated that the historical method's requirement that providers set the number of months they consider when estimating a recipient's future income is problematic because providers would need to average more months from seasonal businesses than other types of businesses. Kapitus states that as a result, providers will be forced to require a greater number of months for all recipients even though they only need more months for certain businesses.

<u>Response to Comment 1.7.14.</u> The DFPI has addressed Kapitus' concern by revising the historical method such that providers can set the number of months used to calculate future income by industry, financing amount, or both.

<u>Comment 1.7.15.</u> Kapitus requests that the underwriting method's audit exclude contracts where true-ups occur, contracts that are modified, contracts involving bankruptcies, and contracts where there is a break followed by early payoff of the contract, because these situations will skew the results of the audit.

<u>Response to Comment 1.7.15.</u> The DFPI revised the audit requirements to exclude contracts where terms have been modified, since payments made under a modified contract cannot be expected to mirror payments made before the contract was modified. While the other circumstances would result in different outcomes as well, the DFPI is not certain these circumstances merit exclusion, because they reflect actual performance on unmodified contracts. That said, the DFPI may reassess the merits of excluding additional transactions based upon additional stakeholder input in the future.

<u>Comment 1.7.16.</u> Kapitus requests that tolerances for calculations under the underwriting method be set higher to account for the inherent fluctuations in sales-based financing or allowing the weighted average not to include the average spread for the first year of implementation, to account for providers' learning curves in implementing the regulations.

<u>Response to Comment 1.7.16.</u> In response to Kapitus' and others' comments, the DFPI amended the audit thresholds to make them higher in the short term (15 percent rather than 10 percent for the last three audits, 10 percent rather than 5 percent for the last five audits) and added an additional retrospective review for the last seven audits that maintains a threshold of 5 percent. This provides more leeway in the rollout of the underwriting method while ensuring that over the long term, providers do not significantly underestimate recipients' future incomes, payments, and APRs.

<u>Comment 1.7.17.</u> Kapitus states that the regulations appear to favor long-term loans that may result in higher costs to recipients over short-term loans with lower costs because the disclosures do not require providers to state a recipient's total costs.

<u>Response to Comment 1.7.17.</u> The DFPI disagrees with the above characterization. The Finance Charge, which is the anticipated cost of financing, must be disclosed prominently on the disclosure form. The DFPI also amended the regulation to disclose the total payment amount.

<u>Comment 1.8 from George Uberti.</u>

<u>Comment 1.8.1.</u> Mr. Uberti asks that the DFPI draft a regulation explicitly stating that the disclosure requirements apply to nondepository subsidiaries of depository institutions.

Response to Comment 1.8.1. This comment was not submitted within the comment period.
However, please see response to Comment 1.10.

Comment 1.9 dated October 28, 2020 from the Responsible Business Lending Coalition
(RBLC).

Comment 1.9.1. RBLC recommends that the DFPI require periodic reporting from providers
that use the underwriting method to ensure that providers are accountable for conducting
accurate audits under the underwriting method. RBLC also suggests this reporting can help
improve on the rules by providing data to better assess the merits of the audit thresholds.

Response to Comment 1.9.1. The DFPI does not disagree that periodic reporting from
providers who use the underwriting method may be appropriate for the reasons stated by
RBLC but believes RBLC's recommended changes are more appropriate for future
consideration.

Comment 1.9.2. RBLC recommends revising the proposed calculation of APR spread such
that the APR spread is not measured in absolute points of difference between disclosed and
actual APR but measured in terms of percent of difference. RBLC recommends this because
the same absolute difference between the disclosed APR and the actual APR matters less for
transactions with higher APRs. RBLC proposed language that would require subtracting the
retrospective APR from the disclosed APR, and dividing that number by the disclosed APR.

Response to Comment 1.9.2. The DFPI agrees with RBLC's reasoning and adopted changes
reflecting RBLC's recommendation in section 931, subdivision (a)(4)(C). However, the DFPI
did not adopt RBLC's recommended language, and instead adopted language requiring the
provider to subtract the disclosed APR from the retrospective APR, and divide this number by
disclosed APR. The DFPI chose this method because the purpose of the APR spread is to
determine how much retrospective APR exceeded disclosed APR.

Comment 1.9.3. RBLC recommends that the DFPI prohibit providers from disclosing anything
except an annual interest rate or annual percentage rate as a "rate" and using the term
"interest" to describe anything except an annual interest rate. RBLC states that providers often
use these terms to describe various cost metrics that lead to recipient confusion.

Response to Comment 1.9.3. The DFPI declines to implement this change because the
requested changes require additional consideration. It appears the recommendations would
assist in effectuating the purpose of SB 1235, but the primary purpose of this rulemaking is to
set out a framework for the disclosure forms set forth by statute and so the DFPI believes
these requested changes are more appropriate for possible future consideration.

Comment 1.9.4. RBLC recommends that every time a price metric is disclosed to a recipient
outside the full disclosure, the provider should also be required to disclose an APR, because
inconsistent price metric disclosures make it difficult for recipients to compare products.

Response to Comment 1.9.4. The DFPI does not disagree with RBLC's reasoning but believes that this proposal is more appropriate for future consideration. This rulemaking is focused on the formatting, contents, and calculation methods for the disclosures mandated by SB 1235, and as such, the DFPI declines to adopt regulations related to statements made by providers outside the context of the required disclosures.

Comment 1.9.5. For financing that is refinanced, RBLC recommends that the DFPI adopt a regulation requiring providers to consider payment of fixed finance charges from a previous financing from the provider as finance charges for the new financing's APR calculation. RBLC states that it is common for financing providers to refinance customers' transactions and that in doing so, they are often able to collect a financing fee twice (once in the payoff amount for the previous transaction, and then again as a new charge for the new transaction).

Response to Comment 1.9.5. The DFPI declines to adopt RBLC's recommended change because the proposal requires further study and assessment. The recommended change would require the DFPI's regulation to diverge from TILA calculation methods for APR. While the DFPI is not opposed to deviations from TILA when merited by SB 1235's purposes, further consideration is necessary in this case because the recipient is already required to pay the finance charges from the previous financing at the time of refinancing and would be required to pay those charges whether the recipient refinanced with the original financing provider or a new financing provider.

Comment 1.9.6. RBLC urges the DFPI to initiate small-business rulemaking related to "unfair, deceptive, and abusive acts or practices in connection with the offering or provision of commercial financing." RBLC also recommends that the DFPI establish a public complaint portal where community groups can monitor complaints related to small business financing.

Response to Comment 1.9.6. The DFPI declines to adopt RBLC's proposals in this rulemaking because the recommendation is beyond the scope of this rulemaking. The recommendation does not directly relate to enabling the disclosures required by SB 1235.

Comment 1.9.7. RBLC recommended that the DFPI publish formulas that providers can use to calculate APR in common software to ease providers' compliance with the regulations.

Response to Comment 1.9.7. The DFPI will further consider this recommendation and determine if publication of appropriate formulas is appropriate, but because publication of compliant formulas would not constitute a rule of general applicability (as other computation tools compliant with Regulation Z would still be permitted), the DFPI does not believe it is necessary to publish such formulas as part of the rulemaking process.

Comment 1.9.8. RBLC recommends changing the disclosure of the "Funding You Will Receive," later renamed "Funding Provided," to include amounts used to refinance loans from unrelated providers. This would ensure that a recipient is not provided with a confusing $0 "Funding Provided" disclosure when funds are being used to refinance a transaction from another provider.

Response to Comment 1.9.8. The DFPI substantially revised the "Funding Provided" disclosures to reflect the entire amount financed, with no deductions of amounts to pay off other financings or third parties. This change incorporates RBLC's recommendation.

Comment 1.9.9. RBLC notes that section 910, subdivision (a)(3)(C)(iii) appears to have been formatted incorrectly, as it includes requirements for contracts with adjustable, non-determined interest rates and requirements for contracts where no part of the finance charge is based upon an interest rate.

Response to Comment 1.9.9. The DFPI agrees with RBLC's comment and implemented RBLC's recommended change.

Comment 1.9.10. RBLC recommends that for disclosure of the maximum non-interest finance charge (see, e.g., Section 910, subd. (a)(9)), for clarity to the recipient, the DFPI should add the word "still" in front of "need pay all or portion of the finance charge…"

Response to Comment 1.9.10. The DFPI agrees with RBLC's reasoning and implemented the change.

Comment 1.9.11. RBLC recommends that for disclosure of additional prepayment fees that are not part of the finance charge, the DFPI revise the following sentences as follows "If you pay off the financing early you must also pay the following additional fees not already included in the finance charge:" and ""If you pay off the financing early you will not pay additional **prepayment** [addition] fees not already included in the finance charge." RBLC recommends the addition of the word "prepayment" to clarify that a recipient may still need to pay additional fees unrelated to prepayment (e.g., late fees). RBLC recommends removing the language "not already included in the finance charge" because RBLC states that the language seems confusing and could be removed to make the disclosure shorter.

Response to Comment 1.9.11. The DFPI agrees and removed the suggested language based upon RBLC's reasoning. The DFPI did not add the word "prepayment" because the DFPI believes the word is not necessary in the context (where the additional fees are already referenced in the context of the act of prepayment).

Comment 1.9.12. RBLC recommends adding "Estimated" before "Average Monthly Cost" in the Commercial Open-End Credit Disclosure (Section 911, subdivision (a)(13)(A)).

Response to Comment 1.9.12. The DFPI declines to adopt this change because the average monthly cost disclosed in the context of the open-end credit disclosure is the actual cost a recipient would pay if they borrowed and paid according to the assumptions disclosed to the borrower. These factors are within the recipient's control, and so the DFPI does not believe it is necessary to disclose the monthly payment amount as an estimate. This circumstance is distinguished from sales-based financing, where the periodic payment amounts vary based

upon factors beyond the recipient's control, and disclosures that certain amounts are based upon estimates is more appropriate.

Comment 1.9.13. RBLC recommends deletion of the "Payment" row from the factoring disclosure because recipients of factoring financing do not make payments.

Response to Comment 1.9.13. The DFPI declines to implement RBLC's recommended change because the explanation drafted by the provider for the third column of the payment section will help the recipient understand how the financing is repaid.

Comment 1.9.14. RBLC recommends deletion of the "Estimated Term" section for factoring transactions since factoring recipients do not typically made payments.

Response to Comment 1.9.14. The DFPI declines to implement RBLC's recommended change because the explanation drafted by the provider for the third column of the payment section will help the recipient understand what term is disclosed.

Comment 1.9.15. RBLC recommends relabeling the "Prepayment" disclosure as "Repurchase Costs" because prepayment may be confusing to recipients in the factoring context, who may mistakenly think that they have to make payments under the contract.

Response to Comment 1.9.15. The DFPI agrees and implemented this change for the reason stated by RBLC.

Comment 1.9.16. RBLC recommends revising the language for prepayment policies without additional fees as follows: "If you repurchase the [description of legally enforceable claim] before the due date, you will not be required to pay any additional fees and charges **that are** not already ~~included in~~ **part of** the finance charge."

Response to Comment 1.9.16. The DFPI revised the language of the disclosure to conform the language with other sections, so the language now reads "you will not be required to pay any additional fees and charges." Because the DFPI has substantially revised the provision, RBLC's proposed changes are no longer relevant.

Comment 1.9.17. RBLC suggests clarifying whether section 913 ("Factoring Disclosure Formatting and Contents for Example Transactions") would apply to a transaction where a specified, identified invoice is being factored, and suggests in that case, no additional example would be required.

Response to Comment 1.9.17. The DFPI declines to adopt RBLC's clarification because Financial Code section 22803 outlines the circumstances in which example disclosures are permitted and section 913 of the regulations provides the formatting required for such example disclosures.

Comment 1.9.18. RBLC recommends adding the word "average" in front of the disclosure of the monthly income estimate used to calculate APR for sales-based financing. RBLC recommends this change because the income estimates of providers may vary over the course of the term.

Response to Comment 1.9.18.  The DFPI agreed with this recommendation and adopted RBLC's recommended change.

Comment 1.9.19. RBLC recommends deleting the word "Estimated" from in front of "Finance Charge" in the finance charge disclosure for sales-based financing because sales-based financing products typically have fixed finance charges.

Response to Comment 1.9.19. The DFPI agreed with this recommendation and adopted RB'C's recommended change.

Comment 1.9.20. RBLC recommends removing the language permitting providers of sales-based financing to state that a recipient's finance charge will not increase if they take longer to pay off what they owe where the recipient's finance charge is not based upon interest. RBLC states that the disclosure is equally true for traditional closed-end loans, and that small businesses are unlikely to mistakenly believe that the finance charge may increase if they take longer to repay.

Response to Comment 1.9.20. The DFPI declined to adopt this change because it is the DFPI's understanding that fixed finance charges are more common for sales-based financing than closed-end transaction. That said, the DFPI will further study this concept and consider further revisions in future rulemakings.

Comment 1.9.21. RBLC recommends removing the words the "other than interest since your last payment" language from the prepayment policy disclosure for lease financing disclosure since typical leases do not involve interest charges.

Response to Comment 1.9.21. The DFPI declined to adopt this change because the DFPI did not receive input from lease financing providers on this provision. The DFPI may revisit this question in future rulemaking.

Comment 1.9.22. RBLC asked whether the reference to "part (e)" in section 931, subdivision (a)(6) should have been a reference to "part 5."

Response to Comment 1.9.22. RBLC is correct that the reference should have been to paragraph (5), so the DFPI has revised the regulation  in response to the comment.

**Comment Letter 1.10 dated October 28, 2020 from California Bankers Association ("CBA").** CBA believes strongly that "subsidiaries, affiliates and entities otherwise related to depository institutions" engaged in the business of lending should be exempted from the proposed regulations. CBA requests a clarifying definition of "depository institution" (as set

forth in statute) to address that issue, as well as alternatives to address the issue in a different way.

Response to Comment 1.10. The Department disagrees with CBA's requests. First, the term "depository institution" is already defined in Financial Code section 22800, subdivision (h). Second, CBA's requested "clarifying definition" would be an expansion of the statute's definition, not a clarification. Similarly, CBA's suggested revision of the term "provider" would also be an expansion of the definition set forth in Financial Code section 22800, subdivision (m). No change to the regulations is warranted by this comment.

**Comment Letter 1.11 dated October 28, 2020 from Small Business Financial Solutions, doing business as Rapid Advance ("RA").**

Comment 1.11.1. RA states the use of the phrase "about the recipient" in the Department's clarification of the phrase "at the time of extending a specific commercial financing offer" set forth in proposed section 2057(a)(4)(A) (since renumbered as section 900) is problematic because it creates an overbroad number of situations requiring disclosures.

Response to Comment 1.11.1. The Department added a clarifying definition (in the same section) limiting the information "about the recipient" that triggers the disclosure requirement.

Comment 1.11.2. RA suggests further revisions to proposed section 2057(a)(4) (since renumbered as section 900) regarding what should prompt disclosure. Specifically, RA suggests that the rule be revised to reflect that "a specific is made when a 'specific amount, term, cost and periodic payment amount' is quoted to a recipient." RA also suggests that, as written, the rule violates the clarity standard of the APA.

Response to Comment 1.11.2. See the Department's response to Comment 1.4.1.

Comment 1.11.3. In further comment on proposed section 2057(a)(4) (since renumbered as section 900), RA states that requiring disclosures "so early in the process will lead to significant issues," mostly with respect to the potential high volume of disclosures that may be required in the ordinary course of business to even a single recipient. RA outlines numerous problems with requiring disclosures prior to consummation.

Response to Comment 1.11.3. See the Department's response to Comment 1.4.1.

Comment 1.11.4. RA requests an amendment to proposed section 2057(a)(4) (since renumbered as section 900) that would not require new disclosures when amending terms of an existing agreement if the amendment is the result of the recipient's default. RA explains that it is common in situations of default to provide the defaulting recipient extensions, etc., often with no new fees and being required to provide new disclosures at that time could create confusion. Moreover, RA indicates that TILA requires new disclosures only when a refinancing is made, which includes amendments to the existing agreement where the rate is increased from the previously agreed upon rate, but not a change in payment amount or term.

Furthermore, RA believes it is burdensome to require new disclosures when an amendment to reduce payments, etc. might be required for circumstances beyond either party's control (e.g., COVID-19). RA argues that because the proposed regulations require disclosure even when the terms of the loan are unchanged, the regulations violate the necessity standard of the APA.

Response to Comment 1.11.4. See the Department's response to Comment 1.4.1.

Comment 1.11.5. RA comments that section 920 is unclear as to whether a provider must obtain a copy of the recipient's signature for each disclosure made, or whether a signature is only necessary when disclosures have been provided for a financing that has been approved and funded. RA argues it makes no sense to obtain signatures for each disclosure and instead makes sense to obtain only the signature for disclosures for funding the recipient actually receives. RA recommended revised language to section 920 to effectuate this concept.

Response to Comment 1.11.5. The Department added new subsection (c) to section 920, clarifying that signatures are not required for transactions that are not consummated, and, where multiple disclosures are provided in advance of a consummated transaction, the only disclosure that requires signature is the final disclosure corresponding to the consummated transaction.

Comment 1.11.6. RA believes there is uncertainty in the regulations as to how closed-end transactions and sales-based financing transactions differ. RA argues that for loan products with unique payment features, including variable payments that require periodic minimum amounts and therefore have a fixed term, the proposed regulations should make clear that such products are closed-end transactions and not sales-based financing products. RA suggests this issue be resolved by amending the definition of "closed-end transaction" and "sales-based financing."

Response to Comment 1.11.6. Please see response to Comment 1.2.18.

Comment 1.11.7. RA argues that section 2057(a)(25) of the proposed text (renumbered as section 900) should be clarified because it does not adequately address differences in different financing products. RA suggests that the contractual term should be referred to in the definition for these products rather than the "anticipated" term. RA notes that the two should be the same but the language, as proposed, creates some ambiguity that may create litigation risk for providers. TILA and other state lending disclosure laws are all based on the contractual term and not the anticipated term.

Response to Comment 1.11.7. The Department modified the section to use the "contracted" term as suggested rather than the "anticipated" term. The Department also further separated the different types of financings for more precise definitions of the word "term" (see new section 900, subdivision (26)(D), specifically).

Comment 1.11.8. RA notes that the proposed regulations use the term "inventory financing," but fail to define it.

<u>Response to Comment 1.11.8</u>. The Department found this comment helpful and removed references to the undefined term.

<u>Comment 1.11.9</u>. RA states that "[t]his regulation violates both the Clarity standard and the Consistency standard of the APA. The regulation is in conflict with other state lending disclosure laws in violation of CA Government Code section 11342.2."

<u>Response to Comment 1.11.9</u>. Given the placement of this comment in RA's comment letter, it was unclear which regulation provision RA was referring to with this comment, or whether it was meant to apply to the entire package. Furthermore, RA fails to make clear how the regulations, either individually or as a whole, conflict with other state lending disclosure laws since this is the state's first effort to require disclosures under these types of commercial financing transactions. This comment was after the initial text was proposed, and the Department has repeatedly endeavored to clarify the regulations through multiple rounds of public commentary and notes that RA has not raised this issue in subsequent comment periods (nor have other stakeholders).

<u>Comment 1.11.10</u>. RA suggests that, to improve the overall effectiveness of the disclosures, the provider should be required to print what type of product is being offered either below/above/or in the same sentence as "Offer Summary." Example: "Offer Summary for Sales Based Financing" or "Offer Summary" and then below that "Sales Based Financing."

<u>Response to Comment 1.11.10</u>. The Department found this comment helpful and modified section 901, subdivision (a)(1) to require a description of the type of product being offered.

<u>Comment 1.11.11</u>. RA states that although the proposed regulations specify how many rows and columns are to be used in the disclosure, they do not specify whether each cell should be outlined or not. The proposed regulations permit one provider to create rows and columns with the cells outlined and another could create rows and cells without the outlines. For consistency, the proposed regulations should be amended to either require or prohibit outlines of the cells in the rows and columns. RA believes outlining would be better and more helpful to small businesses and argues it would make the disclosures more consistent with other disclosure laws in the US.

<u>Response to Comment 1.11.11</u>. The Department found this comment helpful and revised section 901, subdivision (a)(10) to require rows/columns to be outlined.

<u>Comment 1.11.12</u>. RA suggests adding guidance on how wide or narrow the rows and columns should be, so the disclosures provided by different companies are more similar in appearance.

<u>Response to Comment 1.11.12</u>. The Department found this comment helpful and revised section 901, subdivision (a)(8) to address row/column width.

Comment 1.11.13. RA notes that the regulations do not mandate a font size and suggests this could be problematic for various reasons related to the clarity and consistency of the disclosures.

Response to Comment 1.11.13. The Department found this comment helpful and revised section 901, subdivision (a)(7) to address font sizes..

Comment 1.11.14. RA notes that the proposed regulations do not require numerical values (e.g., percentage, date, dollar amounts, etc.) to be disclosed numerically. Accordingly, the proposed regulations would permit some providers to disclose an APR as "26.5%" and other providers to disclose the same APR as "Twenty-Six and One-Half Percent." RA suggests requiring numerical values.

Response to Comment 1.11.14. The Department found this comment helpful and added new section 901, subdivision (a)(14) to require numerical values..

Comment 1.11.15. RA notes that the proposed regulations permit various descriptions of the products to be included with no restrictions. RA fears this could lead to descriptions dominating the disclosures and making them ineffective because the descriptions could easily force the disclosures to span ten or more pages (a strategy some providers might use to make it difficult for small businesses to focus on what matters to them).

Response to Comment 1.11.15. The Department found this comment helpful and revised section 901, subdivision (a)(9) to limit descriptions..

Comment 1.11.16. RA notes that some sections refer to the "best information reasonable available." RA argues that "disclosure laws generally avoid requirements for things such as 'best available' as such words create unneeded litigation risk. Whether something is the best or not is a subjective standard. It would be better to use a phrase that information used in good faith or similar term." RA also suggests that section 2060, subdivision (a) (the subdivision itself, not the content) should be deleted since there is no subdivision (b).

Response to Comment 1.11.16. The Department disagrees with RA on this comment. The Department borrowed this requirement directly from TILA regulations regarding estimates, which require disclosures based upon the "best information reasonably available at the time of the disclosure…" (12 C.F.R. § 1026.17(c).) This requirement has worked for consumer transactions, so the Department sees no reason why it will present an issue for commercial transactions. The Department declined to delete subdivision (a) because it does not agree with RA's assertion that it is inconsistent with generally accepted outlining rules, nor does it make it appear as if a subdivision (b) is missing.

Comment 1.11.17. RA notes that proposed section 2060(a)(3) (renumbered as section 901) provides that the term is to be disclosed in units of years and months. RA suggests that this section is unclear whether it would require a six-month transaction to be disclosed as "0.6 years, 0 months," "0.5 years," or "0 years and 6 months." Accordingly, RA suggests that for

terms of less than one year, providers be required to disclose just the number of months (to the nearest two decimal places) or the total number of days. For terms of a year or more, RA states that the current wording in the is sufficient.

Response to Comment 1.11.17. The Department found this comment helpful and revised section 901, subdivision (a)(4) in the manner suggested by RA (total number of days for terms less than a year)..

Comment 1.11.18. RA notes that proposed section 2060(a)(5) (renumbered as section 901) requires the disclosure of the APR to the nearest ten basis points but notes that "basis points" is undefined. RA suggests the Department remove the reference to basis points and replace it with one decimal place but notes issues with that approach as well.

Response to Comment 1.11.18. The Department found this comment helpful and included an example of what the phrase means.

Comment 1.11.19. RA argues that although row one, column two of the required disclosure set forth in proposed section 2061 (renumbered as section 910) calls for disclosure of the amount of funds that will be provided to the recipient excluding any deductions, it is unclear if this amount is intended to be a gross loan amount or net loan amount. RA argues that it should be the gross loan amount for a variety of reasons, including that it will be less confusing to recipients.

RA also points out that the proposed Regulations are inconsistent with how punctuation is handled: some disclosures include quotation marks with punctuation inside the quotations and other places the punctuation is outside the quotations.

Response to Comment 1.11.19. The Department found this comment helpful and modified section 910, subdivision (a)(2)(B) to require the "amount financed" (as defined in section 900, subdivision (a)(31)). With respect to punctuation, the Department modified the regulations to make the disclosures consistent and grammatically correct.

Comment 1.11.20. RA argues that, depending on how the Department responds to the issue raised in Comment 1.11.19, row one, column three, which calls for a description of how the amount in column two was calculated, will need to be revised. RA suggests, assuming that the Department agrees with its Comment 1.11.19, that the column should have a description of the amount in column two and that it be "the amount of credit provided to you or on your behalf" or similar.

Response to Comment 1.11.20. The Department found this comment helpful and modified section 910, subdivision (a)(2)(C) significantly, requiring explanation (and reference to a new itemization attachment) for discrepancies between the amount financed and the amount received, etc., e.g., that funds were used to pay off creditors or otherwise.

Comment 1.11.21. RA notes several subparagraph typos in proposed section 2061(a)(3)(C) (renumbered as section 910).

Response to Comment 1.11.21. The Department found this comment helpful and corrected the provisions in question.

Comment 1.11.22. RA argues that proposed section 2061(a)(4)(C) (renumbered as section 910), regarding row three, column three which requires the provider to include the provider's calculation of the finance charge with an amount and description of each amount, will cause significant confusion and detract from other disclosures. RA further argues that TILA does not require such descriptions for similar reasoning. RA suggests removing this requirement.

Response to Comment 1.11.22. The Department found this comment helpful and modified the provision to remove the provider's calculation of the finance charge and to instead simply state "This is the dollar cost of your financing.".

Comment 1.11.23. RA argues that proposed section 2061(a)(5)(D) (renumbered as section 910), calling for an "explanation of the term," is confusing and unnecessary. RA suggests removing it and/or providing form language.

Response to Comment 1.11.23. The Department found this comment helpful and removed the section in question.

Comment 1.11.24. RA argues that proposed section 2061(a)(7) and (a)(8) (renumbered as section 910), relating to prepayment penalties, create "material issues." RA notes that TILA requires only a simple statement regarding prepayment penalties as opposed to requiring a disclosure of penalty amounts in order to avoid confusion. RA suggests we follow TILA's lead in terms of the disclosure, because providers can easily manipulate the regulations as drafted by recharacterizing fixed finance charges previously charged at origination as interest charges earned on the first day of the transaction.

Response to Comment 1.11.24. The Department did not adopt RA's requested change because it does not anticipate that providers will attempt what arguably may be a deceptive recharacterization of fixed finance charge made for the purpose of evading disclosure requirements.

Comment 1.11.25. RA argues that proposed section 2061(a)(10) (renumbered as section 910) exceeds the Department's authority because "it does not implement, interpret, or make specific any provision of SB 1235."

Response to Comment 1.11.25. See Department response to Comment 2.6.2.

Comment 1.11.26. RA argues that although row one, column two of the required disclosure set forth in proposed section 2065 (renumbered as section 914) calls for disclosure of the amount of funds that will be provided to the recipient excluding any deductions, it is unclear if this

amount is intended to be a gross financing amount or net financing amount. RA argues that it should be the gross financing amount for a variety of reasons, including that it will be less confusing to recipients.

Response to Comment 1.11.26. The Department found this comment helpful and modified the provision to require the "amount financed" (as defined in section 900, subdivision (a)(31)).

Comment 1.11.27. RA suggests that row four, column two/three of proposed section 2065 (renumbered as section 914) incorrectly requires *all* periodic payments to be estimated and specified. RA suggests the section be amended since what was seemingly intended, a single average estimated payment to be disclosed, is not clearly reflected in the language.

Response to Comment 1.11.27. The Department found this comment helpful and modified the section (now section 914, subdivision (a)(6)(B)(i)) to require an average.

Comment 1.11.28. RA argues that proposed section 2065(a)(8) and (a)(9) (renumbered as section 914), relating to prepayment penalties, has the same issues as specified above in Comment 1.11.24.

Response to Comment 1.11.28. The Department did not adopt RA's requested change because it does not anticipate that providers will attempt what arguably may be a deceptive recharacterization of fixed finance charge made for the purpose of evading disclosure requirements.

Comment 1.11.29. RA argues that proposed section 2065(a)(11) (renumbered as section 914) has the same issues as outlined above in Comment 1.11.25.

Response to Comment 1.11.29. See Department response to Comment 2.6.2.

Comment 1.11.30. RA states that it is unclear why the regulations require a provider to use the same number of months for all transactions in calculating the average monthly sales, income or receipts. RA argues that it makes no sense to require the same number of months to be considered for all transactions since estimated terms may vary by a recipient's requirements. RA suggests amending the provision to remove that provision or otherwise allow for discretion where appropriate in the length of time to consider.

Response to Comment 1.11.30.  The Department found this comment helpful and removed the requirement for the same number of months to be used in calculations for all transactions.

Comment 1.11.31. RA notes that the proposed regulations do not account for a situation where a recipient gives a provider fewer than the number of requested statements. RA suggests including a provision that accounts for this situation.

Response to Comment 1.11.31. The Department found this comment helpful and added new section 930, subdivision (b)(4)(B) allowing a provider to exclude from its calculations any months that it did not receive requested documentation.

Comment 1.11.32. RA notes that the proposed regulations do not permit distinctions between new and renewal transactions. RA states that while a provider might require 12 months of statements for a new transaction, a renewal of an existing agreement does not often require such review. RA suggests amending the provision to account for these types of situations.

Response to Comment 1.11.32. See Department response to Comment 2.7.20.

Comment 1.11.33. RA notes that proposed section 3000 seems redundant to the other sections that already require the APR to be disclosed. If true, RA suggests this section violates the necessity standard of the APA and should be removed.

Response to Comment 1.11.33. The Department found this comment helpful and removed the provision in question.

Comment 1.11.34. RA included a suggested form for the required disclosures and suggests the Department adopt the edits contained therein or otherwise incorporate the proposed changes.

Response to Comment 1.11.34. The included form encapsulates a variety of the proposed comments submitted by RA and the Department has otherwise revised the required disclosures. As indicated in response to other comments, some of the proposed changes were helpful and others were rejected for the reasons stated.

Comment 1.11.35. RA sets forth reasoned arguments as to why it believes APR is the wrong choice for disclosing the cost of financing as an annualized rate. The first argument is that the mechanism by which the Department has indicated APR should be calculated (in accordance with Appendix J, 12 C.F.R. Part 1026), does not account for amendments that may occur to that section.

Response to Comment 1.11.35. The DFPI did not adopt RA's recommendation because the APA does not allow regulations to incorporate prospective amendments to documents unless those amendments are subject to the APA process.

Comment 1.11.36. RA notes that Regulation Z only covers closed-end transactions and does not apply to open-end transactions. RA states that this is a material problem because the proposed regulations would require open-end financial products to calculate APR based on a

closed-end transaction calculation. RA suggests using TILA's specific open-ended APR calculations instead.

Response to Comment 1.11.36. See the Department's response to Comment 1.4.11.

Comment 1.11.37. RA notes that proposed section 3001(b) (renumbered as section 940) states that a disclosed APR shall be deemed accurate if it is not more than 1/8 of 1 percentage point "above or below" the calculated APR. RA notes this language exists in TILA and has been the subject of significant litigation in the past. RA suggests amending the language to make clear that overestimations of APR should not be deemed inaccurate since it does not harm the recipient.

Response to Comment 1.11.37. The Department found this comment helpful and added new section 955 addressing tolerances generally, including the overestimation amendment suggestion.

Comment 1.11.38. RA notes that proposed section 3001(d) (renumbered as section 940), which states that a provider, when calculating APR, can assume it can collect payments every calendar day even if it cannot do so, in conjunction with sections permitting providers to assume there are 30 calendar days in each month, will lead to inaccurate calculations of APR because there are many holidays and weekends in repayment terms. RA notes that TILA does not permit such assumptions. Because of these differences, RA notes that for the exact same financing offer, one offered to a consumer under TILA, and one offered to a small business under the proposed regulations, a significantly different APR would be disclosed. RA argues that because of this issue, as well as provisions of TILA itself, TILA preempts the proposed regulations.

Response to Comment 1.11.38. The DFPI declines to make changes in response to RA's comment because the DFPI believes it is unlikely recipients will frequently be comparing consumer and commercial financing offers. In addition, the assumption RA references has been removed and language mirroring TILA has been added. (Section 901, subd. (a)(16).) Furthermore, TILA does not preempt the regulations as drafted. The regulations do not conflict with TILA because the regulations, which are only applicable to commercial financing transactions, do not affect any consumer financing transactions that TILA covers.

Comment 1.11.39. RA notes that proposed section 3023(a)(3) (renumbered as section 952), which requires a financer to maintain a copy of the "evidence of transmission" of the disclosure to a recipient, contains no description on what constitutes such evidence. RA requests clarification on what such evidence may be and argues the provision otherwise violates the clarity standard of the APA.

Response to Comment 1.11.39. The DFPI disagrees that "evidence of transmission" violates the APA's clarity standard, as the terms "evidence" and "transmission" are easily understood by providers without further definition. That "evidence of transmission" provides flexibility to providers to develop reasonable and reliable standards does not mean that the regulatory language is unclear.

Comment 1.11.40. RA argues that proposed section 3023(a)(4) (renumbered as section 952), which requires providers to develop procedures designed to ensure recipients receive the disclosures from a broker, is practically impossible to accomplish based on how the section is structured. RA suggests instead requiring each financer to provide a copy of the disclosures to the recipient before consummation if it has not otherwise provided the disclosures.

Response to Comment 1.11.40. The Department found this comment helpful and modified the provision to allow direct disclosure to the recipient as an alternative option.

**Comment Letter 1.12 dated October 28, 2020 from Stripe ("Stripe").**

Comment 1.12.1. Stripe suggests that in mandating estimation methods for sales-based financing disclosures, the final regulations should adopt as a guiding principle the requirement in proposed section 2060(a)(9) (renumbered as section 901) to base estimates or assumptions on the best information reasonably available.

Response to Comment 1.12.1. The proposed regulations already require using the best information available where appropriate. No change to the regulations was warranted by this comment.

Comment 1.12.2. Stripe encourages the final regulations to promote the use of the underwriting method prescribed by proposed section 2092 (renumbered as section 931) for estimations of APR for sales-based financing instead of the historical method (in proposed section 2091, renumbered section 930) because the historical method could lead to misleading disclosures.

Response to Comment 1.12.2. The Department declines to implement a regulation that would "promote" the use of one method of estimating APR over another. Providers should be free to use the method that best suits their business practices, within the parameters already established.

Comment 1.12.3. Stripe suggests that, to encourage useful and meaningful disclosure, the Department should reconsider the appropriate audited APR thresholds generated by the audit prescribed in proposed section 2092 (renumbered as section 931) that would result in a provider being disallowed from using the underwriting method. Stripe argues the Department should determine the maximum allowable audited APR spreads by weighing the expected benefit to a recipient that is given the estimated APR based on the historical method against

the cost to a recipient of not having access to what a provider actually expects the estimated APR to be.

Response to Comment 1.12.3. In response to Stripe's and others' comments, the Department amended the audit thresholds to make them higher in the short term (15 percent rather than 10 percent for the last three audits, 10 percent rather than 5 percent for the last five audits) and added an additional retrospective review for the last seven audits that maintains a threshold of 5 percent. This gives providers more leeway in the rollout of the underwriting method while ensuring that over the long term, providers do not significantly underestimate recipients' future incomes, payments, and APRs. See also response to comment 1.2.9.

Comment 1.12.4. Stripe asks the Department to consider that some resulting variation between the retrospective APR and estimated APR for sales-based financing products is a "feature of their design rather than a bug." Stripe argues that the Department should consider allowing providers of sales-based financing products to provide an estimated APR range that shows, for example, the estimated APRs in multiple repayment scenarios, including the estimated APR if a recipient uses the maximum term length to repay a loan. In the alternative, Stripe argues that any penalty for excessive audited APR spreads over time should apply only where the audited APR spread is positive, meaning that the disclosed APR is consistently lower than the retrospective APR and that providers would not be penalized for disclosing APRs in excess of retrospective APRs.

Response to Comment 1.12.4. The Department does not read the audit requirements as drafted to require a reversion to the historical method when the audited APR spreads reflect that estimated APRs are consistently higher the retrospective APRs. As such, the Department declines to make the requested change.

Comment 1.12.5. Stripe asks the DFPI to consider in setting any maximum allowable audited APR spreads that the application of mandatory APR disclosure to sales-based commercial financing products is entirely novel. Stripe believes the Department may be able to better ground the appropriate audited APR spread cap in the future when the effects of the required disclosures and the benefits and costs to recipients are better understood. Stripe further believes that it would therefore be appropriate for the Department to phase in determination of maximum allowable audited APR spreads or penalties for excessive audited APR spreads sometime after final regulations go into effect.

Response to Comment 1.12.5. While the Department is open to modifying regulations in the future when there is more data available as Stripe suggests, the Department declines to take a "phase in" approach since to remove the tolerance requirement would invite gaming of the disclosures by unscrupulous providers and risk eliminating all benefits to borrowers of the ability to meaningfully comparison shop.

Comment 1.12.6. Stripe suggests that the final regulations should permit simplification of the mandatory disclosures where such simplification has the effect of making the cost of financing easier to understand. Stripe notes that the prescribed formats in sections 2061 through 2068

(now sections 910 through 917) of the proposed regulations contemplate many possible variations and complex features of commercial financing products. Final regulations should provide pathways to simplify required disclosures where a product's pricing or other terms can be more simply explained.

In addition, Stripe suggests that where mandatory disclosure is inapplicable, providers should be permitted to exclude inapplicable rows rather than trying to shoehorn their product into a concept. For example, the proposed regulations introduce the concept of a "draw period" for open-end credit plans. Stripe notes that the Department stated in the Initial Statement of Reasons that while "term" "is designed to reflect the length of time it will take for a financer to be repaid in connection with a specific advance," it "recognizes that… there may also be a time period during which a recipient may make draws under the agreement." Stripe argues that the final regulations should clarify that where a draw period does not differ from a term, separately describing a draw period is optional.

Response to Comment 1.12.6. While the Department declines to make the specific change requested, numerous changes to the definitions since the initial text have helped clarify these issues for each different type of financing.

Comment 1.12.7. Stripe recommends that the final regulations should balance risks of unexpected market changes with safe harbors for providers that adhere to the regulation requirements. For example, the final regulations should provide that calculations based on specified assumptions shall not be used as the basis for any civil claim as long as the assumptions are disclosed in the manner required by the regulations. Stripe further suggests that the final regulations should also build in phase-in periods that allow the Department to study their effects and should include enough time before becoming fully effective for providers to prepare to comply and seek clarifying guidance from the Department where necessary.

Response to Comment 1.12.7. The Department declines to implement this proposed change because it would provide a shield to liability for providers who purposefully mislead recipients by quoting unrealistically low payment and APR estimates. With respect to phase-in periods, see the Department's response to Comment 1.12.5.

**Comment Letter 1.13 dated October 26, 2020 from Quadra & Coll ("QC")**.

Comment 1.13.1. With respect to the $500,000 threshold for disclosures to be made, QC assumes but requests clarification that the regulation is meant to convey that the "approved advance limit" in the factoring context is the maximum advance that a financer is required to pay a recipient for the purchase of outstanding, unpaid legally enforceable claims under a factoring agreement, if the customer presents collectable accounts receivable qualifying the customer to receive the advance, the customer is not in default, and the customer requests such an advance. Alternatively, QC suggests the language could be revised to state, "'Approved advance limit' means the minimum amount that a financer is reasonably expected to advance to the recipient for legally enforceable claims that have not yet been paid." QC also

requests clarification whether the "approved advance limit" includes amounts to be held in a reserve account.

Response to Comment 1.13.1. The Department found this comment helpful and modified the definition to clarify that it does not include amounts held in a reserve account and that the definition refers to the maximum amount a provider *may* advance in exchange for outstanding, unpaid legally enforceable claims, not including previous distributions, to the extent those distributions have been repaid.

Comment 1.13.2. QC is concerned that the use of the word "term" in the factoring context may inadvertently prohibit a factor from providing information based on a term that is comparable to other types of financing the customers may be comparing when shopping for financing opportunities. QC recommends modifying the provision to allow use of a sample term within a reasonably expected range of terms.

Response to Comment 1.13.2. The Department found this comment helpful and modified section 900, subdivision (a)(26)(B) to allow the use of a sample term, as suggested by QC.

Comment 1.13.3. QC proposes changing how the finance charge for factoring transactions is determined in the following manner: "In a factoring transaction, the difference between **(a)** the face value on the invoice and **(b)** the amount paid directly to the recipient upon assignment of the legally enforceable claim to the financer, ~~but excluding~~ plus . . ."

Response to Comment 1.13.3. The Department revised the language of this section to clarify treatment of reserve amounts for the purposes of the finance charge calculation.

**Comment Letter 1.14 dated October 28, 2020 from Rewards Network ("RN")**.

Comment 1.14.1. RN suggests that a provider should be required to print what type of product is being offered either below/above or in the same sentence as "Offer Summary." Example: "Offer Summary for Sales Based Financing" or "Offer Summary" and then below that "Sales Based Financing." RN argues this will ensure that it is clear to the recipient what type of financing is being offered without having to study the wording in the disclosure chart itself and is critically important as the proposed regulations require the disclosures be provided long before contractual terms are typically provided.

Response to Comment 1.14.1. The Department found this comment helpful and modified the provision in a similar manner.

Comment 1.14.2. RN notes that although the proposed Regulations specify how many rows and columns are to be used, they do not specify whether each cell should be outlined or not. The proposed Regulations permit one provider to create rows and columns with the cells outlined and another could create rows and cells without the outlines. For consistency, RN argues the proposed regulations should be amended to either require or prohibit outlines of the cells in the rows and columns.

Response to Comment 1.14.2. The Department found this comment helpful and revised section 901, subdivision (a)(10) to require rows/columns to be outlined.

Comment 1.14.3. RN notes that there is no specified font size. RN states that the concern with this is that some providers could try to make the disclosures smaller or make the text very large so it consumes multiple pages (less likely a small business will read through multiple pages). For consistency, RN suggests the regulations should be amended to require a font size range (e.g., between 10 point and 14 point font) and that all of the disclosures be required to be in the same font size except the Offer Summary.

Response to Comment 1.14.3. The Department found this comment helpful and revised section 901, subdivision (a)(7) to address font sizes.

Comment 1.14.4. RN points out that the regulations do not require numerical values (e.g., percentage, date, dollar amounts, etc.) to be disclosed numerically. RN suggests the proposed Regulations require that any number that must be disclosed be disclosed in numeric value.

Response to Comment 1.14.4. The Department found this comment helpful and added new section 901, subdivision (a)(14) to require numerical values..

Comment 1.14.5. RN argues that the proposed regulations permit various descriptions to be included with no restrictions. RN fears this could lead to descriptions dominating the disclosures and making them worthless and could easily force the disclosures to span multiple pages (a strategy some providers might use to make it difficult for small businesses to focus on what matters to them). RN also suggests that section 2060, subdivision (a) (the subdivision itself, not the content) should be deleted since there is no subdivision (b).

Response to Comment 1.14.5. The Department found this comment helpful and revised section 901, subdivision (a)(9) to limit descriptions. The Department declined to delete subdivision (a) because it does not agree with RN's assertion that it is inconsistent with generally accepted outlining rules, nor does it make it appear as if a subdivision (b) is missing.

Comment 1.14.6. RN notes that the regulations refer to the "best information reasonable available." RN notes that disclosure laws generally avoid requirements for things such as best available as such words creates unneeded litigation risk. Whether something is the best or not is a subjective standard. It would be better to use a phrase that information used in good faith or similar term.

Response to Comment 1.14.6. The Department disagrees with RN on this comment. The Department borrowed this requirement directly from TILA regulations regarding estimates, which require disclosures based upon the "best information reasonably available at the time of the disclosure…" (12 C.F.R. § 1026.17(c).) This requirement has worked for consumer transactions, so the Department sees no reason why it will present an issue for commercial transactions. No change to the regulations was warranted by this comment.

Comment 1.14.7. RN notes that proposed section 2060(a)(3) (renumbered as section 901) provides that the term is to be disclosed in units of years and months. RN suggests that this section is unclear whether it requires a six-month transaction to be disclosed as "0.6 years, 0 months", "0.5 years", or "0 years and 6 months." Accordingly, RN suggests that for terms of less than one year, providers be required to disclose just the number of months (to the nearest two decimal places) or the total number of days. For terms of a year or more, RN states that the current wording is sufficient.

Response to Comment 1.14.7. The Department found this comment helpful and revised section 901, subdivision (a)(4) in the manner suggested by RN (total number of days for terms less than a year).

Comment 1.14.8. RN notes that proposed section 2060(a)(5) (renumbered section 901) requires the disclosure of the APR to the nearest ten basis points but notes that "basis points" is undefined. RN suggests the Department remove the reference to basis points and replace it with one decimal place but notes issues with that approach as well.

Response to Comment 1.14.8. The Department found this comment helpful and included an example of what the phrase means.

Comment 1.14.9. RN notes that the regulations require a sales-based financing provider to disclose the estimated payment, or if there are periodic payments, a list of the periodic payments. RN explains that all sales-based financings are based on variable payments as the payments will vary every day based on the card sales or gross revenue of the business. In this situation, RN argues that all that can be disclosed is an assumed payment amount based on the estimated terms and the applicable calculations required under the proposed regulations. RN further argues that the requirement to list the estimated periodic payments is simply not possible because there is no way to tell ahead of time what those daily variable payments would be as it is based on the recipient's sales. RN suggests permitting sales-based financings that are variable with no true-up mechanism to calculate the payments based on the estimated term and total payback amount and display only one estimated payment.

Response to Comment 1.14.9. The Department generally agrees that for payments that may vary based upon anticipated changes in income, the regulation should not require each varied payment to be specified, since a recipient should understand based upon the "Payment Terms" disclosure that payments may vary based upon income. For this reason, the Department revised the payment disclosure so that the estimated payment disclosed is the average amount of estimated periodic payments.

Comment 1.14.10. RN notes that the section discussing the use of the historical method requires a provider to use the same number of months for all transactions to calculate the average monthly sales, income, or receipts. RN states it is unclear why this "one size fits all" approach is being mandated. If a business operates in a seasonal market, for instance, a provider will generally require twelve months of historical statements.

Response to Comment 1.14.10. The Department found this comment helpful and removed the requirement for the same number of months to be used in calculations for all transactions.

Comment 1.14.11. RN notes that the historical method section of the proposed regulations does not account for a situation where a recipient gives a provider fewer than the number of requested statements. RN suggests including a provision that accounts for this situation.

Response to Comment 1.14.11. The Department found this comment helpful and added new section 930, subdivision (b)(4)(B) allowing a provider to exclude from its calculations any months that it did not receive requested documentation.

Response to Comment 1.14.12. RN notes that the historical method section of the proposed regulations does not permit distinctions between new and renewal transactions. RN states that while a provider might require 12 months of statements for a new transaction, a renewal of an existing agreement does not often require such review. RN suggests amending the provision to account for these types of situations.

Response to Comment 1.14.12. See Department response to Comment 2.7.20.

Comment 1.14.13. RN notes that proposed section 3000 seems redundant to the other sections that already require the APR to be disclosed. If true, RN suggests this section violates the necessity standard of the APA and should be removed.

Response to Comment 1.14.13. The Department found this comment helpful and removed the provision in question.

Comment 1.14.14. RN states that it believes APR is the wrong choice for disclosing the cost of financing as an annualized rate and incorporates arguments made by other commenters in support of this comment.

Response to Comment 1.14.14. Please see the Department's response to Comment Letter 1.4.

**Comment Letter 1.15 dated October 28, 2020 from Equipment Leasing and Finance Association ("ELFA")**.

Comment 1.15.1. ELFA asks the Department to consider that if the Truth-in-Lending Act has provisions regarding a financial product within the scope of the California laws and regulations (such as closed-end credit), then compliance with TILA's provisions will be sufficient in lieu of compliance with California law. Thus, companies that already comply with TILA's closed-end credit provisions for consumers, can extend those same disclosures (in content and format) to non-consumers in a much more seamless manner and with less disruption or error.

Response to Comment 1.15.1. The Department declines to adopt ELFA's proposed approach because ELFA failed to articulate how TILA requirements will meet the requirements of SB 1235 and allowing this approach could interfere with recipients' ability to compare disclosures issued under these regulations and disclosures issued pursuant to ELFA's proposed revisions.

Comment 1.15.2. ELFA notes that there are references throughout the regulations excluding from "finance charges" "interest accrued since the recipient's last payment." ELFA argues this is too limited because the recipient's last payment may be a partial payment or may occur after one or more prior missed payments with respect to which interest has accrued but remains unpaid. ELFA further suggests there may also be other overdue payment obligations that the recipient has under the financing documents or payments made by the financer that the recipient failed to make in breach of the agreement that have accrued and unpaid interest. ELFA recommends that these references be changed to "accrued and unpaid interest" and not limited to just accrued interest since the recipient's last payment.

Response to Comment 1.15.2. The Department found this and similar comments helpful and modified the relevant provisions to remove the language limiting the explanation to unpaid interest accrued since the recipient's last payment.

Comment 1.15.3. ELFA notes that the definitions of "approved advance limit" and "approved credit limit" state "the maximum advance that a provider is required to pay," which does not take into account that many approvals contemplate multiple advances including in closed credit and lease financings and that these advances may be discretionary or subject to conditions precedent. For example, a maximum $1,000,000 lease credit approval is often disbursed in multiple advances based on the customer's delivery schedule, receipt of acceptable equipment and documentation, and there not being any event of default at the time of the advance. ELFA argues that the "required to pay" language is insufficient and requests that the language be changed to "can receive."

Response to Comment 1.15.3. The Department found this and similar comments helpful and modified the definitions to remove the aforementioned "required to pay" language in favor of language that instead identifies a maximum amount that a provider *may* provide under a particular agreement.

Comment 1.15.4. ELFA argues that the definition of "at the time of extending a specific commercial financing offer" could be construed to mean that a full disclosure would need to be made every time any communication is made to the customer relating to amount, rate or price even in preliminary negotiations prior to an approval and communication of agreed final terms. This would be extremely burdensome to the provider and confusing to the recipients. ELFA argues that this definition seems to conflict with the more reasonable approach in section 2070 (renumbered as section 920), Signatures, which says that the disclosures are to be obtained prior to consummation of the transaction. This makes much more sense since the disclosure will be based on the actual final agreed terms between the parties. For "comparison shopping"

purposes we believe that the recipient will be most interested in comparing the final offers of competing providers in choosing a provider.

Response to Comment 1.15.4. The Department made substantial revisions to the section in question in response to stakeholder input. Please see response to Comment 1.4.1.

Comment 1.15.5. ELFA notes that the regulations require a separate disclosure not only when there is a change in finance charge or APR but also when there is a change in payments or terms. ELFA argues this is administratively burdensome to the provider and confusing to the recipient as it seems to require a new disclosure any time that the provider, even at the customer's request, waives a payment default or grants an extension for payment or of the term to accommodate the recipient's needs. ELFA believe this fails to conform with the intent of the statute to provide for "comparison shopping" or further useful information when the recipient has already incurred the obligation and the provider is accommodating a recipient request.

Response to Comment 1.15.5. The Department found this and similar comments helpful and modified the relevant provisions by limiting the trigger for disclosures to circumstances that result in an APR increase.

Comment 1.15.6. ELFA argues that the definition of "depository Institution" should include depository subsidiaries and affiliates subject to federal regulation.

Response to Comment 1.15.6. The Department disagrees with ELFA's argument. The term "depository institution" is already defined in Financial Code section 22800, subdivision (h). ELFA's suggested inclusion would be an expansion of the statute's definition, not a clarification. No change to the regulations is warranted by this comment.

Comment 1.15.7. ELFA requests clarification of what is intended to be covered in the definition of "irregular payment." ELFA questions whether this term is intended to include charges unrelated to the financing such as payments made for property taxes, maintenance, insurance discharge of liens.

Response to Comment 1.15.7. The Department believes the definition of this term is already clear, especially when read with the other necessary, defined term "periodic payment." No change to the regulations is warranted by this comment. See response to Comment 3.12.3.

Comment 1.15.8. ELFA argues that the definitions "person who is presented with a specific commercial financing offer" and "recipient" do not provide adequate guidance about what relationship a recipient must have to California in order to trigger the disclosure requirements. ELFA suggests that the regulations would provide better guidance if recipients were defined to be persons having legal residence in California or entities having their principal place of business in California.

Response to Comment 1.15.8. The Department notes that the regulations already contain
provisions clarifying this issue in section 954. No change to the regulations is warranted by this
comment.

Comment 1.15.9. ELFA questions the intent of the definitional statement that "average" refers
to "mean." ELFA's understanding is that these terms are synonymous.

Response to Comment 1.15.9. The Department clarified the relevant provision and affirmed
ELFA's understanding with a provision that states "average" refers to the "arithmetic mean",
unless otherwise stated.

Comment 1.15.10. ELFA argues that section 2060, subsection (a)(3) (renumbered as section
901) is not as clear as it could be. ELFA notes that expressing the term in years and months
with partial months expressed as a decimal is not a market standard. ELFA suggests
expressing terms in months - e.g., instead of "4 years, 6 months," using 54 months. ELFA
believes that for at least some providers, this will be more consistent with documents and
systems used to prepare the disclosure forms.

Response to Comment 1.15.10. The Department did not make the change requested by ELFA,
because, for periods greater than one year, lay persons commonly refer to these periods in
years and months.

Comment 1.15.11. ELFA argues that section 2060, subsection (a)(4) (renumbered as section
901) includes two additional commonly used methods for calculating interest rates in addition
to 30/36. These are Actual/365 and Actual/360. ELFA suggests that any of these 3 methods be
allowed as long as the method is disclosed. For financings under $500,000, the difference in
interest rate is actually negligible and should be less than the 10 basis points set forth in
subsection (a)(5).

Response to Comment 1.15.11. The Department disagrees with ELFA's suggestion but
ultimately removed the section in question based on other commentary. No change to the
regulations is warranted by this comment.

Comment 1.15.12. ELFA argues that section 2066, subsection (a)(8) and (9) (renumbered as
section 915) requires that the disclosure include "finance charges other than interest accrued"
since the recipient's last payment" and also "prepayment charges." ELFA requests the
regulations include examples or what kinds of charges would fall into each category.

Response to Comment 1.15.12. The Department finds that this comment is addressed in
current section 943. No change to the regulations is warranted by this comment.

Comment 1.15.13. ELFA notes that section 2071 (renumbered as section 921) provides for
use of approved credit limits/approved advance limits for open-end credit plans, asset-based
loans, and factoring transactions, but not for lease transactions. However, ELFA argues that
both closed-end loans and leases often have approved credit limits although advances may be

made over time as equipment is delivered to and accepted by the recipient. For example, a lease credit limit approval may be for $1,000,000 for five $200,000 items to be delivered over a 6-month period with 5 separate $200,000 advances. The $1,000,000 represents the "net cost to the financer to acquire the property to be leased" but ELFA requests clarification that, as with open-end credit plans, asset-based loans and factoring transactions, the aggregate cost of the equipment subject to the credit approval is used to determine whether the lease financing or loan exceeds $500,000.

Response to Comment 1.15.13. In conjunction with how the threshold determinations are made (for some transactions, the "amount financed" determines whether the threshold is met), the Department addressed this issue by including new definitions to aid in determining the "amount financed" based on the type of transaction (e.g., lease transactions) under section 900.

**Comment Letter 1.16 dated October 28, 2020 from Senator Steven M. Glazer ("Glazer")**.

Comment 1.16.1. Glazer argues that proposed sections 2091 and 2092 (renumbered sections 930 and 931), which describe two methods for estimating the APR that will be disclosed to potential customers for sales-based financing, would create a situation where two firms offering the same terms on their financing could describe it to customers in different ways, advertising different APRs. Glazer notes that this is exactly what the legislation was seeking to prevent.

Glazer argues that the "historical method" should be the mandated method because the second method, the "underwriting method," invites abuse since the provider's projection of the recipient's cash flow will have a direct impact on the estimated APR that will be disclosed. Glazer suggests the underwriting method creates an incentive for the provider to manipulate the projection in order to offer an estimated APR that is low enough to entice the customer to opt for the financing being offered.

Glazer further argues that the safeguards built into the underwriting method to discourage any form of abuse are insufficient.

Glazer urges the Department to remove the underwriting method or, at the very least, that if a provider uses the underwriting method, they should be required to disclose to the recipient the difference between its projections under that method with the historical method. Glazer further suggests that providers should be required to disclose to the Department the actual gap between their estimated APR and actual APR for each transaction so that the Department will have the tools it needs to ensure providers are not misleading their customers about the cost of financing.

Response to Comment 1.16.1. The Department respectfully declines to implement Glazer's suggestion to make the historical method mandatory (which would eliminate the underwriting method) because the goal of providing two methods is to enable providers to make the most accurate estimates possible to the benefit of the borrowers. For some providers that may be

best accomplished by being able to consider information beyond a particular recipient's financial history. Of course, the Department recognizes the potential for manipulation with the underwriting method and therefore the Department built in additional requirements to ensure it is not abused to borrower detriment. While the Department respects Glazer's belief that the safeguards built into the underwriting method are insufficient, Glazer did not offer any explanation as to why the safeguards were insufficient.

Nonetheless, the Department has sought to fine tune the self-audit requirements based on Glazer's and other comments to help minimize the likelihood of abuse while simultaneously maximizing a provider's ability to use the underwriting method to the benefit of its customers. The Department respectfully declines Glazer's suggestion to require providers to disclose *both* calculations under the underwriting method and historical method. The Department believes that requiring both such disclosures at once risks confusing the recipient.

The Department does not disagree that periodic reporting to the Department from providers who use the underwriting method may be appropriate to ensure providers are not misleading their customers, however, the Department believes that such a requirement is more appropriately implemented in a subsequent rulemaking grounded in the authorities granted under SB 1235 and AB 1864 (Stats. 2020, ch. 157). AB 1864, which explicitly empowers the Department to require data collection related to financial products and services provided to small business recipients, had not passed at the time that the Department initially proposed the underwriting method rule. Since AB 1864's enactment, the Department has also begun to hire staff who will be focused on market monitoring. The Department is now better positioned than it was at the time of its initial proposal to consider a new regulation relating to data collection and small business financing.

**Comment Letter 1.17 dated October 23, 2020 from State Financial Corporation and Camel Financial ("SFCCF").**

Comment 1.17.1. SFCCF argues that the regulations ignore how asset-based lending is typically structured (lines of credit subject to a contract with a fixed term, with it being very common for a balance to be owing at any given time given that borrowers access the line of credit as needed and repay through the collection of accounts receivable). SFCCF suggests the regulations incorrectly base calculations on the assumption that the lender makes a single advance and the transaction ends with repayment of the first advance, not the length of the contract. SFCCF argues this has the effect of inflating the APR of asset-based loans since in reality any upfront costs are amortized over the life of the contract, not the initial advance/repayment period. SFCCF recommends the regulations be revised to make calculations based on the contractual term for loans less than one year, and if greater than a year, calculations should be based on a one-year term.

Response to Comment 1.17.1. The Department found this comment helpful and modified section 900, subdivision (a)(32) to include a specific provision for asset-based lending (subsection (D)). This provision specifies that the disclosure should assume a contractual term of the draw period, or one year, whichever is less.

Comment 1.17.2. SFCCF argues that how the proposed regulations would have asset-based lenders calculate the APR is confusing because it requires the amount of funds used in the calculation to be half of the maximum line of credit. SFCCF suggests this is problematic in situations where some part of the amount financed is used to pay off a senior lender because it is not uncommon for that amount to be more than half of the total amount financed. This results in a situation where the amount disclosed to the borrower as "Funding You Will Receive" is potentially much lower than the actual amount funded. SFCCF recommends basing the disclosures on 100 percent of the line amount.

Response to Comment 1.17.2. The Department found this comment helpful and modified section 916, subdivision (a)(2) and section 950 to require the example disclosure assume the recipient borrows the approved credit limit at origination.

Comment 1.17.3. SFCCF argues that section 2057(a)(2) (renumbered as section 900) is not entirely accurate because most often the financer is not required to make advances, as advances are discretionary. SFCCF recommends striking the words "that a financer is required to pay a recipient."

Response to Comment 1.17.3. The Department found this comment helpful and modified the provision in a manner similar to the suggested edit.

Comment 1.17.4. SFCCF suggests changing section 2057(a)(4) to require disclosure 24 hours before funding since it is not uncommon for the assumptions necessary to make the disclosure to be unavailable at the time the quote is made.

Response to Comment 1.17.4. While the Department disagrees specifically with this suggestion (to require disclosure 24 hours before funding) because the Department believes it would deprive consumers of the ability to properly compare financing offers with the necessary disclosures in hand, the Department nonetheless modified section 900 to include a clarifying definition of the term "specific commercial financing offer" as well modifying section 900 subdivision (5) to allow leeway for more general disclosures that include numerous financing offer options . The Department believes that these changes may address the concerns raised here.

Comment 1.17.5. SFCCF requests clarity on proposed section 2057(b), which states that "all references to average" refer to "mean." SFCCF suggests modifying the regulations to refer to mean where appropriate and to average where appropriate.

Response to Comment 1.17.5. The Department disagrees with SFCCF that there is a difference in definition between the terms and so the Department added a provision that makes clear "average" refers to the "arithmetic mean", unless otherwise stated.

Comment 1.17.6. SFCCF states that proposed section 2060(a)(5) requires the APR to be expressed to the nearest 10 basis points, whereas proposed section 3001(b) provides a safe

harbor of the APR calculation to within 1/8th of 1 percent. SFCCF suggests the regulations be made consistent in whether it refers to fractions or basis points, but not both.

Response to Comment 1.17.6. The Department found this comment helpful and modified section 901, subdivision (a)(5) to make clear that the references in the disclosures to a recipient should be to the nearest ten-basis points with the  example "10.45%". The tolerance provision however, section 955, refers to 1/8th of 1 percent to identify when a disclosure is considered accurate, not to how disclosures should be made to recipients. In other words, they are not inconsistent.

**Comment Letter # 1.18 dated October 28, 2020 from Rabo AgriFinance LLC (RAF).**

Comment 1.18.1. RAF's product is structured as an open-end credit line that farmers may use to finance the cost of materials purchase from a variety of agricultural retailers and manufacturers. At the time a farmer opens a credit line, RAF does not know key terms that would be necessary to provide required disclosures such as interest rate, program end and start dates, due dates, and fees. This is because the terms of each draw on the credit line are specific to the retailer or manufacturer that the recipient chooses, and some retailers and manufacturers have multiple financing programs with varying terms.

To address the above concerns, RAF proposes two possible solutions:

1) DFPI could issue a clarification stating that the regulations do not apply to agricultural lenders like RAF because the protections of the proposed regulations are not necessary to protect borrowers, among other reasons.
2) The DFPI could allow providers like RAF to make disclosure based upon hypothetical terms similar to what is permitted for factoring disclosures.

Response to Comment 1.18.1. The DFPI declines to adopt RAF's recommended approaches to resolve RAF's concerns. With respect to the first recommendation, the DFPI believes that exemptions like the one RAF proposes are better created by the Legislature based upon the policy considerations RAF presented. With respect to the second recommendation, the DFPI notes that Legislature expressly permitted factoring and asset-based lending disclosures to be based upon example transactions, but there is no similar provision for open-end credit. In light of this, the DFPI again defers to the Legislature with respect to RAF's request for an example disclosure for its product.

Although the DFPI did not make RAF's requested changes, the DFPI revised the regulations at section 900, subdivision (a)(4)(C), section 910, subdivision (a), and section 911, subdivision (a), to permit providers such as RAF to make disclosures based upon each draw on the credit line. Thus, rather than make a disclosure based upon a draw equal to the approved credit limit, RAF could make a disclosure based upon discrete draws using the pricing and terms specific to a particular manufacturer or retailer.

SUMMARY AND RESPONSE TO COMMENTS RECEIVED DURING THE PUBLIC HEARING HELD ON NOVEMBER 9, 2020:

Comment 1.19.1 from Gary Reese with State Financial Corporation. "First, to be successful, the matrix needs to be revised with an eye to simplification."

Response to Comment 1.19.1. The comment is not specific enough for the Department to respond to substantively. No change to the regulations was warranted by this comment.

Comment 1.19.2. "Second, the regs do not allow an apples-to-apples comparison between different financial products, particularly ABL to MCA. This is because under the regs, fixed upfront costs are spread over the time it takes us to collect first advance, something, like, 40 days, rather than determine any agreement normally a year or even longer. This doesn't make sense when the expectation of all parties is that there will be a loan balance maintained over the life of the contract. A savvy borrower would have to reverse engineer the matrix to determine the cost over the life of the loan. An unsavvy borrower will simply be misled."

Response to Comment 1.19.2. This comment is similar in substance to the one given by State Financial Corporation in Comment 1.17.1. Since Mr. Reese also is with State Financial Corporation, the Department incorporates its response to Comment 1.17.1 by reference.

Comment 1.19.3. "Third, the regs require too many speculative assumptions. For instance, the amount of collections, time of advances, collateral balances, and others. As a result, even with a common interest rate, inconsistent assumptions among lenders will result in a different APR. The speculative assumptions provide an opportunity for unscrupulous lenders to lowball assumptions resulting in a lower rate and stacking assumption upon assumption may magnify the error of each. Thus, the safe harbor should be incorporated into the regs to protect honest lenders who, in their assumptions which, after all, will often be based on the borrower's own estimates relating their business and their needs."

Response to Comment 1.19.3. The Department declined to implement this proposed change because it is not aware of a precedent for a regulator granting a general approval for a market participant's approach to regulatory compliance without clear direction from the Legislature. That said, the Department often provides formal legal opinions in response to discrete legal compliance questions submitted to the Department through requests for interpretive opinions or specific rulings. No change to the regulations is warranted by this comment.

Comment 1.20.1 from Hamid Namazie with Secured Finance Network. The disclosure of an estimated annual percent rate is our first discussion point. The simplest variation of the factoring product is when the account receivable owed to the small business is purchased by the factor for a purchase price less than the face amount of the invoice. Section 3000 of the regulations suggest that the APR is to be determined based on the payment of the invoice on

the last day of its payment terms in the case or a determination based on a single transaction and based on actual payment terms of the invoice in an example translation. However, depending on the term estimated for the transaction, the disclosed APR will vary wildly. In either event, the reality is that the cost of the factoring is always a fixed amount, and the APR is meaningless and confusing. Also, it creates the impression that the factoring product is extremely expensive, when in reality, it may be the cheapest source of capital available to the small business. Small businesses may see this disclosure and the inaccuracy that it creates and walk away from factoring when, in fact, the factoring product might be the best product available to them.

Response to Comment 1.20.1. While the Department can appreciate the points raised by Mr. Namazie, one of the features of APR is representing the time value of money (i.e., different terms resulting in different APRs is accurate). Furthermore, the goal of the disclosures is to give borrowers the ability to compare different financing offers and using the same metric to measure the cost of financing as an annualized rate across different products and offers makes sense in order to avoid confusing potential borrowers with different disclosures for different products. No change to the regulations is warranted by this comment.

Comment 1.20.2. "Let's take a look at asset-based lending. Similar issues exist here. To identify one of the issues, the disclosure requires that the lender use an assumed advance under the revolving credit facility. In order to determine the APR, the interest rate as well as the fees will be taken into account to calculate the APR under the assumed advance amount. A revolving asset-based credit facility has a number of variables that need to be made static in order to calculate the APR. The regulations require that the following assumptions be made: One, a single advance is made that stays outstanding over the year. And two, a certain amount of daily collection be assumed which are applied. With asset-based lending, these assumptions create a false calculation, just as I said in factoring. So here we just have a quick proposal we'd like the [Department] to take into account. Asset-based lenders actually look at monthly outstandings in order to determine the income that they generate off any transaction…"

Response to Comment 1.20.2. While Mr. Hamazie was unable to finish his comment, the example transaction that asset-based lenders may choose to use for disclosure is exactly as he describes: several assumptions made in order to calculate the APR for the example transaction. Authorized by the enabling statute, it is intended to give the borrower an idea of what their (ostensibly similar) transaction will cost. No change to the regulations is warranted by this comment.

Comment 1.21.1 from Sydnee Breuer from Rosenthal and Rosenthal of California. "We need clear regulation on how to comply. If my attorneys can't figure out the chart to ensure compliance, how can I be sure I'm complying? I urge that at a minimum, a safe harbor provision for good faith attempts and compliances included in the DBO's proposed regulations. Unless my attorneys can advise the Rosenthal family that we can clearly comply with the regulation and are not at risk for litigation trolls, we will have no choice but to exit the lower end

of the market and stop providing loans to the very businesses that the regulation is trying to protect. Thank you for your time and consideration."

Response to Comment 1.20.1. The Department agrees that the regulations should be clear, and since this comment have implemented numerous improvements to nearly all substantive aspects of the regulations to improve clarity and effectiveness. However, with respect to the safe harbor comment, the Department declines to implement this proposed change because it is not aware of a precedent for a regulator granting a general approval for a market participant's approach to regulatory compliance without clear direction from the Legislature. That said, the Department often provides formal legal opinions in response to discrete legal compliance questions submitted to the Department through requests for interpretive opinions or specific rulings. No change to the regulations is warranted by this comment.

Comment 1.22.1 from Scott Riehl with ELFA. Mr. Riehl summarized ELFA's business and clients and did not comment substantively on the proposed regulations but rather referred to ELFA's written comments as to what he would like the Department to review and respond to.

Response to Comment 1.22.1. No change to the regulations is warranted by this comment.

Comment 1.23.1 from Charles Cross with Wells Fargo. "One of the references throughout the course of the regulations is to accrued interest since the recipient's last payment, and this appears in sections relating to prepayments and the calculation of finance charges. We think that the definition is a little bit too limited because the accrued interest can occur and remain outstanding for time periods for before the last payment was received. So, we just wanted to point out if we use accrued interest since the last payment, you are effectively deleting from the obligations of the borrower accrued interest that accrued prior to the time of the last payment but remains outstanding."

Response to Comment 1.23.1. The Department found this and similar comments helpful and modified the relevant provisions to remove language limiting accrued interest to interest that accrued since the consumer's last payment.

Comment 1.23.2. "The second point I wanted to make was regarding the time of extending a specific commercial financing offer. We think the initial definition that was in the prior drafted rights worked a little bit better because it referred to communications at the time that the final offer was made. The problem with the way this definition has been revised, where it says that it has to be at the time with a specific amount rate of price quoted to the recipient, is that there is a lot of negotiation that goes on between the provider and the recipient that leads up to the point where a final offer may be made. Technically, if we had to give a disclosure every time a quote is given, i.e., we provide a price, the customer gets back and says they want a different price and confirms a payment amount. Every time we do that with the regulations right now, it seems to say we have to make a full disclosure every time that is done, as opposed to waiting for the deal to be actually formed. And then when we get to the final offer, i.e., the terms that the parties have settled on, and giving a disclosure at the time, we think makes a lot more sense."

Response to Comment 1.23.2. The Department has addressed this issue based on this comment and numerous other, similar comments by revising the definition clarifying when "extending a specific commercial financing offer" occurs as well as what a "specific commercial financing offer" is. Please see response to Comment 1.4.1

Comment 1.23.3. "The third point I wanted to make is that we think leasing and financing should be treated the same as asset-based lending and open-end credit in terms of the use of approved credit limits or approved funding amounts. Because just like those products that are specifically authorized for approved credit limits and funding amounts, these loan approvals can often be an aggregate approval where we give the customer, say, a million dollar approval, but it might be broken down into $200,000.00 or $300,000.00 chucks to fit the customer that is scheduled for delivery, and there might be a separate lease entered into each time a takedown occurs, but it's all underneath an aggregate approval that exceeds the disclosure threshold. We are looking for some clarification of the disclosure threshold provisions so that leasing and closed-in lending would be treated the same way as asset-based lending in terms of the ability to use the credit limits."

Response to Comment 1.23.3. In conjunction with the how the threshold determinations are made (for some transactions, the "amount financed" determines whether the threshold is met), the Department addressed this issue by including new definitions to aid in determining the "amount financed" based on the type of transaction (e.g., lease transactions) under section 900.

Comment 1.24.1 from Kate Fisher with CFC. "The CFC opposes requiring an APR disclosure. I've submitted written comments on behalf of the CFC setting out our legal analysis. And today, rather than go into a legal analysis, I would like to discuss the practical problems with operationalizing an APR disclosure." Ms. Fisher proceeded to discuss why APR is problematic for a variety of products from an operational standpoint.

Response to Comment 1.24.1. The Department responds at length to CFC's objections to APR in Comment Letter 1.2, above, and incorporates those comments here by reference.

Comment 1.25.1 from Heidi Pickman with California Association for Micro Enterprise Opportunity ("CAMEO"). Ms. Pickman discusses at length the challenges small businesses, especially minority-owned small businesses, are facing during the COVID-19 pandemic. She emphasizes that transparency in lending is of particular importance and the proposed regulations will go a long way in helping to achieve that.

Response to Comment 1.25.1. The Department appreciates Ms. Pickman's comments and discussion of the challenges facing the industry. However, no changes to the regulations are warranted by her comments.

Comment 1.26.1 from Greg Hoover witih Rabo AgriFinance. "A key issue we would like further clarification on is an understanding that the proposed rules do not apply to agricultural lenders.

Our crop input finance program does not fit neatly into any of the defined categories covered by the proposed rule. Given the nature of agricultural lending and the terms of Rabo AgriFinance input finance program, the protections of the proposed rule are unnecessarily to protect borrowers. This is consistent with the California Financing Law which excludes various types of agricultural lending and lenders from the scope of the law. In order to preserve competitive quality Rabo AgriFinance should be afforded the same treatment as the farm credit system institution and exempted from the rules as the organization serves similar agricultural borrowers." Mr. Hoover also references Rabo AgriFinance's Comment Letter submitted for this written comment period, addressed above in Comment 1.5.

Response to Comment 1.26.1. The Department thoroughly responded to Mr. Hoover's comments above in Comment Letter 1.5 and incorporates those responses here. No change to the regulations are warranted by this comment.

Comment 1.27.1 from Steve Denis with SBFA. Like in the SBFA Comment Letter 1.5, Mr. Denis argues against using APR as the annualized rate metric for a variety of reasons, arguing ACC is a better way to compare offers. Mr. Denis cites conclusions gleaned from focus-testing undertaken by SBFA to support his assertions.

Response to Comment 1.27.1. The Department incorporates by reference its responses to SBFA's Comment Letter 1.4, above.

Comment 1.28.1 from Scott Pearson with SBFA. "California, as you know, has a very strong commitment to transparency and to open public hearings, and we have some concerns about this hearing and the way that the hearing was noticed. We think that the Department ought to consider curing those issues by having another hearing that's been noticed correctly. First of all, there was only one week of notice given for the hearing. It's very difficult for people to schedule things only a week in advance. We think more notice ought to be provided for a hearing in order to comply with the statutory requirements."

Response to Comment 1.28.1. Mr. Pearson's comment that there was only "one week of notice" is factually incorrect. The Department gave notice of the public hearing on October 30th, 2020, and the hearing was held on November 9th, 2020. Thus, notice was given 10 days prior to when the hearing was held. While the statute governing the holding of public hearings does not specify a minimum notice period, the Department endeavored to provide a notice period that would be reasonable. To do so, the Department looked to analogous laws to determine what would be considered reasonable, such as the Bagley-Keene Open Meeting Act. While the hearing is not subject to that act, Bagley-Keene requires a 10-day notice before holding a public meeting. Similarly, the Brown Act, although also inapplicable here, permits an even shorter notice period for meetings. The Department thus concludes that a 10-day notice for the requested public hearing is reasonable, since the public hearing is most analogous to a meeting open to the public held under Bagley-Keene.

Comment 1.28.2. "Additionally, the distribution of the notice appears to be incomplete, and it's not clear to me why that's the case. I don't know if there is a technical issue. I can tell you I did not receive the hearing notice. I have submitted a whole bunch of comment letters throughout this process, and I have been pretty active. And I have submitted requests for notice, and I didn't get the notice of this hearing. I didn't get a request for comments on one of the prior rounds either. I have spoken to a number of other people who also have filed requests with the Department for regulatory notices who have not receive the notices. That's a problem for obvious reasons. If people aren't given notice of the hearing, then they don't have an opportunity to attend and present their views. We think that that is something that really ought to be considered and addressed."

Response to Comment 1.28.2. The Department agrees that it is important that all persons interested in being noticed receive notice. To that end, and among other methods of providing notice, the Department maintains a list of e-mail addresses that have been voluntarily provided by individuals (via the Department's website) interested in receiving updates on the Department's various regulations packages, including this package. When a notice is required, the Department sends the relevant documentation to the full list of the provided e-mail addresses. In researching Mr. Pearson's stated issue after the hearing, the Department discovered that Mr. Pearson's provided e-mail address had previously repeatedly rejected the Department's e-mails (on separate regulation packages, prior to the Department initiating this one) as being undeliverable (it is not clear to the Department why the e-mails were undeliverable, but it appears to have been an issue either with the e-mail itself or the servers handling Mr. Pearson's e-mails). In order to ensure the list remains current, the system is configured to remove e-mail addresses from the list if e-mails are unable to be delivered after a certain number of failures. We informed Mr. Pearson of the issue and instructed him to resubmit his e-mail via the Department's website. As to Mr. Pearson's statement regarding others who have apparently not received notices, the Department does not have enough information to review those concerns, but it may be similar issues as what caused Mr. Pearson's issue.

Comment 1.28.3. "The initial statement of reasons accompanying the proposed rules, among other things, doesn't address reasonable alternatives or explain why they were rejected. This isn't the first round of commentary. There's been a lot of discussion in, you know, all of these voluminous comment letters that have been submitted over time. Also, frankly, when the legislation was being considered about alternatives, the most important example being the annualized cost of capital as an alternative to APR, the initial statement of reasons does not address that at all. It doesn't summarize it or it doesn't explain why it was rejected. That's only one of many issues."

Response to Comment 1.28.3. The Department addressed this comment in response to SBFA's Comment Letter 1.5.

Comment 1.29.1 from Jan Owen with CFC. "We understand from the statement of reasons, that the Department did not rely on any study results or any outside APR, APP, and defended analysis. I want the Department to understand that the companies that belong to CFC are

trying to get this right. With that in mind, we need to know more about your analysis, and that we understand what the Department's goal and final analysis is. We are aware of public comments provided by interested parties on the previous proposed regs, but we also are interested in other information gathered by the Department but not yet publicly provided."

Reponse to Comment 1.29.1. This comment was not related to the form or content of Department's regulation so does not require a response under the APA. Furthermore, disclosure testing was not mandated by statute. Although a response to this comment is not required, the DFPI concludes that it will not be pursuing testing at this time.

Comment 1.31.1 from Jesse Carlson with Kapitus. "There is no safe harbor or even mechanism to get input from the [DFPI] at this time. We would appreciate a mechanism by which we could review the disclosures, should the regulations pass in the current form, such as that we can get input to make sure we are complying and don't run to any issues when we get into an examine there is a disagreement in terms of how we have interpreted one part of the regulation or the other."

Response to Comment 1.31.1. The Department declines to implement this proposed change because it is not aware of a precedent for a regulator granting a general approval for a market participant's approach to regulatory compliance without clear direction from the Legislature. That said, the Department often provides formal legal opinions in response to discrete legal compliance questions submitted to the Department through requests for interpretive opinions or specific rulings. No change to the regulations was warranted by this comment.

Comment 1.31.2. "There is no separate line item for any fees charged by a broker or an arranger of commercial financing. There are industry participants who use brokers and include their fees within the finance charge paying separately. We believe that small businesses should know the amount being paid to a broker to assist them in arranging the financing."

Response to Comment 1.31.2. The Department declines to adopt a proposed change on this issue but notes that this does not mean it necessarily disagrees. Rather, the Department believes further input from stakeholders may be appropriate before the Department adopts regulations requiring disclosure of broker fees that are not part of the amount financed.

Comment 1.31.3. "There is no clear disclosure of the total cost of the financing for the small business. The total cost is something that's calculable across all products as the ABL lenders have mentioned, and as many of our product work. There is a fixed finance charge, not a periodic rate that's charged, such that what you see is what you get in terms of the cost. We would like to ensure that small businesses understand that a product that may have a low nominal rate, it may have a higher total cost given that the cost is dependent on the term, such that a lower rate for a longer term may be more expensive."

Response to Comment 1.31.3. See the Department's response to Comment 1.8.2.

<u>Comment 1.32.1 from Alexis Shapiro with Forward Financing</u>. "Sales-based finance differs from traditional loans in that the repayment term length is not set. We have had many, many customers, especially during the current pandemic, whose payments have been suspended or drastically reduced, thereby lengthening their payment remittance period. Had we predicted an APR on their financing on Day 1, in retrospect, it would have been misstated. Moreover, implying or suggesting that there is a fixed repayment period through an APR disclosure, will obscure the products fails contingent repayment structure and potentially confuse the customer into thinking they are receiving a fixed-term loan when they are not. The confusion and potential misinformation flowing from an APR disclosure on sales-based financing products would be a disservice to the small business that we are all here today trying to the help. If APR is ultimately adopted as a required metric, Section 3001(b) [renumbered as section 940] of the proposed regulations as currently written may lead to substantial litigation. Section 3001(b) specified that a calculation will be considered inaccurate if it is more than one-eighth of one percentage point above or below current APR calculation."

<u>Response to Comment 1.32.1</u>. The Department found this and similar comments helpful and modified the relevant provision (section 955, subdivision (a)) to clarify when an APR disclosure might be considered inaccurate by limiting the inaccuracy only to disclosures that are 1/8 of 1 percentage point below (rather than above or below) the determined rate. Additionally, the Department added additional tolerances that may be higher in certain cases (section 955, subdivision (a)(3)) and added provisions that permit a provider to correct any discovered errors in the disclosure.

<u>Comment 1.32.2</u>. "Section 3003(a) [renumbered as section 942] of the proposed regulations requires sales-based financing providers in arriving at their APR calculation to account for reasonably anticipated true-ups. Meaning, those adjustments made to a customer payment as the revenue fluctuates. However, true-ups by the very nature, are not able to be anticipated. Sales-based financing providers should not have to risk litigation for APR calculations that ultimately prove inaccurate due to the funder's inability to precisely predict the daily revenues of the small business funds."

<u>Response to Comment 1.32.2</u>. The Department incorporates by reference its response to Comment 1.2.13 as well as its response to Comment 1.32.1.

<u>Comment 1.33.1 from Bianca Blomquist with Small Business Majority</u>. "Put frankly, APR is the only price metric that enables apples-to-apples comparisons between financing products of different types, different amounts, and term lengths. And it is a familiar term to both borrowers and financers and has been vetted by over 50-plus years of the Truth and Lending Act. We recommend that any number described as 'rate' and 'interest' should be APR and not these nonstandard terms. We urge the APR be disclosed alongside those terms to further increase transparency."

<u>Response to Comment 1.33.1</u>. The Department appreciates the comment regarding APR's lengthy use history but declines to revise the terms "rate" and "interest" to be APR, as requested, since those terms are often contextually different than APR. Where appropriate,

however, the regulations already require APR to be disclosed alongside those terms. No change to the regulations is warranted by this comment.

Comment 1.34.1 from Natalie Pappas with RA. "The disclosures are provided very early on in the process. This is typically not how this is handled. In most laws, especially in the Truth and Lending Act, typically the disclosure is provided only once there is a product consummation of the transaction. [The regulations as written] will require disclosures early on and the process of repeat disclosures down the line once more information is provided to the provider from the small business. And also, businesses like to consider numerous products and negotiate terms. This means that the business was considering two types of products to determine between a sales-based financing transaction or a loan, and they want to see three different terms for each one of those."

Response to Comment 1.34.1. The Department has addressed this issue based on this comment and numerous other, similar comments by revising the definition clarifying when "extending a specific commercial financing offer" occurs as well as what a "specific commercial financing offer" is. Please see Response to Comment 1.4.1

Comment 1.34.2. "The other item we would request be implemented is what happens if the provider gives the disclosure but the business refuses to sign the disclosure, but the business still wants to proceed with financing? What would happen in that situation? This is also why the Truth in Lending Act does not require signatures on disclosures."

"The business should only be required to sign the disclosure that is going to correlate with the financing they receive. Some businesses might not want to sign multiple disclosures because they might think that these are the terms of the contract and they may be bound by that term even if they don't want it."

Repsonse to Comment 1.34.2. While the Department can appreciate the difficult position this hypothetical situation could put a provider in, subdivision (a) of Financial Code section 22802 requires a provider to obtain a recipient's signature on the disclosures prior to consummation of the financing transaction. No change to the regulations is warranted by this comment.

As to the signing of the disclosure that correlates with the financing, the Department added section 920, subdivision (c) to the proposed regulations, which requires the provider to obtain a recipient's signature only on the final disclosure of a commercial financing transaction that is ultimately consummated.

Comment 1.34.3. "When it comes to formatting the actual disclosure, we request some type of safe harbor form as TILA does. This is something that the providers are able to use. And just some more guidance as to whether or not the sales and disclosures should be outlined, the types of width. Some providers might make the width of the disclosures very narrow for it to go multiple pages and potentially confuse small businesses. And also, whether or not the percent of the dollar amounts of the financing should be presented numerically or not. You could

technically write out the disclosure and try to hide the actual calculation and how much the financing is going to be."

Response to Comment 1.34.3. The Department found portions of this comment (and other similar comments) helpful and implemented clarifying provisions to ensure the disclosures are uniform in presentation, with some flexibility. With respect to a "safe harbor form," the Department often provides formal legal opinions in response to discrete legal compliance questions submitted to the Department through requests for interpretive opinions or specific rulings.

Comment 1.34.4. "We would suggest the financing amount be the first amount and the net funding amount be second, as well as any of the itemization of the net funding amount be removed from the disclosure box and put it underneath. This follows TILA, as TILA requires itemizations to be provided outside of the TILA box."

Response to Comment 1.34.4. The Department found this and other, similar comments helpful and made changes to the affected sections accordingly. Specifically, disclosure formatting sections were modified to, where applicable, change the order of disclosure as suggested. Furthermore, the Department added section 956 which requires an itemization of the amount financed when the amount financed is greater than the recipient funds.

Comment 1.34.5. "We also request the prepayment language follow TILA, and simply state whether or not there is a prepayment and not an explanation, to avoid confusion."

Response to Comment 1.34.5. The Department declined to make the proposed change because it disagrees that an explanation of any prepayment penalties/requirements is confusing.

Comment 1.34.6. "A lot of these products are daily or weekly payments, so having to provide an estimated monthly or monthly cost can only diffuse and detract from the actual cost of the financing. Also, this is not permitted under SB 1235, and not one of the disclosures Senator Glazer had included on any of his forms."

Response to Comment 1.34.6. See the Department's response to Comment 2.6.2.

Comment 1.34.7. "In regards to calculation of APR, since TILA has a specific APR calculation for open-end credit, we would suggest that the APR for open-end products under the proposed regulations be calculated in accordance with TILA's open-end section."

Response to Comment 1.34.7. The Department declines to adopt the proposed approach because the proposed approach would undermine a recipient's ability to compare open-end credit products to other financing options. Furthermore, the TILA approach to APR calculation for open-end credit fails to account for finance charges incurred at origination, which can result in APR disclosures that in some cases do not incorporate some or all the costs associated with financing. No change to the regulations is warranted by this comment.

Comment 1.35.1 from Gilberto Mendoza with Axiom Opportunity Fund. "We commend the Department for continuing to anchor the proposed rules around APR as the annualized rate required by SB 1235. As the Department has recognized, and ALS and RBLC have advocated for years, APR is the only established metric that enables uniform comparison of the cost of capital over time in between products of different dollar amounts and term life. APR is a time-tested rate that people know and expect because it is the legally required status of mortgages, auto loans, credit cards, student loans, and personal loans including short-term loans. As stated on the website, APR is the standard weight to compare how much loans cost and lets you compare the cost of loan products on an apples-to-apples basis." Mr. Mendoza continued with a lengthy discussion on the benefits of APR and cited a study supporting the use of APR.

Response to Comment 1.35.1. No change to the regulations is warranted by this comment.

Comment 1.35.2. "We urge you to improve the rules by including reporting [to] the DFPI for providers using the underwriting method of estimating self-projection."

Response to Comment 1.35.2. While it is a little unclear from the transcript, it appears Mr. Mendoza is encouraging the Department to adopt a requirement that providers using the underwriting method to report their findings to the Department to ensure compliance. The Department does not disagree that periodic reporting to the Department from providers who use the underwriting method may be appropriate to ensure providers are not misleading their customers, however, the Department believes that such a requirement is more appropriately implemented in a subsequent rulemaking grounded in the authorities granted under SB 1235 and AB 1864. AB 1864, which explicitly empowers the Department to require data collection related to financial products and services provided to small business recipients, had not passed at the time that the Department initially proposed the underwriting method rule. Since AB 1864AB 1864's enactment, the Department has also begun to hire staff who will be focused on market monitoring. The Department is now better positioned that it was at the time of its initial proposal to consider a new regulation relating to data collection and small business financing.

Comment 1.36.1 from Louis Caditz-Peck with RBLC. "As written, [the underwriting] method is not paired with sufficient accountability to prevent its abuse. If there is a reliance on self-policing with no accountability, that flexibility will be abused in the way that [Gary from State Financial] referenced. Additionally, the Department, without reporting, will have no ability to understand how to improve the rules which speaks to some of the concerns that others have raised about tolerance, thresholds for accuracy, and so on." Mr. Caditz-Peck goes on to explain, at length, why the reporting requirement should be added, including a reference to the new authority given to the Department under AB 1864.

Response to Comment 1.36.1. The Department does not disagree that periodic reporting to the Department from providers who use the underwriting method may be appropriate to ensure providers are not misleading their customers, however, the Department believes (as Mr. Caditz-Peck mentioned) that such a requirement is more appropriately implemented in a

subsequent rulemaking grounded in the authorities granted under SB 1235 and AB 1864. AB 1864, which explicitly empowers the Department to require data collection related to financial products and services provided to small business recipients, had not passed at the time that the Department initially proposed the underwriting method rule. Since AB 1864's enactment, the Department has also begun to hire staff who will be focused on market monitoring. The Department is now better positioned that it was at the time of its initial proposal to consider a new regulation relating to data collection and small business financing.

Comment Letter 1.37 Dated October 27, 2020 from ILPA, received during the Public Hearing on November 9, 2020.

Comment 1.37.1. ILPA provides a history of its development of the "SMART Box", a disclosure tool that presents small businesses with a variety of information about a particular financing, including several disclosures also required under SB 1235 (along with many that are not required). ILPA states it designed the SMART Box to be used nationwide and believes it can also be used to accomplish what SB 1235 requires. Specifically, ILPA argues that SMART Box can already meet the requirements of SB 1235, but the regulations are overly prescriptive (i.e., font sizes, chart/row sizes and numbering, ordering of disclosures, specific language to be included, etc.) and as a result, ILPA members would be unable to use the SMART Box to comply with SB 1235.

ILPA urges the DFPI to either (a) draft regulations that require the use of forms mirroring the format and headings of emerging national standards (ILPA Is prepared to make small modificiaties to SMART Box if necessary on this front) or (b) draft a regulation that permits additional forms (such as SMART Box), that satisfy the requirements of SB 1235, to be approved by DFPI.

Response to Comment 1.37.1: The Department declined to adopt ILPA's suggestions because it determined that the SMART Box form was insufficient to meet the requirements of SB 1235 because, among other limitations, it would include disclosures that the Department deemed would be potentially confusing to recipients when compared to other forms that comply with the proposed regulations (e.g., including using language such as "Total Cost of Capital" that deviates from the language of the proposed rules) ,. Furthermore, the Department determined that in order to make disclosures easily comparable, they should all contain the same information and appear generally consistent in terms of style, etc. and the SMART Box form, even if modified, might look substantially different. For that reason, the Department declined to implement a regulation that would permit the approval of additional forms satisfying the requirements of SB 1235. That being said, the Department intends to monitor the industry and the format of disclosures when the regulations are approved and, in the future, if it determines that such a regulation would be beneficial to the public, the Department is open to promulgating a regulation allowing the approval of substantially similar and compliant forms of disclosure.

**SUMMARY AND RESPONSE TO COMMENTS RECEIVED DURING THE FIRST 15-DAY COMMENT PERIOD FROM APRIL 7, 2021 to APRIL 26, 2021.**

Comment Letter 2.1 Dated April 26, 2021 from Quadra and Coll (QC).

Comment 2.1.1. QC requests that the DFPI clarify the definition of approved advance limit to specify whether the definition means the maximum advance that a financer may provide for outstanding, unpaid legally enforceable claims under a factoring agreement cumulatively over the life of the agreement, or the amount that can be outstanding at any one point in time.

Response to Comment 2.1.1. In response to QC's comment the DFPI amended the definition of approved advance limit (section 900, subd. (a)(1)) to clarify that the definition is meant to cover the maximum outstanding, unpaid legally enforceable claims at one point in time, "not including any previous distributions advanced to the recipient" that have been repaid. In other words, a contract where a recipient can receive up to $50,000 in advances for assignment of unpaid legally enforce claims would have an approved advance limit no greater than $50,000, notwithstanding that the cumulative amounts advanced and repaid under the agreement may exceed $50,000 over the life of the agreement.

Comment 2.1.2. QC requests the DFPI revise the disclosures for an example factoring transaction by allowing a provider to use a disclosure of an example transaction reflecting the face value of a single invoice that is reasonably expected to be within the range of the face values for invoices expected to be purchased or assigned within the life of the master agreement. QC says that this is more reflective of a transaction that may occur under the agreement. QC also requests that the disclosure incorporate into the amount financed any reserve amounts, because failing to do so artificially raises the cost of financing.

Response to Comment 2.1.2. The DFPI declines to adopt QC's recommendation that the disclosure reflect the face value of a single invoice, because where a general factoring agreement is in place, the cumulative costs of the financing are better reflected through use of the approved advance limit and using the approved advance limit facilitates comparing the factoring disclosure to similar transactions that are structured as open-end credit. The DFPI also declines to adopt QC's recommendation that the amount financed incorporate reserve amounts, because reserve amounts are not advanced to a recipient and thus not financed by the financer.

Comment 2.1.3. QC states that the regulations are not clear when a new disclosure is required under section 900, subdivision (a)(4)(B). QC requests a change to this section to specify that where there is a sample disclosure made pursuant to a general agreement, amounts funded over time pursuant to such an agreement shall not require a new disclosure for each individual funding. QC also requests a clarification that the disclosure requirements do not apply to factoring agreements that predate the effective date of the disclosure regulations.

Response to Comment 2.1.3.  The DFPI declines to update the regulations to address QC's concerns about the need for multiple disclosures, because the regulations are already sufficiently clear that new disclosures would not be required for individual advances where a disclosure based upon the general agreement was previously provided. New disclosures are

only required "when the terms of a consummated commercial financing contract are amended, supplemented, or changed," which presumably would not occur when individual advances are made under a general agreement.

The DFPI declines to make changes to address QC's concerns related to general agreements that predate the effective date of the disclosure regulations for the same reason. That is, new disclosures would only be required if the terms of the existing agreement have changed and the change results in an increase to the APR.

Comment 2.1.4. QC requests that the DFPI amend the definition of finance charge for factoring transactions with the following changes:

> "[T] difference between **(a)** the face value on the invoice and **(b)** the amount paid directly to the recipient upon assignment of the legally enforceable claim to the financer, ~~but excluding~~ **plus** reserve amounts, only if the financer reasonably anticipates that it will return all reserve amounts to the recipient once it has been paid for the legally enforceable claim or claims assigned by the recipient or upon termination of the contractual relationship between the financer and the recipient, properly crediting payments made by account debtors and previous collections by the financer from the recipient, all amounts held in reserve, and payments by insurers on defaulted accounts."

QC states that without this change, the regulation could be read to mean that the reserve amount should not be included in the "amount paid directly to the recipient," which would effectively make the reserve amount a part of the finance charge.

Response to Comment 2.1.4. The DFPI substantially revised the definition of finance charge for factoring transactions to address ambiguities in the language raised by QC's comment (see section 943, subdivision (a)(3)). The new language clarifies that reserve amounts can only be excluded from the finance charge "only if the financer reasonably anticipates that it will return all reserve amounts to the recipient once it has been paid for the legally enforceable claim or claims assigned by the recipient or upon termination of the contractual relationship between the financer and the recipient, properly crediting payments made by account debtors and previous collections by the financer from the recipient, all amounts held in reserve, and payments by insurers on defaulted accounts." The purpose of this language is to ensure that reserve amounts that are routinely retained by providers after account debtors have paid amounts outstanding are properly characterized as finance charges. Additionally reserve amounts would not be included in the "amount paid directly to the recipient upon assignment of the legally enforceable claim," because reserve amounts are never paid "upon" assignment of the legally enforceable claim.

Comment 2.1.5. QC requests that the disclosure be permitted to caution the customer that the finance charge an APR do not include "potential non-finance fees such as bank charges, set-up, or application fees at the outset of the factoring relationship, or actual legal or administrative fees should they become necessary."

<u>Response to Comment 2.1.5.</u> The DFPI declines to adopt QC's requested change because it is unclear how the fees described by QC are not the equivalent of routine servicing fees that would be included in the "finance charge" for a factoring transaction pursuant to section 943, subdivision (a)(1).

## **Comment 2.2 dated April 23, 2021 from PayPal, Inc. (PayPal)**

<u>Comment 2.2.1.</u> PayPal requests at least a 12-month implementation timeframe between the time that the regulations are finalized and the date that the regulations go into effect to allow adequate time to adjust business practices.

<u>Response to Comment 2.2.1.</u> See the Department response to Comment 2.3.6.

<u>Comment 2.2.2.</u> PayPal requests that regulations account for business practices where a provider's website may allow a recipient to select from multiple financing offers by selecting from a menu or moving a slider. Specifically, PayPal requests that the regulation be clarified so that where a provider allows a recipient to select from multiple options or customize their offer, disclosures need only be presented for the offer that the recipient elects to pursue.

<u>Response to Comment 2.2.2.</u> The DFPI revised the trigger for disclosure such that, in circumstances where a provider allows a recipient to select from multiple offers, the disclosure must be provided at the time a recipient selects an option (section 900, subd. (a)(4)(A)).

<u>Comment 2.2.3.</u> PayPal requests the historical method allow providers to exclude from a recipient's income calculation months in which sales are higher than average due to circumstances that a provider determines are unlikely to recur during performance of the contract.

<u>Response to Comment 2.2.3.</u>  The DFPI declines to implement this change because providers may have an incentive to exclude months with higher monthly sales in order to present lower payment amounts or APRs in their disclosures. This incentive does not exist for excluding months with abnormally low monthly sales, which is why the DFPI allowed these months to be excluded (section 930, subd. (b)(4)(A)).

<u>Comment 2.2.4.</u> PayPal requests clarification whether the "Total Payments" and "Estimated Total Payments" disclosures were intended to mean the total number of payments (e.g. 12 payments) or the total dollar amount of payments.

<u>Response to Comment 2.2.4.</u> In response to PayPal's comment, the DFPI revised the language of the Total Payments and Total Estimated payments disclosure to clarify that the amount to be disclosed is the total dollar amount of payments or total estimated dollar amount of payments that the recipient will make during the term of the contract if the recipient makes minimum required payments. (See, e.g., section 910, subd. (a)(5)(B), and section 914, subd. (a)(5)(B).)

**Comment 2.3 Dated April 26, 2021 from Wells Fargo**

Comment 2.3.1. Wells Fargo requests that the timing of the disclosure requirements be revised such that disclosures are only required when a final loan offer is presented, because requiring disclosures earlier in the negotiation process "would be burdensome to the provider and consuming to the recipient."

Response to Comment 2.3.1. See response to Comment 1.4.1.

Comment 2.3.2. Wells Fargo notes that the language of section 900, subd. (a)(4), suggests that disclosures would be required to every draw on an open-end credit plan, even if the provider had previously provided a disclosure with respect to the open-end credit plan. Wells Fargo notes that such a disclosure would be duplicative and administratively burdensome for providers. Wells Fargo suggests that if there is reason to permit draw-by-draw disclosures, this should be provided only as an alternative to a disclosure at the outset of the transaction. Wells Fargo suggests language that would require new disclosures if a draw on an open-end credit plan varied from the terms previously disclosed.

Response to Comment 2.3.2. The DFPI agrees with Wells Fargo's reasoning. In response to Wells Fargo's concern, the DFPI added section 900, subdivision (a)(4)(C)(iii), to clarify that providing disclosures for each advance is an alternative for providers rather than a disclosure that is required for all providers of open-end credit. The DFPI adopted this language rather than Wells Fargo's requested language because the changes proposed by Wells Fargo do not reflect the underlying purpose of the alternative, which the DFPI added to accommodate certain purchase financing products like those described by RaboBank in previous comments.

Comment 2.3.3. Wells Fargo requests that the DFPI amend section 921 to clarify that amendments to agreements that predate the effective date of the regulations are also covered by the provisions of this section.

Response to Comment 2.3.3. The DFPI agrees that it is appropriate for section 921 to specifically incorporate amendments to agreements that predate the effective date of the regulations and so the DFPI added language incorporating such agreements.

Comment 2.3.4. Wells Fargo requests that the new definition of "recipient funds" include amounts paid to third parties on the recipient's behalf, since many inventory and equipment financing transactions, the amount funded is paid directly to the recipient's inventory or equipment provider. Wells Fargo requests that if the definition of recipient funds is not revised, then the DFPI should update section 956 so that the name of each person or entity receiving payments need not be listed, because a financer may not know the retailer or supplier a recipient will ultimately use at the time an offer is presented. The DFPI proposed language allowing a provider to include a "statement that the applicable purchase price or invoice amount will be paid to recipient's supplier or retailer" in lieu of identifying the supplier or retailer by name.

<u>Response to Comment 2.3.4.</u> The DFPI declines to adopt Wells Fargo's requested change to the definition of recipient funds because the purpose of the recipient funds disclosure is to communicate the amount of funding paid directly to the recipient. The disclosure of the amount financed will communicate amounts that include payments to third parties such as inventory and equipment providers. The DFPI revised section 956 to allow certain payees, including suppliers or retailers, to be described in general terms, which addresses the concern presented by Wells Fargo. The DFPI chose this option over the suggested language Wells Fargo provided because the DFPI believes the proposed language allowing general descriptions will result in clearer disclosures than Wells Fargo's language requiring a statement concerning where payments will be made.

<u>Comment 2.3.5.</u> Wells Fargo requests that the DFPI revise the definition of "Amount Financed" with respect to lease financing to include soft costs a financer may finance as part of a commercial financing transaction. Wells Fargo provided example language to implement this requested change.

<u>Response to Comment 2.3.5.</u> The DFPI agrees that the "Amount Financed" with lease financing should capture these additional costs that are financed and adopted the changes suggested by Wells Fargo.

<u>Comment 2.3.6.</u> Wells Fargo requests a delayed effective date for the regulation of at least 6-months.

<u>Response to Comment 2.3.6.</u> In accordance with the information contained within the Department's Initial Statement of Reasons, the regulations will not become effective until 6 months after adoption.

<u>Comment 2.3.7.</u> For the purpose of determining whether a recipient is principally directed or managed from California, Wells Fargo requests that the DFPI revise the language permitting a provider to rely upon any representation made by a recipient or any representation made by a broker submitting an application on a recipient's behalf. Wells Fargo states that these revisions will provide clarity in circumstances when the application includes multiple addresses.

<u>Response to Comment 2.3.7.</u> To address Wells Fargo's concern relating to multiple addresses in a financing application, the DFPI revised the proposal to allow a provider to rely upon any representation made by a recipient but added to Wells Fargo's suggested language a requirement that the representation be written. The DFPI added the requirement that the representation be made in writing because the DFPI believes this will discourage providers from attempting to evade disclosure requirements by relying upon fictitious oral representations. The DFPI declines to adopt Wells Fargo's recommendation to allow providers to rely upon brokers' representations due to concerns that brokers may misrepresent a recipient's address to avoid having to provide required disclosures.

Comment 2.3.8. Wells Fargo recommends that sections 910 through 917 be revised so the language "the amount financed is less than the funds available to the recipient" reads "the amount financed is more than the funds available to the recipient."

Response to Comment 2.3.8. The DFPI agrees that Wells Fargo's suggested revision reflects the intended purpose of the disclosures, which is to require a disclosure of the recipient funds when the amount financed is greater than the recipient funds.

**Comment 2.4 dated April 23, 2021 from the Secured Finance Network (SFN).**

Comment 2.4.1. SFN requests various changes to the regulatory text to limit the circumstances when disclosures must be provided after a change to the financing agreement. Specifically, SFN suggests the following possible limitations on disclosures:

- Limiting disclosures to written changes to the financing.
- Excluding "ordinary course" changes that are requested by the recipient due to changes in their business.
- Limiting disclosures to material changes, such as for changes that materially increase APR.
- Excluding changes that cause an increase to the finance charge that are based upon avoidable fees and expenses.

SFN states that these changes will help providers adjust financings as needed for recipients who are not shopping for financing.

Response to Comment 2.4.1. The DFPI implemented amendments to the redisclosure requirements to limit redisclosure to changes that would result in an increase to the APR. The DFPI declines to adopt the requested modification to limit changes to written changes to a financing, because this would effectively permit providers to implement changes that result in an increase to a transaction's APR without any written notice to the recipient. The DFPI declines to adopt SFN's requested amendments related to "ordinary course" and "material" changes and avoidable fees or expenses, because the DFPI does not find this terminology sufficiently specific to prevent abuse of the exceptions that would be created by those changes. That said, the DFPI exempted from the disclosure requirements changes made to resolve a recipient's default, which should exclude some circumstances where a recipient pays avoidable fees and expenses.

Comment 2.4.2. SFN recommends revising the definition of approved advance limit to add a reference to financings secured by "inventory or others." SFN also recommends removing a reference to "legally enforceable claims that have not yet been paid" from section 921, subdivision (a)(3)(A)(iii). SFN requests these changes to accommodate disclosures for factoring transactions that are based upon something other than the assignment of legally enforceable claims.

<u>Response to Comment 2.4.2.</u> The DFPI declines to adopt SFN's requested changes because the changes would reflect a factoring definition that conflicts with the statutory definition, which defines factoring. (See. Fin. Code, § 22800, subd. (i).)

<u>Comment 2.4.3.</u> SFN requests that the DFPI remove the reference to "different types of legally enforceable claims" in the definition of "approved credit limit" and replace it with "each category of advance" to accommodate open-end transactions where the amount advanced is not based upon legally enforceable claims.

<u>Response to Comment 2.4.3.</u> The DFPI adopted SFN's requested change because the change reflects that open-end credit transactions may have approved advance limits that are based upon factors other than outstanding legally enforceable claims and the changes do not conflict with the statutory definition of open-end credit plan. (See Fin. Code, § 22800, subd. (f).)

<u>Comment 2.4.4.</u> SFN requests that the DFPI revise section 921, subdivision (a)(3)(B), to state that if the approved advance limit of a factoring transaction is $0, the commercial financing offer associated with that approved advance limit is not subject to the disclosure regulations. SFN reasons that this change is appropriate because the regulations would not apply to "non-borrowing" factoring transactions and that the approved advance limit for such transactions would be $0.

<u>Response to Comment 2.4.4.</u> The DFPI did not implement SFN's requested change because SFN is mistaken that the regulations do not apply to non-borrowing factoring transactions or that the approved advance limit for non-borrowing factoring transactions would be $0. The DFPI assumes when SFN refers to "non-borrowing factoring transactions," SFN means transactions that are not loans under California law. Financial Code section 22800, subdivision (i), defines factoring as an accounts receivable "purchase" transaction that includes "an agreement to purchase, transfer, or sell a legally enforceable claim for payment." This definition is not limited to transactions that would be loans under California law. If it were, then there would be no need for the definition given that such transactions would fall under the definition of "commercial loan," which is also a defined term and a type of transaction that is subject to the statutory disclosure requirements (See Fin. Code, § 22800, subds. (d)(1) and (e), § 22802, subd. (a).) Similarly, the DFPI disagrees that the "approved advance limit" definition under section 900, subdivision (a)(1), would be $0 for a non-loan factoring transaction. Funds are still advanced in a non-loan factoring transaction because the recipient of the financing receives payment in advance of payment by the account debtor.

<u>Comment 2.4.5.</u> SFN recommends modifying the definition of recipient to include recipients that are controlled, controlled by or under common control of a previous recipient. SFN explained that recipients who are affiliates with previously recipients who have already received financing exceeding the statutory threshold should be treated as the same as the original recipient and should not receive a disclosure.

Response to Comment 2.4.5. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 2.4.6. SFN recommends adding a safe harbor to the regulations that insulate providers from liability it they comply with the disclosure requirements in good faith. SFN recommends this change because the assumptions required to make disclosures could result in a margin of error greater than the tolerance level provided.

Response to Comment 2.4.6. The DFPI declines to adopt this change because the regulations already incorporate significant protections for providers. The DFPI can review the effectiveness of these protections after enactment of the regulations and reassess whether some kind of good faith safe harbor standard is appropriate.

Comment 2.4.7. SFN requests language clarifying that where a financing agreement has different maximum for different categories of legally enforceable claim assigned or category of advance, the applicable approved advance limit or approved credit limit is the maximum total advance that the financer may provide the recipient.

Response to Comment 2.4.7. The DFPI revised the definitions of "approved advance limit" and "approved credit limit" to clarify that each represent the total maximum advance that can be provide under an agreement that has different maximum advances for different types of legally enforceable claims or categories of advance.

**Comment 2.5 dated April 26, 2021 from Katten Muchin Rosenman (Katten).**

Comment 2.5.1. Katten recommends revising the definition of amount financed to mirror the definition provided by 12 C.F.R. § 1026.18(b). Katten recommends this change because the federal definition informs commercial credit providers as to the treatment of prepaid financed charges and understanding how prepaid finance charges are considered when calculating the amount financed will also affect the APR calculation.

Response to Comment 2.5.1. The DFPI agrees with Katten's reasoning and amended the definition of amount financed to address treatment of prepaid finance charges, mirroring treatment under the federal rules.

Comment 2.5.2. Katten recommends revising the definition of recipient funds to not incorporate the amount financed: "'Recipient funds' means the funds given to the commercial borrower in the form of cash or a check. Recipient funds excludes, without limitation, any funds used to pay off other financings, funds paid to brokers and funds paid to other third parties." Katten recommends this revision, because, if the DFPI agrees to the change recommended in Comment 2.5.2 (which the DFPI did), then the definition of recipient funds would not provide the recipient with an accurate dollar amount of the total funds made available upon consummation of the transaction.

<u>Response to Comment 2.5.2.</u> The DFPI agrees with Katten's reasoning and amended the definition of recipient funds to substantially mirror the definition Katten recommended.

<u>Comment 2.5.3.</u> Katten recommends reinserting language that was struck from section 901(a)(3) that would allow providers to assume there are 30 days in every month and 360 days in a year. Katten states that this language is necessary to provide certainty for providers to eliminate confusion about the actual number of days between payments with monthly loans.

<u>Response to Comment 2.5.3.</u> The DFPI did not adopt Katten's recommended change because the DFPI revised section 901 by adding subdivision (a)(16)(C) to clarify a provider can disregard that months have different numbers of days. This addresses Katten's desire for clarity for providers in assessing the number of days between monthly payments.

<u>Comment 2.5.4.</u> Katten recommends deleting section 955, subsection (a)(2), because the section is unduly burdensome and does not align with Regulation Z. Katten instead proposes a new (a)(2) that tracks Regulation Z's tolerances for irregular transactions.

<u>Response to Comment 2.5.4.</u> The DFPI incorporated the additional recommended language that mirrors the tolerances for irregular transactions under Regulation Z but did not remove the additional tolerance that is not part of Regulation Z. The DFPI incorporated the additional language because higher tolerances are appropriate for irregular transactions, where calculating APR may be comparatively more difficult. The DFPI declines to remove the additional tolerance that is not part of Regulation Z because the DFPI believes this tolerance provides appropriate protection for providers with higher APRs.

<u>Comment 2.5.5.</u> Katten recommends that section 956 be deleted and replaced with a requirement to provide an Itemization of Amount Financed that mirrors 12 C.F.R. § 1026.18(c), to better align the disclosure with the requirements of Regulation Z.

<u>Response to Comment 2.5.5.</u> Based upon Katten's reasoning, the DFPI revised section 956 to substantially mirror Regulation Z requirements. The DFPI made some revisions to the recommended language to reflect the definitions and terminology of the DFPI's proposed regulations (ex. references to financer and recipient were added to the language from Regulation Z).

<u>Comment 2.5.6.</u> Katten requests that any references to Regulation Z specifically state that Supplement I to Part 1026, *Official Interpretations*, also apply. Katten states that this will help providers rely upon the body of interpretive guidance that has grown out of past federal regulation.

<u>Response to Comment 2.5.6.</u>  The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 2.5.7. Katten recommends revising section 3000 because it includes two different points in time as drafted: (1) the point in time when a provider extends a specific financing offer and (2) the time at which financing is extended. Katten explains that (1) and (2) may not be contemporaneous, and that the definition does not conform with Regulation Z's definition of the term of a transaction. Katten recommends revising section 3000 to specify only the time when a provider extends a specific commercial financing offer.

Response to Comment 2.5.7. The DFPI removed section 3000 because the section was duplicative of other sections requiring disclosure of APR and the definitions of "at the time of extending a specific commercial financing offer" and "specific commercial financing offer" are adequate to clarify the time when disclosures are required. For these reasons, the DFPI did not adopt Katten's recommended revisions to section 3000.

**Comment 2.6 Dated April 26, 2021 from the Small Business Financial Association (SBFA).**

Comment 2.6.1. SBFA states that the proposed regulations are preempted by the Truth in Lending Act because the regulations deviate in some ways from how APR and finance charges are calculated.

Response to Comment 2.6.1. The DFPI declines to make changes in response to SBFA's comment because TILA does not preempt the regulations as drafted. The regulations do not conflict with TILA because the regulations, which are only applicable to commercial financing transactions, do not affect any consumer financing transactions that TILA covers.

Comment 2.6.2. SBFA objects to the regulations' required disclosure of the average monthly cost for transactions that do not have monthly payments. SBFA states that this requirement exceeds the DFPI's authority because SB 1235 only requires disclosure of the "method, frequency, and amount of payments" (Fin. Code, § 22802, subd. (b)(4)) but does not permit payments to be aggregated to disclose average monthly payments. SBFA states that disclosing an average monthly payment for a product without monthly payments could lead recipients to incorrectly assume that they are receiving a monthly payment product. The SBFA also objects that the DFPI did not provide guidance on the calculation of the average monthly cost for providers.

Response to Comment 2.6.2. The DFPI declines to remove the average monthly cost disclosure because requiring the disclosure is within the DFPI's regulatory authority and the disclosure will aid recipients in comparing products with different payment frequencies. The average monthly cost of a product is an "amount of payments" (id.) and the Commissioner is authorized to adopt regulations concerning each of the required disclosures, including the "definitions, contents, or methods of calculations" for the required disclosures and the "manner" and "format" of those disclosures. (See Fin. Code, § 22804, subds. (a)(1) & (2).) In this case, the DFPI has determined that an average monthly payment disclosure will fulfill SB 1235's purposes by aiding recipients in comparing products with different payment frequencies. For this reason, the regulation requires providers to disclose the "amount of payments" in terms of

periodic and irregular payments, and average monthly payment (if payments are not made monthly). The DFPI disagrees that an average monthly payment disclosure will cause confusion among recipients because the disclosures include periodic and irregular payment disclosures as well, and the average monthly payment disclosure includes an explanation that a recipient's payments are not monthly. With respect to SBFA's objection that the DFPI did not provide guidance on how to calculate average monthly cost, the DFPI revised the definitions of "average monthly cost" and "estimated monthly cost" to provide guidance to recipients on calculations. (Section 900, subd. (a)(33) & (34).)

Comment 2.6.3. SBFA recommends removing the requirement that disclosures be provided in certain circumstances when an estimate it provided to a recipient based upon information "about" the recipient. SBFA states that this language could require disclosures even when a provide is only providing a sample estimate to a recipient based solely on information such as the recipient's name and address.

Response to Comment 2.6.3. The DFPI did not remove the language SBFA identified because there are circumstances in which a provider may use information "about" a recipient that is not "from" a recipient to provide a tailored financing estimate (ex. credit information, bank account information, etc.). However, to address SBFA's concern, the DFPI clarified what information "about a recipient" includes and does not include: "Information 'about the recipient' includes information about the recipient that informs the provider's quote to the recipient, such as the recipient's financial or credit information, but not the recipient's name, address, or general interest in financing." This clarification ensures that information that informs a provider's quote to a recipient could trigger a disclosure, but general information like a name, address, or general interest in financing would not.

Comment 2.6.4. SBFA states that the requirements for disclosure timing would result in an excessive amount of disclosures and recommends limiting when disclosure is required to circumstances when a specific amount, term, cost and periodic payment amount are disclosed to the recipient. SBFA also recommends only requiring disclosure before consummation of a transaction to limit the possibility that a recipient will receive multiple disclosures from a provider.

Response to Comment 2.6.4. Please see response to Comment 1.4.1.

Comment 2.6.5. SBFA states the definition of "recipient funds" at section 900, subdivision (a)(32), is unclear. SBFA explains that the definition appears to exclude deductions for pay-offs but that other sections that reference "recipient funds" appear to include payoffs. SBFA recommends clarifying the definition to make sure the amount require by the definition matches the same amount to be disclosed in the rest of the proposed regulations.

Response to Comment 2.6.5. In response to SBFA's comment the DFPI reviewed all references to recipient funds to confirm that references to the term did not conflict with the term's definition. The DFPI was unable to identify any conflicts and therefore made no changes in response to SBFA's comment.

**Comment 2.7 Dated April 26, 2021 from Small Business Financial Solutions, LLC, dba Rapid Advance (RA).**

Comment 2.7.1. RA makes a comment that substantially mirrors Comment 2.6.3 (requesting removal of the word "about" from the language relating to disclosure timing).

Response to Comment 2.7.1. Please see response to Comment 2.6.3.

Comment 2.7.2. RA makes a comment that mirrors Comment 2.6.4. RA further states that the regulations' language regarding disclosure timing violates the clarity standard of the APA.

Response to Comment 2.7.2. Please see response to Comment 1.4.1. With respect to RA's APA concerns, the language regarding disclosure timing has been substantially revised and the current language at section 900, subdivision (a)(23) uses defined terms and provides clarifying language that will allow providers to implement the regulation without need for further clarification.

Comment 2.7.3. RA makes a comment that substantially mirrors Comment 2.2.2. RA further states that providers may limit recipients' ability to access pricing and estimate tools in advance of underwriting to avoid having to provide disclosures associated with offers presented to recipients.

Response to Comment 2.7.3.  Please see response to Comment 2.2.2. In addition, to the extent providers allow recipients to input information and receive tailored estimates, it furthers SB 1235's purposes to require disclosures in this context since these estimates may lead a recipient to invest significant time and resources to work with a provider to secure a final financing offer.

Comment 2.7.4. RA recommends eliminating disclosure requirements for situations in which a contract is modified because of the recipient's default. RA states that it is common for providers to grant extensions to recipients in default and that disclosures should not be required in this context. RA also recommends only requiring disclosures where a transaction is refinanced, as that term is defined by TILA. RA states that because the disclosure requirements require redisclosure when the terms of a contract are unchanged, the regulation violates the APA's necessity standard.

Response to Comment 2.7.4. The DFPI revised the regulation to eliminate the disclosure requirement for changes made to a contract to resolve a recipient's default in order to encourage accommodations like the ones RA described. The DFPI did not adopt RA's recommendation to adopt TILA's model for requiring disclosures only for refinancing, because the DFPI determines that the draft language would only require new disclosures when contract terms are "amended, supplemented, or changed," contrary to RA's assessment. However, the DFPI revised the disclosure timing requirements to limit redisclosure for consummated

contracts to only cover circumstances where the APR will increase. This should limit the circumstances in which redisclosures are required.

Comment 2.7.5. RA comments that the definition of "initial interest rate" does not make clear that change in a rate due to default are not subject to the definition.

Response to Comment. 2.7.5. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). In addition, no change is warranted because the definition states that the initial interest rate would be the interest rate in effect at the time the disclosure is made, which is a time before consummation of the transaction and therefore before any possibility of default.

Comment 2.7.6. RA provides a comment that substantially mirrors Comment 1.2.18 concerning potential overlap between closed-end transactions and sales-based financing.

Response to Comment 2.7.6.  The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, please see response to Comment 1.2.18.

Comment 2.7.7. RA recommends revising section 901, subdivision (a)(1) to remove the word "for," so that a provider can include an em dash followed by a description of the financing product. RA states that using the word "for" is confusing.

Response to Comment 2.7.7. The DFPI revised the section to use an em dash rather than the word "for" to address any potential confusion that might arise from the use of the word "for."

Comment 2.7.8. RA requests more leeway for providers to be able to adjust the size of their fonts to comply with the Americans with Disabilities Act (ADA).

Response to Comment 2.7.8. Based upon RA's reasoning, the DFPI revised the font requirements to allow providers to adjust fonts to comply with the ADA. (See section 901, subd. (a)(7)(D)(i).)

Comment 2.7.9. RA requests that the DFPI allow providers to issue disclosures without signature lines since only the disclosure provided for a consummated transaction need be signed. RA states the requiring a signature line on disclosures that are not intended to be signed will confuse recipients.

Response to Comment 2.7.9. The DFPI agrees with RA's reasoning and therefore revised the disclosure requirements so that signature lines need only be included on disclosures that are required to be signed. (See section 901, subds. (a)(2) & (3).)

Comment 2.7.10. RA makes a comment substantially similar to Comment 1.7.12.

<u>Response to Comment 2.7.10.</u> Please see response to Comment 1.7.12.

<u>Comment 2.7.11.</u> RA recommends copying TILA for prepayment policy disclosures and require a disclosure of fees or savings associated with prepayment, in lieu of requiring disclosure of a maximum non-interest finance charge. RA states that requiring disclosure of non-interest finance charges will not result in meaningful disclosures because a provider can simply recharacterize fixed fees earned at origination as interest earned on the first day after consummation.

<u>Response to Comment 2.7.11.</u> The DFPI did not adopt RA's requested change because the DFPI does not anticipate that providers will attempt what would arguably be a deceptive recharacterization of fixed finance charge made for the purpose of evading disclosure requirements.

<u>Comment 2.7.12.</u> RA states that section 910, subdivision (a)(9), discusses a non-interest finance charge but does not define the term and requests clarity as to what this term means.

<u>Response to Comment 2.7.12.</u> The DFPI made no change in response to this comment because the paragraph in question references the "maximum non-interest finance charge" which is a defined term under section 900, subdivision (a)(16).

<u>Comment 2.7.13.</u> RA recommends removing the average monthly cost disclosure in a comment substantially similar in substance to Comment 2.6.2. RA also states that requiring disclosure of monthly cost violates the APA's necessity standard.

<u>Response to Comment 2.7.13.</u> See response to Comment 2.6.2.

<u>Comment 2.7.14.</u> RA requests clarification as to whether the "average monthly cost" means the total monthly payments or the average monthly finance charge.

<u>Response to Comment 2.7.14.</u> The DFPI responded to this clarification request by adding definitions of "average monthly cost" and "estimated monthly cost" to clarify that these terms relate to total monthly payments and not the average monthly finance charge. (See section 900, subds. (a)(33) & (34).)

<u>Comment 2.7.15.</u> RA noted that section 911, subdivision (a)(5) and (6) references "assumption described above" but that it is unclear what this language refers to. RA requests clarification on this point.

<u>Response to Comment 2.7.15.</u> In response to RA's comment, the DFPI revised the text to refer to "assumptions described at the top of this disclosure" so that recipients understand that the assumptions referenced are those that appear in the first row of the disclosure.

Comment 2.7.16. RA notes that section 914, subdivision (a)(4)(C) requires a provider to disclose how a finance charge was calculated for sales-based financing, but not similar disclosure is required for closed-end or open-end transactions. RA suggests deleting this requirement since it is not required for other transactions and is not required under TILA.

Response to Comment 2.7.16. The DFPI deleted this requirement based upon RA's reasoning.

Comment 2.7.17. RA requests clarification as to whether the estimated total payments disclosure required by section 914, subdivision (a)(6), requires disclosure of the total number of payments or the estimated payment amount of all payments combined.

Response to Comment 2.7.17. See response to Comment 2.2.4.

Comment 2.7.18. RA requests that the DFPI revise the historical method to allow providers to vary the number of months used to calculate a recipient's future income based upon the anticipated term of the transaction, because some providers vary the number of months used to underwrite a transaction based upon the expected term.

Response to Comment 2.7.18. The DFPI declines to adopt RA's requested change because it is unclear how a provider would estimate a term without collecting a recipient's income data. However, the DFPI added section 930, subdivision (b)(4)(C) to the regulations to allow providers to exclude months for which the provider neither requires nor receives income documentation. Thus, providers who use fewer months to underwrite certain transactions would not be required to request additional months of documentation from the recipient that they would not otherwise need to approve the financing.

Comment 2.7.19. RA requested that the DFPI provide guidance on whether a provider can incorporate into the historical method income calculation months for which a recipient provides income documentation that the provider did not require.

Response to Comment 2.7.19. The DFPI added Section 930, subdivision (b)(5), to clarify that a provider can incorporate into the calculation additional months for which the recipient has provided income documentation because additional months of data may result in more accurate estimates.

Comment 2.7.20. RA recommends revising the historical method to allow providers to use a different number of months for transactions that are with new customers versus transactions with existing customers, because providers often require less documentation for transactions with existing customers.

Response to Comment 2.7.20. The DFPI did not make any changes directly responsive to this comment, because it is unclear that providers use fewer months to underwrite refinancing transactions or simply require less or no new documentation from the recipient. If the latter is the case, no change would be required. However, the DFPI added section 930, subdivision (b)(4)(C) to the regulations to allow providers to exclude months for which the provider neither

requires nor receives income documentation. Thus, providers who use fewer months to underwrite certain transactions would not be required to request additional months of documentation from the recipient that they would not otherwise need to approve the financing.

Comment 2.7.21. RA notes that section 930, subdivision (b)(2), permits providers to vary the number of months used by "loan size," which RA says is problematic for providers who maintain that the financings they provide are not loans. RA recommends deleting the word "loan" and using "financing" instead.

Response to Comment 2.7.21. The DFPI adopted RA's recommendation so that providers understand that the months used can vary by financing size, regardless of whether the transaction would be characterized as a loan under California law.

Comment 2.7.22. RA recommends removing section 3000 because it is unnecessary and would require additional and unnecessary disclosures.

Response to Comment 2.7.22. The DFPI removed section 3000 because the DFPI agreed that the section was duplicative of other APR disclosure requirements in the regulation.

Comment 2.7.23. RA recommends that the DFPI incorporate any future amendments to Appendix J, 12 C.F.R. Part 1026 into the regulation.

Response to Comment 2.7.23. The DFPI did not adopt RA's recommendation because the APA does not allow regulations to incorporate prospective amendments to documents unless those amendments are subject to the APA process.

Comment 2.7.24. RA recommends revising the APR disclosure requirements for open-end credit plans to follow TILA's approach to APR calculations for open-end credit.

Response to Comment 2.7.24. See response to Comment 1.4.11.

Comment 2.7.25. RA recommends issuing a calculator that all providers can use to calculation APR.

Response to Comment 2.7.25. The DFPI did not adopt RA's recommendation to issue a calculator because the DFPI determines that providers can calculate APRs using commonly available spreadsheet programs. (See response to Comment 1.2.14.)

Comment 2.7.26. RA makes a comment substantially similar in substance to Comment 2.6.1. RA further states that certain federal regulations prohibit the DFPI from requiring disclosure of a finance charge or APR that is calculated differently that TILA requires.

Response to Comment. 2.7.26. Please see response to Comment 2.6.1. TILA's rules relating to APR and finance charge only apply to consumer credit transactions, whereas SB 1235 only applies to commercial transactions (*See, e.g.,* 15 U.S.C. §§ 1605, 1606; Fin. Code, § 22802.)

TILA specifically provides that it "does not annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency." (15 U.S.C. § 1610.) Since TILA's rules relating to APR and finance charge apply only to consumer credit transactions, and SB 1235 only applies to commercial transactions, TILA's preemption provision appears inapplicable because there can be no inconsistency between TILA rules and SB 1235 rules. In addition, the official comment on TILA's preemption rule also suggests that TILA does not preempt the DFPI's proposed regulations: "Generally, state law requirements that call for the disclosure of items of information not covered by the Federal law… do not contradict the Federal requirements." (12 C.F.R. Pt. 1026, Supp. I, Part 3.) Since the regulations "call for the disclosure of items of information not covered by Federal law" – disclosures of items relating to commercial financing – TILA preemption would not apply.

Comment 2.7.27. RA makes a comment substantially similar in substance to Comment 2.8.4. RA added that the term "evidence of transmission" violates the clarity standard of the APA.

Response to Comment 2.7.27. Please see response to Comment 2.8.4. The DFPI disagrees that "evidence of transmission" violates the APA's clarity standard, as the terms "evidence" and "transmission" are easily understood by providers without further definition. That "evidence of transmission" provides flexibility to providers to develop reasonable and reliable standards does not mean that the regulatory language is unclear.

Comment 2.7.28. RA makes a comment substantially similar in substance to Comment 2.8.5.

Response to Comment 2.7.28. Please see response to Comment 2.8.5.

Comment 2.7.29. RA objects that it would be "practically impossible" to develop procedures "reasonably designed to ensure recipients receive" disclosures from a broker and recommends instead the providers be permitted to provide a disclosure before consummation.

Response to Comment 2.7.29. The DFPI declines to adopt RA's proposal because RA provides no supporting argument for why implementing procedures to ensure recipients receive disclosures would be "practically impossible." In addition, RA's proposed change could result in recipients receiving no disclosures prior to being presented with a final contract, limiting recipients' ability to use a disclosure to shop for better financing.

Comment 2.7.30. RA makes a comment substantially similar in substance to Comment 2.8.6.

Response to Comment 2.7.30. Please see response to Comment 2.8.6.

Comment 2.7.31. RA suggests revising section 955 to clarify that the tolerances listed under that section apply to all APR disclosures rather than just disclosures under section 3000 (since removed).

<u>Response to Comment 2.7.31.</u> The DFPI revised section 955 as RA recommended because the DFPI intended the tolerances to apply to all APR disclosures made under the rules.

**<u>Comment 2.8 dated April 26, 2021 from Reliant Services Group, LLC doing business as Reliant Funding (Reliant).</u>**

<u>Comment 2.8.1.</u> Reliant provides a comment substantially similar in form to Comment 1.4.1 and Comment 2.6.3.

<u>Response to Comment 2.8.1.</u> Please see response to Comment 1.4.1 and response to Comment 2.6.3.

<u>Comment 2.8.2.</u> Reliant recommends that the DFPI revise the definition of "recipient funds" to clarify whether it is intended to capture the net disbursement amount given to the recipient after deductions for pay-offs.

<u>Response to Comment 2.8.2.</u> In response to Reliant's comment, the DFPI revised the definition of recipient funds to clarify that it means the "net amount to be given directly to the recipient."

<u>Comment 2.8.3.</u> Reliant makes a comment substantially like Comment 2.7.21.

<u>Response to Comment 2.8.3.</u> Please see response to Comment 2.7.21.

<u>Comment 2.8.4.</u> Reliant requests clarification as to what constitutes satisfactory evidence of transmission of disclosures under section 952, subdivision (a)(2).

<u>Response to Comment 2.8.4.</u> The DFPI declines to revise this section to allow providers flexibility to develop their own standards that are reasonable and reliable.

<u>Comment 2.8.5.</u> Reliant notes that section 952, subdivision (f)(2), provides that brokers are not liable for providing disclosures that do not comply with the regulations. Reliant requests a similar protection be included for providers in the event that brokers commit fraud in connection with providing disclosures.

<u>Response to Comment 2.8.5.</u> The DFPI declines to adopt this change because the change could be interpreted as inconsistent with section 952, subdivision (a)(3), which imposes an obligation on providers to ensure that brokers with whom they deal provide the required disclosures.

<u>Comment 2.8.6.</u> Reliant requests that the DFPI delete a sentence from section 954 (previously section 3024), subdivision (b). The first part of that paragraph stated that that a provider's mere use of various words would not constitute evidence that a contract was or was not a loan under California law. The second sentence clarified that preceding sentence should not preclude a trier from considering a provider's statements in the disclosures when assessing whether a

transaction is a loan under California law. Reliant requested deletion of the second sentence because Reliant said that "a provider's product should not be able to be classified as a loan due to disclosures required by the State."

Response to Comment 2.8.6. The DFPI deleted all of subdivision (b) and therefore removed the sentence that Reliant requested be removed. However, this sentence was removed because it clarified the first sentence (which was also removed) and not because the DFPI agrees with Reliant's reasoning (see response to Comment 1.4.15).

**Comment 2.9 Dated April 26, 2021 from Strategic Funding Source, Inc. doing business as Kapitus (Kapitus).**

Comment 2.9.1. Kapitus requests that the DFPI reinsert a deleted paragraph of section 940 that stated that "[w]hen calculating the annual percentage rate, a provider may assume that it can collect payments on every calendar day, regardless of bank holidays, weekends, or other days that would otherwise delay or accelerate the provider's collection of a payment." Alternatively, Kapitus requests an addition "clearly stating how the APR calculation should be done for products with… daily, weekly, or bi-monthly payment frequencies." Kapitus states that these changes are necessary because TILA does not address how to calculate APR for contracts with payments that are not monthly.

Response to Comment 2.9.1. The DFPI declines to reinsert the deleted language because it appears that other stakeholders interpreted that language to suggest they could assume daily payments for their product even if the product's contract terms did not call for daily payments, which was not the DFPI's intent. To address Kapitus' concerns relating to how to calculate APR, the DFPI instead added section 901, subdivision (a)(16), which permits a provide to ignore that some years are leap years, that months have different days, and that some dates for scheduled payments are not business days. This language substantially mirrors what is permitted under TILA and serves the same purpose as the deleted language but is less susceptible to being interpreted in a manner contrary to the DFPI's intent. The DFPI concludes that language is sufficient to allow providers to calculate APRs using commonly available spreadsheet programs without further changes. (See response to Comment 1.2.14.)

Response to Comment 2.9.2. Kapitus requests that the DFPI add language to the regulation permitting a provider or financer to consult with the DFPI on methods of estimates and calculations called for under the regulations and rely upon the guidance as a safe harbor. Kapitus requests this because Kapitus is concerned with liability arising from challenges in calculating APR and estimates.

Response to Comment 2.9.2. Please see response to Comment 1.7.1.

Comment 2.9.3. Kapitus recommends that the disclosure required by section 956 be included in the main disclosure as a line item rather than as a separate document. This change is necessary to ensure recipients have all necessary information upfront and ensure the recipients are aware of all amounts paid to brokers in connection with their financing. Kapitus

also recommends revising section 956 to require disclosure of all fees paid to brokers in connection with a financing (not just fees that are paid out of the amount financed).

Response to Comment 2.9.3. The DFPI declines to adopt Kapitus' recommended change, because including the content that is required by section 956 could detract from the information included in the main disclosure. In addition, while the DFPI agrees that recipients may benefit from additional disclosures in connection with fees paid to brokers, the DFPI believes further input from stakeholders may be appropriate before the DFPI adopts regulations requiring disclosure of broker fees that are not part of the amount financed.

Comment 2.9.4. Kapitus requests at least 6 months to implement the regulations and a provision allowing the DFPI to grant a CFL licensee an extension beyond the 6-month period if necessary due to challenges in implementation.

Response to Comment 2.9.4. See Department response to Comment 2.3.6.

**Comment 2.10 Dated April 27, 2021 from the Responsible Business Lending Coalition.**

Comment 2.10.1. RBLC submitted a comment substantially similar in substance to Comment 1.9.1.

Response to Comment 2.10.1.  Please see Response to Comment 1.9.1.

**Comment 2.11 Dated April 26, 2021 from Rabo Agrifinance LLC (RAF).**

Comment 2.11.1. RAF notes that the proposed rules would require a signature of all co-borrowers for a financing rather than just a single or primary borrower on behalf of all borrowers. RAF states that this could create operational burdens for providers and requests that the DFPI revise section 900, subdivision (a)(20), to remove plural references to borrowers.

Response to Comment 2.11.1. The DFPI agrees with RAF's reasoning and revised the section in question to reference the "primary borrower" rather than "primary borrowers." The DFPI also revised references to "sellers" and "lessees" to "seller" and "lessee."

**Comment Letter 2.12 dated April 8, 2021 from Riviera Finance ("Riviera").**

Comment 2.12.1. The DBO should make a distinction in definitions between financing through "buying" and financing through "lending."

Response to Comment 2.12.1. While the Department might be able to make such a distinction in specific instances unrelated to this rulemaking if the circumstances were appropriate to do so, these regulations are not the appropriate place to make such a distinction, especially given the statutory definitions set forth in division 9.5 of the Financial Code that authorize these limited regulations. No change to the regulations is warranted by this comment.

Comment 2.12.2. "Because a purchase from an outright sale of accounts receivable is not a loan for which repayment is expected from the receiver of the money, [Financial Code] sections 22802(b)(6) and 22803(a)(6) are inapplicable. However, a legal distinction exists between 'recourse' and 'non-recourse' factors. Non-recourse factors are viewed by courts as being true purchasers. For example, a recourse factoring company will seek repayment of the purchase price of an undisputed receivable that does not pay in a set number of days. That seeking of repayment of an undisputed but aging receivable is not a true sale - unilateral right to be repaid makes the purchase a disguised financing transaction. Because a company has the choice to either 'borrow' money from a 'lender' OR, alternatively, 'sell' assets to a 'purchaser,' any regulation or rule adopted by the [DFPI] should reflect, and not confuse, purchasers and lenders. More specifically, any regulation adopted by the [DFPI] related to factoring should reflect and reinforce the legal distinction of non-recourse factoring that is a 'true sale' as distinct from recourse factoring as a financing arrangement."

Response to Comment 2.12.2. The Legislature chose not to differentiate between factors in the manner specified in SB 1235. As such, the Department is limited to the Legislature's treatment of factoring in how it drafts these regulations. No change to the regulations is warranted by this comment.

Comment 2.12.3. Non-recourse factoring companies should be exempt from these regulations. If the DFPI does not exempt non-recourse factoring companies, the state should prepare itself for litigation.  By compelling a purchaser of an account under a true sale to speak by making disclosures in terms of loans, lending, interest rates, and annualized percentages, the state has regulated too far.

Response to Comment 2.12.3. As mentioned above, the Legislature chose not to make such a distinction in the authorizing language for these regulations. No change to the regulations is warranted by this comment.

Comment 2.12.4. Riviera quotes a statement from the Senate Judiciary about the "problem" with APR, commenting on SB 1235. However, it makes no comment about the proposed regulations.

Response to Comment 2.12.4. No change to the regulations is warranted by this comment.

Comment 2.12.5. "Section [941] of the regulations contain[s] a grotesque red flag of illegality and regulation through hypothetical situations. The section is titled, 'Additional Assumptions for Factoring Transactions.' This section betrays California's position that it is dealing with a real problem.' The provider shall assume that it will receive full payment of the legally enforceable claim upon the date that legally enforceable claim becomes due and payable.' It seems as if the government doesn't understand the classic punch line that 'the check is in the mail!' Such an assumption required by the regulation fails to address the true value of non-recourse factoring!! The very reason that small businesses use non-recourse factoring is so that they don't assume the risk of nonpayment. Indeed, non-recourse factors write-off losses on accounts receivable purchased every month! To require a factor to report APR based on an

assumption that an invoice will pay on its due date shows how disconnected the DFPI is with reality. Generally, invoices are not paid on their due date (often 5, 10, 15, and 20 days later). APR is higher when assuming a bill pays in 30 days than the average 45 days. In almost every situation, the government will be requiring a non-recourse factor to quote APR at a higher rate than is accurate. The state is compelling speech that is neither accurate nor based in reality. Unlike disclosure regulations that the Food and Drug Administration requires on the back of food packaging, which are based in fact, these regulations are based in the quicksand of assumptions, theory, and hypothetical situations."

Response to Comment 2.12.5. The comment suggests the section in question is "illegal" but fails to explain that position or recommend changes to the section. No change to the regulations is warranted by this comment.

Comment 2.12.6. "The regulations also provide for 'example transactions.' The existence of an 'example' transaction underscores, highlights, and makes conspicuous the problem with SB 1235 and its related regs: the law fails to provide meaningful help to a business consumer because the examples (scripted by the state) do not permit room for the myriad of variables involved in a factoring transaction." Riviera includes an e-mail exchange between itself and the SB 1235 author's office and summarizes the exchanges as follows: "Senator Glazer's own Chief of Staff admits that the law requires disclosure based on a hypothetical financing scenario. This is the very issue which caused the US Supreme Court to recently find California's FACT Act unconstitutional. Nothing in the government's disclosure regulations addresses the variables. It is no better drafted than a law that places all objects that 'may help people move' into the category of 'vehicle,' whether it is a boat, a car, a plane, or a banana peel on the floor."

Response to Comment 2.12.6. Riviera suggests no changes to the regulations and the Department disagrees with its position. Therefore, no changes to the regulations are warranted by this comment.

Comment 2.12.7. "While the State of California has the right, under First Amendment jurisprudence, to correct misleading or confusing or deceptive communication in the business context, it does not have the right to do so when the problem is hypothetical.  As it were, the law and its regulations are now unconstitutional -- though the Senate Judiciary sounded the alarm which the Legislature ignored and though the sponsoring Senator's own staff admits deal with a limited set of facts."

Response to Comment 2.12.7. The Department does not agree with Riviera's position and the comment does not recommend any changes to improve the regulations. As such, no changes are warranted by this comment.

Comment 2.12.8. "The government does not get to regulate based on good intentions. Its actions, whether prohibitive or compulsory, must conform to the scrutiny of the Constitution, especially when implicating speech.  Here, the law and regulations fail to pass Constitutional muster. They:

1) ignore the distinction of non-recourse factoring from recourse factoring (sale vs lending), ultimately failing to exempt purchasers of intangible personal property and accounts on a non-recourse basis from the regulations (compelling purchasers to speak the language of lenders);
2) are overinclusive (including purchasers of personal property in lending regulations);
3) are underinclusive (based on exemptions currently listed, failing to include financers that fund small businesses);
4) compel speech that is, by the California Senate Judiciary's own words, misleading and confusing;
5) address hypothetical needs, not real problems; and
6) fail to fully analyze implications of the regulations (the DBO/DFPI has said that these regulations will result in an 'increase' in business - surely the DFPI can provide its extensive research into that conclusion)."

Riviera implores the government to recognize the difference between lending and non-recourse factoring.  In the latter, no APR should be calculated or disclosed unless "0% APR" is permitted."

Response to Comment 2.12.8. See the Department's response to Comment 2.12.2 and 2.4.4.

**Comment Letter 2.13 dated April 12, 2021 from Riviera**. Riviera's second comment for this comment period is a lengthy discussion on how factoring works at their business and why they believe it should not be subject to the disclosure requirements of these regulations.

Response to Comment 2.13. Even if the Department agrees with Riviera's assertions, the Legislature wrote the definitions contained within division 9.5 of the Financial Code in a manner that includes factoring companies like Riviera. No change to the regulations is warranted by this comment.

**Comment Letter 2.14 dated April 13, 2021 from Douglas Fox**. "If I am reading this correctly what is to stop a business from having several offices and filing the application in a state where no discussion is to be had like Florida. [APR] is regulated by […] not just one state if I am correct. Until the senate passes a bill to regulate APR and license brokers you will not obtain a proper APR. Look at NY and NJ. They passed a law to protect the merchant against a COJ, that said they set up camp in Florida. Now all offices send their paper to Florida. Where does any state protect the consumer against bad Funders. You don't period. This has to be a vote and all states must follow the law."

Response to Comment Letter 2.14. Mr. Fox makes several statements that do not appear applicable to the regulations. No changes to the regulation are warranted by this comment.

**Comment Letter 2.15 dated April 23, 2021 by SFCCF**.

Comment 2.15.1.  SFCCF suggests section 900(a)(3)(i) use the term "account debtors." "Account debtor" is defined in the California Uniform Commercial Code, the law which governs all transactions in which lenders obtain security interests in personal property. All asset-based

lenders make loans subject to the Commercial Code. See also section 900(a)(29)(A). This section defines account debtor differently than the Commercial Code, which again is the law which governs all secured loans. SFCCF sees no reason to use the same term defined by the Commercial Code if a different meaning is intended. If a different meaning is intended, SFCCF suggests using a different term.

Response to Comment 2.15.1. The Department declines to make the suggested change. Different statutes commonly use similar terms with different definitions and the Commercial Code definition may be inappropriate for these regulations.

Comment 2.15.2. SFCCF submits a comment substantially like Comment 1.17.5.

Response to Comment 2.15.2. Please see the Department's response to Comment 1.17.5.

Comment 2.15.3. Section 3021(a) (renumbered as section 950): The reference in the first line should be to section 2067 not 2062 (renumbered as section 916).

Response to Comment 2.15.3. The Department found this comment helpful and modified the typo  in response to the comment.

Comment 2.15.4. "[Section 900](a)(4)(C). One should keep in mind that the purpose of the statute is to allow borrowers to compare costs. It is less relevant when a borrower is under contract, and even less so if the borrower is in default of its loan agreement. At the least, consideration be given to limiting the effect for this section to changes made while the borrower is in compliance with the terms of its agreement with the lender. If the borrower is in default this provision should not be applicable.

Similarly, temporary accommodations to the borrower should also be excluded. In our experience temporary accommodations are not documented. As prior comments describe, asset based loans typically consist of frequent transactions, often daily, of sales, collections and advances. Communication between borrowers and lenders also often occurs daily. Accommodations to borrowers are often made on the fly. The regulation is not amenable to this constant flow. Thus, we suggest this section be applicable to changes [which] are meant to remain in force for more than 30 days."

Response to Comment 2.15.4. The Department declines to implement the suggested revision to have the applicable section only apply to changes intended to remain in force for more than 30 days, however, the Department did modify the provision to exclude situations where the recipient is in default. The Department also separately clarified the definition of "specific commercial financing offer" to assist in the determination of disclosure timing.

Comment 2.15.5. [Section 900](a)(31) Recipient funds and [Section 916](a)(3)(A) Funding you will be provided. Asset based lenders commonly charge a loan fee upon initiation. Ordinarily, this fee is deducted from the initial advance. Assume a $100,000 line of credit and a 1 percent loan fee deducted upon closing. It is not clear if under the proposed regulations the funding to

be provided is $100,000 or $99,000. The borrower owes the lender $1,000. Is $100,000 being provided and the deduction is merely a matter of accounting or is the funding $99,000? To our reading the proposed regulations are not clear as to what should be disclosed, $99,000 or $100,000.

Response to Comment 2.15.5. The Department believes the definition set forth in section 900, subdivision (a)(35) (defining "prepaid finance charge") exactly describes the situation presented in this comment and is therefore already sufficiently clear.

Comment 2.15.6. "[Section 916](a)(5)(C). We strongly suggest that the language 'with the amount and description of each expense' be reinstated. Without this language hidden fees will remain hidden. A prime motivation for the statute is to provide disclosure. The omitted language provides disclosure. Without it [b]orrowers are left to guess how the cost is calculated. Currently, some lenders fail to tell borrowers about some of their fees. The omitted language cured that problem. In order for a borrower to fairly compare dollars they should be able to see the cents that have added up. The borrower must also see the assumptions that went into the calculation. We can easily reduce the projected cost of our loans with unrealistic assumptions. Often, some lenders also try to get a leg up by doing just that."

Response to Comment 2.15.6. The Department disagrees with the comment that the deleted language would have revealed otherwise hidden fees that will now remain hidden. This section governs example transactions for asset-based lending, given the nature of those transactions and, in connection with sections 943 and 950, the disclosures must still include the finance charge, as well as an itemization via section 956 if the amount financed is greater than the funding the recipient will receive. No change to the regulations is warranted by this comment.

Comment 2.15.7. 4. "[Section 955]. These provisions are too tight. First, given most asset-based lenders use an adjustable benchmark rate plus margin to calculate an interest rate, if the reference rate increases by more than 1/8 of one percent the safe harbor provided by [Section 955, subdivision (a)(1)] disappears. If a lender is charging 10 percent per annum a .25 percent change in the reference rate will increase the annual percentage rate by 2.5 percent wiping out the protection provided by of [Section 955, subdivision (a)(2)(A)]. The flexibility apparently given by [Section 916, subdivision (a)(5)(C)(ii)], disclosing that the estimated finance charge is subject to an adjustable benchmark, does not salvage the ineffectiveness of [Section 955]."

Response to Comment 2.15.7. The Department disagrees that the tolerances are too restrictive. The language is comparable to similar provisions in TILA, and section 955 contains additional provisions that permit a provider to correct any discovered errors in the disclosure.

Comment 2.15.8. Different forms of financing require different rules under section 955. Different forms of financing all require calculation of "estimated finance charge" for open ended financing (section 911, subdivision (a)(5)), "finance charge" for sales-based financing (section 914, subdivision (a)(4)), and estimated finance charge for asset-based financing (section 916, subdivision (a)(5)), but each of these types of financing are very different. Most importantly the

inputs necessary to make the calculation for asset-based lending are the most variable and require a larger safe harbor. Thus, these tolerances are too tight. SFCCF suggests the DFPI, as borrowers should, and these regulations provide, first look at dollars, and then percentages.

Response to Comment 2.15.8. See the Department response to Comment 2.15.7.

**Comment Letter 2.16 dated April 23, 2021 from AFSA.** This comment is substantially similar to Comment Letter 1.3.

Response to Comment Letter 2.16. TThe Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, please see the Department's responses to Comment Letter 1.3.

**Comment Letter 2.17 dated April 26, 2021 from ARF Financial ("ARF").**

Comment 2.17.1. "Are we to assume from [the deletion of language in section 901, subdivision (a)(3), formerly section 2060] that the calculation of term should be based upon a 365 day year and if so, how do you calculate the number of months for months with more or less than 30 days? Therefore, retention of the language deleted as referenced above is appropriate."

Response to Comment 2.17.1. Please see the Department's response to Comment 1.7.6.

Comment 2.17.2. The regulations do not distinguish between preexisting financing provided by the provider and preexisting financing owed to unrelated parties that would need to be satisfied as a condition to funding through the amount financed. This presents practical problems and limitations in that at the introduction and negotiation stage with a prospective recipient and before formal underwriting, when a financing proposal is made and a disclosure is required, the existence of obligations unrelated to the provider/financer (i.e., third party obligations) will either not be known or will be based upon unverified or potentially inaccurate information from the recipient. ARF proposes that any reference to payments required from available funds be allowed to be deferred until a "final" disclosure is issued prior to completion of the loan, that has more accurately verified the amount of funds which will be used to satisfy existing obligations. Alternatively, this requirement should be clarified to only deduct from the funding provided, amounts necessary to pay off existing financing contracts owed to the provider or related parties which the provider would know and thereafter, funds necessary to payoff third party financing contracts only known. ARF further recommends, with respect to the "funding provided" row, that the DFPI allow for an additional option if existence of other financing to third parties is not known at the time of providing the disclosure, that the disclosure allow for language in column three, to the effect: "If this financing will be used to pay off another financing contract owed to a third party, the amount we pay you directly may change."

Response to Comment 2.17.2. The Department addressed this issue in proposed section 900, subdivision (a)(26) by clarifying how a provider should calculate "recipient funds" in situations where the amount needed to pay off other financing is not known or may change over time.

Comment 2.17.3. Proposed section 910, subdivision (a)(2)(C) (ii) and (iii) states in pertinent part "if the amount financed is less than the funds available to the recipient……." ARF believes the reference to "less than" should be changed to "greater than."

Response to Comment 2.17.3. The Department found this, and other, similar comments helpful and corrected the typo.

Comment 2.17.4. In addition to the proposed language for the first row of section 910, subdivision (a)(12), the provider should be able to provide in the first row of the disclosure an additional statement explaining how the provider has based the disclosure on the minimum payments permitted under the contract. This would comply with the requirement that an explanation be not more than 60 words. See section 901, subdivision (a)(7).

Response to Comment 2.17.4.  The Department declined to make this change because it determined that the existing language sufficiently conveys that the disclosure is based upon the minimum payments permitted under the contract.

**Comment Letter 2.18 dated April 26, 2021 from CBA.**

Comment 2.18.1. CBA reiterates its position that subsidiaries, affiliates, and entities otherwise related to depository institutions, which are engaged in the business of commercial lending under federal regulatory oversight, should be exempted from application of the proposed regulations in the same manner that depository institutions are exempted.

Response to Comment 2.18.1. T The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). See also the Department's response to CBA's identical Comment 1.10.1.

**Comment Letter 2.19 dated April 26, 2021 from CFC.**

Comment 2.19.1. If the proposed regulations go into effect accordance with Government Code section 11349.3, the effective date could be fewer than 6 months from adoption. CFC respectfully requests that the DFPI honor the initial statement that effectiveness would be delayed at least 6 months.

Response to Comment 2.19.1. See the Department response to Comment 2.3.6.

Comment 2.19.2. It is unclear how a provider of commercial financing can reasonably comply with the requirement in section 900, subdivision (a)(4)(B) if any of the payment amount, rate or price terms are "verbally quoted" by a broker or other third party. In addition, a provider of commercial financing would be unable to defend itself against a claim that the provider failed to provide the disclosure within one business day of such "verbally quoted" information if there is no written record. Subparagraph (B) creates exposure for providers that they cannot

reasonably defend against except by refuting that terms were verbally quoted to the recipient, with no means to provide additional support for the provider's claim. This requirement also is in conflict with SB 1235's requirement to provide the disclosures "to a recipient at the time of extending a specific commercial financing offer to that recipient." (Fin. Code, § 22802, subd. (a).) A verbal quote of terms is not an offer that a recipient can orally accept to bind the provider and should not, then, be treated as an offer to the recipient. CFC requests the DFPI clarify that by "specific" payment amounts, rate or price, a quote of a range of possible terms is not "specific" and would not, as a result, trigger the disclosure requirement.

Response to Comment 2.19.2. Please see the Department's response to Comment 1.4.1 and 1.5.19 as to how this issue has been addressed.

Comment 2.19.3. Unless the recipient business communicates to the financing provider that its business is seasonal, a financing provider has no way to reasonably anticipate a true-up, even "accounting for past performance of similar contracts." As a result, the requirement in section 914, subdivision (a)(6)(iii) for a sales-based financing provider to disclose the date and amount of any reasonably anticipated true-ups will be difficult, if not impossible to comply with. CFC asks the DFPI to remove the definition of "reasonably anticipated true-up" and the requirement to disclose the date and amount of any reasonably anticipated true-ups.

Response to Comment 2.19.3. Please see the Department's response to Comment 1.2.13.

Comment 2.19.4. CFC requests that the DFPI provide additional clarity on what it means by disclosures required "If the amount financed is less than the funds available to the recipient."

Response to Comment 2.19.4. The Department corrected the typo in response to this and other, similar comments.

Comment 2.19.5. Section 914, subdivision (a)(3)(D) conflates the difference between the purchase price paid to the recipient and the purchased amount with a "fee." This is misleading and does not accurately describe the transaction.

Response to Comment 2.19.5. The Department disagrees that the statement is misleading or that it inaccurately describes the transaction because the purpose of the provision is to alert the borrower that the transaction at issue does not have an interest rate and that their costs are based on another mechanism. No change to the regulations is warranted by this comment.

Comment 2.19.6. In section 914, subdivision (a)(10), requiring the disclosure of a "finance charge" up to the "maximum non-interest finance charge" will likely confuse business owners into thinking that there is an additional amount charged for paying faster than required.

Response to Comment 2.19.6. This provision is only triggered if there is in fact a non-interest amount that the recipient must pay. Whether or not that amount would have been owed if the financing had not been prepaid seems immaterial to the intent of the disclosure. No change to the regulations is warranted by this comment.

Comment 2.19.7. CFC requests that the word "loan" in section 930, subdivision (b)(2) be changed to "transaction."

Response to Comment 2.19.7. The Department modified the provision  in response to the comment.

Comment 2.19.8. CFC requests that the DFPI allow (but not require) providers to assume that they can collect payments on every calendar day.

Response to Comment 2.19.8. Please see the Department's response to Comment 1.7.6.

Comment 2.19.9. CFC requests that the DFPI either choose an easier-to-calculate method of disclosing an annual rate such as the annualized cost of capital or create a safe harbor for good-faith attempts to calculate the estimated APR for the first year of implementation.

Response to Comment 2.19.9. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 2.19.10. CFC asks that the DFPI add "or create a presumption" after "constitute evidence" in the first sentence of a since-deleted part of section 953 and delete the second sentence of that same part.

Response to Comment 2.19.10. The Department declines to make the requested change because the Department ultimately decided to remove that portion of section 953 entirely.

Comment 2.19.11. Section 914, subdivision (a)(12) requires a sales-based financing provider to disclose the "estimated monthly cost" if the contract provides for periodic payments that are not monthly. As a result, the disclosures will feature a monthly representation of the cost of capital that is unrelated to the annual representation of the cost of capital. This will confuse customers and create liability for providers of financing related to claims that the disclosures are deceptive. CFC also notes that SB 1235 did not include an "estimated monthly cost" disclosure in its mandate that the DFPI adopt regulations. CFC requests that the DFPI remove the "estimated monthly cost" disclosure from the regulations.

Response to Comment 2.19.11. See the Department's response to Comment 2.6.2.

**Comment Letter 2.20 dated April 26, 2021 from ETA**.

Comment 2.20.1. DFPI should provide at least 6 months to implement required changes after the final regulations are released. This time period, which comports with previous comments by the Department, would ensure that companies would have enough time to make internal changes and work with vendors and other third parties to ensure a smooth implementation.

<u>Response to Comment 2.20.1</u>. See the Department response to Comment 2.3.6.

<u>Comment 2.20.2</u>. From time to time, innovative products may appear that have features not clearly contemplated by the disclosure categories and requirements set forth in sections 910 through 917. To ensure that it can remain nimble and react to market developments, DFPI should include in the final regulations a mechanism by which financers can apply to the DFPI to vary the prescribed disclosures or seek exemptive relief.

<u>Response to Comment 2.20.2</u>. See the Department's response to Comment 3.2.6.

<u>Comment 2.20.3</u>. Transactions that do not have interest or fees should be excluded from the disclosures in section 910 as the disclosures for these transactions could be misleading and confuse recipients of the funds. For example, in instances where there is no finance charge for prepaying, the proposed regulations would require prepayment disclosure language that states: "If you pay off the financing early, you will not need to pay any portion of the finance charge other than unpaid interest accrued." The reference to a finance charge and interest may cause confusion about whether or not fees are charged for programs that do not actually assess any fees or interest.

<u>Response to Comment 2.20.3</u>. While the Department found this comment helpful, it declined to take the recommended action. Instead, it modified the provision to include "if applicable" in the referenced statement to ensure borrowers are aware their particular product may not have a finance charge/interest.

<u>Comment 2.20.4</u>. Unlike TILA, the proposed regulations would require all disclosures be made whenever a payment amount, rate, or price is quoted based on information provided by a proposed borrower/recipient of financing. Requiring full disclosure at this stage seems unduly burdensome and disruptive to the user experience, especially if the borrower is just trying to determine commercial finance options.

<u>Response to Comment 2.20.4</u>. Please see the Department's response to Comment 1.4.1 as to how this issue has been addressed.

<u>Comment 2.20.5</u>. Regulation Z treats APR disclosure and transaction-based fee disclosure for open-end credit products separately. Unlike Regulation Z, the proposed regulations require that all finance charges be included in the APR calculation, rather than only interest rates that apply to periodic balances. ETA urges the DFPI to hew more closely to Regulation Z's approach and more clearly delineate finance charges that should be clearly disclosed to borrowers and finance charges that should be included in APR calculations.

<u>Response to Comment 2.20.5</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, see also the Department's response to Comment 1.4.11.

Comment 2.20.6. ETA urges that the definition of the broker fee, "Funds paid to brokers," be expanded to include all amounts paid to a broker in connection with a specific offer of commercial financing where such amount varies based on the specific offer of financing, not just amounts that are characterized as a deduction from the amount financed. In addition, to prevent confusion, the information regarding the funds paid to brokers should be required to be disclosed should be included in the main disclosure to ensure the borrower receives this information up front as part of the overall disclosure, rather than in a separate calculation, and urges corresponding changes to the formatting and content requirements to include the "Funds Paid to Brokers" by either the provider or the broker.

Response to Comment 2.20.6. Please see the Department responses to Comments 3.13.10 and 4.4.2, discussing the different sources of broker compensation. In general, while the Department understands the argument that brokers receive payment from providers not just as amounts deducted from the recipient's amount financed, the Department nonetheless believes further input from stakeholders is appropriate before the Department adopts regulations requiring disclosure of broker fees that are not part of the amount financed.

Comment 2.20.7. Section 2091(b)(4) should be modified to permit providers to also exclude from calculation months where increases in monthly sales, income, or receipts are unlikely to recur.

Response to Comment 2.20.7. The Department declines to implement this change because it believes that allowing a provider to exclude from its calculation higher sales/income/receipt months could permit an unscrupulous provider to provide a "gamed" disclosure that does not accurately represent the recipient's actual financial situation and estimates.

## Comment Letter 2.21 dated April 26, 2021 from ELFA.

Comment 2.21.1. Due to the substantial administrative and operational issues and costs (particularly to small business providers) involved in interpreting and implementing the disclosure requirements, ELFA requests confirmation that providers will not be required to comply with the disclosure requirements until at least 180 days after final regulations have been adopted and have become effective.

Response to Comment 2.21.1. See the Department response to Comment 2.3.6.

Comment 2.21.2. ELFA requests that the Department revise and post template disclosure forms compliant with the new law and final regulations.

Response to Comment 2.21.2. While this is something the Department is willing to consider doing in the future, currently the Department has no plans to provide template forms. That said, the DFPI often provides formal legal opinions in response to discrete legal compliance questions submitted to the DFPI through requests for interpretive opinions or specific rulings.

Comment 2.21.3. ELFA believes that revised section 900, subdivision (a)(4)(B) goes far beyond the clear language and intent of the of the statute and, in most cases will be impossible to comply with and would just bury the recipient in paper having little relevance to an informed decision to enter into the commercial financing. A "verbal quote" of a payment amount or a rate, or a price is simply not a specific commercial financing offer as it lacks all of the other elements required to be disclosed and would typically be conveyed in the back and forth of negotiations between provider and recipient that ultimately result in an offer which, if accepted could lead to a binding contract.

Response to Comment 2.21.3. Please see the Department's response to Comment 1.4.1 and 1.5.19 as to how this issue has been addressed.

Comment 2.21.4. ELFA believes that the new requirement in section 900, subdivision (a)(4)(D) that would require a separate disclosure "in connection with each draw" is unnecessary and administratively burdensome because if the rate or price varies based on the retailer or supplier, or the products or services purchased, this can be disclosed in the initial disclosure relating to the facility as a whole. ELFA believes this subsection should be deleted.

Response to Comment 2.21.4. The DFPI revised this section to clarify that this approach to disclosure is an option for certain types of open-end credit rather than a disclosure required for all forms of open-end credit.

Comment 2.21.5. In light of the imminent replacement of LIBOR based interest rates by SOFR, ELFA suggests that "benchmark rate" be amended to include a specific reference to SOFR as an acceptable benchmark rate.

Response to Comment 2.21.5. The Department found this comment helpful and modified the provision  in response to the comment.

Comment 2.21.6. Subparagraphs (B) and (C) of Section 915, subdivision (a)(5) appear to be redundant and ELFA requests that one be deleted.

Response to Comment 2.21.6. The Department found this comment helpful and corrected the typo by clarifying subparagraph (B) is the actual number representing the total dollar amount of payments the recipient will make during the term of the contract, and subparagraph (C) is the disclosed explanation of that number.

Comment 2.21.7. In sections 900 through 917 there are a number of references to ". . . if the amount financed is less than the funds available to the recipient. . . ." ELFA believes that the regulations mean to say "if the amount financed is greater than the funds available to the recipient."

Response to Comment 2.21.7. The Department found this comment helpful and corrected the typo.

Comment 2.21.8. ELFA requests that section 956 be deleted. This additional disclosure requirement is not within the scope of the legislation as set forth in Financial Code section 22802, nor does it fall within the scope of regulations authorized in Financial Code section 22804 which are limited to the disclosure items referenced in Financial Code sections 22802 and 22803 and appropriate methods of calculation.

Response to Comment 2.21.8. The Department respectfully disagrees that section 956 is not within the scope of the legislation authorizing the regulations. Financial Code section 22804, subdivisions (a)(2) and (b)(2) specifically empower the Department to determine the contents and methods of calculation, as well as the manner and format of the disclosures. An itemization of the costs of a borrower's financing is necessary to assist a recipient in understanding the amount of funds provided. This requirement prevents confusion for recipients who would otherwise receive a disclosure with an amount financed that is greater than the amount of funds they will receive directly. Therefore, it is within the authority granted to the Department under Financial Code section 22804 and consistent with the purpose of the legislation.

Comment 2.21.9. ELFA requests that the subsections be ordered alphabetically by defined term.

Response to Comment 2.21.9. The Department found this comment helpful and ensured that the defined terms in Section 900 are alphabetical in the final text.

Comment Letter 2.22 dated April 27, 2021 from ILPA. ILPA's comment letter was received after the public comment period for this modification had closed. Therefore, the Department declines to consider and respond to the comments received in this letter.

**SUMMARY AND RESPONSE TO COMMENTS RECEIVED DURING THE SECOND 15-DAY COMMENT PERIOD FROM AUGUST 9, 2021 to AUGUST 24, 2021**

**Comment Letter 3.1 Dated August 24, 2021 from RBLC.**

Comment 3.1.1. The changes to section 900, subdivision (a)(4) regarding the timing of the disclosures could inadvertently lead to inability to effectively compare offers between providers or even from the same provider. Revise or clarify "selects a preferred option" to be "selects an option for consideration" or some other language that doesn't suggest that a borrower might be choosing a product without having the ability to effectively compare the disclosures provided at that time to other options also under consideration.

Response to Comment 3.1.1. Please see the Department's response to Comment 1.4.1. Furthermore, the DFPI declines to implement the change requested by RBLC because the proposed by RBLC appears substantially similar the proposed language.

Comment 3.1.2. The underwriting method needs additional accountability to prevent it being abused by providers and "gaming" their APR estimations. The recommended approach to

fixing this problem is to require providers using the underwriting method to report data to the Department.

Response to Comment 3.1.2. The Department does not disagree that periodic reporting to the Department from providers who use the underwriting method may be appropriate to ensure providers are not misleading their customers; however, the Department believes that such a requirement is more appropriately implemented in a subsequent rulemaking grounded in the authorities granted under SB 1235 and AB 1864. AB 1864, which explicitly empowers the Department to require data collection related to financial products and services provided to small business recipients, had not passed at the time that the Department initially proposed the underwriting method rule. Since AB 1864's enactment, the Department has also begun to hire staff who will be focused on market monitoring. The Department is now better positioned than it was at the time of its initial proposal to consider a new regulation relating to data collection and small business financing.

Comment 3.1.3. The format requirements with respect to layout and font sizes should be relaxed in order to permit additional flexibility, especially with respect to how the disclosures might appear on a mobile device. While deviations for purposes of complying with the ADA is already in the regulations, the Department should consider deviations permissible just for general clarity. We suggest font size requirements be modified to "not smaller than" to permit this flexibility.

Response to Comment 3.1.3. The Department found this comment helpful and modified the section to include a provision permitting a deviation from the requirements for clarity based upon the medium presented (e.g., a mobile device).

**Comment Letter 3.2 Dated August 24, 2021 from ETA.**

Comment 3.2.1. Please provide at least 6 months for compliance after the rules are formally adopted.

Response to Comment 3.2.1. In accordance with the information contained within the Department's Initial Statement of Reasons, the regulations will not become effective until 6 months after adoption.

Comment 3.2.2. ETA argues that the use of APR in disclosures is problematic because:

- Different APR calculations for the same products. Example: TILA doesn't address daily pay loans, so how will providers deal with this? Different providers might deal with this differently, leading to different APRs for the same products despite identical cost/credit.

- APR is highly duration sensitive, in other words, the APR increases rapidly the shorter the loan term. For example, the APR of typical short-term commercial loans will fluctuate widely based on only small differences in the term of the loans.

- Total Cost of Capital (TCC) is what should be used instead of APR. TCC permits a more useful comparison of the absolute cost of capital with a small business's expected return from investing the loan proceeds. A business that expects a short-term return on its investment is more likely to choose a loan with a shorter term and higher payment to minimize TCC, even if the APR would also be much higher.

- Certain products do not work well with APR (e.g., MCAs, factoring). Example: Products with fixed costs but no fixed term and are paid through a merchant's future receivables are incompatible with APR because if a merchant's receivables are unexpectedly higher (resulting in quicker repayment of the amount borrowed), the duration of the transaction decreases and APR increases.

Response to Comment 3.2.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, the Department acknowledges that providers of certain types of financing are not used to having to calculate APR and that doing so may present initial challenges; however, the Department disagrees that TCC is a reasonable alternative to APR because it does not result in a calculation that represents the total cost of financing expressed as an annualized rate, as required by Financial Code section 22802, subdivision (a)(6).

Comment 3.2.3. Requiring the "average monthly cost" for non-monthly pay products is confusing and not required by the statute. Please remove this requirement.

Response to Comment 3.2.3. See the Department's response to Comment 2.6.2.

Comment 3.2.4. Disclosure of All Fees. Section 956 is missing a critical component regarding broker fees. It is industry standard for brokers to receive fees from two sources: fees paid by the borrower and fees paid by the provider. As drafted, section 956 includes fees paid by the borrower, but not those paid by the provider. This is significant because a provider's broker fees will directly affect the borrower's cost of financing (since the provider will adjust the rate accordingly).

Response to Comment 3.2.4. The Department declines to adopt a proposed change on this issue but notes that this does not mean it necessarily disagrees. Rather, the Department believes further input from stakeholders may be appropriate before the Department adopts regulations requiring disclosure of broker fees that are not part of the amount financed.

Comment 3.2.5. APR for open-ended credit products is bad because it asks providers to mix rates and fees. Rates are interest rates applied to periodic balances, fees are transaction-based and may depend on how a borrower uses a financing product. Regulation Z does not require the mixing of these concepts but instead requires an APR with the fees not included in the calculation. Annualization of transaction-based fees while assuming specific borrower behavior leads to APR disclosures that bear no relation to the true cost of credit and make

comparison shopping useless. ETA recommends the Department follow Regulation Z's approach.

Response to Comment 3.2.5. The Department declines to adopt the proposed approach because the proposed approach would undermine a recipient's ability to compare open-end credit products to other financing options. Furthermore, the TILA approach to APR calculation for open-end credit fails to account for finance charges incurred at origination, which can result in APR disclosures that in some cases do not incorporate some or all the costs associated with financing. No change to the regulations is warranted by this comment.

Comment 3.2.6. The Department should include a mechanism for financing companies to vary the required disclosures when necessary (example: new products that are not contemplated by the statute/regulations). This variance could be by application for approval, or otherwise.

Response to Comment 3.2.6. The Department is open to revising regulations in the future should there be changes in how industry conducts business or upon the emergence of new products that are outside the scope of the regulations (statute permitting). However, no change to the regulations at this time is warranted by this comment.

**Comment Letter 3.3 Dated August 24, 2021 from ELFA.**

Comment 3.3.1. Section 900, subdivision (a)(4)(A) should be reverted to its previous version because the required disclosures can only be made at the time of a final offer in writing because that is the only time that all of the information necessary to make a compliant disclosure can be made. Prior to the final offer certain elements of the proposed transaction may be conveyed in writing but other elements may not have been determined at that time, making it impossible to provide a compliant and meaningful disclosure.

Response to Comment 3.3.1. See the Department response to Comment 1.4.1 and 1.5.19.

Comment 3.3.2. With respect to the changes in section 900, subdivision (a)(4)(A) regarding "selecting the preferred option," providers need time to process the borrower's choice in order to make the disclosure pursuant to the selection made. Please include a reasonable period of time for the disclosure to be made after selection, e.g., 2 business days.

Response to Comment 3.3.2. See the Department response to Comment 1.4.1 and 3.17.1.

Comment 3.3.3. Section 900, subdivision (a)(6) definition of "broker" is too broad and inconsistent with industry understanding of brokerage activities, as well as regulatory guidance previously provided by DFPI relating to the definition of brokerage activities. For example, an outside law firm preparing documents, and/or communicating with the provider and/or recipient would be a "broker" under this definition. Entities that simply deliver documentation such as the USPS, UPS, FedEx and other delivery services would be brokers.

The California Financing Law defines broker as a company engaged in the business of

"negotiating" or "performing any act as broker" in connection with "loans made by a finance lender." DFPI guidance in 2016 was more nuanced in defining these activities, stating that certain activities would "always" be broker activities (i.e., actually negotiating loans or counseling or advising borrowers about a loan); while other activities might be broker activity, depending on facts and circumstances. We suggest that the previous guidance be included in the regulations and also that the definition of broker exclude representatives, employees, and agents of the provider or the recipient.

Response to Comment 3.3.3. While ELFA's comments regarding the California Financing Law's definition of broker are misguided because the authorizing statute for these regulations (division 9.5 of the Financial Code) is not part of the California Financing Law, the Department nonetheless found the comment regarding the definition of broker being a bit too broad helpful and narrowed the definition in section 900, subdivision (a)(6) by inserting an additional requirement that the action in question be for compensation and further excluding recipient's agents from the definition.

Comment 3.3.4. Section 900, subdivision (a)(30)(B) will be confusing to the provider and recipient. The "amount financed" is the principal amount. The reference to "plus any other amounts that are financed by the financer" is not accurate since those amounts will be part of the principal amount by definition.

Response to Comment 3.3.4. The Department disagrees that this definition is confusing because some providers may not refer to the amount financed by the borrower but used to, for example, pay off previous financings, as the principal, and this section ensures that amount is captured in the definition.

Comment 3.3.5. Section 954, subdivision (b), in (ii) should be revised for clarity to include, after the word "provider," the words: "or broker."

Response to Comment 3.3.5. The Department found this comment helpful and revised the section to remove the reference to the provider (and thus eliminating the need to refer additionally to the broker). Instead, the section now simply refers to the address provided by the recipient in the application for financing.

Comment 3.3.6. In the Itemization of Amount Financed chart in section 956, subdivision (b), a line item should be included that states "Amounts paid to Supplier" since it is common practice for providers to pay loan proceeds directly to recipient's vendor or supplier as directed.

Response to Comment 3.3.6. The section in question already requires this, if appropriate. The included chart is merely an example transaction and not how every itemization should appear for every transaction. No change is warranted by this comment.

Comment 3.3.7. Please include directly in the regulations an effective date at least 6 months from the date the regulations are adopted.

Response to Comment 3.3.7. See the Department response to Comment 2.3.6.

**Comment Letter 3.4 Dated August 24, 2021 from Financial Innovation Now ("FIN")**.

This letter is substantively identical to the ETA letter dated August 24, 2021, above, with respect to Comments 3.1.5 and 3.1.6. Please see the Department responses to Comments 3.1.5 and 3.1.6.

**Comment Letter 3.5 Dated August 24, 2021 from Forward Financing**.

Comment 3.5.1. Because APR is widely known to be confusing to borrowers, DFPI should follow the lead taken by the Dodd-Frank Act in amending TILA to include a "Total Interest Percentage" disclosure. TIP is the total amount of interest that a consumer pays over the life of a mortgage loan expressed as a percentage (e.g., a 500,000 loan with 250,000 interest paid over the life has a TIP of 50 percent). DFPI should require for sales-based financing transactions, as an alternative or additional disclosure, disclosure of a rate comparable to TIP (ex: "Total Financing Percentage", or similar). This would present a more complete and easy-to-understand picture of a sales-based financing transaction.

Response to Comment 3.5.1. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, while the Department is open to considering alternative, helpful metrics by which borrowers can understand the costs of their financing, it believes TIP requires additional research and comparison before being incorporated into the regulations at this time. The Department will consider adding such a disclosure in a future rulemaking.

Comment 3.5.2. To accurately reflect a sales-based financing transaction with an expiration date in its financing contract financers offering such a product should be allowed to disclose an APR range, instead of a static APR. Using a static APR does not adequately take into account the longer expiration of certain sales-based financing agreements, nor their fluctuating characteristic.

Response to Comment 3.5.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 3.5.3. Section 955's APR tolerance range is a useful safe harbor for other financing products, but not sales-based financing transactions. The variables involved in developing an APR for a sales-based financing make it an invitation for legal and regulatory disputes. Estimating sales, income or receipts is not a precise exercise, and other elements like "reasonably anticipated true-ups" underscore the need for a standard that reflects the nature of computing an APR for sales-based financing. The APR tolerance measure should be eliminated, or at least it should be specified that a miscalculation cannot be grounds for private litigation.

<u>Response to Comment 3.5.3</u>. The Department declines to adopt the proposed revision because it would provide a shield to liability for providers who purposefully mislead recipients by quoting unrealistically low payment and APR estimates.

<u>Comment 3.5.4</u>. The historical method is too narrow in scope to be useful to providers like Forward Financing. Forward Financing performs a multi-faceted analysis, which includes analysis of the customer's industry, geography, time in business, whether or not the business is seasonal, history of bankruptcy or other financial events, along with recent receipts, among other things. Forward Financing typically reviews three months of an applicant's receipts and strongly believes this number serves the best interests of Forward Financing's customers, whose primary interest is to receive financing expeditiously rather than enduring the added burden of providing additional bank statements. Please reduce the required number of months of sales receipts necessary to use the historical method to 3 or omit the requirement entirely.

<u>Response to Comment 3.5.4</u>. The Department declines to make the suggested modification. The historical method already permits a review of as few as 4 months of statements and Forward Financing does not persuasively argue that being required to review 4 months instead of 3 is somehow "too narrow in scope." Furthermore, Section 930, subdivision (b)(4)(C), allows a provider to use fewer than 4 months in certain circumstances if the provider does not require or receive income documentation for those months from the recipient. No further change to the regulations is warranted by this comment.

<u>Comment 3.5.5</u>. True-ups, required under section 914, are by their nature unforeseeable. A financer who foresees true-ups during underwriting should provide for a different periodic payment amount at the outset. Even if it made sense to anticipate a true-up, predicting the date and amount would be speculative at best. Delete the true-up disclosure but retain the disclosure regarding a provider's true-up policy.

<u>Response to Comment 3.5.5</u>. Please see the Department's response to Comment 1.2.13.

<u>Comment 3.5.6</u>. Sections 914 and 956 require providers to give disclosures in a chart breaking down the itemization of the amount financed and broker fees. However, neither of the charts in the regulations account for Forward Financing's methodology with respect to how it pays brokers – e.g., from profits *after* a transaction is consummated, not upfront or withheld. There is also no way for Forward Financing to provide a "substantially similar" chart in this situation. Please revise the charts accordingly.

<u>Response to Comment 3.5.6</u>. The Department declines to adopt a proposed change on this issue but notes that this does not mean it necessarily disagrees. Rather, the Department believes further input from stakeholders may be appropriate before the Department adopts regulations requiring disclosure of broker fees that are not part of the amount financed.

<u>Comment 3.5.7</u>. Applying consumer loan standards to commercial financing transactions is troubling with respect to how those transactions might be viewed under California law. Section

953 should make clear that the imposition of consumer loan protection standards and requirements to commercial financing transactions does not mean such transactions are loans under California law. Forward Financing recommends that section 953 be amended by adding the following after section 953, subdivision (a): "(b) Compliance of commercial financing transactions with the rules of this Chapter does not change or alter the financing transactions into loans under California law."

Response to Comment 3.5.7. The Department declines to include a section as suggested because it would likely exceed the Department's regulatory authority for this rulemaking.

**Comment Letter 3.6 Dated August 17, 2020 from Law Offices of Paul Soter**.

Comment 3.6.1. A 14-day comment period in the middle of the summer when most of Mr. Soter's clients are on vacation and unable to review/comment to the latest proposal is unacceptable. Please establish a new comment period of at least 60 days.

Response to Comment 3.6.1. Mr. Soter's comment is factually incorrect. As required by the APA, the Department provided at least 15 days for public comment on this version of the regulations. Given the time constraints on rulemaking, a 60-day comment period for modifications after the initial text would be unreasonably and unnecessarily long.

Comment 3.6.2. The proposal seeks to implement, for the first time, a definition of the term "broker." While such a definition is long overdue in regulations interpreting the California Financing Law, this is an inopportune time and place to introduce such a definition. First, such a definition is significant to many areas of licensees' operations under the California Financing Law, well beyond the scope of the SB 1235 disclosures. It should therefore be implemented following the publication of a full explanation by the Department of its reasoning behind such a regulatory definition; an appropriate notice and comment period; full discussion by the Department in consultation with stakeholders; and a full deliberation of all input received by the Department. Second, the definition of the term "broker" is not necessary to promulgate in a regulation implementing SB 1235.

Response to Comment 3.6.2. Mr. Soter's comment regarding a definition of broker interpreting the California Financing Law being long overdue is inapplicable to these regulations because the statutes governing these regulations are not part of the California Financing Law (see Financial Code division 9.5). The Department respectfully disagrees that a definition of the term "broker," limited to compliance and effect within these regulations, is not necessary.

Comment 3.6.3. Instead of singling out brokers, the regulation could provide that its provisions apply to "brokers, finders, channel partners, agents, co-venturers, or other intermediaries that refer loans and other financing transactions to persons covered by SB 1235." This would fully apply SB 1235 to all persons whom the Legislature intended to be covered, without the unnecessary and foreseeable potential for mischief that promulgation of an inappropriate definition of "broker" will cause.

<u>Response to Comment 3.6.3</u>. Although Mr. Soter's more broad broker comments are addressed in the previous comment response, the Department nonetheless narrowed the definition in response to this and other, similar comments that were made. Specifically, in section 900, subdivision (a)(6), the Department inserted an additional requirement that the action in question be for compensation and further excluded recipient's agents from the definition.

<u>Comment 3.6.4</u>. Numerous technical operational issues exist in the draft regulations, which need a thorough review by operators, for which time is not provided.

<u>Response to Comment 3.6.4</u>. While no specific issues were identified in this comment, numerous other commenters were quite thorough in their review of the regulations draft and many such issues were corrected or modified  in response to those comments. No changes to the regulations are warranted by this comment.

<u>Comment 3.6.5</u>. The deletion of the previous draft provision that an entity would not be deemed to have engaged in lending simply because it used the terms set forth in the regulation in a disclosure. This is clearly contrary to analogous federal disclosure law, and thus deserves full explanation and discussion.

<u>Response to Comment 3.6.5</u>. The Department deleted the provision in question based upon the reasons stated in response to comment 1.4.15. b. An analogous provision existing in federal law does not inherently provide the Department authority to promulgate a similar or even identical provision via regulation.

**<u>Comment Letter 3.7 Dated August 24, 2021 from QC</u>.**

<u>Comment 3.7.1</u>. Clarify any difference in meaning between "maximum aggregate purchase price" (section 951) and "approved advance limit" (section 900, subdivision (a)(1); section 921, subdivision (a)(3)) in the context of factoring. If these two phrases are not intended to be synonymous in the context of factors, then the meaning of the term "maximum aggregate purchase price" should be clarified.

<u>Response to Comment 3.7.1</u>. The Department found this comment helpful and deleted all references to the "maximum aggregate purchase price" in response to the comment.

<u>Comment 3.7.2</u>. Allow the factoring "example transaction" disclosure (per section 913) to Include "total dollar cost." The "example transaction" disclosure set forth in section 913 of the proposed regulations does not provide for disclosure of the "total dollar cost" of the proposed transaction. Moreover, section 913 now requires the factor to use the phrase "annual percentage rate" in the example disclosure instead of the term used in the statute, "cost of financing expressed as an annual rate." The "example transaction" disclosure should include a row for "total dollar cost" immediately under the "funding provided," and the title of the row "annual percentage rate (APR)" should be changed to "total cost of financing expressed as annualized rate." These changes are necessary to track the language of the statute.

Response to Comment 3.7.2. The Department declines to make the requested changes because the requested modifications are unnecessary "to track the language of the statute" since the Department has created definitions within the regulations that make the statute's language clearer and/or more specific. For example, section 913 requires disclosure of "APR" instead of "cost of financing expressed as an annualized rate" because the Department, in accordance with its authority granted under Financial Code section 22804, determined that APR would be the cost of financing expressed as an annualized rate. Additionally, section 913 requires disclosure of "Finance Charge" instead of "total dollar cost" because the Department defined that as such in section 900, subdivision (a)(13).

Comment 3.7.3. Allow the "example transaction" disclosure (per section 913) to use a $10,000 sample advance amount instead of the full "approved advance limit." Using the maximum possible amount was not the intent of the statute in providing the option of an "example" of "an amount financed" that may be outstanding at any given time in the sample disclosure. Doing so would create more transparency for the consumer, who would understand the comparison with other similar advances.

Response to Comment 3.7.3. The relevant sections permit the use of a $10,000 sample transaction in the event the factoring agreement does not specify a maximum draw amount. The Department disagrees that using a $10,000 example transaction in instances where the factoring agreement specifies a maximum draw amount would provide more transparency for the customer since, depending on the maximum draw amount, a $10,000 example transaction risks being a substantial underestimate of the actual transaction(s).

Comment 3.7.4. Revise the "prepayment" language in the "example transaction" disclosure (per section 913) to use the term "unpaid fees" instead of "unpaid interest." Factors do not always charge interest, so this language will be confusing. QC requests that this language be revised to say, "If you repurchase the [description of legally enforceable claim] before the due date, you will not pay any portion of the finance charge other than unpaid fees accrued since disbursement." Examples of such fees would include banking, legal, and administrative fees.

Response to Comment 3.7.4. While the Department declines to make the requested change, it modified the relevant section to include an "if applicable" statement to make clear not all transactions may involve interest.

Comment 3.7.5. Clarify the frequency of disclosures in the factoring context. A clause should be added specifying that where there is a sample disclosure made pursuant to a general agreement to purchase accounts receivable and purchase orders, amounts funded over time pursuant to such an agreement shall not each require a new disclosure form for each individual advance unless the terms have changed. Moreover, clarify that the disclosure requirements apply to all new general agreements and do not require the creation of a disclosure for already existing general agreements.

<u>Response to Comment 3.7.5</u>. The Department found this comment helpful and modified the relevant provisions in a manner that accommodates this request where the language is not already clear.

<u>Comment 3.7.6</u>. Section 943 refers to a "commercial credit transaction," a term which is neither defined nor used anywhere else in the regulations. QC suggests clarifying the meaning of that term.

<u>Response to Comment 3.7.6</u>. The Department found this comment helpful and revised the typo to say "commercial financing transaction".

**<u>Comment Letter 3.8 Dated August 24, 2021 from Reliant Funding</u>.**

<u>Comment 3.8.1</u>. The historical method proposed by the DFPI for estimating projections under section 930, subdivision (b)(2) states that "[a] provider shall fix the number of months used to calculate the recipient's average monthly historical sales, income, or receipts for all transactions, or by recipient industry or financing amount (or both)." As currently drafted, it is unclear whether financers are able to group certain industries together for the calculation and utilize the same number of months for all recipients in the same industry. Further clarification in this regard would be appreciated.

<u>Response to Comment 3.8.1</u>. The Department found this comment helpful and revised the provision for clarification. Specifically, the Department added language to show that financers can fix the months used to perform the calculation in a different amount depending on how they choose to group their transactions, e.g., by industry, by amount (or both), or simply the same across all transactions.

<u>Comment 3.8.2</u>. Section 952, subdivision (a)(3) requires a financer to "[m]aintain a copy of the evidence of transmission of the disclosures provided by a broker to the financer in compliance with subdivision (b) for a period of at least four years following the date that the disclosure is presented to the recipient." However, it is unclear what would constitute "evidence of transmission of the disclosures." Reliant Funding requests clarification as to what would suffice as evidence to ensure compliance with this section.

<u>Response to Comment 3.8.2</u>. See Department response to Comment 1.11.39.

<u>Comment 3.8.3</u>. Section 952, subdivision (b) requires a broker to provide the "evidence of transmission of the disclosures to the financer." However, this section does not contemplate the possibility of fraud on the part of the broker and the potential liability that could be imputed on the provider. Subdivision (c)(2) states that this section is not to be construed to "[c]reate any liability for a broker if the disclosures that the financer provides do not comply," but does not provide any safeguards or waiver for the provider. Thus, consideration should be given to ensure reciprocity.

<u>Response to Comment 3.8.3</u>. See the Department response to Comment 2.8.5.

**Comment Letter 3.9 from the Revenue Based Finance Coalition (RBFC).**

Comment 3.9.1. RBFC states that the DFPI's revised definition of broker is over-inclusive because it could cover a licensed attorney who participates in preparation of a providers' financing documents, financers' employees, accountants, notaries, or electronic signature services. RBFC requests that the definition of broker exclude employees of financing providers and licensed attorneys who have no direct contact with the recipient. RBFC also requests that the DFPI remove the phrases "gathers financing application documentation or delivers the documentation to the financers," "or obtains the recipient's signature on financing documents," and "communicates financing decisions or inquiries from the financer to the recipient." Finally, RBFC requests that the definition of broker only include persons who receive "separate, identifiable compensation for providing brokering services."

Response to Comment 3.9.1. In response to RBFC's comment, the DFPI incorporated a "for compensation" requirement into the definition of broker because the DFPI agrees that brokers provide their services for compensation. The DFPI did not include the language "separate" or "identifiable" to modify compensation because RBFC did not demonstrate why these terms are necessary to accurately describe brokers. The DFPI did not exclude employees of financing providers because DFPI sees no reason why a financing provider's employee would not be treated as a financer under the law, and thus excluded from the definition of broker. Financers that are corporations necessarily act through their employees. The DFPI did not exclude licensed attorneys from the "broker" definition because the definition is used only in section 952, and DFPI could not identify a good reason why a person should be relieved of the obligations imposed under section 952, subdivisions (b) and (c), solely because they have a license to practice law. The DFPI did not remove the other phrases requested by RBFC, because the phrases described activities often performed by brokers and the "broker" definition is used only in section 952. As with licensed attorneys, the DFPI could not identify a good reason why any person who performs those activities should be relieved of the obligations imposed by section 952, subdivisions (b) and (c).

Comment 3.9.2. RBFC identified a potential conflict between the definition of "funds paid to brokers" and revisions to the definition of "amount financed" that exclude prepaid finance charges. RBFC explained that because "funds paid to brokers" included portions of the amount financed that are paid to any broker, they would necessarily exclude prepaid finance charges that are paid to brokers, even those these are funds that are paid to brokers in connection with the transaction.

Response to Comment 3.9.2. Any potential conflict that may have existed between the defined terms was resolved when the DFPI removed the "funds paid to brokers" definition (and disclosures tied to that definition) from the rules.

Comment 3.9.3. RBFC requests that the DFPI delay the implementation date for the proposed regulations by at least six months.

Response to Comment 3.9.3. In accordance with the information contained within the
Department's Initial Statement of Reasons, the regulations will not become effective until 6
months after adoption.

**Comment 3.10 Dated August 24, 2021 from Rewards Network Establishment Services
("RN").**

Comment 3.10.1. RN states that requiring disclosure of an average monthly cost will cause
confusion for recipients who receive RN's non-monthly payment financing product.

Response to Comment 3.10.1. The Department declines to address this comment because the
comment is not regarding a change to the language that was made available to the public
during this comment period. (Government Code section 11346.8, subdivision (c)). Please see
response to Comment 2.6.2.

Comment 3.10.2. RN states that requiring an APR disclosure will lead recipients to believe that
their product has an interest rate and/or fixed payments.

Response to Comment 3.10.2. The Department declines to address this comment because the
comment is not regarding a change to the language that was made available to the public
during this comment period. (Government Code section 11346.8, subdivision (c)). Please see
response to Comment 1.2.15, response to Comment 1.2.3, and response to Comment 1.4.7.

**Comment 3.11 Dated August 24, 2021 from the Secured Finance Network (SFN).**

Comment 3.11.1. SFN requests that the DFPI limit the circumstances in which a provider is
required to issue new disclosures when a contract is amended, supplemented, or changed, to
exclude circumstances in which there are increases to the financing charge due to charging of
avoidable fees, exclude ordinary course changes, and limit the disclosure requirements to
contract changes made in writing. SFN states that these changes are justified because this will
ease accommodations made by providers, the accommodations are typically temporary, and
recipients are rarely looking for other financing when they receive accommodations from
providers.

Response to Comment 3.11.1. Please see response to Comment 2.4.1.

Comment 3.11.2. Comment 2.4.3. SFN requests that the DFPI revise the definition of
approved credit limit to implement the change captured by Comment 2.4.7.

Response to Comment 3.11.2. Please see response to Comment 2.4.7.

Comment 3.11.3. SFN requests that the DFPI revise the regulations to exclude "non-borrowing
factoring" or "collection factoring," because in these financing arrangements a financer does
not provide an advance to the recipient. SFN states that these transactions are more akin to a
collections service than a financing transaction.

Response to Comment 3.11.3. Please see response to Comment 2.4.4.

Comment 3.11.4. SFN makes a comment substantially similar in substance to Comment 2.4.5.

Response to Comment 3.11.4. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 3.11.5. SFN makes a comment substantially similar in substance to Comment 2.4.6.

Response to Comment 3.11.5. Please see response to Comment 2.4.6.

**Comment 3.12 Dated August 24, 2021 from the Small Business Financial Association (SBFA).**

Comment 3.12.1. SBFA states that they did not receive notice of the modifications associated with their comments, and that the two-week review period provided did not provide sufficient time for SBFA to review and comment on the regulations. SBFA therefore requested that the DFPI re-issue the notice and provide more time for companies and organizations to respond to the revisions.

Response to Comment 3.12.1. The DFPI offers a subscription system that allows all stakeholders to enroll to receive notifications relating to proposed rules. At the time the DFPI sent the notice in question, SBFA's contact Steve Denis had not subscribed to receive notices for the SB 1235 rulemaking. However, the DFPI did deliver a notice to Scott Pearson, SBFA's counsel who submitted SBFA's October 28, 2020 comment to the proposed rules. For these reasons, the DFPI does not believe that its notice procedures were ineffective. After Mr. Denis informed the DFPI that he did not receive the notice, the DFPI provided Mr. Denis with the information needed to subscribe to future notices. The fifteen-day comment period provided for the DFPI's August 9, 2021 revisions to the proposed rules met the requirements of the APA and, given the time sensitivities of rulemaking involving multiple modifications to the initial text, was sufficient for stakeholders provide comment on the DFPI's proposed changes to the text.

Comment 3.12.2. SBFA makes a comment substantially similar in substance to Comment 2.6.2.

Response to Comment 3.12.2. Please see response to Comment 2.6.2.

Comment 3.12.3. SBFA requests clarification as to whether a double payment collected after a bank holiday (i.e. (1) the payment due on day following the bank holiday and (2) the payment collected on the day following the bank holiday that was due on the bank holiday) would be treated as a periodic payment or an irregular payment under the regulations. SBFA notes that if this type of payment is treated as an irregular payment, this will cause significant burdens for a provider who will have to review a calendar for the estimated term, determine when any

payment falls on a bank holiday, and classify any day when two payments are collected as an irregular payment in the disclosures. SBFA requests that the DFPI clarify that such payments would not be treated as irregular.

Response to Comment 3.12.3. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, providers concerned with how to classify the payments described above may consider section 901, subdivision (a)(16)(B), which allows providers to disregard the effect of "dates of scheduled payment and advances… changed because the scheduled date is not a business day." This provision would allow providers to disregard the effects of bank holidays when crafting disclosures such that when multiple payments are collected on a single day due to a bank holiday, the provider could still treat both payments as periodic payment. Put another way, a provider would not violate the rules by assuming for the purposes of disclosures that a payment can be collected on a bank holiday.

Comment 3.12.4. SBFA makes a comment substantially similar in substance to Comment 1.2.13 and Comment 1.4.4's with respect to true-ups.

Response to Comment 3.12.4. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). Please see response to Comment 1.2.13 and response to Comment 1.4.4.

Comment 3.12.5. SBFA requests that sections requiring disclosure of the amount financed (ex. section 910, subd. (a)(2)) account for situations in which parts of the amount financed are used to pay-down or pay-off amounts owed by a recipient in connection with obligations such as rent or other non-financing obligations. SBFA requests that the sections be revised to account for deductions for any recipient debt so that recipients are aware of deductions for debts other than debts associated with other financings.

Response to Comment 3.12.5. The DFPI agrees with SBFA's reasoning and revised the sections in response to the comment. For example, section 910(a)(2)(C) and its subsections were revised by removing language referring to the recipient's "other financing agreements" in exchange for more the more general term "obligations". Similar changes were made to the other disclosure sections, as well as Section 956 which contains the itemization requirements.

Comment 3.12.6. SBFA requests that prepayment policy disclosures be revised to inform a recipient only if there are prepayment penalties or not or to direct a recipient to a specific provision of the contract relating to prepayment.

Response to Comment 3.12.6. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment 3.13 Dated August 24, 2021 from Small Business Financial Solutions, LLC doing business as Rapid Advance ("RA").**

Comment 3.13.1. RA notes that each header for the different types of financing is labeled differently, which makes it seem as though each type of financing has different requirements or disclosures. RA requests that the DFPI revise the regulations so that different types of financing are listed in the same order in different sections and that sections that dealing with those types of financings also appear in that order. RA requests that definitions be listed alphabetically. RA states these changes will make the regulations easier to read and understand.

Response to Comment 3.13.1.  The Department declines to change the order of the types of financing because it disagrees that it would make the regulations easier to read or understand, but agrees that the definitional sections should be listed alphabetically and made the requested change. The Department also found the initial comment regarding headings helpful and revised each header to be consistent throughout the regulations.

Comment 3.13.2. RA requests that the DFPI correct a typo in section 943, subdivision (a)(1), and requests that the DFPI review the regulations for missing periods and semicolons.

Response to Comment 3.13.2. The DFPI agrees that the language in question was a typo and revised the language as RA suggested. The DFPI also reviewed the rules for missing periods and typos.

Comment 3.13.3. RA requests that the DFPI add page numbers to the regulations for ease of review during the rulemaking process.

Response to Comment 3.13.3. The DFPI added page numbers to the document for future reviews.

Comment 3.13.4. RA requests that the DFPI revise the timing for when a provider must issue disclosures to only require disclosures after a provider has received "verified information" from the recipient or relating to the recipient, such as a credit report, bank statements, etc. This would prevent a provider from having to provide a second disclosure once verified information is obtained after a general inquiry.

Response to Comment 3.13.4. The DFPI did not adopt RA's requested change because RA's proposed terminology – "verified information" – is too susceptible to abuse by unscrupulous providers, who could maintain that information is not verified until the latest possible moment before a recipient is asked to execute a financing contract.

Comment 3.13.5. RA requests additional clarity for how providers should treat the effects of prepayment provisions that allow a recipient to pay less than the fixed fee required by the financing, but which have the effect of increasing a recipient's APR. RA asks whether an

additional disclosure is necessary for early payoff addendums, and if a disclosure is required, how or when it would be given.

Response to Comment 3.13.5. The DFPI did not make revisions in response to RA's inquiry because the rules already specify in detail when disclosure are required. (Section 900, subd. (a)(4).) In addition, section 922, subdivision (a), provides that for contracts that offer multiple payment options (such as minimum payments or minimum payments plus a larger early payoff), the provider should assume the recipient will make the minimum payments allowed under the contract.

Comment 3.13.6. RA states that the definition of broker is overbroad because it could cover a business's accountant or spouse. RA recommends resolving this issue by limiting the definition of broker to individuals who receive compensation for acting as a broker.

Response to Comment 3.13.6. The DFPI agreed with RA's reasoning and revised the rules as requested.

Comment 3.13.6. The DFPI makes a comment substantially similar in substance to Comment 3.12.3.

Response to Comment 3.13.6. Please see response to Comment 3.12.3.

Comment 3.13.7. RA recommends defining "specific offer" using the language that was previously included in section 900, subdivision (a)(4)(A). This would allow the term "specific offer" to be used in various sections rather than the more complicated language that was previously used in section 900, subdivision (a)(4)(A).

Response to Comment 3.13.7. The DFPI agreed with RA's reasoning and implemented the change requested.

Comment 3.13.8. RA submitted a comment substantially similar in form to Comment 1.2.18.

Response to Comment 3.13.8. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, please see response to Comment 1.2.18.

Comment 3.13.9. RA requests that the DFPI clarify that recipient funds exclude funds paid to third parties, including payments made to satisfy obligations other than obligations connected with other financings. RA states this is appropriate because this will ensure that the amount disclosed as recipient funds is the actual amount the recipient receives.

Response to Comment 3.13.9. The DFPI agrees with RA's reasoning and therefore revised the recipient funds definition to exclude funds paid to third parties, including amounts paid to

satisfy other amounts owed by the recipient, regardless of whether those amounts owed are connected to another financing.

Comment 3.13.10. RA requests that the DFPI revise the definition of funds paid to brokers to clarify that it includes funds paid by the financer out of the financer's fee, in addition to funds paid from the amount financed. RA states that most broker fees are paid out of the financer's fee and so these amounts should be disclosed to the recipient.

Response to Comment 3.13.10. The DFPI agrees that recipients may benefit from disclosures in connection with fees paid to brokers but did not implement this change because the DFPI believes further input from stakeholders may be appropriate before the DFPI adopts regulations requiring disclosure of brokerage fees that are not part of the amount financed.

Comment 3.13.11. RA recommends requiring language at the bottom of disclosures that do not have signature lines to explain that the disclosure is being provided to comply with California law. RA reasons that this will help recipients understand why they're receiving disclosures.

Response to Comment 3.13.11. The DFPI agrees with RA's reasoning and adopted a change requiring a disclosure substantially similar to what RA recommends.

Comment 3.13.12. RA requests that the DFPI remove a paragraph in section 901 that requires that a provider assume there are 360 days in a year and 30 days in a month, because not all months have 30 days, and a provider cannot actually collect payments on all 30 days. RA recommends that DFPI replace the paragraph with a requirement that "a provider shall assume that there are 30 days in every month and that for every 30-day period there are 8 weekend days or holidays . . . ."

Response to Comment 3.13.12. The DFPI removed the paragraph in question based upon comments from RA and others. The DFPI declines to adopt RA's recommended change, instead choosing to add section 901, subdivision (a)(16), which addresses the variability in the number of days in a month, leap years, and bank holidays by ensuring that providers need not consider these factors when making calculations and disclosures. The DFPI chose this approach in lieu of RA's recommended change because it provides more flexibility to provider and mirrors similar allowances under TILA.

Comment 3.13.13. For clarity, RA requests that the regulation include an example of how an APR can be expressed to the nearest ten basis points.

Response to Comment 3.13.13. The DFPI adopted RA's recommended change for clarity.

Comment 3.13.14. RA requests the DFPI revise section 901, subdivision (a)(8) to allow column widths that use an "approximate" ratio of 3:3:7.

<u>Response to Comment 3.13.14.</u> The DFPI declines to adopt this change because the section already permits disclosures that use other widths. The 3:3:7 ratio is a specific ratio that complies with the other requirements of the paragraph, but other ratios that comply with those requirements are also permitted by the rule.

<u>Comment 3.13.15.</u> RA requests the regulation allow a provider to obtain an electronic signature that complies with the federal ESIGN Act, because the "ESIGN Act preempts… California law in most respects."

<u>Response to Comment 3.13.15.</u> The DFPI did not implement RA's change, because the DFPI was not able to find evidence that the ESIGN Act preempts California law regarding electronic signatures.

<u>Comment 3.13.16.</u> RA recommends revising section 910, subdivision (a)(15), to ensure the providers need not issue new disclosures when amounts due that will be paid down or paid off using the amount financed change, since this could result in multiple disclosures as amounts due change over time.

<u>Response to Comment 3.13.16.</u> The DFPI agrees with RA's reasoning and implemented the requested change.

<u>Comment 3.13.17.</u> RA recommends requiring that providers state in the disclosure that the numbers presented are based on on-time payments and no default, to avoid confusion in situations where a recipient defaults.

<u>Response to Comment 3.13.17.</u> The DFPI declines to adopt this change because the recipients are unlikely to assume that disclosures are based upon late payments or circumstances involving default.

<u>Comment 3.13.18.</u> RA recommends using only the term "total amount of funds provided" rather than the recipient-facing term "funding provided" and the provider-facing term "amount financed," because the first term matches the language of the statute and using additional terms could create confusion.

<u>Response to Comment 3.13.18.</u> The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, the DFPI nonetheless declines to adopt RA's recommendation because it is apparent from the text that "funding provided" is the recipient-facing term used to describe the "amount financed," which is a defined term under the regulations. Furthermore, both terms are more succinct than the statutory terminology and nothing in the statute limits the DFPI's mandates the use of the statutory language.

<u>Comment 3.13.19.</u> RA recommends removing the requirement that providers identify the name of the financer in the disclosure, because this is unnecessary wording. RA also notes that the

language does not specify whether a provider would be allowed to use a DBA name or required to use their legal name.

Response to Comment 3.13.19. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 3.13.20. RA requested that the DFPI revise disclosures for contracts that do not have charges based upon an interest rate to clarify that charges are not based upon interest "that accrues over time," because under state law certain interest fees can still be deemed an interest rate.

Response to Comment 3.13.20. Based upon RA's reasoning, the DFPI revised section 910(a)(3)(C)(iii) to include a statement that the APR is based upon fees charged rather than interest that accrues over time.

Comment 3.13.21. RA makes a comment substantially similar in substance to Comment 2.7.11.

Response to Comment 3.13.21. Please see response to Comment 2.7.11.

Comment 3.13.22. RA makes a comment substantially similar in substance to Comment 2.7.13.

Response to Comment 3.13.22. Please see response to Comment 2.6.2.

Comment 3.13.23. RA makes a comment substantially similar in substance to Comment 1.2.13.

Response to Comment 3.13.23. Please see response to Comment 1.2.13.

Comment 3.13.24. RA recommends revising the rule for the historical method to remove the word "fix" from section 930, subdivision (b)(2), because RA states that this language appears to contradict the flexibility provided by subdivision (b)(4). RA recommends revising subdivision (b)(2) to allow a provider to "request the number of months used to calculate" the recipient's average monthly historical sales, income, or receipts.

Response to Comment 3.13.24. The DFPI declines to implement RA's requested change because the precatory language of subdivision (b)(4) ("notwithstanding subdivision (b)(2)") already clarifies that the provisions of that section override (b)(2), when applicable.

Comment 3.13.25. RA recommends removing the number of months a provider is required to use to calculate a recipient's income as long as the number of months used is consistent and following written underwriting policies. RA states that this change is necessary because

providers often request fewer or no months of documentation from recipients who are renewing their existing financing.

Response to Comment 3.13.25.  Please see response to Comment 2.7.20.

Comment 3.13.26. RA makes a comment substantially in substance to Comment 2.2.3.

Response to Comment 3.13.26. Please see response to Comment 2.2.3.

Comment 3.13.27. RA makes a comment regarding penalty payments similar in substance to Comment 1.2.12.

Response to Comment 3.13.27. Please see response to Comment 1.2.12.

Comment 3.13.28.  RA makes a comment regarding evidence of transmission of a disclosure substantially similar in substance to Comment 2.7.27.

Response to Comment 3.13.28. Please see response to Comment 2.7.27.

Comment 3.13.29. RA makes a comment regarding fraud commitment by brokers that is substantially similar in substance to Comment 2.8.5.

Response to Comment 3.13.29. Please see response to Comment 2.8.5.

Comment 3.13.30. RA objects that the regulations requiring financers who deal with brokers to develop procedures reasonably designed to ensure that brokers communicate disclosures to recipients, because RA states that this provision interferes with a financer's right to contract.

Response to Comment 3.13.30. In response to RA's comment, the DFPI revised the rules so that the elements of the procedures, which were previously required, are now illustrative only, and also adopted RA's request as an alternative (disclosure provided directly to the recipient in lieu of disclosures provided through the broker).

Comment 3.13.31. RA makes a comment regarding terms required by the regulations and proposes a safe harbor substantially similar in substance to comment 1.4.15.

Response to Comment 3.13.31. Please see response to Comment 1.4.15.

Comment 3.13.32. RA recommends removing a tolerance that references section 3000 because section 3000 was removed from the regulations.

Response to Comment 3.13.32. The DFPI removed the reference to section 3000 but did not remove the tolerance, because the DFPI intends the tolerance to apply to all APR disclosures required by the rules.

Comment 3.13.33. RA recommends limiting a provider or financer's liability in the event that the recipient identifies an inadvertent error, provided that the provider or financer makes necessary adjustments within 60 days of being notified by the recipient.

Response to Comment 3.13.33. The DFPI declines to implement the requested change because the change would diminish providers' incentives to develop and rely upon their own compliance programs.

Comment 3.13.34. With respect to section 956, RA objects the defined term "recipient funds" described in disclosures to the recipient as "amount given directly to you."

Response to Comment 3.13.34. The DFPI chooses not to use a single term because "recipient funds" is a shorter phrase more appropriate for the regulations, while "amount given directly to you" is self-explanatory label more appropriate for a disclosure provided to a recipient.

Comment 3.13.35. With respect to section 956, RA recommends that the disclosure labeled "amount provided to you or on your behalf" as "total amount of funds provided" to maintain consistency throughout the disclosures.

Response to Comment 3.13.35.  The DFPI declines to adopt this change because the total amount of funds provided, which the DFPI considers to be the amount financed, is not always the same as the "amount provided to you or on your behalf" when there is a prepaid finance charge.

Comment 3.13.36. RA requests revising section 956 so that a provider can display the total amount of third-party payments rather than an itemization of third-party payments, because this disclosure would be easier to calculate and view.

Response to Comment 3.13.36. The DFPI declines to adopt this change, because the purpose of the disclosure under section 956 is to help a recipient understand how parts of the amount financed that the recipient does not receive directly will be used. Presenting third-party charges as a single line-item will prevent a recipient from fully understanding how portions of the amount financed will be used.

Comment 3.13.37. RA objects to the use of APR as the annualized rate metric.

Response to Comment 3.13.37. The Department declines to address this comment because the comment does not relate to a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c).)

Comment 3.13.38. RA requests that the DFPI remove a paragraph from section 940 that allows a provider to assume when calculating APR that it can collect payments on every calendar day, regardless of bank holidays, weekends, or other days that would otherwise delay or accelerate the provider's collection of a payment. RA explains that this provision would result in APR calculations that are misleading because a provider could assume it could collect

payments on 30 days per month for a weekday payment product when there are actually only 22 payments in a month. RA states that discrepancies between disclosed APR based upon these assumptions will lead to litigation, and RA requests immunity for providers who calculate disclosure in accordance with the regulations to address this concern.

Response to Comment 3.13.38. It was not the DFPI's intent with respect to the aforementioned section to allow a provider whose contract only provides for weekday payments to be able to assume that they can collect on weekends. Rather, the purpose of the section was to insulate a provider from liability for APR discrepancies that might otherwise arise if their APR calculation assumed (for example) a payment could be collected on a Monday that turned out to be a bank holiday. The DFPI nonetheless removed the section in question because RA's comment indicated it was susceptible to multiple interpretations. The DFPI replaced this language with section 901, subdivision (a)(16)(B), which accomplishes the DFPI's purpose using language that mirrors TILA, while eliminating the potential for multiple interpretations that arose from the previous language. Having addressed RA's concerns with the new language the DFPI determines it is unnecessary to implement the immunity provision RA requested.

Comment 3.13.39. RA requests that the DFPI revise Section 940 so that minimum on-time payments exclude payments made due to default.

Response to Comment 3.13.39. The Department declines to address this comment in these proposed regulations because comment does not relate to a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c).)

Comment 3.13.40. RA makes a comment substantially similar in substance to Comment 1.11.35.

Response to Comment 3.13.40. Please see response to Comment 1.11.35.

Comment 3.13.41. RA makes a comment substantially similar in substance to Comment 1.11.36.

Response to Comment 3.13.41. Please see response to Comment 1.11.36.

Comment 3.13.42. RA makes a comment substantially similar in substance to Comment 2.7.26 relating to preemption.

Response to Comment 3.13.42. The Department declines to address this comment because comment does not relate to a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c).)

Comment 3.13.43. RA comments that because the rules diverge in some ways from how APR is calculated under TILA, businesses may receive TILA disclosures for some products and SB

1235 disclosures for the same product from other providers, and that the differences between the disclosures "will create material confusion."

Response to Comment 3.13.43. The Department declines to address this comment because comment does not relate to a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c).)

Comment 3.13.44. RA makes a comment similar in substance to Comment 3.13.10 indicating that the DFPI would require disclosure of all funds paid to brokers in connection with a transaction.

Response to Comment 3.13.44. Please see response to Comment 3.13.10.

**Comment 3.14 Dated August 24, 2021 from Stripe.**

Stripe's comment concerns the ways in which the rules handle open-end credit product disclosures in ways that deviate from TILA disclosures for consumer open-end credit and urge the DFPI to adopt the approach set out in Regulation Z. Stripe also requests that the rules create a mechanism by which providers can apply to the DFPI to vary the prescribed disclosures, seek exemptive relief, or request approval of alternative disclosure formats.

Response to Comment 3.14. Please see the Department response to Comment 1.1.5. In addition, the Department disagrees with Stripe that this calculation could obscure the cost of credit for open-ended credit plans because the disclosures under section 911 already notify the recipient that the disclosed finance charge is an estimate which may change depending on the details of the contract with the provider. Furthermore, providers are required to provide recipients with an itemization of the amount financed (see section 956) when the amount financed is greater than the amount recipient funds. In other words, Stripe's assertion that the deviations from TILA in how the rules handle open-ended credit products may impair clarity is incorrect. With respect to the approval of additional disclosure formats, the Department is open to revising regulations in the future should there be changes in how industry conducts business or upon the emergence of new products that are outside the scope of the regulations (statute permitting). However, no change to the regulations at this time is warranted by this comment.

**Comment 3.15 dated August 23, 2021 from State Financial (SF).**

Comment 3.15.1. SF requests that the DFPI put the defined terms in alphabetical order for ease of navigation.

Response to Comment 3.15.1. The Department found this comment helpful and alphabetized the definitional section.

Comment 3.15.2. SF requests that the reference to [former] section 2062 in [former] section 3021 should instead reference [former] section 2067.

<u>Response to Comment 3.15.2.</u> The DFPI agrees with this comment and revised the rules in response to the comment. Because the DFPI revised the section numbers, section 3021 is now section 950 and section 2067 is now section 916.

<u>Comment 3.15.3.</u> SF requests deleting the reference to section 3000 in section 955 because section 3000 was deleted.

<u>Response to Comment 3.15.3.</u> The DFPI agrees with this comment and revised the rules in response to the comment.

<u>Comment 3.15.4.</u> SF notes that section 900, subdivision (a)(4) will likely require two disclosures, one made at the time of disclosure based upon estimates and a second following underwriting when estimates are confirmed or likely adjusted.

<u>Response to Comment 3.15.4.</u> The DFPI made no change in response to this comment because SF requested no change, and the language reflects the DFPI's intent to require disclosures when a specific offer is presented to the recipient.

<u>Comment 3.15.5.</u> SF makes comments relating to section 916, subdivisions (a)(3)(A), (a)(3)(B), (a)(4), and (a)(5).

<u>Response to Comment 3.15.5.</u> The Department declines to address the comments because the comments does not relate to changes to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c).)

<u>Comment 3.15.6.</u> SF states the terminology used in section 956 does not tie to the terms in Section 916, and that this invites confusion.

<u>Response to Comment 3.15.6.</u> The DFPI declines to adopt changes based upon this comment because the DFPI determined that the calculations disclosed under section 956 are self-explanatory.

<u>Comment 3.15.7.</u> SF comments that the section 916 disclosure requires multiple assumptions that will lead to different lenders generating different disclosures.

<u>Response to Comment 3.15.7.</u> The Department declines to address this comment because the comment does not relate to changes to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c).)

**<u>Comment 3.16 dated August 24, 2021 from Strategic Funding Source, Inc. doing business as Kapitus (Kapitus).</u>**

<u>Comment 3.16.1.</u> Kapitus makes a comment substantially similar in substance to Comment 2.9.3.

Response to Comment 3.16.1. Please see response to Comment 2.9.3.

Comment 3.16.2. Kapitus expresses concerns concerning the required disclosure of average monthly cost and requests that the DFPI remove this requirement from the rules.

Response to Comment 3.16.2. The Department declines to address this comment because the comment does not relate to changes to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c).)

Comment 3.16.3. Kapitus makes a comment substantially similar in substance to Comment 3.13.4.

Response to Comment 3.16.3. Please see response to Comment 3.13.4.

Comment 3.16.4. Kapitus makes a comment substantially similar in substance to Comment 2.9.2.

Response to Comment 3.16.4. Please see response to Comment 1.7.1.

Comment 3.16.5. Kapitus requests at least six months to implement the proposed regulations.

Response to Comment 3.16.5. In accordance with the information contained within the Department's Initial Statement of Reasons, the regulations will not become effective until 6 months after adoption.

**Comment 3.17 dated August 24, 2021 from Wells Fargo Bank, N.A. (WF).**

Comment 3.17.1. WF requests a two business-day period to allow providers to prepare disclosures after a recipient selects a preferred option for financing from options presented to the recipient.

Response to Comment 3.17.1. The DFPI declines to adopt this change because a provider should have the information necessary to prepare and present a disclosure if the provider is has prepared and presented a specific commercial financing offer.

Comment 3.17.2. WF requests that the DFPI remove the language "to the provider" from section 954, subdivision (b)(ii), because sometimes recipients may provide their application to a broker who then transmits the application to the provider.

Response to Comment 3.17.2. The DFPI implemented WF's recommendation based upon its reasoning.

Comment 3.17.3. WF states that the definition of broker is overly broad and could encompass a financer's or recipient's outside counsel, employee, or other representative, and

recommends that the definition be revised to except a "representative, employee, or agent" of the financer or recipient.

Response to Comment 3.17.3. The DFPI incorporated WF's recommendation that recipients' agents be excluded from the definition of broker because these individuals would likely be under an obligation to communicate offers to a recipient. The DFPI did not exclude employees from the definition for the reasons state in response to Comment 3.9.1. The DFPI did not exclude representatives from the definition because this term could arguably encompass many entities that act as brokers. The DFPI did not exclude agents of financers from the definition because the DFPI could not identify a good reason why an agent of a financer should be relieved of the obligations imposed by section 952, subdivisions (b) and (c).

Comment 3.17.4. WF requests that the DFPI revise the "average monthly cost" and "estimated monthly cost" disclosures to "average monthly payment" and "estimated monthly payment," because the former language may lead recipients to believe that the amount disclosed is the average monthly or estimated monthly finance charge.

Response to Comment 3.17.4. The DFPI declines to adopt this change because using the term "payment" could suggest that a recipient has a monthly payment when they do not and the language accompanying the monthly cost disclosures will explain that the cost disclosed is the total amount paid.

Comment 3.17.5. WF requests at least six months to implement the proposed regulations.

Response to Comment 3.17.5. In accordance with the information contained within the Department's Initial Statement of Reasons, the regulations will not become effective until 6 months after adoption.

**SUMMARY AND RESPONSE TO COMMENTS RECEIVED DURING THE THIRD 15-DAY COMMENT PERIOD FROM OCTOBER 12, 2021 to OCTOBER 27, 2021**

**Comment Letter 4.1 Dated October 27, 2021 from ETA.**

Comment 4.1.1. ETA argues that proposed section 956 requires a provider to provide an additional disclosure entitled "itemization of amount financed" in certain circumstances, is overly prescriptive and could require inaccurate disclosures that will confuse consumers. ETA cites an example where a required proposed additional disclosure is for "prepaid finance charge," even if the loan product does not have one. Therefore, DFPI should allow for exceptions and flexibility for loan products that are not relevant to the additional disclosure requirements.

Response to Comment 4.1.1. The Department disagrees that an itemization is overly prescriptive. The example ETA uses in support of its contention is flawed because section 956 only requires the disclosure of a prepaid finance charge if there is in fact a prepaid finance charge. A loan product with no such charge would not include that in the itemization, pursuant

to the language in the relevant section. See also the Department's response to Comment 2.21.8.

Comment 4.1.2. ETA reiterates their argument that the Department should require the compensation that a provider may pay to a broker to be disclosed. ETA notes that it is industry practice for brokers to receive fees from two sources: (1) fees paid directly by the recipient and (2) fees paid by the provider to the broker. ETA states that the disclosures require a provider to disclose any broker compensation that is being paid directly to the broker from the "amount financed," but do not require any broker compensation that is paid outside of that to be disclosed. ETA argues it is imperative that the fees being paid directly to the broker by the provider be disclosed, because otherwise the recipient is not aware that the broker fee is included in the finance charge and does not realize that this fee increases the cost of the product, which increases the APR. ETA suggests that without this clarification, recipients will wrongly believe that the financer is getting all the finance charge, when in actuality the broker is getting a significant portion of the cost of the financing. ETA proposes a solution to this issue: for the regulations to require disclosure of the total amount of compensation that a financer pays to a broker so that the recipient has a full understanding of the costs of the financing.

Response to Comment 4.1.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, please see the Department response to Comment 3.2.4.

Comment 4.1.3. ETA argues that the proposed regulation's requirement of a disclosure of an average monthly cost for non-monthly pay products will not only lead to confusion to recipients but fails to add value to the disclosures. ETA argues that the empowering statute requires only the frequency and amount of payments, which is the actual frequency and the actual amount of payments, not a hypothetical frequency and payment. ETA recommends deleting any requirement for non-monthly pay products to disclose an average monthly cost.

Response to Comment 4.1.3. See the Department's response to Comment 2.6.2.

Comment 4.1.4. ETA reiterates its prior comments arguing that APR is not the correct metric for commercial financing disclosures and will only cause additional confusion. Moreover, ETA suggests that the way the proposed regulations require calculation of the APR will not lead to an apples-to-apples comparison across products and will create material confusion. ETA requests their prior comments on APR be included by reference.

Response to Comment 5.1.4. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, it has been addressed elsewhere, above.

<u>Comment 4.1.5</u>. ETA reiterates its prior comments regarding the implementation date of the proposed regulations. ETA requests the Department provide an implementation date at least 6 months after the final regulations are released.

<u>Response to Comment 4.1.5</u>. See the Department response to Comment 2.3.6.

**<u>Comment Letter 4.2 Dated October 27, 2021 from ELFA</u>**.

<u>Comment 4.2.1</u>. ELFA argues that the fluidity of commercial leasing negotiations, inclusive of the frequent back-and-forth between and among the provider, financer, broker, and recipient, make the timing and frequency of the disclosures set forth in the regulations especially challenging. ELFA proposes a few suggested edits to the revised/new definitions of "at the time of extending a specific commercial financing offer" and "specific commercial financing offer" presented in the latest draft of the regulations.

Specifically, ELFA suggests amending proposed section 900, subdivision (a)(4)(A) to include a two (2) business-day period to provide a recipient with disclosures after a recipient selects a particular presented financing option.

ELFA further suggests amending section 900, subdivision (a)(23) to limit the "specific commercial financing offer" definition to those that would be binding upon the financer, if accepted by the recipient.

<u>Response to Comment 4.2.1</u>. Please see the Department's response to Comment 1.4.1 and 3.17.1.

<u>Comment 4.2.2</u>. ELFA argues that to avoid the potential for overlapping definitions and responsibilities given the discrete roles each party plays in a typical commercial financing transaction, clarifications to the definition of "broker" are necessary to avoid the potential application of disclosure obligations to various third parties involved in these types of transactions, such as attorneys and document preparation and delivery companies.

ELFA suggests amending proposed section 900, subdivision (a)(6) to clarify that in order to be considered a broker, the compensation received should be based on the consummation of the commercial financing transaction and not otherwise.

<u>Response to Comment 4.2.2</u>. The Department declines to make this adjustment because it might exclude persons who are meaningfully participating in a particular transaction but being compensated in a way that does not rely on the consummation of the transaction.

<u>Comment 4.2.3</u>. ELFA states that in order to avoid faults while companies do their best to implement these disclosures where applicable, the Department should issue guidance indicating that enforcement will be tolled for a minimum of six months to allow companies to update their systems to account for the disclosures. ELFA includes a proposed new section to

the regulations (section 957) that would put this proposed delayed implementation date directly into the text.

Response to Comment 4.2.3. See the Department response to Comment 2.3.6.

Comment 4.2.4. ELFA proposes amending section 900, subdivision (a)(33) and (34) as follows (no reasoning was provided):

(33) "Average monthly cost" means the average total amount paid ~~in a month~~ **to the financer over the term of contract, divided by the number of months in** ~~under~~ the term of the contract.

(34) "Estimated monthly cost" means the estimated average total amount paid ~~in a month~~ **to the financer over the term of contract, divided by the number of months in** ~~under~~ the estimated term of the contract.

Response to Comment 4.2.4. The Department found this comment helpful and modified the relevant sections in a similar manner.

Comment 4.2.5. ELFA proposes several edits to the regulations that would clarify that, in ELFA's opinion, brokers are only transmitters of disclosures, i.e., a broker only has a duty to transmit disclosures if the disclosures are required to be provided by the financer in the first place. ELFA uses the example that, for transactions in excess of $500,000, no disclosures are required, and the regulations should clarify that.

Response to Comment 4.2.5. The Department believes the regulations are already clear on this point. If a transaction is in excess of $500,000, then the regulations do not apply and a provision clarifying that would simply be redundant. No change to the regulations is warranted by this comment.

Comment 4.2.6. ELFA proposed amending section 952, subdivision (b), in relevant part: ". . . disclosures received ~~by~~ **from** the financer to the recipient."

Response to Comment 4.2.6. The Department found the comment helpful and agreed to correcting the typo in the manner specified.

**Comment Letter 4.3 dated October 27, 2021 from Forward Financing.**

Forward Financing submitted two comment letters dated October 27, 2021. The first comment letter was identical to their comment letter submitted August 24, 2021, aside from the date. As such, please see those comments and the Department's response to those comments above.

**Comment Letter 4.4 dated October 27, 2021 from Forward Financing.**

Comment 4.4.1. Forward Financing argues that financers that make a good faith effort to comply with the regulations should receive a safe harbor from prosecution or penalty. Alternatively, Forward Financing argues that if the Department is not inclined to provide a permanent safe harbor as part of the regulations, it should extend a safe harbor to financers that make a good faith effort to comply for two years after the regulations become final.

Response to Comment 4.4.1. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, see the Department's response to Comment 2.4.6.

Comment 4.4.2. Forward Financing states that it does not charge customers an upfront broker fee and does not deduct any broker fees from the funding it provides to its customers. Rather, Forward Financing pays brokers out of their profits after consummation, i.e., out of the difference between the amount financed and the amount of future revenue Forward Financing purchases from a customer after the deal closes. As such, Forward Financing notes that it appears proposed section 956 would not require any disclosure of this method of broker compensation to the recipient, and wonders if this was the Department's intent. Forward Financing suggests that either the regulation be clarified that this type of compensation should be disclosed, or specifically state that it need not be.

Response to Comment 4.4.2. The Department agrees that this method of broker compensation would not need to be disclosed under section 956 because it has no direct effect on the recipient's funding (i.e., if a recipient is receiving $10,000, no part of that funding goes to a broker). While Forward Financing almost certainly takes this method of broker compensation into account in its transactions via, for example, its offered interest rate, etc., the Department does not, at this time, believe sufficiently attenuated costs, etc. relating to how a provider's rates and fees are determined internally are helpful as a disclosure to a recipient and potentially risks causing confusion if disclosed. Given that, the Department believes section 956 is already clear: if a broker payment is paid from the amount financed, it must be disclosed and itemized. The Department believes further input from stakeholders may be appropriate before the Department adopts regulations requiring disclosure of broker fees that are not part of the amount financed.

Comment 4.4.3. Forward Financing notes that APR is a metric typically used with loans and argues that sales-based financing is not a loan. As such, Forward Financing argues that requiring sales-based financing providers to disclose an APR will cause confusion because sales-based financing providers simply do not have the information necessary to make a meaningful APR disclosure, due to the nature of the transactions (e.g., a customer's "initial payment amount" is unknown at the time of financing since the actual initial payment is based on future revenue). Given that, Forward Financing argues that sales-based financing companies should not have to disclose an APR, or if they do, it should be calculated differently to account for unique aspects of sales-based financing.

<u>Response to Comment 4.4.3</u>.  The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, it has been addressed elsewhere, above.

## Comment Letter 4.5 dated October 15, 2021 from George Uberti.

<u>Comment 4.5.1</u>. Mr. Uberti argues that proposed "section 2060 (10)" should be adjusted to specify that it only apply to situations where irregular payment schedules designed to accommodate the financial means of borrowers render interest rates incalculable. Mr. Uberti further states that, in such situations, the terms relating to remaining principal and duration of repayment used to calculate developing interest rates must be disclosed to borrowers such that borrowers may be able to calculate new rates of interest on their own as their payments are made. He argues that, without this specification made in the interest of protecting borrowers, this section would effectively provide a loophole which permits lenders to produce lending instruments with no cognizable terms, rendering the legislative intention to protect borrowers moot and giving lenders a blank check to adjust their interest rates as they see fit while still presenting to borrowers whatever initial figure they used to hook them into that dangerously ambiguous instrument.

<u>Response to Comment 4.5.1</u>. Unfortunately, it is unclear to the Department which section of the proposed regulations Mr. Uberti is actually referring to in order to properly respond. In the latest version of the regulations, section 2060 became section 901, however, even when considering that change and assuming Mr. Uberti meant to include subsection (a) in his reference, section 901(a)(10) does not appear to relate to Mr. Uberti's comments, and subsection (10) was not renumbered in this version of the regulations.

<u>Comment 4.5.2</u>. Mr. Uberti argues that in proposed "section 2060 (3), (4)", the representation of days in decimal form together with the assumption that every month has 30 days and every year has 360 days are provisions designed contrary to the clear legislative intent to keep consumers informed of the terms involved in their lending instruments. These sections are designed to make calculations easier for lenders, and that's not the goal of the law. The complaint that a burden will be put on lenders here is a complaint that those lenders should be able to pass this burden on to consumers for their own benefit. These are professional financers; this burden is properly placed on their shoulders and not on the shoulders of the lay consumers whom this law is designed to protect.

<u>Response to Comment 4.5.2</u>. It appears Mr. Uberti is referring to new section 901, subdivision (a)(4) (previous paragraph (4) was deleted in this version of the regulations). Given his comment, however, the Department suspects Mr. Uberti was reviewing a previous version of the regulations when he made his most recent comments. This is because the Department previously chose to delete the section Mr. Uberti is referring to, in this version. No change to the regulations is warranted by this comment.

<u>Comment 4.5.3</u>. Mr. Uberti argues that proposed section "2060 section (8)" creates an opportunity for virtually unpolicable [sic] infliction of injury without providing even a modest paperwork reduction function, which would still not be a sufficient reason to create this suspect circumstance, if it existed. He argues that hard copy documents which borrowers may sign and independently retain are the best way to fulfill the legislative intent to protect consumers and ensure the availability and integrity of all information relevant to their borrowing terms.

<u>Response to Comment 4.5.3</u>. Existing section 901, subdivision (a)(8) does not refer to the subject Mr. Uberti is discussing, and paragraph (8) was not renumbered in this version. Assuming Mr. Uberti is referring to section 901, subdivision (a)(11), which appears to be the subject referenced, Mr. Uberti seems to be suggesting that although allowing electronic signatures of disclosures is good, permitting an electronic signature but then also permitting the provider to send hard copies of the signed disclosures to the recipient thereafter creates a risk that the provider may maliciously send documents the recipient never actually signed. The Department understands the concern Mr. Uberti is raising but does not believe any change to the regulations is warranted by this comment.

**<u>Comment Letter 4.6 dated October 18, 2021 from Hudson Cook, LLP</u>.**

<u>Comment 4.6.1</u>. Hudson Cook suggests that modifications to proposed sections 910 and 956 make it unclear whether an itemization of the amount financed is needed if 100 percent of the amount financed will be paid on the recipient's behalf to retailers and/or suppliers to which the recipient owes funds for inventory and/or equipment purchases (this would presumably be the parties' agreed-upon purpose of the purchase-money commercial financing). In such cases, Hudson Cook argues, there would not be any so-called "recipient funds" and an itemization of the amount financed would not provide useful information to the recipient (particularly since revised section 956, subdivision (a)(3) appears to allow the recipient's suppliers and retailers to be identified using generic terms without further identification on one single line).

<u>Response to Comment 4.6.1</u>. The Department declines to modify the text in the manner suggested. An itemization would be *especially* useful when a recipient is not actually receiving any "recipient funds" to ensure the recipient knows exactly where the funds financed *are* going. In this context, the recipient funds ($0) would be less than the amount financed, so a disclosure would be required.

**<u>Comment Letter 4.7 dated October 27, 2021 from ILPA</u>.**

<u>Comment 4.7.1</u>. ILPA suggests that to ensure that providers may use the same disclosure form for states with similar, or ideally, identical disclosure requirements, to remove the requirement for any state-specific language in the disclosure form. For example, section 901 states, "the provider shall print the following statement: 'California law requires this information to be provided to you to help you make an informed decision.'" ILPA suggests replacing "California" with "state law" to provide the necessary flexibility and will help facilitate the adoption of uniform disclosure forms across states.

Response to Comment 4.7.1. The Department found this comment helpful and replaced the instance of "California law" with "applicable law."

Comment 4.7.2. ILPA suggests rewording the proposed section 952, subdivision (b), to make it clear what the broker's responsibilities are, in the following manner. "Following receipt of the disclosures required by subdivision (a)(1) of this section, and before communicating a specific commercial financing offer to a recipient, a broker shall transmit the unaltered disclosures received by **from** the financer to the recipient."

Response to Comment 4.7.2. The Department found this comment helpful and updated proposed section 952, subdivision (b)  in response to the comment.

Comment 4.7.3. ILPA requests the Department provide a 6-month compliance delay after the regulations are filed with the Secretary of State.

Response to Comment 4.7.3. See the Department response to Comment 2.3.6.

Comment 4.7.4. ILPA notes that it pioneered a well-known industry standard commercial disclosure form known as the "SMART Box." ILPA argues that the Department has authority to authorize additional forms for disclosure and the Department should revise the proposed regulations to permit other form types that may meet the requirements of the regulations, such as ILPA's SMART Box form. ILPA suggests the Department could either create a formal process for providers to submit a form for approval or perform a case-by-case review. ILPA suggests that this is important because the current requirements are overly prescriptive and do not take into account disclosures made via app, etc.

Response to 4.7.4. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment Letter 4.8 dated October 27, 2021 from Kapitus**.

Comment 4.8.1. Kapitus notes that brokers are compensated in two different ways: (1) by the recipient and (2) by the provider. Kapitus suggests that the current itemization of costs does not take into account broker compensation paid by the provider that otherwise affect a provider's costs (and thus also affects a recipient's costs). To ensure that recipients fully understand both the cost of financing and who is receiving the fees, Kapitus recommends that the Department add back the definition of "funds paid to brokers," redefine it as set forth below, and add it as a separate line item in the disclosures set forth in sections 910 through 917.

"(32) Funds paid to brokers means the total amount of compensation that a provider pays to a broker in connection with the specific financing."

Response to Comment 4.8.1. See Department response to Comment 4.4.2.

Comment 4.8.2. Kapitus applauds that the Department deleted proposed section 940, subdivision (c); however, it argues that guidance is still needed as to how to calculate APR for daily payment products as Appendix J does not provide the necessary information to do the calculation. Because each month has a different number of days in which payments are collected, providers need to know how many days to assume exist in every month. Kapitus argues that without such guidance, daily repayment products without a fixed amount, which many small businesses benefitted from, and which were critical during the pandemic, will be taken off the market because of uncertainty about how to comply with the regulations.

Response to Comment 4.8.2. The Department believes proposed section 901, subdivision (a)(16), which allows providers to disregard certain issues in making its calculations, including that different months have different numbers of days, leap years, scheduled payments etc. needing to be changed because of business days, and so forth, addresses the issue raised by Kapitus.

Comment 4.8.3. Kapitus argues that the current requirement for disclosure of an estimated monthly cost for sales-based financing (or average monthly cost for closed-end transactions) for periodic payments that are not monthly is problematic for two reasons. First, it will lead to confusion by the recipient regarding whether the small business has a monthly payment or a payment of a different frequency. Second, it expresses a preference for products that potentially have a higher overall total cost. To eliminate confusion and provide purely facts to recipients rather than a hypothetical scenario, Kapitus recommends deleting the requirement of a hypothetical disclosure and instead require just a disclosure of the actual payment amount and frequency.

Kapitus further states that if the average monthly cost metric is maintained, additional guidance on how to calculate it is required (different months have different numbers of days, etc.). Further, Kapitus suggests that the disclosure as currently drafted could cause the estimated monthly cost included as part of the required disclosure to be different from the payment amount included in the actual contract. To have an estimated payment amount that is different from the actual payment amount will lead to tremendous confusion. To avoid this problem, Kapitus recommends that:

(1) the estimated payment in the disclosures be defined to match the amount in the contract rather than a mathematical calculation based on a hypothetical monthly revenue estimate; and

(2) the estimated monthly cost (if it is to be disclosed for all contracts regardless of payment frequency) also be based on the actual terms of the contract. To provide an estimated monthly cost for contractual terms different from a monthly term, it would be essential for the Department to define the number of days in a month. As noted above, this also is critical for providers to calculate an APR disclosure for daily payment products.

Response to Comment 4.8.3. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public

during this comment period. (Government Code section 11346.8, subdivision (c)). However, see the Department's response to Comment 2.6.2.

Comment 4.8.4. Kapitus notes that, as the definition of "specific commercial financing offer" is currently drafted, it is unclear if the disclosure obligation would be triggered when a recipient elects to pursue an offer based on a self-report of financial or credit information or after such information has been verified such that the offer would be binding on the provider. This distinction is important because of the potential for "bait and switch" tactics from unscrupulous providers. Kapitus seeks to prevent the situation where a recipient self-reports information and receives a misleading quote based on this incomplete or inaccurate information only to later learn, after verification, that the actual offer has much less favorable terms for the recipient.

Kapitus points out that the New York Department of Financial Services recognized this concern and in its most recent draft (released on October 20, 2021) addressed it by including the following language:

"any time specific terms of commercial financing, including price or amount, is quoted in writing to a recipient, based upon information from, or about, the recipient, which, if accepted by a recipient, shall be binding on the provider."

Kapitus requests that the DFPI add the New York language to its definition of "specific commercial financing offer."

Response to Comment 4.8.4. See Department response to Comment 1.4.1.

Comment 4.8.5. Kapitus again urges that the Department add language to allow providers the ability to ask questions and seek guidance from the Department (perhaps through a designated individual or office) regarding the methods being used to comply with the DFPI's regulations. This is essential to ensure that Kapitus is using the correct methods to provide the disclosures that the Department is mandating and to ensure that recipients have the necessary information to compare products across providers. As a licensee under the California Financing Law, Kapitus wants to ensure it understands the intent of the regulations and that it complies with the regulations. Further, it wants to ensure that it understands and complies before an examination. Without a resource to ask questions and seek guidance or a safe harbor, Kapitus is concerned that it will misunderstand or misapply the regulations and be left exposed to the risk of possible adverse action during the examination process.

Response to Comment 4.8.5. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 4.8.6. Because the regulations require complicated calculations and estimates as currently written and will require significant technology changes prior to implementation, Kapitus requests that (1) the Department provide at least 6 months to implement any required changes after the final regulations are released; and (2) the Department allow licensees the

ability to ask for an extension beyond this 6-month period if it is necessary due to challenges with estimates, calculations, and/or technology, provided that the provider has made good faith efforts to comply as demonstrated to the Department.

Response to Comment 4.8.6. See the Department response to Comment 2.3.6.

**Comment Letter 4.9 dated October 26, 2021 from Katten.**

Comment 4.9.1. Katten suggests the Department revise proposed section 910, subdivision (a)(9)(A) (Closed-End Transaction Formatting Requirements) to replicate proposed section 915, subdivision (a)(9)(A) (Lease Financing Formatting Requirements). Katten suggests this change would take into account fees and charges that may be assessed in connection with certain closed-end commercial financing transactions including, for example, a document fee that is assessed by a lender and treated as a "finance charge" in accordance with section 943, subdivision (a). Katten feels this proposed revision clarifies that accrued and unpaid interest would also be due in certain instances involving the prepayment of a closed-end credit transaction, where in the current draft that concept is excluded.

Response to Comment 4.9.1. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment Letter 4.10 dated October 25, 2021 from State Financial (SF).**

Comment 4.10.1. SF requests that, with respect to asset-based lending transactions, a prepaid finance charge should only include those charges paid to the financer. Section 900, subdivision (a)(35) defines a prepaid finance charge as "any finance charge paid separately to the financer in cash, check, or electronic funds transfer before or at consummation of a transaction, or withheld from the proceeds of the financing at any time." SF indicates that commonly a closing loan fee is withheld from the proceeds but added to the loan, and that limiting the definition of prepaid finance charge as requested would ensure that the amount financed only includes amounts upon which interest is charged.

Response to Comment 4.10.1. The DFPI declines to make this change because the "amount financed" is not intended to mirror a disclosure of the principal amount. Rather, it is intended to include amounts paid by the financer on the recipient's behalf, and so excludes finance charges that are added to recipient's interest-bearing principal balance.

Comment 4.10.2. SF states that funding provided that is required to be disclosed under section 916, subdivision (a)(3) is the amount calculated pursuant to section 950, subdivision (a)(2)(A). SF observes this is usually an amount greater than collateral values allow, and that this will result in disclosure of fees based on collateral and collections that do not exist at the time of disclosure. SF also states that the "line of credit amount does not tie at all to the [section 950, subdivision (a)(2)] required disclosures."

Response to Comment 4.10.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 4.10.3. SF requests that for terms of less than one year, a provider should be able to present the term in whole months.

Response to Comment 4.10.3. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment Letter 4.11 dated October 27, 2021 from the SBFA.**

Comment 4.11.1. SBFA makes various arguments against the DFPI's decision to require APR disclosures and to require APR disclosures for open-end transactions to use an example transaction and incorporate all finance charges into the APR calculation.

Response to Comment 4.11.1. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, it has been addressed elsewhere, above, in response to other, similar comments.

Comment 4.11.2. SBFA repeats various concerns that requiring disclosure of a monthly cost for non-monthly products made in previous comments and asks that the monthly cost disclosure be removed.

Response to Comment 4.11.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). However, it has been addressed elsewhere, above, in response to other, similar comments.

Comment 4.11.3. SBFA requests that the prepayment disclosures required by the regulation be revised to only require a description of the policy or a reference to the section of the contract relating to prepayment.

Response to Comment 4.11.3. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment Letter 4.12 dated October 27, 2021 from the Secured Finance Network (SFN).**

Comment 4.12.1. SFN requests additional revisions to section 900 to limit circumstances in which contract amendments trigger a new disclosure. SFN notes that its members have indicated that its members frequently change their contracts, often to accommodate requests

from financing recipients, and so new disclosures for these changes could be burdensome. SFN notes that in this context, a recipient is not often looking to other sources of financing, so a required disclosure will not be useful for comparison purposes. In connection with the above concerns, SFN makes the following requested changes: (1) not requiring disclosures if the fees associated with a change is less than $1,000; (2) limiting disclosure to "material changes"; (3) adding an exception that redisclosure is not required if avoidable fees are charged due to a modification; and (4) excluding "ordinary course" changes to a contract.

Response to Comment 4.12.1. The Department disagrees with the requested changes to when disclosures must be made. To further limit disclosure requirements risks giving unscrupulous providers additional ways to game the disclosure requirements, risks frustrating the purposes of the statute and, despite SFN's suggestion to the contrary, affects a recipient's ability to compare different offers.

Comment 4.12.2. SFN requests that the DFPI add a safe harbor from liability for persons who provide disclosures in good faith, mirrored on safe harbors available under TILA. (See 15 U.S.C. § 1640(b); 15 U.S.C. § 1640(c).). SFN explains that many of its members are small companies and cannot absorb the costs of litigation associated with disclosures.

Response to Comment 4.12.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment Letter 4.13 dated October 27, 2021 from Stripe**.

Comment 4.13.1. Stripe requests that the DFPI amend the disclosure requirement for open-end credit so that the APR calculation aligns with the APR calculation methodology for open-end credit under TILA.

Response to Comment 4.13.1. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 4.13.2. Stripe requests that section 911, subdivision (a)(4)(C)(iv) be amended such that the disclosure provided to the recipient include the following additional underlined language: "APR is not an interest rate. Your financing does not charge interest. The cost of this financing is based upon an annualization of fees charged rather than interest that accrues over time."

Response to Comment 4.13.2. The Department declines to make the requested change as it believes the specified section is already clear.

**Comment Letter 4.14 From the RBFC Submitted on October 27, 2021**.

Comment 4.14.1. RBFC requests that the DFPI issue a new notice of proposed action because it has been more than a year since the previous notice issued on September 11, 2020. RBFC maintains that a new notice is required pursuant to Government Code section 11346.4, subdivision (b).

Response to Comment 4.14.1. The Department disagrees with RBFC's suggestion for reasons clarified in the Notice of Fourth Modifications, as well as because the transmission deadline specified in Government Code section 11346.4, subdivision (b) was extended 60 calendar days pursuant to Executive Order N-40-20 and an additional 60 calendar days pursuant to Executive Order N-71-20.

Comment 4.14.2. RBFC requests that the DFPI amend section 900, subdivision (a)(23), to limit the definition of "specific commercial financing offer" to offers which "if accepted by a recipient, shall be binding on the provider." RBFC states that this would make California's disclosure requirement consistent with New York's and it would be impractical to provide the required disclosures during the negotiation process before the provider makes a formal offer. RBFC states that many providers offer tools that offer a sliding scale of terms that the recipient can adjust, and that, in this context, providing the required disclosures is impractical.

Response to Comment 4.14.2. See Department response to Comment 1.4.1.

**Comment Letter 4.15 dated October 27, 2021 from RBLC**.

Comment 4.15.1. RBLC requests that the DFPI remove the reference to "California law" in Section 901 and replace it with "applicable law," so that providers that want to use their disclosure form to comply with multiple state laws can do so.

Response to Comment 4.15.1. The Department found this comment helpful and made the requested change.

Comment 4.15.2. RBLC requests that DFPI require annual reporting to DFPI from providers to ensure estimated APRs quoted to small business are accurate.

Response to Comment 4.15.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 4.15.3. RBLC requests that the DFPI allow a compliance date that is six months from the effective date of the regulations.

Response to Comment 4.15.3. In accordance with the information contained within the Department's Initial Statement of Reasons, the regulations will not become effective until 6 months after adoption.

**Comment Letter 4.16 Dated October 20, 2021 from Riviera Finance (RV)**.

Comment 4.16.1. RV requests that the DFPI exempt non-recourse factoring from the disclosure requirements imposed by statute.

Response to Comment 4.16.1. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 4.16.2. RV requests that section 943, subdivision (a)(3) account for "fee rebates," which RV describes as amounts to be paid by the seller of an account that are in some ways similar and some ways distinguishable from a reserve.

Response to Comment 4.16.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 4.16.3. RV maintains that SB 1235 and the DFPI's regulations trade in hypotheticals, fail to remedy an actual harm, and extend beyond the bounds of lending, and are therefore unconstitutional.

Response to Comment 4.16.3. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment Letter 4.17 Dated October 26, 2021 from the Rewards Network (RN)**.

Comment 4.17.1. RN requests that the DFPI eliminate APR and monthly payment disclosure requirements for MCAs because these requirements will lead to confusion for products that do not charge interest or require monthly payments.

Response to Comment 4.17.1. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment 4.18 Letter Dated October 27, 2021 from RA**.

Comment 4.18.1. RA requests that DFPI revise section headings so that they are uniform (e.g., conforming headings such as "Closed-End Transaction Formatting and Content Requirements", "Commercial Open-End Credit Plan Disclosure Formatting," and "Factoring Disclosure Format").

Response to Comment 4.18.1. The Department found this comment helpful and made the headings consistent as requested.

Comment 4.18.2. RA requests initially that the definitions be revised to be in alphabetical order. RA then further requests that the DFPI revise the definition of "specific commercial financing offer (section 900, subdivision (a)(23)) to cover only circumstances in which a provider has verified a recipient's stated financial information. RA states that providing a disclosure earlier than the point when the provider has verified financial information would result in misleading disclosures and multiple disclosures.

Response to Comment 4.18.2. The Department agreed with RA's request to alphabetize the definitions section and did so in the final text. However, the Department declines to make the second requested change because it believes it would unnecessarily limit a recipient's ability to compare different offers in a timely manner.

Comment 4.18.3. RA requests that the regulations clarify that APR disclosures are not required for early payoff options available to recipients that may result in the recipient paying a higher APR than if they did not exercise the option.

Response to Comment 4.18.3. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 4.18.4. RA requests that the DFPI revise the definition of irregular payment (section 900, subdivision (a)(14)) to clarify whether multiple scheduled payments made on the same day as a result of a bank holiday are considered irregular.

Response to Comment 4.18.4. The requested change is addressed by section 901, subdivision (a)(16)(B).

Comment 4.18.5. RA requests that DFPI revise the definitions of closed-end transaction and sales-based financing such that closed-end transactions and sales-based financing are mutually exclusive terms.

Response to Comment 4.18.5. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 4.18.6. RA requests that DFPI allow for an "approximate ratio of 3:3:7" for column width under section 901, subdivision (a)(8).

Response to Comment 4.18.6. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 4.18.7. RA requests that DFPI revise section 901, subdivision (a)(11) to permit a provider to comply with the federal eSIGN Act.

<u>Response to Comment 4.18.7</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.8</u>. RA requests that DFPI include in the standard disclosure language a statement that all disclosures assume timely payments and no default.

<u>Response to Comment 4.18.8</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.9</u>. RA requests that DFPI revise any recipient-facing references to "funding provided" or "amount financed" to "total amount of funds provided."

<u>Response to Comment 4.18.9</u>. The DFPI declines to change references to "funding provided" to "total amount of funds provided," because "funding provided" conveys the same information as "total amount of funds provided" using fewer words. The DFPI declines to change references to "amount financed" to "total amount of funds provided" for similar reasons, and because the itemization required by section 956 provides sufficient information as drafted to allow recipients to understand the data presented.

<u>Comment 4.18.10</u>. RA requests that the DFPI require disclosures of fees paid to brokers that are not paid out of the amount financed, or to allow these fees to be disclosed.

<u>Response to Comment 4.18.10</u>. The Department declines to amend the rules as requested but notes that this does not mean it necessarily disagrees. Rather, the Department believes further input from stakeholders may be appropriate before the Department adopts regulations requiring disclosure of broker fees that are not part of the amount financed.

<u>Comment 4.18.11</u>. RA requests that clarification be provided under section 910, subdivision (a)(6) as to how make-up payments should be treated when a scheduled payment occurs on a bank holiday (whether these should be disclosed as a variable payment, periodic payment or irregular payment).

<u>Response to Comment 4.18.11</u>. The Department believes this issue is already addressed under section 901, subdivision (a)(16).

<u>Comment 4.18.12.</u> RA requests that the description of prepayment policies under section 910, subdivision (a)(8) through (10) and other sections be revised such that it requires disclosures under TILA.

<u>Response to Comment 4.18.12.</u> The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.13.</u> RA requests that the DFPI remove disclosure requirements relating to average monthly cost that appear in section 910, subdivision (a)(11) and other sections.

<u>Response to Comment 4.18.13.</u> The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.14.</u> RA requests that the DFPI remove the requirement that reasonably anticipated true-ups be disclosed in the estimated payment section of the sales-based financing disclosure. (Section 914, subdivision (a)(6).)

<u>Response to Comment 4.18.14.</u> The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.15.</u> RA requests the removal of the word "fix" from section 930, subdivision (b)(2) and the removal of lower and upper limits on the months a provider must consider when using the historical method.

<u>Response to Comment 4.18.15.</u> The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.16.</u> RA request that section 930, subdivision (b)(4)(A) be revised to allow a provider to exclude from its calculation months where income is greater than the historical norm.

<u>Response to Comment 4.18.16.</u> The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.17.</u> RA requests that the DFPI remove section 930, subdivisions (a)(4) and (b)(4) because RA maintains that these provisions require a provider to anticipate a recipient's default and draft disclosures based upon the assumption that a recipient will default.

<u>Response to Comment 4.18.17.</u> The DFPI declines to make further changes in connection with these sections. The purpose of these sections is to prevent providers from ignoring the effect of contractual payment provisions that require additional payments when a serious of payments falls below a threshold set in the contract. The DFPI incorporates by reference its response to Comment 2.12.

<u>Comment 4.18.18.</u> RA requests that the DFPI clarify what constitutes "evidence of transmission of the disclosure" under section 952, subdivision (a)(2), and provide protection from liability if a broker fraudulently creates or alters the evidence of transmission.

Response

<u>Response to Comment 4.18.18.</u> The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.19.</u> RA requests that a financer be given certain protections that arise from the broker misconduct.

<u>Response to Comment 4.18.19.</u> The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.20.</u> In connection with section 955, subdivisions (a)(2) and (b), RA requests that the DFPI address treatment of irregular payments and extend liability protections to cover inadvertent errors identified by a recipient if they are then corrected by the financer.

<u>Response to Comment 4.18.20.</u> The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.21.</u> RA requests that the DFPI revise section 956 to allow providers to disclose a total amount of third-party payments, rather than an itemization of third-party payments. RA states this will be make it easier to calculate and view the disclosure.

<u>Response to Comment 4.18.21.</u> While it may be easier to calculate and view the disclosure, one of the purposes of this section is to itemize the costs for the borrower and lumping all third-party payments together would defeat that purpose. No change to the regulations is warranted by this comment.

<u>Comment 4.18.22.</u> RA requests that the itemization required by section 956 be permitted to appear as part of the main disclosure document, which RA states is consistent with TILA. RA states that because many recipients will review and sign disclosures electronically, they will never review the itemization. RA also states that the requirement that the itemization appear in a separate document (paragraph (c)(1)) and the requirement that the itemization appear after other required disclosures (paragraph (c)(2)) are contradictory.

<u>Response to Comment 4.18.22.</u> The Department disagrees with RA's argument that the provisions are contradictory. A document may simultaneously be presented as a separate document and be after the other required disclosures, e.g., it may appear after the last page of the disclosure packet. No changes to the regulations are warranted by this comment.

<u>Comment 4.18.23.</u> RA proposes various changes to section 940, including a request under section 940, subdivision (c), to exclude payments made due to default, a request to incorporate any amendments made to Appendix J (12 C.F.R. § 1026), and a request that APR for an open-end product be calculated based upon the TILA sections applicable to open-end-credit. (12 C.F.R. § 1026.14.)

<u>Response to Comment 4.18.23.</u> The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.24.</u> RA maintains that various provisions of the regulations, including how the regulations define APR and finance charge, conflict with TILA and are therefore preempted.

<u>Response to Comment 4.18.24.</u> The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 4.18.25.</u> RA maintains that the regulations must require disclosure of broker compensation that is not paid from recipient funds.

<u>Response to Comment 4.18.25.</u> The Department declines to adopt a proposed change on this issue but notes that this does not mean it necessarily disagrees. Rather, the Department believes further input from stakeholders may be appropriate before the Department adopts regulations requiring disclosure of broker fees that are not part of the amount financed.

<u>Comment 4.18.26.</u> RA requests that the DFPI provide longer comment periods because the comment period provided in connection with the Department's third revision to the proposed regulations was too short. RA claims that the comment period precluded testing "some of the more complicated mathematical issues" related to the regulations or drafting model forms based upon the regulations.

<u>Response to Comment 4.18.26.</u> The fifteen-day comment period provided for this comment period's revisions to the proposed rules meets the requirements of the APA and, given the time sensitivities of rulemaking involving multiple modifications to the initial text, was sufficient for stakeholders provide comment on the DFPI's proposed changes to the text.

**SUMMARY AND RESPONSE TO COMMENTS RECEIVED DURING THE FOURTH 15-DAY COMMENT PERIOD FROM NOVEMBER 5, 2021 to NOVEMBER 22, 2021**

**<u>Comment Letter 5.1 dated November 22, 2021 from International Factoring Association and the American Factoring Association.</u>**

<u>Comment 5.1.1.</u> The Department continues to ignore the distinction between recourse factors and non-recourse factors. Since non-recourse factors are clearly and simply purchasers, and, therefore, in no way lenders, the commentors fail to understand the Department's continued insistence on including non-recourse factors as lenders in the proposed regulations. The commentors strongly urge the Department to recognize this distinction and make it clear that non-recourse factors will not be covered in the regulations. Similarly, the Department should state that factoring agreements in states in which there are true sale statutes are not covered by the disclosure regulations in question.

Response to Comment 5.1.1. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.1.2. Given the complexities involved in attempting to comply with the proposed regulations, the commentors again urge the Department to consider providing a safe harbor for factors purchasing accounts receivable from small businesses. The commentors appreciate the Department including a safe harbor for the correction of errors which is similar to TILA. However, the commentors strongly believe that this safe harbor alone is not sufficient to protect factors who use good faith efforts to comply with the regulations but are alleged to be in violation due to the complexities previously noted. The commentors request that the Department also include a safe harbor for unintentional violations which are bona fide errors.

Response to Comment 5.1.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment Letter 5.2 dated November 22, 2021 from Buchalter, a Professional Corporation.** The commentor respectfully requests the DFPI's consideration of the definition of "term" with respect to factoring transactions under Financial Code section 22802, subdivision (b)(3). For the calculation of APR under section 940 of the regulation, section 900, subdivision (a)(26)(A) defines term as "the length of time between when the recipient receives payment from the financer for the legally enforceable claim and the date the legally enforceable claim becomes due and payable." This provision assumes that when the recipient receives payment from the financer, the legally enforceable claim is not yet due and payable. The provision does not address factoring transactions whereby a recipient receives payment from the financer on a legally enforceable claim that is already past due, e.g., invoices due on receipt or circumstances where the due date may be unknown.

Response to Comment 5.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment Letter 5.3 dated November 8, 2021 from Hudson Cook, LLP.**

Comment 5.3.1. The proposed revision in section 901, subdivision (a)(2) and (3) would refer to "applicable law" instead of "California law" as the source of the requirement that the recipient receive certain information. If this proposed revision is intended to (for example) permit providers to furnish the same general offer summary to recipients in states other than California (for example, because other states may in the future adopt substantially similar offer summary disclosure requirements for certain commercial loan recipients), then it would be very useful to add a subsection (b) to section 901, authorizing the offer summary to include additional rows at the end (following the rows specifically required in sections 910 through 917) that contain supplemental information directly related to the commercial financing, including

(for example) information about collateral (security) requirements and information about fees and charges that are avoidable by the borrower (such as late fees and returned payment fees). Subsection (b) to section 901 could also address the optional continued provision of the "annual percentage rate" disclosure in the offer summary on and after January 1, 2024 (when the statutorily-required disclosure of the total cost of the financing as an annualized rate is repealed).

Response to Comment 5.3.1. The Department disagrees with the suggested changes at this time but may consider such options for a future rulemaking as other state rules are promulgated.

Comment 5.3.2. To facilitate optional or precautionary provision of the offer summary to recipients that might not be specifically required to receive the offer summary (due to Cal. Fin. Code Section 22801), it would also be useful to further modify the sentence preceding the recipient's signature line, along the lines of, "Applicable law may require this information to be provided to you to help you make an informed decision." (This would accommodate such things as optional or precautionary provision of an offer summary to a recipient that might (for example) be affiliated with a vehicle dealer or vehicle rental company.)

Response to Comment 5.3.2. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.3.3. Please also consider adding a 6-month period for mandatory compliance with the final regulations (so that compliance is optional for the first 6 months after the effective date) - this would be especially useful given industry's inability to accurately anticipate when final regulations will be filed by the Office of Administrative Law with the Secretary of State.

Response to Comment 5.3.3. See Department response to Comment 2.3.6.

**Comment Letter 5.4 dated November 19, 2021 from ILPA.**

Comment 5.4.1. ILPA has a concern regarding section 956, subdivision (b)(2). ILPA believes there may be an error in the table provided in the draft regulations. Specifically, ILPA believes that no. 7, "Amount Financed (5 minus 6)" should be " Amount Financed (5 plus 6) instead of "5 minus 6."
In the Itemization of Amount Financed chart, no., 1, "Amount Given Directly to You" is the total amount to the customer's bank account. If a provider charges an origination fee and deducts the fee from the loan amount before disbursement, that inherently would be excluded from no. 1, "Amount Given Directly to You." However, the origination fee is also a prepaid finance charge, so as currently drafted, the draft regulations would, in this circumstance, require deducting the origination fee a second time.

Response to Comment 5.4.1. In the example provided, the provider would, pursuant to section 956, include another line item for the origination fee to ensure it was captured in the

itemization. The itemization chart examples are not intended to be exhaustive of all situations. No change to the regulations is warranted by this comment.

Comment 5.4.2. ILPA reiterates its request for a 6-month compliance window from when regulations are complete until they become effective.

Response to Comment 5.4.2. See Department response to Comment 2.3.6.

**Comment Letter 5.5 dated November 22, 2021 from Kapitus.**

Comment 5.5.1. DFPI amended section 900, subdivision (a)(33) and (34) to state that "[t]o calculate the number of months in the estimated term, a provider may divide the number of days in the estimated term by 30.4." Kapitus is unsure if in revising the definition of "estimated monthly cost" (as well as "average monthly cost"), the DFPI meant to define the number of calendar days in a month as 30.4, or the number of payment days. If the intent was to use an average of 30.4 payment days in a month, this is problematic for the same reason as former section 940, subdivision (c). Daily payments cannot be made on weekends or on bank holidays, and thus, an assumption of 30.4 days in a month for purposes of calculating APR for daily payment products is inaccurate and misleading.

Response to Comment 5.5.1. The revision was solely intended to help calculate the estimated term in the context of the average/estimated monthly cost, and the Department used the term "may" in order for the new language to be permissive. The provision is not intended to be used outside of this specific context, which is why it is confined to those specific definitions.

Comment 5.5.2. There also is a reference in the regulations (in section 914) to the possibility of payments "every calendar day." Kapitus wants to make sure that the DFPI understands that payments for daily payment products are not made every calendar day, but rather are made only on weekdays and non-holidays.

Response to Comment 5.5.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). That said, the provision identified in this comment is merely an example of a description that might be used by a provider in a disclosure.

Comment 5.5.3. Because of the uncertainty around calculating APR for daily payment products, providers need guidance from the DFPI. In our last letter, we suggested a few ways to address the issue. Providers could: (1) assume a certain number of payment days each month on average for which payments could be made (e.g., 19, 20.5, or 20 days rather than 30.4 days as 30.4 includes days on which payments cannot be made); (2) base the APR calculation for daily payment products off the estimated average monthly income as described in the regulations, i.e., calculate a monthly payment based on monthly revenue since bank transactions generally only post on business days when the banks are open and operating; or (3) assume that there are five days in each week and use a weekly payment calculation for the

purposes of APR. Kapitus and other providers can implement any of the above approaches but need guidance to ensure that all providers are using a consistent methodology, which is necessary for recipients to be able to compare offers between providers. As things currently stand, providers will have to make their own estimates of payment days, and those estimates may vary.

Response to Comment 5.5.3. Please see the Department's response to Comment 4.8.2. The Department has proposed allowing providers to disregard certain issues in making calculations (see Section 901, subdivision (a)(16)), but does not anticipate that variations in calculations that may be permitted by this allowance will result in significant differences in the numbers ultimately disclosed to recipients. Should the Department receive data to the contrary, the Department may consider additional regulations to address issues that arise.

Comment 5.5.4. As Kapitus has noted in prior comment letters, Kapitus is concerned that the disclosure of an estimated monthly cost for periodic payments that are not monthly will be confusing to recipients. Recipients who are making payments on a less frequent basis may not understand why there are two different payment amounts in the disclosure document. To prevent confusion, Kapitus proposes that the actual payment metric (whether it be daily, weekly, or bi-weekly) be disclosed rather than a hypothetical one.

Response to Comment 5.5.4. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.5.5. Kapitus believes that additional clarification regarding the timing of disclosures will assist providers in understanding their obligations. Kapitus assumes that the disclosure obligation is triggered not based on a self-report of financial or credit information, but rather after such information has been verified such that a complete and binding offer can be made by the provider. This would help to eliminate any bait and switch tactics by unscrupulous providers. The concern is that a provider will provide an unrealistic initial quote complete with full disclosure documents to make the unrealistic quote appear more legitimate, and then (after the recipient has stopped pursuing other offers), offer a higher rate or higher cost product. To avoid this situation, the offer made with the disclosure documents should be binding. Kapitus requests that the DFPI add language to its definition of "specific commercial financing offer" to accommodate this request.

Response to Comment 5.5.5. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.5.6. Kapitus is concerned that section 956, as currently drafted, will give recipients a false sense of security in believing that all fees paid to brokers are disclosed when, in fact, only those fees deducted from the amount financed will be disclosed to the recipient. The disclosure in section 956 provides complete disclosures if recipients are dealing directly with providers without the assistance of a broker. It does not, however, provide complete

disclosures if a broker is involved in the transaction. Kapitus previously proposed revisions to the definition of "funds paid to brokers" to require that the disclosure include the total amount of compensation that a provider pays to a broker in connection with the specific financing offer. The DFPI did not revise the definition, but instead, deleted both the definition and the phrase from the disclosure while at the same time keeping the sample disclosure in section 956 as-is. Kapitus remains unsure about the impact of this change and is unclear what should be disclosed. There may be other ways to accomplish the goal of complete disclosure, but Kapitus believes that the simplest would be to add back the definition of "funds paid to brokers," redefine it as stated below, and include this as a separate line item in the disclosures set forth in sections 910 through 917.

"(32) Funds paid to brokers means the total amount of compensation that a provider pays to a broker in connection with the specific financing."

Response to Comment 5.5.6. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.5.7. Kapitus continues to be concerned about the inherent difficulty in calculating APR and the use of estimates, specifically for daily payment products. For this reason, Kapitus again urges that the DFPI add language to allow providers the ability to ask questions and seek guidance from the DFPI (perhaps through a designated individual or office) regarding the methods being used to comply with the DFPI's regulations. This is essential to ensure that (1) Kapitus is using the correct methodology and (2) recipients have the necessary information to compare products across providers. As a licensee under the California Financing Law, Kapitus wants to ensure that it is complying with the regulations before an examination. Without a resource to ask questions and seek guidance or a safe harbor, Kapitus is concerned that it will misunderstand or misapply the regulations and be left exposed to the risk of possible adverse action during the examination process. As such, Kapitus recommends the addition of section 955, subdivision (d):

"A provider or financer shall have the ability to consult with the DFPI on the methods of estimates and calculations called for under this Subchapter and rely on the guidance offered in writing by the DFPI regarding interpretive questions as safe harbor."

Response to Comment 5.5.7. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.5.8. Kapitus requests that (1) the DFPI provide at least 6 months to implement any required changes after the final regulations are released; and (2) the DFPI allow licensees the ability to ask for an extension beyond this 6-month period if it is necessary due to challenges with estimates, calculations, and/or technology, provided that the provider has made good faith efforts to comply as demonstrated to the DFPI.

Response to Comment 5.5.8. See Department response to Comment 2.3.6.

**Comment Letter 5.6 dated November 22, 2021 from QC.**

Comment 5.6.1. This comment is substantially similar to Comment 3.7.2.

Response to Comment 5.6.1. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). See also Department response to Comment 3.7.2.

Comment 5.6.2. This comment is substantially similar to Comment 3.7.3.

Response to Comment 5.6.2. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). See also Department response to Comment 3.7.3.

Comment 5.6.3. This comment relates to the timing of commercial financing offers and when a disclosure might be required. QC believes the regulations are unclear as to when a factor must make a disclosure to a recipient.

Response to Comment 5.6.3. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment Letter 5.7 dated November 22, 2021 from RBLC**. RBLC previously proposed that DFPI require annual data collection for providers that use the opt-in method for calculating estimated annualized percentage rates (APR). DFPI did not include this recommendation in the fourth modification, but still has the opportunity to mandate APR reporting under Financial Code section 90009, subdivision (e) small business data collection rulemaking. RBLC encourages DFPI to collect APR data through either avenue, to ensure that providers do not disclose unreasonably low APRs and also to maintain consistency between California and New York, where APR reporting is required by statute.

Response to Comment Letter 5.7. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**Comment Letter 5.8 dated November 22, 2021 from RBFC.**

Comment 5.8.1. This comment argues that calculating APR for open-ended credit financing transactions needs to be clarified.

<u>Response to Comment 5.8.1</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 5.8.2</u>. The comment argues ACC is the only reasonable metric for sales-based transactions.

<u>Response to Comment 5.8.2</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).
<u>Comment 5.8.3</u>. This comment argues that the estimated sales, income, or receipts projection is misleading and unreliable.

<u>Response to Comment 5.8.3</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).
<u>Comment 5.8.4</u>. This comment argues the audit requirements and penalties for using the underwriting method are unreasonable/not useful.

<u>Response to Comment 5.8.4</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).
<u>Comment 5.8.5</u>. This comment argues that a sales-based financer cannot possibly calculate true-ups.

<u>Response to Comment 5.8.5</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).
**<u>Comment Letter 5.9 dated November 18, 2021 from RN</u>**.

<u>Comment 5.9.1</u>. This comment argues that non-loan products should not have to disclose an average monthly cost.

<u>Response to Comment 5.9.1</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).
<u>Comment 5.9.2</u>. This comment argues that the proposed regulations will have a chilling effect on providing financing to an underserved, "unbankable" area of small businesses: restaurants.

<u>Response to Comment 5.9.2</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 5.9.3</u>. This comment argues the regulations are confusing and difficult to comply with, particularly regarding when a disclosure must be made.

<u>Response to Comment 5.9.3</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**<u>Comment Letter 5.10 dated November 22, 2021 from SFN</u>**. "We have read the latest revisions to the Proposed Regulations. While we have no comments aimed directly at the most recent amendments, we would like to take this opportunity to reiterate our concerns [SFN enclosed copies of its previous comment letters] over the challenges these regulations will pose to our members and the resulting unintended consequences, which we believe will adversely affect both the small businesses that provide commercial financings and the small businesses that look to obtain a commercial financing."

<u>Response to Comment Letter 5.10</u>. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

**<u>Comment Letter 5.11 dated November 22, 2021 from RA</u>**.

<u>Comment 5.11.1</u>. This comment is regarding the timing of making the disclosures.

<u>Response to Comment 5.11.1</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 5.11.2</u>. This comment is regarding the definition of "irregular payment."

<u>Response to Comment 5.11.2</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 5.11.3</u>. This comment is regarding the definition of sales-based financing.

<u>Response to Comment 5.11.3</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 5.11.4</u>. Proposed section 900(a)(33) and (34) – the most recent edits to these definitions have resulted in the calculation of these terms to be based on the "average total

amount paid" by the recipient over the term or estimated term of the financing divided by the months in the term or estimated term. These definitions make no sense as there is no such thing as an "average total amount paid" in a commercial financing transaction. An "average total amount paid" implies that there are multiple "total amounts paid" to be averaged. We believe the inclusion of the word "average" in the phrase "average total amount paid" was an error and should be deleted from the definitions.

Response to Comment 5.11.4. The Department disagrees with RA's interpretations of the definitions in question. No changes to the regulations are warranted by this comment.

Comment 5.11.5. This comment is regarding the definitions section not being entirely alphabetical.

Response to Comment 5.11.5. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.6. The definition of average monthly cost is confusing. The label (average monthly cost) implies this would be the monthly cost of the funding. However, the calculation includes the cost and the principal repayment. So, this amount is not actually the average monthly cost but the average monthly payment amount. Either this definition needs to be changed so the calculation is just the monthly costs (the finance charge divided by the number of months) or that the term is relabeled to be average monthly payment amount (although this would also be confusing as it makes it appear as if this amount is an actual payment, which it is not as explained below).

It is confusing that for purposes of this calculation in the definitions of section 900, subdivision (a)(33) and (34) a provider must assume 30.4 days in a month but elsewhere the regulations permit each provider to assume months have the same number of days with no requirement on how many days per month should be assumed (see section 901, subdivision (a)(16)(C)). This will lead to providers using 30.4 days for this calculation but maybe 28 or 31 for other calculations. The rules for days in a month should be uniform for each calculation for the disclosures to have meaning and be reliable.

Response to Comment 5.11.6. The Department disagrees with RA's suggestion that this will be confusing since it is only for purposes of these definitions and the associated calculation of monthly costs that a provider may assume 30.4 days in a month. No change to the regulations is warranted by this comment.

Comment 5.11.7. Incorrect Outlining Format – Despite numerous comments RA has submitted highlighting outlining errors, such errors have still not been fixed. For example, Section 901

starts with subdivision (a) but there is no other subdivision. This will lead to confusion as basic outlining practices permit the use of subdivisions only if there are more than one subdivision. It is not proper to have a subdivision (a) when there is no subsection (b). Yet, this is exactly what section 901 does. It includes a subdivision (a) but there is no subdivision (b).

Additionally, section 914, subdivision (a)(3) includes subparagraph (A) twice. This should clearly be (A), (B), (C) and (D) and not (A), (A), (B) and (C). These incorrect references matter and must be fixed. Section 914, subdivision (a)(3)(C) now refers to itself when it is meant to refer to section 914, subdivision (a)(3)(B) due to the outlining errors.

Response to Comment 5.11.7. The Department has updated the outlining errors.

Comment 5.11.8. Imprecise Grammar – At various places in the regulations, the grammar should be improved. For example, conjunctions are used throughout the regulations. Because and since are two such conjunctions. Both are used to describe a logical relationship between two or more ideas or events. However, since is typically used when the ideas or events have a sequential relationship (a relationship in time) and because is used when the two ideas or events have no sequential relationship. In section 914, subdivision (a)(3)(B) (this actually should be labeled (b) as described above), the disclosure includes the phrase "[s]ince your actual income may vary from . . . ." However, the logical connection is not based on time so the better conjunction to use is because. Accordingly, we suggest this disclosure be amended to state "[b]ecause your actual income may vary from . . .

Response to Comment 5.11.8. The Department declines to address these comments in these proposed regulations because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.9. Section 901, subdivision (a)(4)(A) provides that if the term or estimated term is one year or less, the term or estimated term must be disclosed in days. However, there is no guidance how to calculate days. Should the day the transaction is consummated be included or should you start counting days on the day after consummation? Does the day of the final payment count as a day in the calculation? Additionally, the disclosure of terms greater than one year is going to create significant confusion. The regulations require that such transactions with terms with partial months be disclosed as a portion of a month to the nearest two decimal points. This means that a transaction with a term of 465 days must be disclosed as having a term of "1 year and 3.33 months." Small business owners do not think in terms of .33 months and demanding months be disclosed as decimals will simply create confusion. It would be much less confusing to require the disclosure to be 1 year, 3 months and 10 days.

<u>Response to Comment 5.11.9</u>. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 5.11.10</u>. Section 901, subdivision (a)(6) provides that the disclosures shall be presented to the recipient as a separate document. However, there is no guidance on what is meant by the phrase "separate document." The regulations make it clear that the disclosures can be provided in the same package as long as they are separate. However, the regulations do not address this issue in connection with electronic disclosures (which is odd as the vast majority of these disclosures will be provided electronically). How are disclosures "separate" from other documents when provided electronically? Do the disclosures have to be a separate attachment or link, or can they be included in the same attachment or link as long as they are separated by a page break or some other break? Note that for disclosures provided other than the final version that must be signed, it is likely that an attachment will not even be reviewed if it is not part of the overall document package that is emailed to the recipient.

<u>Response to Comment 5.11.10</u>. The Department declines to address these comments in these proposed regulations because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 5.11.11</u>. Section 901, subdivision (a)(7) addresses font requirements and provides that a provider shall not use "colors and fonts that make any enumerated terms required by section 22802, subdivision (b), of the code more clear or conspicuous than any other term required by that subdivision." The problem with this is that the regulations require disclosures that are not enumerated in 22802, subdivision (b). So, any disclosure not enumerated in 22802, subdivision (b) can be clearer and more conspicuous than those enumerated. This means that disclosures like the average monthly payment disclosure for daily or weekly payment products can be clearer and more conspicuous than the items enumerated in 22802, subdivision (b) as it is not included in 22802, subdivision (b). Rather, it only appears in the regulations. Accordingly, this may result in the enumerated terms being hidden by a highlighted or oversized monthly payment disclosure. RA suggests this section be amended to state that a provider shall not use "colors and fonts that make any disclosure required in this subchapter more clear or conspicuous than any other term required by that subdivision."

<u>Response to Comment 5.11.11</u>. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

<u>Comment 5.11.12</u>. Section 901, subdivision (a)(8) provides guidance on how wide the columns for each disclosure should be. However, the "3:3:7" ratio is too prescriptive. While RA agrees

that there should be limits on the ratio, something that is more flexible should be used. RA suggests this be amended to state "the approximate ratio of 3:3:7." Requiring an exact ratio will be impossible to comply with as the ratios will always be off by very small amounts. Failure to address this will make the safer harbor provision in section 901, subdivision (a)(8) ineffective as no disclosure form will have an exact ratio of "3:3:7."

Response to Comment 5.11.12. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.13. RA suggests that somewhere in the disclosure language the DFPI add a statement that all disclosures assume and are based on timely payments and no default. This will reduce confusion in situations where a recipient defaults. Section 900, subdivision (a)(4)(B) provides that there is no need to re-disclose in event of a default but nothing in the disclosure alerts the recipient that the disclosures assume there is no default and that additional charges may be imposed in an event of default. We suggest this be added to the disclosure form.

Response to Comment 5.11.13. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.14. RA argues that the various disclosures of the phrases "funding provided," "amount financed" and "recipient funds" are inconsistent, confusing and conflict with the statutory requirements. RA addresses each phrase and makes recommendations on how to make the phrases clearer and more consistent.

Response to Comment 5.11.14. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.15. In order to truly have the recipient understand the cost of the financing, it is important to include the amount of commission or fee that a broker is paid. Although the regulations require certain broker commissions to be disclosed, they fail to address the manner in which the vast majority of broker commissions are paid. The majority of the time the financer pays the broker out of the financer's fees – not from the proceeds. The broker fee is typically the most expensive third-party fee associated with a transaction and would be valuable information for a recipient to know. Accordingly, it should be separately itemized and disclosed.

Response to Comment 5.11.15. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.16. Funding Provided (section 910, subdivision (a)(2)(C)(ii) and others) – The section provides that if the amount financed is greater than the recipient funds, the provider must state the following: "Due to deductions or payments to others . . . ." However, the amount financed may be greater than the recipient funds due to payments made to the provider and not to others. So, if there is an outstanding balance with the provider that the recipient must satisfy, that is an amount deducted from the amount financed but not paid to others as the provider is not an "other" in this scenario. RA suggests the reference to "others" be deleted. If the DFPI is concerned about how to handle prepaid finance charges, it can be reworded to state: "Due to deductions or payments other than prepaid finance charges . . . ."

Response to Comment 5.11.16. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.17. Finance Charge (section 910, section (a)(4)(C)(i) and others) – In various places in the regulations, different phrases are used for loans and sales-based financing when there is no justification for the difference. These wording inconsistencies will create confusion as recipients will compare disclosures for both products and not understand why different wording is used when not necessary. They will imply some reason for it when there is none. This issue arises when a loan and sales-based financing product has a fixed finance charge (not an accruing rate). For the sales-based financing disclosures, the regulations permit the provider to include the following statement: "Your finance charge will not increase if you take longer to pay off what you owe." This phrase is not permitted for closed-end loans when there is a fixed finance charge. This discrepancy will cause confusion and make recipients believe the sales-based financing product is a better choice as finance charges cannot increase for that transaction and they will believe they can for the closed-end loan when in fact they will not under this scenario. The disclosures may literally push the recipient to select the more expensive product due to this confusion.

Response to Comment 5.11.17. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.18. Payment (section 910, subdivision (a)(6) and others) – RA's comments regarding irregular payments are relevant to this section as well. It is important to provide clarification as to how make-up payments should be handled so that providers know how to accurately give the disclosures. Once again if a provider is to assume that it can collect on all bank holidays, when in actuality it cannot, it knows that the payment after the holiday will be for two days. That should not be a variable payment under the regulations.

Response to Comment 5.11.18. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.19. Prepayment (section 910, subdivision (a)(8)(9)(10)) and others) - Section 22802, subdivision (b)(5) of the Financial Code only requires a "description of prepayment policies." The regulations require substantially more than the statute permits. The statute was modeled off of certain parts of TILA and one of those parts was the one relating to prepayment. After much debate, the Legislature adopted language that requires only that there be a description of prepayment policies – not that prepayment amounts be calculated and disclosed. This was prudent as requiring amounts to be disclosed creates confusion. For example, the proposed regulations refer to prepayment fees being fees other than accrued interest. What is accrued interest? There is no definition or guidance as to what constitutes "accrued interest." Under the proposed regulations, a provider could legally disclose that there are no prepayment fees if the contract provides all fees are earned on day one. The recipient is then further misled by the disclosures when the next row provides that there are no additional fees for prepayment. In this scenario the disclosures make it appear as if there is a discount for repaying early when there is in fact no such discount. Given the above, RA believes the better approach with respect to prepayment penalties is to have a more definitive statement about them rather than a calculation and a disclosure amount that can be easily manipulated. RA suggests the DFPI follow TILA's lead here and simply require a simple statement.

Response to Comment 5.11.19. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.20. Average Monthly Cost – As RA has reiterated numerous times in past comment letters, the "average monthly cost" for a non-monthly pay product should not be required. The disclosure of the monthly cost for a non-monthly pay product does not implement, interpret, or make specific any provision of Financial Code section 22802, subdivision (b)(5).

Response to Comment 5.11.20. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)). See also response to Comment 2.6.2.

Comment 5.11.21. Estimated Annual Percentage Rate (section 914, subdivision (a)(3)(C)) – This section is mislabeled and should be section 914, subdivision (a)(3)(D). It also is inconsistently worded with section 910, subdivision (a)(3)(iv), which is a nearly identical section

but for some reason is worded slightly differently. There is no logical basis to have the disclosures worded differently. In fact, doing so will create confusion. The goal of the disclosures and the statute is to facilitate a comparison of different commercial financing products by recipients.

Response to Comment 5.11.21. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.22. Estimated Total Payment Amount (section 914, subdivision (a)(5)) – Practically all sales-based financing transactions are structured so that the total amount to be paid by a recipient is known at the time of funding (except when there is a default in some cases). However, the proposed regulations only permit a provider to disclose an "estimated total payment amount" for a sales-based financing transaction and prohibits them from disclosing the actual "total payment amount." This is inconsistent with the disclosures required for closed-end transactions (section 910, subdivision (a)(5)) which permit a disclosure of either a "total payment amount" or an "estimated total payment amount" depending on whether it "is possible to calculate with certainty the total payments the recipient will make during the contract's term."

Response to Comment 5.11.22. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.23. Section 914, subdivision (a)(6)(B)(ii) refers financers to section 942 to calculate the average amount of estimated periodic payments, but section 942 actually does not help with that. Section 942 simply requires financers to use the estimated monthly sales calculations provided for in section 930 or 931 as applicable. These sections in turn create rules for financers to use when estimating a recipient's average monthly sales or revenue. None of these sections address how to calculate a daily payment amount based on the average monthly sales volume calculated pursuant to these sections. Therefore, there is an entire step missing from the estimated payment amount calculation. The regulations provide no guidance on how to calculate a daily, weekly, or bi-weekly payment amount. This is a critical matter for the regulations to address as different providers make different assumptions. In a previous version of the regulations, the DFPI addressed this issue but did so incompletely. The DFPI's remedy for that was to delete all references to this issue. Section 901, subdivision (a)(17) might have been an attempt to address this issue by telling providers they may disregard the fact that months have different numbers of days. However, this provision is not enough. There is no guidance in the regulations as to what assumptions to make regarding payment days and how to calculate the actual payments amounts for products that require payments more frequently than monthly.

Response to Comment 5.11.23. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.24. Section 914, subdivision (a)(9), (10), and (11)) - The form disclosure language in this section entirely misrepresents the sales-based financing transaction. A sales-based financing transaction does not have a term and the recipient is not required to "pay-off the financing" in a specific period of time. This is exactly why the regulations require disclosure of an estimated term for these transactions rather than a term. However, the disclosure language in this section requires a provider to state "If you pay off the financing faster than required . . . ." Not only will this cause confusion it is materially misleading and harmful to recipients. They will be led to believe they must pay off a sales-based financing transaction by a specific date and fail to recognize the benefit of the bargain they negotiated (that the product does not have a fixed term). In effect, this disclosure will force providers to make materially false statements as there is no "required" timeframe to repay the financing.

Response to Comment 5.11.24. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.25. Section 914, subdivision (a)(12) - This disclosure is labeled as an estimated monthly cost, but it is an average. The label should be estimated average monthly cost. This would make it more consistent with the closed-end transaction section as that refers to this disclosure as average monthly cost.

Response to Comment 5.11.25. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.26. Section 930, subdivision (b)(2) states that the provider "shall fix the number of months used to calculate the recipient's average monthly historical sales, income, or receipts for all transactions or by recipient industry or financing amount (or both), provided that the period of historical data used by the provider shall not be less than four (4) months or more than twelve (12) months." As stated in previous comment letters, even if a provider requests a certain number of statements, it does not mean the recipient will provide all months requested. The use of the phrase "shall fix" in this section appears to require providers to collect statements for a minimum number of months. This scenario was taken into account in section 930, subdivision (b)(4)(B), which allows a provider to be able to calculate the historical monthly sales based on what was provided by the recipient if the recipient fails to provide revenue data for all the requested months. The wording in these two sections is contradictory. RA believes

this is just a drafting error and section 930, subdivision (b)(2) should simply be amended to state that the provider "shall request the number of months used to calculate . . . ."

Response to Comment 5.11.26. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.27. In Section 930 there should be no limitations on how many months a provider requests as long as they are consistent and following written underwriting policies. It makes no sense to preclude a provider from asking for 18 months of monthly data as the more data provided the more accurate the pricing can be. The proposed regulations would also apply the same four (4) or twelve (12) month limit to renewals but in many cases only one (1) month is needed for that (and in some cases no months are needed). For a renewal, the provider already has performance data from the recipient as well as older bank/processing statements and should not be required to ask for more when they will not be used. The provider should be allowed to request whatever number of statements it deems necessary to underwrite the transaction (no more and no less).

Response to Comment 5.11.27. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.28. Section 930, subdivision (b)(4)(A) allows a provider to exclude from the average calculation certain months where there were "less than the average monthly sales . . . ." While RA understands the intent is to exclude outlier months, it does not make sense to permit providers to exclude only months that are less than the historical norm. Requiring provides to include only outlier months that are greater than the historical average (and not ones that are lower than the historical average) will cause the provider to take more revenue every day and be more of a burden on the recipient. RA suggests that the language be changed to allow a provider to exclude any month that is materially greater or less than the average monthly sales.

Response to Comment 5.11.28. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.29. There is a requirement in section 942, subdivisions (a)(4) and (b)(4) to account for payments required when the timely payments fall below a contacted threshold. The previous version of this section referred to penalty payments. RA submitted a comment and highlighted the issues this creates. It appears the DFPI may have edited this pursuant to RA's comment, but the same issue still exists. Payments that fall below a contacted threshold are in effect breaches of an agreement so any payment in relation to that is a penalty payment. It is

unclear to RA what the DFPI is trying to address here. The wording still needs to be fixed to
make it clear that payments related to a default (which would include payments falling below a
contracted threshold) are not included in the payments or APR disclosures. It is impossible for
the provider to know what "penalty fees" will be charged or how often they will be charged as
they have no idea if there will be a default or "penalty" or if there is a default or penalty, how
many times it will happen. RA suggests that paragraphs (a)(4) and (b)(4) be deleted as they do
not make sense to be used in this calculation and conflict with other provisions of the proposed
regulations.

Response to Comment 5.11.29. The Department declines to address these comments
because the comments are not regarding a change to the language that was made available to
the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.30. Section 952, subdivision (a)(2) requires that a financer maintain a copy of
the "evidence of transmission of the disclosure." There is no description as to what would
constitute "evidence of transmission." Would a copy of the sent email or facsimile be sufficient
or is there something else specifically that the DFPI is looking for the provider to maintain?

Response to Comment 5.11.30. The Department declines to address this comment because
the comment is not regarding a change to the language that was made available to the public
during this comment period. (Government Code section 11346.8, subdivision (c)). See also
response to Comment 1.11.39.

Comment 5.11.31. In the event the broker fraudulently creates an "evidence of transmission,"
is the provider liable for storing that transmission or not being able to determine if it is
fraudulent? Just as a waiver of liability is given to brokers for potentially providing recipients
with misleading or incorrect disclosures created by a provider, a provider should be provided
with a waiver of liability if the broker fraudulently creates the transmission or alters it in anyway.

Response to Comment 5.11.31. The Department declines to address this comment because
the comment is not regarding a change to the language that was made available to the public
during this comment period. (Government Code section 11346.8, subdivision (c)). See also
response to Comment 2.8.5.

Comment 5.11.32. Section 955 is confusing. It lists three separate tolerance rules to determine
if an APR disclosure is accurate. Between option 1 and 2 there is an "or." However, there is no
"or" between option 2 and 3. RA believes the intent here is to make it clear that there are three
possible scenarios under which an APR will be deemed within the tolerance limit. However, the
drafting of this section makes that unclear. It seems that either the "or" between 1 and 2 should
be deleted (and the semicolon replaced with a period) or an "or" be added between sections 2
and 3 (and the period be replaced with a semicolon). Additionally, option 3 has a typo. The last

part of the option provides the "resulting difference shall be divided by rate disclosed pursuant . . . ." However, it should say the "resulting difference shall be divided by the APR disclosed pursuant . . . ."

Response to Comment 5.11.32. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.33. Section 955's option 3 also appears to totally consume options 1 and 2. In order to determine if a disclosed APR is within the tolerance under option 3, providers must follow the calculation steps provided in option 3. Let's follow those steps for a transaction with a disclosed APR of 30 percent but an actual APR of 30.2 percent. The instructions require you to subtract the disclosed APR from the actual APR (30.2 minus 30). This results in .2 (slightly higher than the tolerance permitted under option 1). Then you are instructed to divide that amount by the disclosed APR (.2/30). This results in .006666666. You then multiply that by 100 and the result is in .6666. What this means (RA thinks) is that the disclosed APR in this scenario is understated by .666 percent. The question this raises is what purpose does option 1 or 2 serve? In RA's example in this paragraph, the APR was understated in excess of the tolerance limit permitted in option 1 (.125 percent) but is deemed accurate under option 3. The same issue arises with respect to option 2. So, option 3 would always govern and option 1 and 2 would never be used. RA suspects there is a drafting error here as it is unlikely the DFPI intended to have a completely irrelevant option that would never be used for tolerances.

Response to Comment 5.11.33. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.34. Section 955, subdivision (b) only limits provider or financer liability when an inadvertent error is made, and the provider or financer catches that error. Once again RA would argue that this liability limitation should also be extended if a recipient discovers the inadvertent error, notifies the provider or financer and the provider or financer makes the appropriate adjustments and refunds any overpayments based on that disclosure within 60 days of being notified by the recipient.

Response to Comment 5.11.34. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.35. Paragraphs (c)(1) and (c)(2) of sections 956 could be read to conflict with one another. Section 956, subdivision (c)(1) requires that the itemization appear in a document separate from the other disclosures. However, section 956, subdivision (c)(2) then states the

itemization must immediately follow the other disclosures. RA presume the DFPI means that it must be in the next page of information provided. If so, that will create problems. Most of these disclosures will be provided electronically. So, when the main disclosures are reviewed and then signed, the recipient will likely stop scrolling through the electronic document and submit it. That means they will likely never see the itemization. This issue does not exist in TILA as TILA does not require the disclosures to be signed. RA highly recommends the DFPI permit the disclosures to be part of the same document with the main disclosures being separated from the itemization (as TILA does) and the signature appearing below the itemization.

Response to Comment 5.11.35. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.36. Calculation of Annual Percentage Rate (Section 940) - As RA has argued in the other comment submissions RA has provided on this topic, RA does not believe APR is the best metric and will cause more confusion. RA incorporates its prior comments provided to the DFI into this letter.

Response to Comment 5.11.36. The Department declines to address this comment because the comment is not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.37. The proposed regulations are preempted by TILA. "APR" and "finance charge" are terms of art created by TILA and have different meanings than how they are defined in the regulations. The goal of SB 1235 is for businesses to be able to compare products, and because APR calculations will differ between consumer and commercial products and even between providers offering commercial products, the goal of SB 1235 is defeated. RA once again request that the proposed regulations not require the disclosure of an APR or estimated APR. This inconsistency will result in misleading disclosures of credit choices, thwarting Congress' primary objective in enacting TILA. The regulation violates the APA consistency standard.

Response to Comment 5.11.37. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

Comment 5.11.38. It is imperative that the DFPI add broker compensation as a disclosure. RA reiterates its prior comments as this is an important disclosure for small businesses. Based on how the regulations are drafted, it appears the DFPI either (i) has decided to ignore broker compensation that is paid by a financer directly to a broker rather than from recipient funds, or (ii) misunderstands how the majority of financers compensate brokers for referrals. In either

case, the regulations should be revised so that the amount and manner of compensation a broker receives for a commercial financing transaction is clearly disclosed to a recipient.

Response to Comment 5.11.38. The Department declines to address these comments because the comments are not regarding a change to the language that was made available to the public during this comment period. (Government Code section 11346.8, subdivision (c)).

## ALTERNATIVE DETERMINATIONS

The DFPI considered alternatives to a variety of aspects of the regulations and discusses why the DFPI accepted or rejected those alternatives in the comment responses above. Other than recommendations that necessitated changes, no reasonable alternatives to the regulations have been identified or brought to the Department's attention that would be more effective in carrying out the purpose for which the action is proposed; as effective and less burdensome to affected private persons than the proposed action; or more cost-effective to affected private persons and equally effective in implementing the statutory policy or other provision of law.

Various stakeholders proposed changes that they claimed would be less burdensome on small business providers of financing, or recipients who are small businesses. The DFPI described its justification for accepting or rejecting those proposed changes in the responses to comments above. Other than the recommendations accepted by the DFPI, no reasonable alternatives considered by the Department, or that have otherwise been identified and brought to the attention of the Department, would be as effective and less burdensome to affected small businesses, or would lessen any adverse impact on small businesses.

The regulations prescribe, minimally, the use of specific actions and procedures in making the disclosures. Specifically, they prescribe the formatting for how the disclosures must be made to recipients (a table with a particular format and clear readability requirements). Despite this prescribed formatting, providers are free to customize the look and feel of the disclosure document to match their preferred styling, company colors, etc. The alternative to this prescribed procedure would be to permit providers to make the disclosures in a completely unprescribed format. The Department determined that such an alternative could lead to significant confusion among recipients given the high probability that each provider would prepare its own version of the disclosures. Such variability would almost certainly impair the legislative intent of ensuring recipients receive clear, complete, and meaningful disclosures for purposes of making informed business decisions and comparison shopping.

## LOCAL MANDATE DETERMINATION

The proposed regulations do not impose any mandate on local agencies or school districts.

INCORPORATION BY REFERENCE

The documents proposed for incorporation by reference were available upon request from the agency and reasonably available from a commonly known source, the online Code of Federal Regulations. The incorporated documents would be cumbersome to include in the text of the regulation.