1   BENJAMIN H. BRODSKY *(Admitted Pro Hac Vice)*
2   Email: bbrodsky@bfwlegal.com
    PHILIP T. MERENDA *(Admitted Pro Hac Vice)*
3   Email: phil@bfwlegal.com
    BRODSKY FOTIU-WOJTOWICZ, PLLC
4   200 SE 1ST St., Suite 400
5   Miami, FL 33131
    Telephone:   305.503.5054
6   Facsimile:    786.749.7644
7
8   PAUL A. LEVIN (CA State Bar No. 229077)
    Email: paul@markmigdal.com
9   LAUREN M. GIBBS (CA State Bar No. 251569)
    Email: lauren@markmigdal.com
10  MARK MIGDAL &HAYDEN
11  11150 Santa Monica Blvd., Suite 1670
    Los Angeles, CA 90025
12  Telephone: 305.374.0440
13
    *Attorneys for Plaintiff* SMALL BUSINESS FINANCE
14  ASSOCIATION

15              UNITED STATES DISTRICT COURT
16             CENTRAL DISTRICT OF CALIFORNIA
                    WESTERN DIVISION
17

| | |
|---|---|
| 18  SMALL BUSINESS FINANCE ASSOCIATION, | Case No. 22-cv-08775-RGK-PLA |
| 19                    Plaintiff, | **DECLARATION OF BENJAMIN H. BRODSKY IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE CERTAIN OPINIONS OF DEFENDANT'S EXPERT, ADAM J. LEVITIN** |
| 20          v. | |
| 21  CLOTHILDE HEWLETT, solely in her official capacity as Commissioner of the | |
| 22  California Department of Financial Protection and Innovation, | |
| 23 | Hearing Date: October 30, 2023 at 9:00 am |
| 24                    Defendant. | Judge: Hon. R. Gary Klausner Courtroom: 850 |
| 25 | Complaint Filed: December 2, 2022 Trial Date: December 12, 2023 |
| 26 | |
| 27 | |
| 28 | |

## <u>DECLARATION OF BENJAMIN H. BRODSKY</u>

I, Benjamin H. Brodsky, declare as follows:

1.      I am counsel for Plaintiff Small Business Finance Association.  I make the following statement based on my personal knowledge, except as explicitly stated otherwise. If called as a witness, I could and would competently testify under oath as to the facts set forth below.

2.      On September 26, 2023, I held a Zoom meet and confer conference with counsel for Defendant, Douglas Beteta, Esq.  Mr. Beteta did not agree to the relief requested in Plaintiff's Motion to Exclude Certain Opinions of Defendant's Expert, Adam J. Levitin.

3.      Attached to this Declaration as Exhibit 1 is a true and correct copy of the Expert Report of Professor Adam J. Levitin that we received from Defendant's counsel via email on September 22, 2023.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this September 27, 2023, at Miami, Florida.


/s/ *Benjamin H. Brodsky*
BENJAMIN H. BRODSKY

# EXHIBIT 1

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

# EXPERT REPORT OF PROFESSOR ADAM J. LEVITIN

*Small Business Finance Association v. Clothilde Hewlet*, No 22-cv-08775-RGK-SK (C.D. Cal.)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

I.      INTRODUCTION ................................................................................... 3

II.     PROFESSIONAL BACKGROUND AND QUALIFICATIONS ....................... 3

III.    BACKGROUND AND ASSIGNMENT ....................................................... 5

IV.     SMALL DOLLAR COMMERCIAL FINANCING .......................................... 5

V.      MERCHANT CASH ADVANCES ............................................................. 6

   A.   The Use of MCAs .......................................................................... 6

   B.   The Structure of MCAs ................................................................. 7

   C.   Regulatory Concerns About MCAs .............................................. 9

   D.   MCAs Are Frequently Just Disguised Loans ............................. 10

      *a.   Recourse Against Collateral Exceeding the Receivables* ...................... 11

      *b.   Recourse Against the Small Business Generally Through Warranties* ..... 11

      *c.   Recourse Against the Owner-Guarantor Through Warranties* ............... 13

      *d.   Repayment Obligations on MCAs Are Not Really Contingent Upon Generation of Future Receivables* ................................................. 14

VI.     THE DIFFICULTY IN DETERMINING IF A TRANSACTION IS ACTUALLY A NON-LOAN TRANSACTION ................................................................ 14

VII.    THE CONFUSING NATURE OF VOLUNTARY DISCLOSURE OF MCA TERMS PRIOR TO THE DFPI REGULATIONS UNDER THE CFDL ...................... 15

VIII.   THE IMPORTANCE OF THE ANNUAL PERCENTAGE RATE (APR) AS A STANDARDIZED MEASURE OF CREDIT COST DISCLOSURE ....................... 19

   A.   The Function of the Annual Percentage Rate ........................... 19

   B.   Federal Regulatory Concerns About the APR Are Not Applicable to MCAs . 21

   C.   The "Estimated APR" and "Estimated Term" Are Exactly What They Say They Are ................................................................. 22

   D.   The Estimated Term Methodologies Are Necessary Because MCA Providers Are Incentivized to Manipulate the Estimated Term to Make Their Product Look Less Expensive ................................................................. 23

   E.   Without the Estimated APR It Is Impossible to Undertake a Meaningful Cost Comparison of MCAs with Different Payment Percentages ........................... 24

CONCLUSION ............................................................................................ 25

APPENDIX A. LIST OF EXPERT TESTIMONY GIVEN AT DEPOSITION OR TRIAL DURING THE PREVIOUS FOUR YEARS ................................................. 26

APPENDIX B. CURRICULUM VITAE OF ADAM J. LEVITIN ............................ 27

APPENDIX C. DOCUMENTS RELIED UPON IN FORMULATING THE REPORT ...................... 55

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## I.     INTRODUCTION

1.  My name is Adam Jeremiah Levitin. I was retained by the Attorney General of the State of California (the "**State**") on behalf of the California Department of Financial Protection and Innovation to provide expert testimony in the case captioned *Small Business Finance Association v. Clothilde Hewlet*, No 22-cv-08775-RGK-SK (C.D. Cal.) (the "**Litigation**") regarding the application of its regulations[1] under the California Commercial Financing Disclosure Law ("**CFDL**")[2] to various forms of small business financing, including merchant cash advances.

2.  I have read the Complaint and defendant's Answers in the aforementioned cases, as well as the Court's opinion on the State's motion to dismiss, and am so acquainted with the subject of the Litigation relating to the California Commercial Financing Disclosure Law.

3.  The State has requested that I opine on certain topics relating to the nature of the small dollar commercial financing market and merchant cash advances. Although my opinions are informed by my legal knowledge, they are a predicate or input to the determinations that are reserved for the trier of fact, and I express no opinion here on any ultimate question of whether the disclosures required by California CFDL violate the First Amendment of the United States Constitution. Instead, the opinions I state here would merely be evidence that the trier of fact could use in reaching a conclusion on the ultimate issue.

## II.     PROFESSIONAL BACKGROUND AND QUALIFICATIONS

4.  I am the Carmack Waterhouse Professor of Law and Finance at the Georgetown University Law Center in Washington, D.C., where I have taught as a full-time faculty member since 2007. I have held tenure at Georgetown University Law Center since 2011. From 2018-2020 I held the Agnes N. Williams Research Professorship, and from 2020-2023, I held the Anne Fleming Research Professorship.

5.  At Georgetown University Law Center, I teach courses in bankruptcy, consumer finance, secured lending, and structured finance, among other topics, and in these courses I regularly teach about the economics and regulation of consumer and small business financing transactions.

6.  I have previously served as the Bruce W. Nichols Visiting Professor of Law at Harvard Law School; as the Robert Zinman Scholar in Residence at the American Bankruptcy Institute; as a faculty member for the Practicing Law Institute's Consumer Financial Services program; and as the faculty instructor for the training program for the Federal Trade Commission ("**FTC**") Division of Financial Practices attorneys.

7.  From 2008-2010, I served as Special Counsel to the Congressional Oversight Panel that supervised the Troubled Asset Relief Program ("**TARP**").

8.  From 2012-2015, I served as a member of the statutory Consumer Advisory Board for the Consumer Financial Protection Bureau ("**CFPB**").

9.  Since 2008, I have testified thirty-two times before Congress on financial regulatory issues, including testifying before the House Committee on Small Business on three occasions, one of which was a hearing on price transparency in small business lending.

10. I regularly consult informally with members of Congress, the Consumer Financial Protection Bureau, the Federal Reserve, the Federal Deposit Insurance Corporation, the Departments of Commerce, Housing and Urban Development, and Treasury, the International Monetary Fund, the World Bank,

---

[1] Cal. Code Reg. title 10, § 900 *et seq.*
[2] Cal. Fin. Code §§ 22801 *et seq.*

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

state attorneys general offices, and non-profit policy groups on various financial regulation topics, including financing for small-to-medium enterprises.

11. I have previously served as an expert witness for the State of New Jersey in litigation against a merchant cash advance company. I have also served as an expert witness in several securitization litigations that involved the questions of violations of representations and warranties, issues about what triggers an "Event of Default," and guarantor liability. A list of my testimony at trial or deposition in the past four years may be found in Appendix A to this report.

12. Financial regulation is a major focus of my academic research. I have authored over eighty academic articles and book chapters and encyclopedia entries all of which deal with various topics in financial regulation and financing. Among my publications is a law school textbook on consumer finance and its regulation, *CONSUMER FINANCE: MARKETS AND REGULATION* (2d ed. Aspen, 2023). The book contains a chapter on consumer credit cost disclosure, including calculation of the finance charge and the annual percentage rate ("**APR**"). I am also a co-author of the National Consumer Law Center's treatise on *CONSUMER BANKING AND PAYMENTS LAW*. Among my articles is one that specifically addresses high-cost small business lending. Adam J. Levitin, *Rent-A-Bank: Bank Partnerships and The Evasion of Usury Laws*, 71 DUKE L.J. 329, 331-35 (2021). Additionally, I am the author of a law school textbook on financial restructuring, *BUSINESS BANKRUPTCY: FINANCIAL RESTRUCTURING AND MODERN COMMERCIAL MARKETS* (3d ed. Aspen, 2023) that covers the operation of guaranties in some detail. A complete list of my academic publications from the last ten years may be found in my curriculum vitae in Appendix B to this report.

13. My work has been published in leading law, economics, and finance journals and has been awarded prizes from the American College of Commercial Financial Lawyers, the American College of Consumer Financial Services Lawyers (twice), the *American Bankruptcy Law Journal*, the George Washington University Center for Law, Economics and Finance, and the *Yale Journal on Regulation*. My scholarship has also been cited in numerous judicial opinions, including by several state supreme courts and several federal circuit courts of appeals.

14. I am elected Fellow of the American College of Consumer Financial Services Lawyers, an elected Fellow of the American College of Bankruptcy, and an elected member of the American Law Institute. In 2013, I received the American Law Institute's Young Scholar's Medal, which is awarded every two years to "one or two outstanding early-career law professors whose work is relevant to the real world and has the potential to influence improvements in the law."

15. I hold a J.D. *cum laude* from Harvard Law School. I also hold a Bachelor of Arts (A.B.) degree *magna cum laude* with highest honors in field from Harvard College, a Master of Arts (A.M.) degree and a Master of Philosophy (M.Phil.) degree from Columbia University.

16. I have served as law clerk to the Honorable Jane R. Roth on the United States Court of Appeals for the Third Circuit and am admitted to practice before the bars of the State of New York, the Supreme Court of the United States, the United States Court of Appeals for the Third Circuit, the United States District Court for the Southern District of New York, and the United States District Court for the Eastern District of New York.

17. Based on the foregoing experiences, as well as my research following my engagement in this case, I am familiar with the structure, regulation, and custom and practices of small business finance in general and merchant cash advances in particular. I am also familiar with the calculation of the annual percentage rate and the finance charge and the role of these terms in consumer credit cost disclosure. I believe this specialized knowledge would be helpful to the trier of fact in understanding the evidence and determining ultimate issues regarding whether the disclosures required by the California CFDL violate the First Amendment of the United States Constitution.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

18. My compensation for preparing this report, for preparing for giving testimony, and for any testimony given in this litigation is at the rate of $700/hour plus reimbursement of approved expenses.

19. My compensation does not depend on either the opinions I express or the outcome of this litigation.

20. This report is the product solely of my own work. I received no assistance from any person in the writing of the report.

21. The sources I considered upon in preparing this report are listed in Appendix C to this report.

### III.   BACKGROUND AND ASSIGNMENT

22. In September 2018, California enacted the CFDL,[3] which directed the California Department of Financial Protection and Innovation ("**DFPI**") to promulgate disclosure regulations for offers of commercial financings of $500,000 or less in California.[4]

23. On June 9, 2022, the California Office of Administrative Law approved the DFPI's final regulations implementing the CFDL. The regulations went into effect on December 9, 2022.

24. The Small Business Finance Association ("**SBFA**") has brought suit claiming that the regulations violate the First Amendment of the United States Constitution because they constitute compelled speech. In particular, the SBFA alleges that "the Regulations compel providers of commercial financing to speak messages that are false, misleading, and controversial. By compelling commercial speech that is neither factual nor uncontroversial, the Regulations violate the First Amendment."[5] SBFA claims that "By treating non-loan transactions (such as leases and sales transactions) and open-end credit like closed-end loans, the speech compelled by the Regulations is inaccurate and does not translate into meaningful disclosures regarding the costs and characteristics of the transactions governed by SB 1235."[6]

25. In order to help inform the trier of fact about the underlying subject of the challenged regulation and the product about whose required disclosures the plaintiffs are complaining, the Office of the California Attorney General has requested that I opine on:

    a. The nature of the small dollar commercial financing market (that is the market for commercial financings of $500,000 or less) and small dollar commercial financing borrowers;

    b. The nature and structure of merchant cash advances ("**MCAs**");

    c. The relationship between performance guaranties and personal guaranties in MCAs;

    d. The difficulty in determining whether a transaction is in fact a non-loan transaction;

    e. Whether the pre-regulation, voluntary disclosure of MCA terms was inherently likely to be confusing to many of the businesses that use them; and

    f. The importance of the Annual Percentage Rate ("**APR**") as a standardized measure of credit cost disclosure.

### IV.   SMALL DOLLAR COMMERCIAL FINANCING

26. The CFDL covers offers of commercial financing for $500,000 or less. Although such financings are large relative to many consumer obligations, they are of a size that would be considered "small dollar" commercial financing in comparison to financings for millions or even billions of dollars.

---

[3] SB 1235 (Sept. 30, 2018).
[4] Cal. Fin. Code § 22804.
[5] Complaint, ¶ 2.
[6] Complaint, ¶ 13.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

27. The federal Truth in Lending Act, the law that governs consumer credit cost disclosures, does not apply to business financing.[7]

28. The primary users of small dollar commercial financing are small businesses. Although small businesses are frequently incorporated, they are closely held, usually by an owner-operator who is the decision-maker for the business.

29. Because of their closely held nature, small businesses are often more akin to consumers in terms of their financial sophistication. A small business selling goods or non-financial services is unlikely to be any more expert in financial matters than a consumer; the small business's expertise is that of its owner-operator, that is of a consumer.

30. Small business financing is frequently underwritten based on the personal credit of the business owner and guaranteed by the business owner.[8] Accordingly, many of the same concerns about adequacy of cost of credit disclosure obtain for small businesses as for consumers.

31. The small dollar commercial financing market involves several different products, which compete with each other to some degree, although many financing providers offer more than one category of product.

32. Among the product classes are closed-end credit (term loans), open-end credit (lines of credit), and what is called sales-based financing (merchant cash advances and, less commonly, products expressly structured as loans with repayment keyed to the borrower's sales). Some small business financings are partially guaranteed by the U.S. Small Business Administration ("**SBA**").[9] (The SBA will also make direct loans in declared disaster areas.)

33. Different small business financing products are provided by different types of entities. Although non-bank finance companies provide all types of small business financing products, banks rarely offer sales-based financing and are generally considered to have more demanding underwriting standards than non-bank finance companies. SBA loans are made primarily, but not exclusively by banks.

## V.    MERCHANT CASH ADVANCES

34. The most common type of sales-based financing for small businesses is a product generally called a "merchant cash advance" or MCA. Unlike other types of financing, including invoice factoring, a MCA does not require the merchant to have any collateral in hand. Instead, it is structured as a purchase of the merchant's future sales, which are credited to the buyer periodically as a fixed percentage of the merchant's sales (or typically just a percentage of payment card receipts). If this formal structure is credited as being the true nature of the product—a major issue with MCAs—it removes MCAs from being treated as extensions of credit in many states. Accordingly, MCAs are not generally regulated as credit, meaning that they are not subject to usury laws and MCA providers are not subject to lender licensing requirements, at least by virtue of offering MCAs.

### A.  The Use of MCAs

35. MCAs are a product used exclusively or almost exclusively by small businesses. Only a small percentage of small businesses with non-owner employees apply for MCAs—just 7% according to a recent Federal Reserve System survey.[10] MCA financing tends to be for smaller amounts than bank loans, although

---

[7] 15 U.S.C. § 1603(1).

[8] *See, e.g.*, Dock Treece, *Personal Guaranties and Business Loans*, BUS. DAILY NEWS, Feb. 21, 2023, *at* https://www.businessnewsdaily.com/16467-personal-guarantee.html.

[9] The guaranty is up to 75% for loans over $150,000 and 85% for smaller loans. 15 U.S.C. § 636(a)(2).

[10] Fed. Reserve Sys., *Small Business Credit Survey, 2023 Report on Employer Firms*, 14, *at* https://www.fedsmallbusiness.org/-/media/project/smallbizcredittenant/fedsmallbusinesssite/fedsmallbusiness/files/2023/2023_sbcs-employer-firms.pdf.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

this might merely reflect the smaller size and weaker financial condition of businesses that apply for MCAs.[11]

36. MCAs are considered a high-cost financing product,[12] but they have certain attractions to small businesses. First, they are quicker to obtain than other forms of financing. Small businesses can apply on-line and get approved and funded within days, as opposed to months for a bank loan.

37. Second, MCAs are easier for small businesses with poor or limited credit histories to obtain than traditional forms of small business financing. A 2023 Federal Reserve Board survey of small business credit found that the approval rate for MCAs (90%) was higher than for any other common form of small business financing.[13]

38. Third, there are generally no restrictions on how the funding from an MCA can be used, unlike many other small business financing products.[14]

39. Fourth, some MCAs have a different payment structure than traditional loans. Although the periodic payment for some MCAs is a fixed dollar amount,[15] for others it is based on a percentage of the merchant's sales (typically just payment card transactions). For MCAs with a variable payment amount the small business's payment obligations rise and fall with its sales revenue stream, which can be attractive to merchants with seasonal sales (Christmas, summer, e.g.).[16] The flip side, however, with variable payment amounts is that there is uncertainty about precisely when the small business will manage to pay off the MCA; lower sales mean a longer payback period.

40. As one small business finance company that does not provide MCAs explains, "MCAs are typically used as a last resort for small, quick financing arrangements that can be repaid in a short amount of time."[17] In this regard, MCAs bear some similarities to high-cost, small-dollar consumer finance products like payday loans.

### B. The Structure of MCAs

41. MCAs are structured to give the small business a lump sum payment. This payment, sometimes known as the "advance amount," is what the DFPI regulations require to be disclosed as "Funding Provided."[18] The "payback amount" that the small business is then expected to repay is the advance amount multiplied by a "factor" plus certain fees.[19] The factor typically ranges from 1.1 to 1.5.[20] It is applied as a multiplier to the advance amount. For example, an advance amount of $100,000 with a multiplier of

---

[11] What Is Revenue-Based Financing? *Why It's Different*, at https://whatisrevenuebasedfinancing.com/why-its-different/ (last viewed Sept. 20, 2022, at 9:20am).

[12] Forward Financing, *Merchant Cash Advances vs. Business Loans — What's the Difference?*, Sept. 13, 2023, *at* https://www.forwardfinancing.com/2023/09/13/merchant-cash-advances-vs-business-loans-whats-the-difference/ (last viewed Sept. 20, 2022, at 9:09am) ("Typically, a traditional business loan – usually from a bank or a credit union – will be less costly than an MCA…"); Kapitus, *Financing Your Small Business With a Merchant Cash Advance*, at https://kapitus.com/wp-content/uploads/2019/11/MCA_eGuide.pdf (merchant cash advances can end up being a much more expensive borrowing option than other kinds of financing.").

[13] Fed. Reserve Sys., *Small Business Credit Survey, 2023 Report on Employer Firms*, 17, *at* https://www.fedsmallbusiness.org/-/media/project/smallbizcredittenant/fedsmallbusinesssite/fedsmallbusiness/files/2023/2023_sbcs-employer-firms.pdf.

[14] Rapid Finance, *Everything You Need to Know About A Merchant Cash Advance*, at https://www.rapidfinance.com/blog/everything-you-need-to-know-about-a-merchant-cash-advance/ (last viewed Sept. 20, 2022, at 9:11am).

[15] *See, e.g.*, SBFA 00629.

[16] *Id.*

[17] eCapital, *Invoice Factoring vs. Merchant Cash Advances: Choosing the Right Funding Solution*, at https://ecapital.com/blog/invoice-factoring-vs-merchant-cash-advances-choosing-the-right-funding-solution/ (last viewed Sept. 20, 2022, at 9:12am).

[18] Cal. Code Reg. title 10, § 914(a)(2)(A).

[19] *See, e.g.*, eCapital, *What Is MCA Factor Rate?*, at https://ecapital.com/financial-term/mca-factor-rate/ ((last viewed Sept. 20, 2022, at 9:12am).

[20] eCapital, *Invoice Factoring, supra* note 17. *See also* Jordan Stevens, *Comment, The Merchant Cash Advance Industry May Have a Few Bad Apples, But That Does Not Mean It's Time to Empty the Barrel*, 49 Tex. Tech L. Rev. 501, 515 (2017).

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

1.4 would mean that the payback amount would be $140,000. The payback amount will be the amount of the receivables that are supposedly purchased by the MCA provider. Thus, the MCA will appear to be a discounted purchase of receivables, rather than a markup of the funding amount, although the factor calculation is really a markup off the funding amount. Recognizing that MCAs are really markups of the funding amount underscores that the markup is just a charge for providing the financing.

42. In addition to the markup/discount, merchant cash advances often come with other fees: origination fees, underwriting fees, risk assessment fees, facility fees, wire fees, ACH fees, funding fees, administrative fees, etc.

43. The repayment of the payback amount is based on a holdback percentage (which goes by different names) of the merchant's credit card (or credit and debit card) sales. In some cases, this means that the periodic payment is simply the holdback percentage multiplied by the specified receivables. For example, a merchant might be required to remit 28% of its receipts every day.[21] In such instances, if the merchant's sales are up in a given period, the merchant will pay back more of the advance, and if they are lower, then the merchant will pay back less.

44. In other cases, however, the merchant is required to remit a fixed periodic amount. That fixed amount is derived from an application of a holdback percentage to estimated periodic income, but the mandatory payment does not vary with the merchant's sales.[22]

45. MCAs frequently take a security interest in various assets of the small business (not just the assets that are allegedly being purchased). They are also almost invariably guaranteed by the small business's owner, and the MCAs are underwritten based in part on the personal credit of the small business owner.[23] Indeed, some MCA providers refer to the small business *owner* as the client.[24]

46. Some MCAs have a reconciliation or "true-up" provision that enables an adjustment of the holdback percentage at the small business's request if it is finding the payments too onerous.[25] A true-up is merely a formalized mechanism for amending a contract.

47. Not all MCAs have true-ups,[26] and for those that do the true-up is not automatic and self-executing. Instead, it is an option that must be exercised by the small business, and there is considerable variation in what the small business must do to invoke a true-up. Even then, however, there is variation in whether the small business has a right to a true-up or whether the true-up is discretionary to the MCA provider. In some cases, the discretionary is express, but in other cases it is more subtle.

48. For example, a Forward Financing MCA, one of the exemplars produced by the SBFA, says that if there is a true-up request, "Provided that the information provided by the Customer supports the requested Adjusted Weekly Amount, Purchaser shall make the adjustment for a period of 14 days." Although the use of the word "shall" would make the true-up provision seem of right, not discretionary, it is all dependent on the Purchaser, Forward Financing, determining that the information provided supports the requested adjustment. In other words, granting the true-up is entirely discretionary to Forward Financing.

49. Similarly, a Kapitus LLC MCA, another of the exemplars produced by the SBFA states that if a true-up is requested, then "Upon verification of the Receipts generated by Seller, Servicer shall adjust the Specified Amount on a going-forward basis to more closely reflect the Seller's actual Receipts."[27] Again,

---

[21] SBFA 00097.

[22] *See, e.g.,* SBFA 00627.

[23] SBFA 00907 (use of personal credit reports by Kapitus); SBFA 01082; SBFA 01086-87 (Rapid Finance reviewing personal consumer report and credit score), 01091-92 (similar). *See also supra* note 8.

[24] SBFA 01082 (referring to "the business or the client").

[25] *See, e.g.,* SBFA 00629 (Kapitus MCA); SBFA 00030 (Forward Financing MCA).

[26] *See, e.g.,* SBFA 00097-00106 (Rapid Finance MCA) (holdback of 28% of daily receivables with no true-up provision).

[27] SBFA 00629.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

the word "shall" would seem to make the true-up provision one of right, not discretion, but the extent of the adjustment is left up to the discretion of Kapitus.

50. Critically, prior to the mandatory CFDL, the price disclosures in MCA contracts were not standardized in either substance or formatting among providers, and frequently used unique terminology, such as "factors" and "holdback percentages." This meant that it is extremely difficult for a small business owner to compare the costs of one MCA against another or to compare the costs of an MCA with the costs of other forms of credit. In order to do so, the merchant would have to determine (1) what charges for an MCA would be equivalent to finance charges, estimated the likely term of the advance, and use that information to calculate a standard financing cost comparison measure, namely the APR.

### C. Regulatory Concerns About MCAs

51. MCAs are a product with a troubled reputation, having been the target of enforcement actions by the FTC and New Jersey Attorney General in recent years, as well as substantial private litigation.[28] This is because of the high cost of MCA financing relative to other types of financing,[29] the difficulty in comparing MCA financing costs to those of other types of financings, and the concern that MCAs are merely disguised loans, structured so as to avoid licensing and usury statutes. In fact, as discussed in the following section, a number of federal and state courts have found certain MCAs to be nothing more that disguised loans,[30] and New York, Virginia, and Utah have all enacted MCA disclosure regulation in recent years.[31]

52. The SBFA conspicuously avoids using the term MCA in its pleadings, but it describes an MCA to a tee as a form of financing in which a provider "purchases a portion of a business's future receivables at a discount and collects those receivables as they are generated by the business."[32] That "sales-based financing" is generally synonymous with MCAs is clear from the website of Upscale Capital LLC, a MCA provider, which notes that "Commonly referred to as a merchant cash advance or an MCA, revenue-based financing is a merchant cash advance that technically doesn't count as a business loan."[33]

53. The term "Merchant Cash Advance" is also absent from any of the allegedly representative contracts of MCA members produced in this litigation. Yet a perusal of the websites of those SBFA members makes clear that the products that they label for CFDL purposes[34] as "Forward Purchase Agreement"[35] or as "Future Receivables Sales"[36] or "Future Receipts Sales Agreement,"[37] are merely MCAs. Kapitus publishes a guide on "Financing Your Business With a Merchant Cash Advance."[38] Forward Financing has an entire web page devoted to "Merchant Cash Advances Vs. Business Loans — What's the

---

[28] Michael A. Mora, *"I'm Ruined": Litigation Trend Takes Aim at Merchant Cash Advance Industry*, N.Y.L.J., Sept. 7, 2022; Jacob H. Nemon & Jeffrey S. Boxer, *Merchant Cash Advance Litigation Is Getting Wilder*, N.Y.L.J., July 2, 2021.

[29] *See, e.g.*, SBFA 00029 ("This financing may be more expensive than a traditional bank loan.").

[30] *See, e.g.*, Lateral Recovery LLC v. Capital Merchant Services, LLC, 2022 U.S. Dist. LEXIS 181044 (S.D.N.Y. Sep. 30, 2022); Fleetwood Services v. Ram Capital Funding LLC, *2022 U.S.* Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022), *aff'd*, Fleetwood Servs., LLC v. Richmond Capital Grp. LLC, 2023 U.S. App. LEXIS 14241 (2d Cir. 2023); CapCall, LLC v. Foster (*In re* Shoot The Moon, LLC), 635 B.R. 797, 816 (Bankr. D. Mont. 2021); Davis v. Richmond Capital Group LLC, 194 A.D.3d 516 (N.Y. App. Div. 1st Dept. 2021).

[31] N.Y. Fin. Serv. L. §§ 801-812; N.Y. Comp. Codes R. & Regs., tit. 23, part 600; Utah Code §§ 7-27-101 to 7-27-301; Va. Code tit. 6.2, ch. 22.1; 10 Va. Admin. Code §§ 5-240-10 to 5-240-40.

[32] Complaint at ¶ 9(i).

[33] UpScale Capital, *Revenue Based Financing*, *at* https://upscalecapital.com/business-loan-type/revenue-based-financing/ (last viewed Sept. 20, 2022, at 9:11am).

[34] The CFDL requires a one-to-five-word description of the product offered. The CFDL regulations actually illustrate this with "Merchant Cash Advance," Cal. Code Reg. title 10, § 901(a)(1), a term the SBFA's members eschew on their contracts…but not on their websites.

[35] SBFA 00627 (Kapitus), SBFA 00838 (Kapitus), SBFA 00860 (Kapitus).

[36] SBFA 00097 (Rapid Finance).

[37] SBFA 0028 (Forward Financing).

[38] Kapitus, *Financing Your Business with a Merchant Cash Advance, at* https://kapitus.com/guide/financing-your-business-with-a-merchant-cash-advance/ (last viewed Sept. 20, 2022, at 9:09am).

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

Difference?"[39] And Rapid Finance lists "Merchant Cash Advances" among its "Financing Solutions," and refers to "our merchant cash advance."[40]

54. Although the SBFA eschews the use of the term MCA for this Litigation, it is important to recognize that MCAs are a product that the DFPI was concerned about when promulgating its regulations under the CFDL.[41] and that the

### D.  MCAs Are Frequently Just Disguised Loans

55. Although the legal characterization of any particular MCA is not directly at issue in this Litigation, it is important to recognize that the legal characterization of MCAs—whether as sales or loans—has significant consequences for MCA providers. If MCAs are in fact loans, then they fit into the well-established credit cost paradigm pioneered by the federal Truth in Lending Act, to which the CFDL largely adheres.[42] Put another way, the concern that MCAs are often in fact disguised loans is a factor urging the application of loan-type disclosures to MCAs, such that irrespective of whether any particular MCA is in fact a loan, small businesses will receive the same type of disclosures.

56. The idea that a sale could be a loan is not intuitive at first glance, but jurisprudence has historically treated a discounted sale of a payment obligation made with recourse against the seller as a loan.[43] Historically, a common transaction was the discounted sale of a note with recourse against the seller. Frequently, this was done through sale by indorsement—the practice of the seller of the note signing his name on the back (Latin: *in dorso*) of the note prior to delivering it to the buyer. Indorsement would make the seller co-liable on the note in its face amount, as it does under Article 3 the current Uniform Commercial Code,[44] meaning that if the transaction was not really a sale at a discount, but a loan in which the discounted amount was the finance charge that for which the indorser was liable.

57. Thus, if the seller indorsed a note from obligor due in one year with a face amount of $120 and a 0% interest rate for $100 (with the discount reflecting repayment risk), it is equivalent to the buyer making a $100 loan to the seller at 20% annual simple interest. In either case, the buyer would have parted with $100 and would have a right to collect $120 in a year, from either the obligor or the seller. Thus,

---

[39] Forward Financing, *Merchant Cash Advances vs. Business Loans*, *supra*, note 12.

[40] Rapid Finance, https://www.rapidfinance.com/financing-solutions/merchant-cash-advance/ (last viewed Sept. 20, 2022, at 9:09am).

[41] *See*, Cal. Code Reg. title 10, § 901(a)(1) (using "Merchant Cash Advance" as an illustration).

[42] The SBFA has alleged that the CFDL parts ways with TILA because it treats the discount on a putative "sale" of future receivables as a finance charge and also includes broker fees in the finance charge. Complaint, ¶ 53. This is incorrect. TILA defines "finance charge" as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction." 15 U.S.C. § 1605(a). The TILA definition goes on to give some examples of things that are or are not finance charges. It never specifically addresses discounts, but it has been well-established in Anglo-American law for centuries that a discount can be equivalent to a loan, with an implicit interest rate. For example, the National Bank Act and the Federal Deposit Insurance Act both treat discounts as equivalent to loans, 12 U.S.C. §§ 85, 1831d, as have various judicial rulings, including from the Supreme Court of the United States. *See infra* note 45. Likewise, TILA does not address brokers' fees *in general*, which would be covered by the general rule about whether it is a charge that is incident to the extension of credit. TILA's illustrative inclusion of borrower-paid mortgage-broker fees being a finance charge does not create a negative implication that other broker fees would not be finance charges. The likely reason for the mortgage-broker-specific illustration is that broker fees are uncommon in other types of consumer finance transactions.

[43] Adam J. Levitin, *Spurious Pedigree of the "Valid-When-Made" Doctrine*, 71 DUKE L.J. ONLINE 87, 97 (2022) (explaining how a discounted sale of a receivable, with recourse to the seller has historically been considered a loan). California courts have declined to treat as loans traditional factoring contracts—sales of existing  (as opposed to future) receivables—that are made *without* recourse beyond the receivables purchased. West Pico Furniture Co. v. Pac. Fin. Loans (West Pico), 2 Cal.3d 594, 601-606 (1970).

[44] UCC §§ 3-204, 3-415.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

when a note is sold at a discount from its face amount, the discount can be treated as imputed prepaid interest.[45]

58. The idea that a discounted sale can be equivalent to a loan is reflected in the current federal usury statutes for national banks and FDIC-insured state-chartered banks, both of which expressly cover loans and discounted sales of receivables.[46] So too do many state usury laws, and the idea is preserved in the terminology of bank borrowing from the Federal Reserve System's "discount window," where the Federal Reserve System makes loans in the form of a discounted purchase with recourse of obligations owed to a bank.

59. The argument that an MCA is in fact just a disguised loan is because, *inter alia*,[47] MCAs are commonly made with a guaranty from the owner of the small business, and that guaranty functions as recourse on the discounted sale. Thus, although the American Factoring Association and the International Factoring Association criticized the DFPI's proposed rule for not distinguishing between sales with recourse and sales without recourse,[48] it is precisely this issue of recourse—not to the small business, but to its owner-guarantor—that is central to whether an MCA is in fact a disguised loan. If the MCA is made with recourse, it is no longer merely a discounted sale of an asset, but an advance of funds with a requirement to repay with a finance charge.

60. The question, then, is whether MCAs give the provider recourse beyond the actual receivables purchased. They often do, in three ways.

    *a. Recourse Against Collateral Exceeding the Receivables*

61. First, MCAs frequently contain a security interest in certain assets of the small business and the guarantor that exceeds the scope of the receivables allegedly "purchased."[49] Indeed, the security interest is frequently a blanket lien on virtually all assets of the small business.

    *b. Recourse Against the Small Business Generally Through Warranties*

62. The second way MCAs often provide recourse beyond the actual receivables purchased is through general recourse against the small business by virtue of the operation of the warranties made within the contract.[50]

63. For example, one of the paradigm MCA contracts produced by the SBFA, that of Kapitus LLC, for a "forward purchase agreement (fixed)."[51] In the Kapitus MCA, the small business warrants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized

---

[45] *See, e.g.*, Nat'l Bank v. Johnson, 104 U.S. 271, 276–77 (1881); Evans v. Nat'l Bank of Savannah, 251 U.S. 108, 114 (1919). *See also* Daniel v. First Nat'l Bank of Birmingham, 227 F.2d 353, 355–56 (5th Cir. 1955) (addressing whether a discount was usurious), *reh'g denied with opinion*, 228 F.2d 803 (5th Cir. 1956).

[46] 12 U.S.C. §§ 85, 1831d(a).

[47] Evidence in other litigation has shown that MCA providers themselves will internally refer to MCAs as loans and will take collateral that far exceeds the scope of the purchased receivables. *See, e.g.*, CapCall, LLC v. Foster (*In re* Shoot The Moon, LLC), 635 B.R. at 806, 815-16 (Bankr. D. Mont. 2021). *See also* eCapital, *What Is Merchant Cash Advance (MCA) or MCA Loan? At* https://ecapital.com/financial-term/merchant-cash-advance-mca-or-mca-loan/, (last viewed Sept. 20, 2022, at 9:18am), (referring to a "merchant cash advance loan").

[48] American Factoring Association and International Factoring Association, Comment on Proposed Rulemaking/Commercial Financing Disclosure Regulations (PRO 01- 18), Nov. 22, 2021, *at* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/12/American-Factoring-Association-11.22.pdf.

[49] *See, e.g.*, SBFA 00101 (security interest springing automatically upon breach of representation or warranty and covering all inventory and deposit accounts, *inter alia*) SBFA 00640-00642 (security interest covering all inventory and goods, *inter alia*).

[50] There are no judicial decisions interpreting these contract terms because any disputes would be resolved in arbitration. There is no evidence in the discovery record of which I am aware regarding how MCA providers have interpreted this contractual provision. Nevertheless, MCA providers would be incentivized to claim (other than for purposes of the instant Litigation) that the warranties are triggered because it is advantageous to them.

[51] SBFA 00627-00648. Identical terms relating to the guaranty appear in other Kapitus MCAs. *See* SBFA 00838-00859; SBFA 00860-00881.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

and/operates,"[52] that it has "all necessary permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged,"[53] and that the business "is currently in compliance with all federal state and local tax law, ha[s] filed all return[s] and ha[s] paid all taxes due…"[54] These provisions preclude the business from simply ceasing to operate, for if an incorporated business simply ceased to operate, it would not have revenue to pay its franchise taxes, which would result in administrative dissolution by the Secretary of State and the Franchise Tax Board. If the business were to cease operating, the warranties of good standing and tax compliance would be violated.

64.  Likewise, the small business "warrants that it does not anticipate filing any such [state law] receivership or bankruptcy petition."[55] This is a warranty, meaning a promise of a future state of the world, rather than a representation of the present state of the world. If the small business were in the future to file for bankruptcy, it would have, at some point before actually doing so have anticipated doing so. Accordingly, it would have violated its warranty about not anticipating filing for bankruptcy.

65.  Similarly, the small business warrants that it will not divert funds.[56] If before filing for bankruptcy, the small business used its receipts to pay utilities or employees, it would also be a breach of the warranty of no diversion of funds.

66.  The small business also warrants the maintenance of insurance or of bank accounts.[57] If the small business has no revenue, it will not be able to maintain insurance policies or a bank account and will be in breach of these warranties.

67.  The Kapitus MCA additionally provides that the small business "shall not…effectuate the suspension…of Seller's business without the express prior written consent of" Kapitus.[58]

68.  A violation of any of these warranties would be an Event of Default under the Kapitus MCA,[59] which would mean that the "full uncollected Purchased Amount and any unpaid fees due shall become due and payable in full immediately"[60] and that Kapitus would be able to exercise its self-help right to foreclose on the small business's assets by virtue of its security interest.[61]

69.  The warranties in the MCAs of Rapid Finance and Forward Financing operate similarly to those in the Kapitus MCA.[62]

---

[52] SBFA 00635 (§ 2.13).

[53] SBFA 00634 (§2.2).

[54] SBFA 00634 (§ 2.5).

[55] SBFA 00634 (§ 2.9).

[56] SBFA 00634 (§ 2.6(iv)-(v)).

[57] SBFA 00634 (§§ 2.4, 2.6).

[58] *See, e.g.*, SBFA 00635 (§ 2.15). *See also* SBFA 00101 (§ 7(xvii)) ("Merchant will conduct its business consistent with past practice…").

[59] SBFA 00635 (§ 3.1(a), (b), (c), (g), (l)).

[60] SBFA 00635 (§ 3.2).

[61] *Id.* The presence of a security interest in various assets of the small business and the owner ensures that the MCA provider can exercise self-help remedies, depriving the business and the owner of their financial ability to contest the interpretation of the MCA. In many states (although not California) these self-help remedies are bolstered by a confession of judgment.

[62] SBFA 00101 (representations and warranties, including of maintenance of insurance, licenses, and taxes, and continuation of past business practices), 00104 (liquidated damages of amount sold less amount received by MCA provider; SBFA 00031-32 (representations and warranties including all necessary business licenses and taxes paid, and presumption that if there is a bankruptcy filing or goes out of business that representations were materially untrue), 00034 (liquidated damages as amount outstanding on MCA).

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

### c.   *Recourse Against the Owner-Guarantor Through Warranties*

70. The third way MCAs often provide recourse beyond the actual receivables purchased is through general recourse against the small business's owner-guarantor by virtue of the operation of the warranties made within the contract..

71. A personal guaranty by the small business's owner is standard in MCA contracts. The stated scope of the guaranty varies considerably, however. Some MCA providers—such as the ones the SBFA has featured in this Litigation—only have guaranties of performance of specified representations and warranties,[63] while others (whom the SBFA has understandably not wanted to highlight) have guaranties of repayment of the amount advanced.[64] The supposed guaranties of performance of representations and warranties, however, actually operate to create recourse against the small business owner.[65]

72. Consider, for example, the same Kapitus MCA discussed above.[66] The Kapitus MCA includes an unconditional guaranty of "all of the representations, warranties, covenants made by" the small business.[67] It also states that the guarantor "is not making an absolute guaranty of repayment," and "only guaranteeing that they will not take any action or permit the Seller to take any action that is a breach of the Transaction Documents."[68]

73. As the previous section has explained, however, the failure of the small business to make payments on the MCA would invariably result in a violation of warranties. Thus, the guaranty will not be triggered by virtue of non-payment *per se*, but by virtue of violation of the warranties that will be violated if the small business cannot or chooses not to pay. And because of the acceleration of the entire obligation upon an Event of Default, upon the breach of a warranty, the guarantor would be liable for the entire outstanding balance on the MCA.

74. Thus, there is for all practical purposes recourse against the guarantor on the obligation of payment under the MCAs; the guaranty is effectively a guaranty of payment.  That such a functional guaranty of payment exists is hardly surprising given that Kapitus underwrites its MCAs based in part on the personal credit reports of the small business owner.[69]

75. Thus, if the small business filed for bankruptcy because it could not pay the fixed amounts due on the MCA, Kapitus would have recourse against both the small business and its owner-guarantor for the full amount outstanding on the MCA. In short, there functionally is an obligation to repay the MCA, irrespective of business performance. Given that the Kapitus MCA has fixed payments and a discretionary true-up provision, the MCA operates like a traditional closed-end installment loan.

76. The guaranties in the MCAs of Rapid Finance and Forward Financing operate similarly to that in the Kapitus MCA.[70]

---

[63] *See, e.g.*, SBFA 00629, SBFA 00643, SBFA 00105.

[64] *See* CapCall, LLC v. Foster (*In re* Shoot The Moon, LLC), 635 B.R. at 816 (Bankr. D. Mont. 2021) (noting "an absolute, primary, and continuing guaranty of ***payment and performance***") (emphasis original). *See also id.* at 816 n.54 (noting that the difference between a guaranty of payment and of performance "is a distinction without a difference insofar as the personal guaranty of "performance" of an "obligation" to pay money…is functionally a payment guaranty…")

[65] The precise wording of warranties varies among MCA, but the basic operational scheme to create effective recourse against the small business and the guarantor is the same.

[66] SBFA 00627-00648. Identical terms relating to the guaranty appear in other Kapitus MCAs. *See* SBFA 00838-00859; SBFA 00860-00881.

[67] SBFA 00643.

[68] *Id.*

[69] SBFA 00907.

[70] SBFA 00105 (guaranty); SBFA 00030-31 (guaranty).

     *d.   Repayment Obligations on MCAs Are Not Really Contingent Upon Generation of Future Receivables*

77. Although MCA contracts are written to appear to make the MCA provider assume the risk that the small business will not generate future receivables. Often this is not, in fact, how they actually operate.

78. First, many MCAs, such as the Kapitus MCA discussed above, have periodic payments of fixed dollar amounts, rather than ones that vary in dollar amount, but represent a percentage of periodic receipts. The obligation to make fixed dollar payments, rather than ones that vary with sales means that the MCA provider is not assuming the risk of the business's future performance, especially when it has a security interest in the business's current assets.

79. Second, MCA contracts generally prohibit the small business from ceasing to operate without the MCA provider's consent. The Kapitus MCA, for example, provides that the small business "shall not…effectuate the suspension…of Seller's business without the express prior written consent of" Kapitus.[71] If the small business stops operating for reasons other than *force majeure*, it is an Event of Default, which would accelerate the outstanding balance on the MCA and trigger the owner-guaranty.[72]

80. Even if there is a *force majeure* event, the MCA provider does not assume the risk of non-payment. MCA contracts also frequently require the small business to obtain business interruption insurance, with the MCA provider as the loss payee.[73] Business interruption insurance typically covers interruptions caused by specified perils, like fire, wind, water, falling objects, and lightning.[74] This means that the MCA provider does not incur the risk of non-payment because of business interruption from the covered perils.

81. MCA providers claim that there is only a payment obligation to the extent that there is revenue,[75] so long as no representations, warranties, or covenants have been breached. The unavoidable fact, however, is that a business without revenue cannot pay for insurance and taxes, and failure to do so violates warranties, accelerating the MCA balance and triggering the guaranty from the owner. The small business will be liable itself in such instances, and there will also be recourse against the owner. Failure to generate revenue ineluctably means a violation of warranties that can only be performed if there is adequate revenue. In short, the MCA provider frequently does not actually assume the risk of the business failing to generate future receivables because there is recourse against the small business and its owner-guarantor both generally and in the specific assets pledged as collateral that exceed the receivables "sold."

## VI.   THE DIFFICULTY IN DETERMINING IF A TRANSACTION IS ACTUALLY A NON-LOAN TRANSACTION

82. SBFA claims that "By treating non-loan transactions (such as leases and sales transactions) and open-end credit like closed-end loans, the speech compelled by the Regulations is inaccurate and does not

---

[71] *See, e.g.*, SBFA 00635 (§ 2.15). *See also* SBFA 00101 (§ 7(xvii)) ("Merchant will conduct its business consistent with past practice…").

[72] SBFA 00635 (§ 3.1(c)).

[73] *See, e.g.*, SBFA 00634 (§ 2.4) ("Seller will maintain property, liability, and business interruption insurance and name Purchaser as certificate holder, loss payee, and additional insured in amounts and against risks as are satisfactory the Purchaser").

[74] Cal. Dept. of Ins., *FAQ on business interruption insurance and other issues affecting California small businesses*, at https://www.insurance.ca.gov/01-consumers/140-catastrophes/FAQ-on-Business-Interruption-Insurance.cfm.

[75] *See, e.g.*, SBFA 00031 ("The parties agree that provided that the Customer has not violated any of the representations, warranties or covenants in this Agreement, it shall not be a breach of this Agreement if the Customer generates no further Future Receipts and therefore has no funds to remit the Amount Sold."); SBFA 00034 ("if Customer's business slows down and Customer's Future Receipts decrease or Customer closes its business and Customer has not violated any of the representations, warranties or covenants in this Agreement, there shall be no default or breach of this Agreement.").

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

translate into meaningful disclosures regarding the costs and characteristics of the transactions governed by SB 1235."[76]

83. The SBFA's position, however, is dependent on being able to distinguish between loan and non-loan transactions. In fact, it can often be quite difficult to do so, and financiers have every incentive to claim that their transactions are not in fact loans, even if they are.

84. Leases are notoriously difficult to distinguish from loans. The mere fact that a transaction is called a lease is not dispositive. Instead, the Uniform Commercial Code provides that "Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case."[77] The UCC goes on to state that "a transaction in the form of a lease creates a security interest" in certain circumstances and that it does not in others, but the circumstances it describes do not cover all possible lease arrangements, leaving little guidance in those instances.

85. As for sales, as discussed above, a sale at a discount with recourse is economically equivalent to a loan and has, historically, been treated as a loan for purposes of usury law. As discussed above, transactions can be cleverly constructed to appear not to have recourse, but in fact to have its functional equivalent. For example, the Kapitus MCA that the SBFA uses as an exemplar can be easily recharacterized as a closed-end loan.[78] It is for a definite amount, has periodic payments of a fixed dollar amount (and, therefore, a knowable maturity date), has a finance charge (the discount), and has a true-up provision for amending the contract that is discretionary to Kapitus. The warranties operate to create full recourse against the borrower as well as the owner-guarantor in the event the business stops operating or files for bankruptcy including because it cannot handle the fixed payments. Economically, the Kapitus MCA cannot be distinguished from a loan.[79] Nevertheless, it still purports to be a sale of future receivables, and a determination of the proper characterization would require litigation.

86. Given the lack of clarity over whether any particular transaction is a loan or not (be it lease or sale), and the ability of the lender to control the features of the transaction, it is easy for a lender to disguise a loan as a lease or sale. Lenders are generally motivated to disguise their loans as leases or sale because doing so enables them to avoid usury, licensing, and credit cost disclosure requirements.

87. In California, masking commercial loans as leases or sales would enable a lender to avoid the licensing requirements of the California Finance Law. If the DFPI regulations under the CFDL were to treat financings undertaken in the form of leases and sales differently than closed-end loans, it would be an invitation for lenders to evade credit cost disclosure—and thereby defeat price competition from comparison shopping—by pretending that loans were actually leases or sales.

88. Subjecting financing transactions that are nominally leases and sales to similar (although not identical) disclosures as closed-end loans is a reasonable approach for disincentivizing disclosure evasion through transaction structuring. This approach avoids the DFPI having to potentially litigate the application of commercial credit disclosures for any particular MCA.

## VII.  THE CONFUSING NATURE OF VOLUNTARY DISCLOSURE OF MCA TERMS PRIOR TO THE DFPI REGULATIONS UNDER THE CFDL

89. Prior to the DFPI regulations, voluntary disclosure of MCA terms was inherently likely to be confusing to many small businesses. My opinions here are confined to whether the disclosure of MCA terms was objectively confusing. I do not express any opinion about whether any particular MCA user finds the

---

[76] Complaint, ¶ 13.
[77] UCC § 1-203(a).
[78] SBFA 00627-00648.
[79] Cal. Civ. Code § 1912 defines a "loan of money" as "a contract by which one delivers a sum of money to another, and the latter agrees to return at a future time a sum equivalent to that which he borrowed."

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

terms of any particular MCA confusing, but instead base my opinions on my knowledge of what the field of consumer finance understands about consumer comprehension of financing contracts.

90. It bears emphasis that although MCAs are business financing products, they are marketed to small businesses that tend to be owner-operated and that are unlikely to have any special expertise in financing. Instead, the small business owner's experience with financing is likely limited to his or her own experience as a consumer, and the level of financial sophistication among small business owners is simply that of consumers.

91. Additionally, MCAs are expressly marketed to small businesses that have poor or limited credit histories and that need funds fast. These are borrowers that are likely to either have been rejected for credit elsewhere or to anticipate rejection and therefore are less likely to shop around for the best offer possible once they receive a financing offer. This means that they are unlikely to carefully scrutinize MCA terms—they are simply pleased to have an offer of financing.

92. Disclosures have two separate, but related functions. One is to make clear the terms of a contract. In particular, summary financing disclosure information is to provide a quick and easy way for a borrower to understand the key economic terms of the financing so that the borrower can decide if, on a stand-alone basis, he or she wishes to enter into the financing agreement. Use of unique terminology, use of terminology or layouts that mimic other types of disclosures, or lack of provision of information can all render a disclosure confusing from a stand-alone evaluation standpoint.

93. The second function of disclosure is to enable comparison shopping among products. Comparison shopping greatly depends on having standardized disclosures of information: the content, the terminology, and the layout. Any significant deviation in standardization imposes additional search costs on consumers and can render a disclosure confusing from a comparison-shopping standpoint.

94. Pre-CFDL disclosures of MCA terms in California were confusing from both a stand-alone and comparison-shopping standpoint.

95. Prior to the DFPI regulations, there was no standardization of the disclosure of MCA terms in California. Different MCA providers used different terminology, used different disclosure formats, and disclosed different information. This alone rendered MCA disclosures confusing and frustrated apples-to-apples price comparisons.

96. MCAs that are not subject to the CFDL do not disclose an APR. Instead, they tend to disclose the amount of receivables purchased and a purchase price, some sort of periodic payment amount (either estimated or fixed), and the percentage of receivables purchased.

97. Below, as an example, is an MCA from LG Funding, LLC, dated April 12, 2022, available on the United States Securities and Exchange Commission's website.[80] The five rows below are the summary pricing information shown prior to the "Terms and Conditions" of the MCA.

| | |
|---|---|
| *Purchase Price*<br>This is the amount being paid to Merchant(s) for the Receivables Purchased Amount defined below . | $ 205,000.00 |
| *Receivables Purchased Amount*<br>This is the amount of Receivables defined in Section 1 below being sold. | $ 287,000.00 |
| *Specified Percentage*<br>This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is aid in full. | 25% |
| *Net Funds Provided*<br>This is the net amount being paid to or on behalf of Merchant(s) after deduction of<br>applicable fees listed in Section 2 below. | $ 200,850.00 |
| *Initial Estimated Payment*<br>This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below. | $ 1,430.00<br>Per Day |

98. Nowhere in the LG Funding MCA is there an APR disclosed. Instead, there is a percentage disclosed, but it is the "Specified Percentage," meaning the percentage of receivables that are to be paid to LG

---

[80] LG Funding LLC, Standard Merchant Cash Advance Agreement, dated April 12, 2022, *at* https://www.sec.gov/Archives/edgar/data/895665/000149315222010141/ex10-52.htm.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

Funding until the MCA is repaid. A similar use of "Specified Percentage" can be seen in some of the paradigm MCAs submitted by the SBFA.[81]

99. The disclosure of the "Specified Percentage," but not the APR, is confusing for two reasons.

100. First, the presence of a single percentage rate that is not the APR on a financing disclosure is inherently confusing because small business owners—who are consumers first and foremost— are used to seeing the APR as the emphasized percentage rate disclosed in a financing agreement. They would reasonably assume that if a single percentage rate is disclosed that it is the APR, and even if they were to read carefully about what the "Specified Percentage" is, they would still be anchored to the idea of the rate being the APR.

101. Second, the lack of an APR disclosure means that a small business cannot compare the costs of the MCA on an apples-to-apples basis to other MCAs (which might use their own disclosure terminology and layout), much less to non-MCA financing products.

102. The inability for small businesses to engage in effective comparison shopping frustrates price competition and enables MCA providers to charge higher rates than they could in an environment where comparison shopping is easy.

103. Below is a MCA agreement from Knight Capital Funding, dated August 8, 2019.[82] Although it contains similar information to that of the LG Funding MCA, there are some important differences:

   a. Layout. The Knight Capital Funding MCA uses a TILA-disclosure type four box tabular layout instead of the row-based disclosures form LG Funding MCA.

   b. Different terminology. The Knight Capital Funding MCA uses the term "Purchased Percentage" instead of the "Specified Percentage" used in the LG Funding MCA. Contrast this with the term "Split Percentage" that the SBFA uses in its complaint and the "Monthly Percentage" used by Forward Financing.[83]

   c. Content. The Knight Capital Funding MCA lacks a of disclosure of the total funds actually provided (meaning the purchase price net of fees).



**Knight Capital Funding**

**FUTURE RECEIVABLES SALE AGREEMENT**

This **FUTURE RECEIVABLES SALE AGREEMENT** ("Agreement") dated 08/08/2019 ("Effective Date"), is made by and between the undersigned Knight Capital entity ("Purchaser"), and
ABCO SOLAR, INC.                                                                                              ("Merchant").

| Purchase Price: | Amount Sold: | Purchased Percentage: | Dollar Amount of Purchased Percentage: |
|---|---|---|---|
| (The dollar amount Purchaser is paying for the Amount Sold.) | (The amount of Future Receivables being sold by Merchant.) | (The percentage of daily Future Receivables that Merchant agrees to remit to Purchaser.) | (This amount represents the daily dollar amount of the Purchased Percentage based upon the financial information Merchant provided to Purchaser.) |
| $105,000.00 | $144,900.00 | 12.09% | $823.30 |

104. The use of non-standardized terminology, content, and layout, as illustrated by these two MCAs, was the situation that obtained in California prior to the DFPI regulations. Such non-standardized

---

[81] SBFA 00838 (pre-CFDL documentation), SBFA 00861 (pre-CFDL documentation).

[82] Knight Capital Funding, Future Receivables Sale Agreement, dated August, 8, 2019, *at* https://www.sec.gov/Archives/edgar/data/1300938/000118518519001167/ex_155737.htm.

[83] SBFA 00028.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

disclosures are inherently confusing because a consumer cannot readily tell if they are all disclosing the same information.

105.    The confusing nature of pre-DFPI regulation disclosures can still be seen in the additional information provided to small businesses about MCAs. DFPI regulations require a cover sheet that discloses particular information, but the regulations do not govern what else is disclosed. Thus, the information currently disclosed voluntarily by MCA providers in California gives a sense what disclosures would be like without the DFPI-mandated cover sheet.

106.    Rapid Finance, for example, has, on the first page of its Future Receivables Sale Agreement, underneath the DFPI-required cover sheet, a four-box tabular structure.[84] Three of the boxes contain dollar figures, and the fourth a percentage rate. One of the boxes says "Amount Sold" and another the "Discount Charge". The top of the sheet is depicted below.

107.    The Rapid Finance Future Receivables Sale Agreement closely mimics the appearance of the Consumer Financial Protection Bureau's Loan Model Form H-2, a model TILA disclosure form. Form H-2 also has a four-box tabular structure, with three boxes containing dollar figures and one containing a percentage rate. One of its boxes says "Amount Financed" and "another the "Finance Charge". Form H-2 is depicted below.

108.    Form H-2 and variations thereon are familiar to most consumers because lenders generally use it because use of the form creates a safe harbor for TILA compliance.[85]

---

[84] SBFA 00100.
[85] 15 U.S.C. § 1604(b).

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

109.     The boxes on Rapid Finance MCA disclose substantively different information than Form H-2, however, and a small business owner could readily be confused by this sort of voluntary disclosure. The layout of the disclosures is confusingly similar because of the following elements:

    a.   The four-box tabular structure;

    b.   The presence of one box showing a percentage rate;

    c.   The presence of a box with a label that starts with "Amount"; and

    d.   The presence of a box with a label that ends with "Charge".

110.     A reasonable small business owner could reasonably—if mistakenly—believe that the Rapid Finance disclosure was disclosing the same information as a usual Form H-2 disclosure. In particular, a reasonable small business owner could reasonably mistake the "Daily Percentage" in the Rapid Finance disclosure for the APR because that is the only percentage rate that would be shown in the four-box structure on Form H-2.

111.     The DFPI regulations were responding to a situation in which small businesses were confronted with inherently confusing, non-standardized cost disclosures.

## VIII.   THE IMPORTANCE OF THE ANNUAL PERCENTAGE RATE (APR) AS A STANDARDIZED MEASURE OF CREDIT COST DISCLOSURE

### A.   *The Function of the Annual Percentage Rate*

112.     Among the SBFA's objections to the DFPI's regulations under the CFDL is an objection to the mandatory disclosure of the Estimated Annual Percentage Rate (the "**Estimated APR**").

113.   The concept of the Estimated APR is based on the Annual Percentage Rate or APR prescribed by the federal Truth in Lending Act ("**TILA**"), which governs consumer credit cost disclosures. The policy basis behind TILA's disclosure regime is explained by a Congressional finding that:

> economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit….[86]

114.   The APR—an annualized measure of the cost of credit[87]— is the centerpiece of the TILA disclosure regime. The APR facilitates the credit cost comparison that Congress believed was so vital by providing a common denominator for expressing the all-in costs of credit—the total finance charges—*relative to the amount of funds loaned and for how long* through an annual rate. As the Consumer Financial Protection Bureau has explained "The APR, or annual percentage rate, is the standard way to compare how much loans cost. It lets you compare the cost of loan products on an "apples-to-apples" basis."[88]

115.     The APR is calculated based on the finance charge. Finance charges are:

---

[86] 15 U.S.C. § 1601(a)

[87] *See* 12 C.F.R. § 1026.14(a)(1) ("The annual percentage rate is a measure of the cost of credit, expressed as a yearly rate.").

[88] CFPB, *My payday lender said my loan would cost 15 percent but my loan documents say the annual percentage rate (APR) is almost 400 percent. What is an APR on a payday loan and how should I use it?*, Jan. 17, 2022, *at* https://www.consumerfinance.gov/ask-cfpb/my-payday-lender-said-my-loan-would-cost-15-percent-but-my-loan-documents-say-the-annual-percentage-rate-apr-is-almost-400-percent-what-is-an-apr-on-a-payday-loan-and-how-should-i-use-it-en-1625/.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.[89]

116. Interest is always a finance charge,[90] but the finance charge for an extension of credit can include other items, such as certain fees. For example, the finance charges that included in the calculation of the APR include loan origination fees and fees for obtaining credit reports.[91] This means that even if there is no interest rate, but there are fees, the APR will not be zero, and if there is both interest and non-interest finance charges, the APR will not correspond to the annualized interest rate.

117. The calculation of the APR under TILA varies depending on the type of extension of credit. The APR is calculated differently for closed-end credit (credit with a finite due date, such as a home mortgage) and open-end credit (credit without a finite due date, such as lines of credit).[92]

118. For closed-end credit the APR is "a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made."[93] Calculation of the closed-end APR is mathematically complex if a loan has installment payments, and even more so if it has compounded interest,[94] and is often performed using a free on-line tool provided by the federal government.[95] Calculation of the APR for closed-end credit accounts for all finance charges, including both periodic rates and fees.

119. For open-end credit, the APR is "a measure of the cost of credit, expressed as a yearly rate."[96] The calculation of the APR for open-end credit under TILA ignores finance charges other than the periodic rate, which is annualized into an APR by multiplying it by the number of periods in a year.[97]

120. Critically, the APR is not the "price" of credit; borrowers do not pay the APR. Instead, APR is a metric of how expensive it would be to carry the financing for a full year. Because the APR is an annualized percentage rate, its calculation necessarily includes an annualization factor. The annualization is what makes the APR a useful tool for comparing the costs of financings. Without the annualization, costs would be presented on an apples-to-oranges basis because of different lengths of credit extensions, frustrating the comparison shopping that is necessary for efficient markets and borrower protection.

121. Consider, for example, an illustration from the Senate Committee on Banking and Financial Institution's (April 9, 2018) analysis of SB 1235:

> For example, compare the following three loans, all of which carry the same simple interest rate of 15% and are repaid via monthly payments of equal amounts. The total dollar cost of all three loans is the same ($15), but the APRs vary significantly. Because APR treats all loans as if they were one year in length (i.e., it annualizes them), a three-month loan appears more expensive than a one-year loan looking only at APR.

---

[89] 12 C.F.R. 1026.4(a).
[90] 15 U.S.C. 1605(a)(1).
[91] 15 U.S.C. § 1605; 12 C.F.R. § 1026.4(a).
[92] 15 U.S.C. § 1606(a)(1)-(2).
[93] 12 C.F.R. § 1026.22(a)(1).
[94] 12 C.F.R. § 1026, App. J (mathematical calculation of the APR for closed-end credit).
[95] https://www.ffiec.gov/exam tools/FFIEC-Calculators/APR/#/accountdata
[96] 12 C.F.R. § 1026.14(a)(1).
[97] 12 C.F.R. § 1026.14(b). The use of "spurious" open-end credit—that is transactions that purport to be open-end credit and thereby avoid disclosure of non-interest finance charges in the APR—even though the products actually function as closed-end credit has been a consistent policy concern in APR disclosures. *See* NAT'L CONS. L. CENTER, *TRUTH IN LENDING*, § 6.2.3 (11th ed. 2023).

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

> Loan 1: $100 loan carrying a 15% simple interest rate, due in three months, repayable via three monthly payments of equal amounts. No fees. Total dollar cost of the loan = $15. APR = 87%
>
> Loan 2: $100 loan carrying a 15% simple interest rate, due in six months, repayable via six monthly payments of equal amounts. No fees. Total dollar cost of the loan = $15. APR = 49%.
>
> Loan 3: $100 loan carrying a 15% simple interest, due in one year, repayable via twelve monthly payments of equal amounts. No fees. Total dollar cost of the loan = $15. APR = 26%.[98]

122. The Senate analysis misses the point of the APR: it is not supposed to represent the price of the loan. Instead, the APR is measuring that price *relative to the amount of money loaned and for how long*. Relative to how much money is loaned and for how long, the price of the three-month loan in the example is substantially greater than that of the six month or one year loan. Put another way paying $15 to have use of money for three months is more expensive than to pay $15 to have use of the money for six months or for a year. That is what APR is showing, and that is a very useful metric.

123. Consider what would happen if a borrower were confronted with these three loans but was not shown the APR. The borrower might recognize that it is the same dollar price, but different terms, so that the longer-term loans are cheaper, but the borrower would not have a metric indicating the relative differences.

124. Now imagine a more complicated—and realistic comparison, where *(1)* the interest rate differs among the loans, *(2)* the interest is not simple, but is compounded, but with Loan 1 compounding daily, Loan 2 compounding monthly, and Loan 3 compounding annually, and *(3)* there are different fees on each of the loans. At that point, it is virtually impossible for a consumer to find an easy way to compare the costs of the different loans. Many consumers do not understand what compounding is, and even if they do, its calculation is beyond most consumers' mathematical abilities. Indeed, even my law students at Georgetown and Harvard—a highly educated and intelligent population—have been severely challenged by the calculation of compounding.

125. The APR solves the cost comparison conundrum by forcing lenders to disclose a metric that enables an apples-to-apples comparison. This means that consumers are not asked to undertake complex mathematical calculations. Instead, they are given a single percentage rate that they can compare. As two scholars have observed:

> The drafters of TILA understood that without uniform disclosure, interest calculations are forbiddingly complex. The APR is meant to be a simplifying heuristic that allows borrowers to decide between options that are otherwise overwhelmingly complex.[99]

### B.  Federal Regulatory Concerns About the APR Are Not Applicable to MCAs

126. Consumer are generally aware of the APR and believe that it is a "very important" credit term.[100] Federal regulators have, however, in recent years, deemphasized the APR in credit cost disclosures for mortgages, but the concerns that animated their actions are not applicable to MCA disclosures.

---

[98] SBFA 00479.

[99] Elizabeth Renuart & Diane E. Thompson, *The Truth, The Whole Truth, and Nothing but the Truth: Fulfilling the Promise of Truth in Lending*, 25 YALE J. ON REG. 181, 221 (2008).

[100] Thomas A. Durkin, *Consumers and Credit Disclosures: Credit Cards and Credit Insurance*, FED. RES. BULL. 203, 206 (April 2002) (awareness of the APR in the credit card context went from 27% before enactment of TILA to 91% by 2000; 76% of credit card holders surveyed in 2001 responded that the APR was a very important credit term and another 19% indicated that the APR was somewhat important).

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

127. Specifically, the CFPB exercised its exemptive authority to dispense in mortgage loan disclosures with the TILA requirement that the APR be disclosed more conspicuously than other information.[101] The Bureau did so because in the particular context of mortgage loan disclosures, its studies had shown that consumers were often confused about the relationship between the APR and the interest rate,[102] and were not using the APR for its intended purpose of comparing loans.[103]

128. Additionally, the CFPB was concerned about emphasis on APR disclosure because they "focus on the cost of credit based on the loan's contractual term, which for mortgages is typically 15 or 30 years. Because many consumers do not hold their mortgages to term, the TILA disclosures do not accurately reflect the cost of credit in these circumstances."[104] Instead, historically, consumers tend to pay off their mortgage (usually through a sale or refinancing) within 5-7 years, that is massively shorter than the formal length of the mortgage. The prepayment of mortgages meant that consumers were paying much less in finance charges because less interest accrued on the mortgage. Accordingly, the effective APR on the mortgages would have been lower than the stated APR.

129. As a result of these concerns, the CFPB deemphasized APR disclosure in the context of home mortgage cost disclosure. APR disclosure is no longer on the front page of the TILA-RESPA integrated disclosure. But the CFPB does still require disclosure of the APR for mortgages; it merely took care to move the APR away from disclosure of the contract interest rate,[105] lest consumers be confused between the interest rate and the APR. [106]

130. Neither of the concerns that animated the CFPB's deemphasizing of the APR in mortgage disclosures has any applicability to MCA disclosures. MCAs do not have interest rates, so there is no interest rate that could be confused with the APR. In the context of an MCA, an APR disclosure is more likely to be used as intended, that is a comparison-shopping tool.

131. Likewise, because MCAs do not have interest that compounds or an amortization schedule that allocates payments between principal and interest (again because there is no interest), the differences in payoff time do not affect the level of finance charges. The fees and discount that make up the finance charges in an MCA are set from the beginning and do not change based on when the small business pays off the MCA.

### C. The "Estimated APR" and "Estimated Term" Are Exactly What They Say They Are

132. The SBFA's main beef with the mandated APR disclosure for MCAS is that the time to pay off an MCA cannot be perfectly predicted *ex ante*. This is not entirely true. For MCAs with fixed payments, it is entirely possible to calculate when the MCA will be paid off if there is not a true-up. True-ups do not exist in all MCAs, and even those that have true-ups are often discretionary. A true-up provision is merely a mechanism for amending the terms of an MCA contract. All financing contracts can be amended, but that fact does not mean that their term cannot be calculated; it is simply calculated without regard to a possible, but not required, amendment. Indeed, ignoring true-ups for credit cost disclosure purposes is consistent with how TILA treats the exercise of options (such as late payment for a fee) in consumer credit agreements.

133. The situation is different for MCAs that do not have fixed payments. For those MCAs, if a merchant's sales are higher than anticipated, the payoff will be faster and vice-versa.

---

[101] 78 Fed. Reg. 79980 (Dec. 31, 2013).
[102] *Id.* at 79975.
[103] *Id.* at 79979.
[104] *Id.*
[105] *Id.* at 79980.
[106] *Id.* at 79976 (concluding that "moving the disclosure of the APR away from the disclosure of the loan's contract interest rate and placing the APR with other long-term metrics may reduce consumer confusion and highlight the APR as a special tool for comparing costs over time.").

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

134. The DFPI regulations recognize this issue and require only disclosure of what is labeled as "Estimated Annual Percentage Rate (APR)",[107] and "Estimated Term."[108]

135. The use of the word "Estimate" in these disclosures is materially different from TILA disclosures, which have no provision for disclosing estimated APR or terms.

136. Lest there be confusion, the DFPI regulations mandate that the cover sheet disclosure contain explanations of these terms. For the Estimated APR, the MCA provider must disclose that:

> APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through [description of particular payment channel or mechanism] will be [average monthly income estimate determined in accordance with sections 930 or 931]. *Since your actual income may vary from our estimate, your effective APR may also vary.*[109]

137. Additionally, the regulations provide that "If no part of the finance charge is based upon an interest rate, in addition to the language required by subdivision (a)(3)(C) of this section: 'APR is not an interest rate. The cost of this financing is based upon fees charged by [financer] rather than interest that accrues over time.'"[110]

138. Although this language is technical, it is no more technical than the language of the MCA contract itself. More importantly, it is an accurate description of what is being disclosed with the Estimated APR.

139. The same is true for "Estimated Term," which is used in the calculation of the Estimated APR. The DFPI regulations require:

> a short explanation stating that the estimated term is based upon assumptions about the recipient's income. For example: "This is our estimate of how long it will take to collect amounts due to us under the contract based upon the assumption that you will receive $6,000 in monthly income through your BrownPay account."[111]

140. Again, the DFPI regulations require an explanation of the disclosure term and that explanation is accurate in all regards, namely that it is a disclosure that the Estimated Term is just that—an estimate based on certain stated assumptions.

141. Simply put, there is nothing false or misleading in the Estimated APR or Estimated Term disclosures, particularly given the DFPI's requirement that explanations be provided next to them on the cover sheet for an MCA.

### D. The Estimated Term Methodologies Are Necessary Because MCA Providers Are Incentivized to Manipulate the Estimated Term to Make Their Product Look Less Expensive

142. Instead, the SBFA's real complaint is about the calculation of the Estimated Term and thus of the Estimated APR. The DFPI regulations allow MCA providers a choice of two methodologies for estimating the term. One is based on the historical sales figures of the small business,[112] and the other is based on the MCA's internal underwriting and past performance of its MCAs.[113]

---

[107] Cal. Code Reg. title 10, § 914(a)(3)

[108] *Id.*, § 914(a)(8).

[109] *Id.*, § 914(a)(3) (emphasis added).

[110] *Id.*

[111] *Id.*, § 914(a)(8)

[112] *Id.*, § 931.

[113] *Id.*, § 932.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

143. It is necessary for the DFPI to mandate a methodology for estimating the Estimated Term because left to their own devices, MCA providers would be incentivized to pick an estimate of the term that would either minimize the Estimated APR (such as estimating the term to be one year exactly so as to avoid any annualization factor) or to suggest to the merchant that the MCA would be paid off faster. By mandating a pair of standard methods of estimating payoff time, the regulations ensure that MCA providers cannot give self-serving and deceptive estimates. (The deception here is that the estimates would not be good faith estimates of actual repayment time calculated on some basis, but numbers produced to achieve a different end that do not attempt to estimate the actual repayment time.)

### E. Without the Estimated APR It Is Impossible to Undertake a Meaningful Cost Comparison of MCAs with Different Payment Percentages

144. Without the Estimated APR, it would be impossible to compare MCAs of slightly different lengths on an apples-to-apples basis. Consider the paradigm MCA contracts SBFA has submitted.

145. For example, a Kapitus LLC MCA has an estimated term of "1 year, 6 months,"[114] while a Rapid Finance MCA has an estimated term of "1 Year 0.28 Months",[115] and a Forward Financing MCA has an estimated term of "273 days".[116]

146. Without the Estimated APR, how would a small business owner that wanted to compare the cost of these three MCAs in order to find the cheapest funding do so? Simply looking at the discount of the funding amount relative to the purchased amount of receivables would not provide an answer, as the MCAs also vary on their holdback percentage (3.7%, weekly, 28% daily, and 14% weekly, respectively), and therefore will vary on the length of time to payoff even with the same revenue stream for the borrower. Thus, the small business is faced with MCAs with different prices for different payoff rates and therefore periods. At this point, the small business is comparing apples-to-oranges-to-bananas. Without a standard comparison metric like the Estimated APR, there is no way for a small business to make an informed cost comparison.

147. The APR is the best metric available for facilitating apples-to-apples price comparisons of different financing products with different terms. It enables comparison shopping among MCAs and also comparison of MCAs with other types of financing products. The DFPI's requirement of an Estimated APR relies on the Estimated Term, which is different for MCAs than for closed-end credit where there is a known term, but if an Estimated Term calculation methodology were not mandated, MCA providers would be strongly incentivized to manipulate their estimates to lower the APR to make their products look less expensive. And if there were no Estimated APR required, there would be no way of comparing costs among MCAs or between MCAs and other products. Far from being misleading as the SBFA suggests, the DFPI regulations actually help consumers make informed choices.

Continued on Next Page

---

[114] SBFA 00628 (Mattson Ex. 13)
[115] SBFA 00097 (Mattson Ex. 14)
[116] SBFA 00041.

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

**C**ONCLUSION

148. The real gravamen of the SBFA's complaint is that Estimated APR disclosure makes clear that MCAs are high-cost products—the payday loans of small business lending—and that may make small business owners think twice about whether they want to finance using an MCA. In short, the SBFA is invoking the First Amendment as a shield from competition.

149. I reserve the right to amend and supplement this report.

150. I declare the foregoing to all be correct and true to the best of my knowledge.


EXECUTED on September 22, 2023, in the Town of Somerset, Montgomery County, Maryland.


_____

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## APPENDIX A. LIST OF EXPERT TESTIMONY GIVEN AT DEPOSITION OR TRIAL DURING THE PREVIOUS FOUR YEARS

- *De La Torre v. CashCall, Inc.*, No. 19-civ-01235 (San Mateo California Sup. Ct.) (trial testimony, April-May, 2021)

- *In re Navient Corp. Securities Litigation*, No. 17-cv-8373 (RBK/AMD) (D.N.J.) (deposition, June 9, 2021)

- *Deutsche Bank Nat'l Trust Co., as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC1 v. Morgan Stanley ABS Capital I Inc.*, No. 650291/2013 (N.Y. Sup. Ct.)

- *Deutsche Bank Nat'l Trust Co., as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC3 v. Morgan Stanley ABS Capital I Inc.*, No. 651959/2013 (N.Y. Sup. Ct.) (deposition, March 8, 2022)

- *Andrade v. Am. First Fin., Inc.*, No. 3:18-cv-06743 (N.D. Cal.) (depositions, January 25, 2022, and March 15, 2022)

- *Fernandez v. CoreLogic Credco LLC.*, No. 3:20-cv-1262 (S.D. Cal.) (deposition, July 10, 2023)

- *Cox v. Century Financial Group, Inc.*, No. 7-cv-100-4294 (Mo. Cir. Ct. of Clay County) (deposition, August 22, 2023)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## APPENDIX B. CURRICULUM VITAE OF ADAM J. LEVITIN

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

# ADAM J. LEVITIN

Carmack Waterhouse Professor of Law and Finance
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
adam.levitin@law.georgetown.edu
(202) 662-9234 (o)

## ACADEMIC APPOINTMENTS

**GEORGETOWN UNIVERSITY LAW CENTER**                2007-present
*Carmack Waterhouse Professor of Law and Finance (2023-present)*
*Anne Fleming Research Professor (2020-2023)*
*Agnes N. Williams Research Professor (2018-2020)*
*Professor of Law (2011-present) (tenured)*
*Associate Professor of Law (2007-2011)*

**HARVARD LAW SCHOOL**                              2012-2013
*Bruce W. Nichols Visiting Professor of Law*

**AMERICAN BANKRUPTCY INSTITUTE**                   Fall 2009
*Robert Zinman Scholar in Residence*

**FEDERAL TRADE COMMISSION**                        Summer 2008
*Faculty, Division of Financial Practices Academy*

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *cum laude*           2005

**COLUMBIA UNIVERSITY**, M.PHIL. IN HISTORY         2001

**COLUMBIA UNIVERSITY**, A.M. IN HISTORY            2000

**HARVARD COLLEGE**, A.B. IN NEAR EASTERN LANGUAGES & CIVILIZATIONS AND HISTORY,
*magna cum laude with highest honors in field*       1998

## OTHER PROFESSIONAL LEGAL EXPERIENCE

**GORDIAN CRYPTO ADVISORS LLC**                     2022-present
*Principal*

**DELAWARE ATTORNEY GENERAL'S OFFICE**              2011-2012
*Volunteer Consulting Attorney*

**CONGRESSIONAL OVERSIGHT PANEL FOR TROUBLED ASSET RELIEF PROGRAM**   2008-2010
*Special Counsel*

**WEIL, GOTSHAL & MANGES LLP**, New York, New York   2006-2007
*Associate, Business Finance & Restructuring Department*

**HON. JANE R. ROTH, THIRD CIRCUIT COURT OF APPEALS,** Wilmington, Delaware   2005-2006
*Judicial Clerk*

29

Case 2:22-cv-08775-RGK-SK   Document 51-1   Filed 09/27/23   Page 32 of 61   Page ID #:657
*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## HONORARY PROFESSIONAL AFFILIATIONS

- American College of Bankruptcy, Elected Fellow (2021)
- American College of Consumer Financial Services Lawyers, Elected Fellow (2021)
- American Law Institute, Elected Member (2014)

## SCHOLARSHIP AWARDS AND GRANTS

- Grant Gilmore Award, American College of Commercial Finance Lawyers (2022)
- Axiom Business Book Awards, Gold Medal for Real Estate (2021)
- LawDragon 500 Leading Global Insolvency and Restructuring Lawyers (2020)
- LawDragon 500 Leading U.S. Bankruptcy and Insolvency Lawyers (2020)
- Student Loan Law Initiative Research Grant for Understanding and Encouraging Enrollment in Income Driven Repayment Programs (with John Brooks and Brian Galle) (2020)
- Best Professional Article, American College of Consumer Financial Services Lawyers Annual Writing Competition (2014)
- American Law Institute, Young Scholar's Medal (2013)
- Pew Charitable Trusts, Grant for Strategies for Reviving the Housing Market (2012)
- George Washington University, Center for Law, Economics & Finance, Junior Faculty Scholarship Prize (2011)
- Walton H. Hamilton Prize for Outstanding Scholarship, *Yale Journal on Regulation* (2009)
- Best Professional Article, American College of Consumer Financial Services Lawyers Annual Writing Competition (2009)
- Editors' Prize, *American Bankruptcy Law Journal* (2007)

## LEGAL PUBLICATIONS

### Books

- CONSUMER FINANCE: SELECT FEDERAL LAW MATERIALS (CreateSpace, 4th ed. 2022)
- CONSUMER FINANCE: SELECT STATE LAW AND PRIVATE LAW MATERIALS (CreateSpace, 4th ed. 2022)
- THE GREAT AMERICAN HOUSING BUBBLE: WHAT WENT WRONG AND HOW WE CAN PROTECT OURSELVES IN THE FUTURE (Harvard University Press 2020) (with Susan Wachter)
  – "an impressive new book," Robert J. Schiller, *N.Y. Times* (July 31, 2020)
  – "an indispensable analysis of the crisis and the far-reaching measures needed to prevent a recurrence." *Kirkus Starred Review*
  – Axiom Business Book Awards, Gold Medal for Real Estate (2021)
- CONSUMER FINANCE: MARKETS AND REGULATION (Wolters Kluwer, 2018; 2nd edition, Aspen, 2023)
- BUSINESS BANKRUPTCY: FINANCIAL RESTRUCTURING AND MODERN COMMERCIAL MARKETS (Wolters Kluwer, 2015; 2nd edition, Wolters Kluwer, 2018; 3rd edition, Aspen, 2023)
- CONSUMER BANKING AND PAYMENTS LAW (Nat'l Consumer Law Center, 5th ed., 2013; 2014 supplement) (with Lauren Saunders *et al.*)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

**Articles (published or accepted for publication)**

- *Samson's Toupée: The Source-of-Strength Doctrine in Bankruptcy*, 42 YALE J. REG (forthcoming 2024) (invited contribution)

- *The New Usury: The Ability-to-Repay Revolution in Consumer Finance*, 92 GEO. WASH. L. REV. (forthcoming 2023)

- *The Financial Inclusion Trilemma*, 41 YALE J. ON REG. (forthcoming 2023)

- *Not Your Keys, Not Your Coins: Custodial Credit Risk in Cryptocurrency*, 101 TEX. L. REV. 877 (2023)
  –Reviewed in JOTWELL, Oct. 2022
  –Winner, Grant Gilmore Award, American College of Commercial Finance Lawyers

- *Judge Shopping in Chapter 11 Bankruptcy*, 2023 ILL. L. REV. 351 (2023)

- *The Constitutional Problems with Nondebtor Releases in Chapter 11 Bankruptcy*, 90 FORDHAM L. REV. 429 (2022)

- *Purdue's Poison Pill: The Breakdown of Chapter 11's Checks and Balances*, 100 TEX. L. REV. 1079 (2022)
  –Response piece by Jonathan C. Lipson, *First in Time; First is Right: Comments on Levitin's* Poison Pill, 101 TEX. L. REV. ONLINE (2022)

- *The Spurious Pedigree of the "Valid-When-Made" Doctrine*, 71 DUKE L.J. ONLINE 87 (2022)

- *Rent-a-Bank: Bank Partnerships and the Evasion of Usury Laws*, 71 DUKE L.J. 329 (2021)

- *The Proceduralist Inversion—A Response to Skeel*, 130 YALE L.J. FORUM 335 (2020) (with Edward Janger)

- *Redesigning Education Finance: How Student Loans Outgrew the "Debt" Paradigm*, 109 GEO. L.J. 5 (2020) (with John R. Brooks)

- *A Tale of Two Markets: Post-Crisis Regulation and Innovation in the Mortgage and Structured Finance Markets*, 2020 ILL. L. REV. 47 (2020) (with William Bratton)

- *The Fast and the Usurious: Putting the Brakes on Auto Lending Abuses*, 108 GEO. L.J. 1257 (2020)

- *Considering Law and Macroeconomics*, 83 LAW & CONTEMP. PROB. i (2020) (with Anna Gelpern)

- *Mortgage Risk Premiums During the Housing Bubble*, 58 J. R.E. FIN. & ECON. (2019) (with Desen Lin and Susan Wachter) (peer-reviewed journal)

- *Law of the Middle Class: Consumer Finance in the Law School Curriculum*, 31 LOYOLA CONSUMER L. REV. 393 (2019)

- *One Dollar, One Vote: Mark-to-Market Governance in Bankruptcy*, 104 IOWA L. REV. 1857 (2019) (with Edward Janger)

- *Junk Cities: Insolvency Crises in Overlapping Municipalities*, 106 CAL. L. REV. 459 (2019) (with David Schleicher & Aurelia Chaudhury)

- *Badges of Opportunism: Policing Restructuring Support Agreements*, 13 BROOK. J. OF CORP., FIN. & COMM. LAW 169 (2019) (symposium issue) (with Edward Janger)

- *The Faulty Foundation Draft Restatement of Consumer Contracts*, 36 YALE J. ON REG. 447 (2019) (with Nancy Kim *et al.*) (lead author)
  –Reviewed in JOTWELL, May 15, 2019

- *Bankruptcy's Lorelei: The Dangerous Allure of Financial Institutions Bankruptcy*, 97 N.C. L. REV. 101 (2019)
  –Reprinted in BANKRUPTCY'S UNIVERSAL PRAGMATIST (Christoph G. Paulus & John A.E. Pottow, ed.)

- *The New Bond Workouts*, 167 U. PA. L. REV. 1597 (2018) (with William Bratton)

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

- *Pandora's Digital Box:  The Promise and Perils of Digital Wallets*, 166 U. PA. L. REV. 305 (2018)

- *Safe Banking*:  *Finance and Democracy*, 83 U. CHIC. L. REV. 357 (2016)

- *Prioritization and Mutualization:  Clearinghouses and the Redundancy of Financial Contract Safe Harbors in Bankruptcy*, 10 BROOK. J. OF CORP., FIN. & COMM. LAW 129 (2015)

- *Second Liens and the Leverage Option*, 68 VAND. L. REV. 1243 (2015) (with Susan Wachter)

- *Bankruptcy Law and the Cost of Credit: The Impact of Cramdown on Mortgage Interest Rates*, 57:1 J.L. & ECON. 139 (2014) (with Joshua Goodman) (peer-reviewed journal)

- *The Politics of Financial Regulation and the Regulation of Financial Politics*, 127 HARV. L. REV. 1991 (2014)

- *The Paper Chase:  Securitization, Foreclosure, and the Uncertainty of Mortgage Title*, 63 DUKE L.J. 637 (2013)
    − Winner, American College of Consumer Financial Services Lawyers Annual Writing Competition

- *A Transactional Genealogy of Scandal from Michael Milken to Enron to Goldman Sachs*, 86 S. CAL. L. REV. 783 (2013) (with William Bratton)
    − Discussed in TIME ("The Accounting Trick Behind Thirty Years of Scandal," Aug. 15, 2012)
    − Reprinted in 56 CORP. PRACTICE COMMENTATOR (2014)

- *The Consumer Financial Protection Bureau:  An Introduction*, 32 REV. BANKING & FIN. L. 321 (2013)

- *The Commercial Real Estate Bubble*, 2 HARV. BUS. L. REV. 801 (2013) (with Susan Wachter)

- *The Public Option in Housing Finance*, 46 U.C. DAVIS L. REV. 1111 (2013) (with Susan Wachter)

- *Skin-in-the-Game:  Risk Retention Lessons from Credit Card Securitization*, 81 GEO. WASH. L. REV.  813 (2013)

- *The Tenuous Case for Derivatives Clearinghouses*, 101 GEO. L.J. 445 (2013)

- *Why Housing?* 23 HOUSING POL'Y DEBATE 5 (2013) (with Susan Wachter) (peer reviewed)

- *Bankrupt Politics and the Politics of Bankruptcy*, 97 CORNELL L. REV. 100 (2012)

- *Explaining the Housing Bubble*, 100 GEO. L.J. 1177 (2012) (with Susan Wachter)
    − Discussed in THE ECONOMIST ("Bricks and Slaughter," Mar. 3, 2011)

- *The Dodd-Frank Act and Housing Finance:  Can It Restore Private Risk-Capital to the Securitization Market?* 29 YALE J. ON REG. 101 (2012) (symposium volume) (with Andrey D. Pavlov & Susan M. Wachter)

- *Rate Jacking: Risk-Based and Opportunistic Pricing in Credit Cards*, 2011 UTAH L. REV. 339 (2011) (invited theme issue on the Credit C.A.R.D. Act)

- *Private Disordering? Payment Card Fraud Liability Rules*, 5 BROOK. J. OF CORP., FIN. & COMM. LAW 1 (2011) (symposium issue)

- *Mortgage Servicing*, 28 YALE J. ON REG. 1 (2011) (with Tara Twomey)

- *In Defense of Bailouts*, 99 GEO. L.J. 435 (2011)
    − Winner, 2011 C-LEAF Junior Faculty Scholarship Prize
    − Reviewed in JOTWELL, May 14, 2010

- *Rewriting Frankenstein Contracts:  The Workout Prohibition in Residential Mortgage Backed Securities*, 82 S. CAL. L. REV. 1075 (2010) (with Anna Gelpern)
    − Accepted for the 2009 Stanford-Yale Junior Faculty Forum

- *Back to the Future with Chapter 13:  A Reply to Professor Scarberry*, 37 PEPPERDINE L. REV. 1261 (2010)

- *Bankruptcy Markets:  Making Sense of Claims Trading*, 4 BROOK. J. OF CORP., FIN. & COMM. LAW 64 (2010) (symposium issue)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- *The Crisis Without a Face:  Emerging Narratives of the Financial Crisis*, 63 U. MIAMI L. REV. 999 (2009) (invited foreword to themed volume)

- *Resolving the Foreclosure Crisis:  Modification of Mortgages in Bankruptcy,* 2009 WISC. L. REV. 565 (2009)
    –Accepted for the American Law and Economics Association Annual Convention
    –Accepted for Third Annual Conference on Empirical Legal Studies
    –Accepted for Harvard-Texas Conference on Commercial Realities

- *Hydraulic Regulation:  Regulating Credit Markets Upstream*, 26 YALE J. ON REG. 143 (2009)
    –Winner, Walton H. Hamilton Prize for Outstanding Scholarship, Yale Journal on Regulation
    –Accepted for Univ. of Connecticut Workshop on Banking & Consumer Financial Services Law

- *Priceless?  The Costs of Credit Cards*, 55 UCLA L. REV. 1321 (2008)
    –Winner, American College of Consumer Financial Services Lawyers Annual Writing Competition

- *Priceless?  The Social Costs of Credit Card Merchant Restraints*, 45 HARV. J. ON LEGIS. 1 (2008)

- *Payment Wars:  The Merchant-Bank Struggle for Control of Consumer Payment Systems*, 12 STAN. J. L., BUS. & FIN. 425 (2007)

- *Finding <u>Nemo</u>:  Rediscovering the Virtues of Negotiability in the Wake of <u>Enron</u>*, 2007 COLUM. BUS. L. REV. 83 (2007)

- *Toward a Federal Common Law of Bankruptcy: Judicial Lawmaking in a Statutory Regime*, 80 AM. BANKR. L.J. 1 (2006) (double-blind peer-reviewed journal, published by National Conference of Bankruptcy Judges)
    –Winner of American Bankruptcy Law Journal's 2007 Editors' Prize

- *The Limits of <u>Enron</u>:  Counterparty Risk in Bankruptcy Claims Trading*, 15 J. BANKR. L. & PRAC. 389 (2006) (peer-reviewed journal)

- *The Merchant-Bank Struggle for Control of Payment Systems*, 17 J. FIN. TRANSFORMATION 73 (2006) (peer-reviewed applied finance journal)

- *The Antitrust Super Bowl:  America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 BERKELEY BUS. L.J. 265 (2005)

## Book Chapters

- *Rethinking Duties to Serve in Housing Finance*, in HOMEOWNERSHIP BUILT TO LAST, Eric Belsky *et al*., eds. (Brookings Institution Press 2014) (with Janneke Ratcliffe)

- *Deregulation and the Financial Crisis of 2008*, in REGULATORY BREAKDOWN? THE CRISIS OF CONFIDENCE IN U.S. REGULATION, Cary Coglianese, ed. (University of Pennsylvania Press 2012) (with Susan M. Wachter)

- *Fiscal Federalism and the Limits of Bankruptcy*, in WHEN STATES GO BROKE: ORIGINS, CONTEXT, AND SOLUTIONS FOR THE AMERICAN STATES IN FISCAL CRISIS, Peter Conti-Brown, ed. (Cambridge University Press 2011)

- *Information Asymmetries in the U.S. Mortgage Crisis*, in THE AMERICAN MORTGAGE SYSTEM:  RETHINK, RECOVER, REBUILD, Susan M. Wachter & Martin M. Smith, eds. (University of Pennsylvania Press 2011) (with Susan M. Wachter)

- *Modification of Mortgages in Bankruptcy*, LESSONS FROM THE FINANCIAL CRISIS: INSIGHTS AND ANALYSIS FROM TODAY'S LEADING MINDS, Richard W. Kolb, ed. (Wiley 2009)

## Edited Volumes

- 82 LAW & CONTEMP. PROB., *Law and Macroeconomics* (2019) (with Anna Gelpern)

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**Shorter Articles, Research Papers, and Commissioned Studies**

- *Report on Legal and Institutional Differences in the European and American Securitization Markets*, commissioned by the German Council of Economic Experts (Sachverständigenrat zur Begutachtung der gesamtwirtschaftlichen Entwicklung), Sept. 2023

- "*No More Bailouts: A Blueprint for a Standing Emergency Economic Resilience and Stabilization Program*," Great Democracy Initiative whitepaper (July 2020) (with Lindsay Owens and Ganesh Sitaraman)

- "*Abusive Acts and Practices"—Towards a Definition?* Invited Written Presentation for Consumer Financial Protection Bureau Symposium on "Abusive" (June 25, 2019)

- *Independent Review of the Empirical Studies Supporting the Draft Restatement of Consumer Contracts* (Dec. 21, 2017) (lead author)

- *The Economics of Retail Payments Security:  Commentary,* in THE PUZZLE OF PAYMENTS SECURITY:  FITTING THE PIECES TOGETHER TO PROTECT THE RETAIL PAYMENTS SYSTEM 69 (Fed. Res. Bank of K.C. 2016)

- *Pandora's Digital Box: Competitive and Business Risks of Mobile Wallets*, Merchants Advisory Group White Paper (2016) (commissioned study)

- *A Lawyer and Partner, and Also Bankrupt*, 4 J. OF LAW (4 THE POST) 93 (2014) (reprinted from blog post at www.creditslips.org)

- *An Analysis of the Proposed Interchange Fee Litigation Settlement*, Geo. L. & Econ. Research Paper, No. 12-033, *at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2133361

- *Clearing the Mortgage Market Through Principal Reduction:  A Bad Bank for Housing (RTC 2.0)*, Pew Charitable Trusts Strategies to Improve the Housing Market Research Paper (2012), *available at* http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Clearing_the_Mortgage_Market.pdf (commissioned study).

- *What Next for Housing Finance?* 15 WHARTON REAL ESTATE REV. (2012) (with Susan Wachter)

- *Cross-Routing:  PIN and Signature Debit Interchangeability Under the Durbin Amendment*, 2 LYDIAN J. 16 (Dec. 2010)

- *Interchange Regulation:  Implications for Credit Unions*, Research Brief #224, The Filene Research Institute, November 2010

- *Overdraft Regulation:  A Silver Lining to the Regulatory Clouds?*, Research Brief #211, The Filene Research Institute, April 2010 (commissioned study)

- *The Credit C.A.R.D. Act:  Opportunities and Challenges for Credit Unions*, Research Brief #202, The Filene Research Institute, Dec. 2009  (commissioned study)

- *Critique of Evans and Wright's Study of the Consumer Financial Protection Agency Act*, white paper, Oct. 22, 2009, *available at* http://ssrn.com/abstract=1492471

- *Bad and Good Securitization*, 13 WHARTON REAL ESTATE REV. 23 (2010) (with Andrey Pavlov and Susan Wachter), *available at* http://papers.ssrn.com/abstract=1462895

- *The Consumer Financial Protection Agency*, Policy Analysis, Pew Charitable Trusts Financial Reform Project, Research Brief #2, July 2009
    – The "best one-stop paper for understanding why CFPA needs to pass." Baseline Scenario, *at* http://baselinescenario.com/2009/08/17/a-cfpa-research-brief/

- *Evaluation of Alternatives for Secondary Mortgage Markets*, Study for the National Association of Realtors' Presidential Advisory Group (2009) (commissioned study)

- *Remote Deposit Capture:  A Legal and Transactional Overview*, 126 BANKING L.J. 115 (2009) (peer-edited journal)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- *Helping Homeowners:  Modification of Mortgages in Bankruptcy*, 3 HARV. L. & POL'Y REV. (online) (Jan. 19, 2009) (invited contribution), *at* http://www.hlpronline.com/Levitin_HLPR_011909.pdf
- *Reforming Mortgage* Servicing, Research Brief, American Association of Retired Persons, Dec. 2008 (commissioned study)
- *All But Accurate:  A Critique of the American Bankers Association Study on Credit Card Regulation*, white paper, December 6, 2007, *at* http://papers.ssrn.com/abstract=900444
- *Gifting Plans and Absolute Priority*, 124 BANKING L.J. 722 (2007) (peer-edited journal)
- *The Problematic Case for Incentive Compensation in Bankruptcy*, 155 UNIV. PA. L. REV. PENNUMBRA 88 (2007)
- *Antitrust Issues in Credit Card Merchant Restraints Rules*, Tobin Project Working Paper, Risk Policy Working Paper, May 6, 2007 (with Elizabeth Warren)
- *Health Care Privacy Issues in Corporate Reorganizations*, Materials Presented Before the American Bankruptcy Institute 2007 New York City Bankruptcy Conference, May 7, 2007 (with Arthur R. Cormier & Andrew M. Troop)

## Encyclopedia Entries

- *Mortgage Market Character and Trends:  USA*, in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed., (Cambridge University Press 2012) (with Susan Wachter)
- *American Mortgages*, in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed., (Cambridge University Press 2012) (with Susan Wachter)

# LEGISLATIVE TESTIMONY AND BRIEFINGS

- "FTX Bankruptcy," Bipartisan House Financial Services Committee Staff Briefing, Dec. 8, 2022
- Testimony Before the House Judiciary Committee Subcommittee on Regulatory Reform, Commercial and Antitrust Law, July 28, 2021 (hearing on "Oversight of the Bankruptcy Code, Part 1: Confronting Abuses of the Chapter 11 System").
- Testimony Before the House Committee on Small Business, Sept. 9, 2020 (hearing on "Transparency in Small Business Lending").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, March 26, 2019 (hearing on Chairman's Housing Reform Outline:  Part I).
- Testimony Submitted to the Senate Judiciary Committee, Nov. 13, 2018 (hearing on the Taxpayer Protection and Responsible Resolution Act of 2018).
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, Jan. 25, 2018 (hearing on "Examining Opportunities and Challenges in the Financial Technology ("Fintech") Marketplace").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, June 8, 2017 ("Fostering Economic Growth: The Role of Financial Institutions in Local Communities").
- Testimony Submitted to the House Financial Services Committee's Subcommittee on Financial Institutions and Consumer Credit, Mar. 21, 2017 (hearing on "Ending the *De Novo* Drought:  Examining the Application Process for *De Novo* Financial Institutions").
- Testimony Before the House Financial Services Committee, July 9, 2016 ("Making a Financial Choice: More Capital or More Government Control?") (hearing on the CHOICE Act).

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Testimony Before the Senate Judiciary Committee, Subcommittee on The Constitution, July 23, 2015 ("The Administrative State v. The Constitution:  Dodd-Frank at Five").

- Testimony Before the House Financial Services Committee, Mar. 15, 2015 ("Preserving Consumer Choice and Financial Independence").

- Testimony Before the House Judiciary Committee, Subcommittee on Regulatory Reform, Commercial and Antitrust Law, July 17, 2014 ("Guilty Until Proven Innocent?  A Study of the Propriety & Legal Authority for the Justice Department's *Operation Choke Point*").

- Testimony Before the House Financial Services Committee, Subcommittee on Capital Markets and Government Sponsored Enterprises, Feb. 26, 2014 ("The Dodd-Frank Act's Impact on Asset-Backed Securities").

- Testimony Before the House Committee on Small Business, Subcommittee on Oversight, Investigations, and Regulation, Dec. 3, 2013 ("Regulatory Landscape:  Burdens on Small Financial Institutions").

- Testimony Before the Senate Banking Committee, Oct. 1, 2013 ("Housing Finance Reform: Fundamentals of a Functioning Private Label Mortgage Backed Securities Market").

- Testimony Before the House Financial Services Committee, July 18, 2013 ("A Legislative Proposal to Protect American Taxpayers and Homeowners by Creating a Sustainable Housing Finance System") (hearing on the PATH Act).

- Testimony Before the House Judiciary Committee, Subcommittee on Intellectual Property, Competition, and the Internet, July 10, 2012 ("The Dodd-Frank Act's Effects on Financial Services Competition").

- Testimony Before the House Financial Services Committee, Subcommittee on Capital Markets and Government Sponsored Institutions, June 7, 2012 ("Investor Protection:  The Need to Protect Investors from Government").

- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, May 9, 2012 ("Rising Regulatory Compliance Costs and Their Impact on the Health of Small Financial Institutions").

- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit & Subcommittee on Capital Markets and Government Sponsored Enterprises, Nov. 16, 2011 (Joint Hearing on "H.R. 1697: The Communities First Act").

- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Sept. 13, 2011 ("Housing Finance Reform: Should There Be a Government Guarantee?").

- Testimony Submitted to the House Committee on the Judiciary, Sept. 8, 2011 (H.R. 2533, the "Chapter 11 Bankruptcy Venue Reform Act of 2011").

- Testimony Before the House Committee on Small Business, Subcommittee on Oversight, Investigations & Regulation, July 28, 2011 ("Open for Business:  The Impact of the CFPB on Small Business").

- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, July 19, 2011 ("Enhanced Consumer Financial Protection After the Financial Crisis").

- Testimony Before the House Government Oversight and Reform Committee, Subcommittee on TARP, Financial Institutions, and Bailouts of Public and Private Institutions, May 24, 2011 ("Who's Watching the Watchmen? Oversight of the Consumer Financial Protection Bureau").

- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, Apr. 6, 2011 ("Legislative Proposals to Improve the Structure of the Consumer Financial Protection Bureau").

- Testimony Before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010 ("Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing").

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Nov. 16, 2010 ("Problems in Mortgage Servicing from Modifications to Foreclosures").
- Testimony Before the Financial Crisis Inquiry Commission, Oct. 28, 2010, *at* http://fcic.law.stanford.edu/interviews/view/421.
- "Future of Housing Finance," Center for American Progress Mortgage Finance Working Group Presentation to the U.S. Department of Treasury, August 2, 2010.
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, December 11, 2009 ("Home Foreclosures: Will Voluntary Mortgage Modification Help Families Save Their Homes? Part II?").
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, July 23, 2009 ("The Worsening Foreclosure Crisis: Is It Time to Reconsider Bankruptcy Reform?).
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, April 2, 2009 (re: Consumer Debt — Are Credit Cards Bankrupting Americans?).
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, Mar. 24, 2009 ("Abusive Credit Card Practices and Bankruptcy," re: Consumer Credit Fairness Act, S.257).
- Testimony Before the Senate Committee on Banking, Housing and Urban Affairs, Feb. 12, 2009 (re: Modernizing Consumer Protection in the Financial Regulatory System: Strengthening Credit Card Protections).
- Testimony Before the House Judiciary Committee, Jan. 22, 2009 (re: Helping Families Save Their Homes in Bankruptcy Act, H.R. 220, and the Emergency Homeownership and Equity Protection Act, H.R. 225).
- Testimony Before the Senate Judiciary Committee, Nov. 19, 2008 (re: Helping Families Save Their Homes in Bankruptcy Act, now S.61).
- "Bankruptcy Modification of Mortgages," Democratic Staff Briefing, United States House of Representatives, November 14, 2008.
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit on March 13, 2008 (re: Credit Cardholders' Bill of Rights).
- Testimony Submitted to the Economic Matters Committee, Maryland State House of Delegates, March 6, 2008.
- "Credit Card Regulation," Democratic Staff Briefing, United States House of Representatives, March 5, 2008.

## REGULATORY AND LEGISLATIVE COMMENTS FILED

- Letter to the Reporters on the fourth draft of the American Law Institute Restatement of the Law of Consumer Contracts, Nov. 10, 2021
- Letter to the Permanent Editorial Board of the Uniform Commercial Code regrading proposed Commentary on Perfection of a Security Interest in Intangible Money and Related Choice-of-Law Rules, Aug. 9, 2021
- Comments to the Office of the Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "Fair Access to Financial Services," Docket No. OCC- 2020-004, Dec. 18, 2020
- Legal Scholars Letter to Senator Elizabeth Warren Regarding the Consumer Bankruptcy Reform Act of 2020, December 14, 2020 (co-lead drafter)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Comments to the Office of the Comptroller of the Currency regarding the Charter Application of Figure Bank, N.A., 2020-WE-Charter-317953, Dec. 7, 2020
- Letter to Chief Judge Cecilia Morris, U.S. Bankruptcy Court for the Southern District of New York, regarding Local Rule 1073-1, Nov. 24 (2020)
- Comments to the Consumer Financial Protection Bureau regarding "Qualified Mortgage Definition Under the Truth in Lending Act (Regulation Z): General QM Loan Definition", Docket No. CFPB-2020-0020, Sept. 23, 2020
- Comments to the Office of Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "National Banks and Federal Savings Associations as Lenders," Docket No. OCC-2020-0026, September 3, 2020
- Comments to the Consumer Financial Protection Bureau regarding Request for Information from Taskforce on Federal Consumer Financial Law, Docket No. CFPB-2020-0013, June 1, 2020
- Comments to the Federal Deposit Insurance Corporation regarding Notice of Proposed Rulemaking regarding "Federal Interest Rate Authority," RIN 3064-AF21, Jan. 5, 2020
- Comments to the Office of Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "Permissible interest on loans that are sold, assigned, or otherwise transferred," Docket No. OCC-2019-0027, Jan. 5, 2020
- Comments to the Securities and Exchange Commission on Request for Comments on Asset-Level Disclosure Requirements for Residential Mortgage-Backed Securities, Nov. 23, 2019
- Letter to William K. Harrington, Esq. United States Trustee, Region 2, Regarding Appointment of Examiner in the Chapter 11 Case of Purdue Pharma, Inc., No. 19-23649 (Bankr. S.D.N.Y.), Nov. 5, 2019  (co-author with Jonathan Lipson and Stephen Lubben)
- Comments to the Consumer Financial Protection Bureau on proposed rescission of Final Rule regarding Payday, Vehicle Title, and Certain High-Cost Loans, Docket No. CFPB-2019-0006, May 15, 2019
- Letter on behalf of bankruptcy and financial regulation scholars to Senators Warren and Sanders in support of the U.S. Territorial Relief Act of 2019, May 2, 2019 (drafter)
- Joint Letter of Concerned Members of the Members Consultative Group to the American Law Institute Council on Council Draft No. 5 of the Restatement of the Law of Consumer Contracts, Oct. 3, 2018 (lead drafter)
- Letter on behalf of bankruptcy and financial regulation scholars to Senators Warren and Sanders in support of the U.S. Territorial Relief Act of 2018, July 25, 2018 (drafter)
- Comments of Financial Regulation and Consumer Protection Scholars Regarding the Consumer Financial Protection Bureau's Request for Information on Regulatory Guidance, Docket No. CFPB-2018-0013, July 2, 2018 (lead drafter)
- Letter Regarding Independent Review of the Empirical Studies Supporting Council Draft No. 3 of the Restatement of the Law, Consumer Contracts, to the American Law Institute Council, Jan. 12, 2018
- Joint Letter of Empirical Legal Scholars to the American Law Institute Council, concerning the third draft of the Restatement of the Law of Consumer Contracts, Oct. 9, 2017
- Letter to the American Law Institute Council, concerning the third draft of the Restatement of the Law of Consumer Contracts, Oct. 2, 2017
- Legal Scholars Letter to Congressional Banking and Financial Services Committee Leadership Regarding H.R. 10 and the Consumer Financial Protection Bureau, May 12, 2017 (co-lead drafter)
- Joint Letter of Concerned Members of the Members Consultative Group to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts, Oct. 19, 2016 (lead drafter)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Consumer Finance Scholars Comment Letter to the Consumer Financial Protection Bureau regarding Proposed Rulemaking on Payday, Vehicle Title, and Certain High-Cost Loans, Sept. 13, 2016 (lead drafter)

- Joint Letter of Concerned Members of the Members Consultative Group to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts, Dec. 31, 2015 (lead drafter)

- Corporate Finance Scholars' Letter to Congressional Leadership on Proposed Omnibus Appropriations Bill Rider to Amend the Trust Indenture Act, Dec. 8, 2015 (lead drafter)

- Letter to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts. Nov. 15, 2015

- Letter to the Reporters on the first draft of the American Law Institute Restatement of the Law of Consumer Contracts. Mar. 27, 2015

- Comments to the Consumer Financial Protection Bureau on Amendments Relating to Small Creditors and Rural or Underserved Areas Under the Truth in Lending Act (Regulation Z), Feb. 27, 2015

- Letter to the Reporters on the first draft of the American Law Institute Restatement of the Law of Consumer Contracts, Nov. 12, 2014

- Comments to the Consumer Financial Protection Bureau on Advanced Notice of Proposed Rulemaking regarding Debt Collection, Feb. 28, 2014

- Comments to the Federal Housing Finance Agency on Proposed State-Level Guarantee Fee Increases, Nov. 29, 2012

- Comments to the Permanent Editorial Board of the Uniform Commercial Code on the Draft Report on Mortgage Notes, May 27, 2011

- Comments to the Permanent Editorial Board of the UCC on Draft Report on Enforceability of Mortgage Notes, April 2011

- Comments to the Federal Reserve Board on the Durbin Amendment Rulemaking (Reg E), Feb. 21, 2011
  - Cited in *NACS v. Bd. of Governors of Fed. Reserve Sys.*, 2013 WL 3943489 (D.D.C. July 31, 2013)

- Comments to the Bankruptcy Rules Committee on Proposed Amendments to Federal Rule of Bankruptcy Procedure 2019, Feb. 15, 2010.

- Comments to the Permanent Editorial Board of the UCC on Proposed (Pre-Release) Draft Report on Enforceability of Mortgage Notes, Jan. 5, 2011

## AMICUS BRIEFS AUTHORED (LEAD AUTHOR OR CO-AUTHOR)

- Amicus Brief (in support of appellants), *Harrington v. Purdue Pharma L.P.*, No. 23-a-87, Supreme Court of the United States, 2023 (sole author, represented by Daniel Walfish)

- Amicus Brief (in support of respondent), *Community Financial Services Ass'n v. Consumer Financial Protection Bureau*, Supreme Court of the United States, No. 22-448 (lead co-author; represented by Greg Lipper)

- Amicus Brief (in support of appellees and affirmance), *In re Purdue Pharma, LP*, No. 22-110-bk(L) (2d Cir. 2022) (sole author, represented by Daniel Walfish)

- Amicus Brief (in support of plaintiffs), *California ex rel. Becerra v. FDIC*, No. 20-cv-5860 (N. D. Cal. 2020) (sole author, represented by Eliza Duggan and Ted Mermin)

- Amicus Brief (in support of plaintiffs), *California ex rel. Becerra v. v. Brooks*, No. 20-cv-5200 (N. D. Cal. 2020) (sole author, represented by Eliza Duggan and Ted Mermin)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Amicus Brief (in opposition to proposed settlements between the United States Department of Justice and the Debtors and between the United States Department of Justice and the Sackler Family), *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y.) (lead co-author; co-counsel with Jonathan Lipson and Daniel Walfish)

- Amicus Brief (in support of respondent), *City of Chicago v. Fulton*, Supreme Court of the United States, No. 19-357 (co-author; represented by David Kuney)

- Amicus Brief (in support of the judgment below), *Seila Law LLC v. Consumer Financial Protection Bureau*, Supreme Court of the United States, No. 19-7 (lead co-author; co-counsel with Deepak Gupta and Patricia McCoy)

- Amicus Brief (in support of neither party), *McShannock v. JP Morgan Chase Bank N.A.*, No. 1:19-15899 (9th Cir. 2019) (sole author)

- Amicus Brief (in support of appellant), *Rent-Rite Super Kegs West, Ltd. v. World Business Lenders, LLC*, No. 1:19-cv-01552 (D. Colo. 2019) (sole author) (discussed favorably in decision reversing and remanding)

- Amicus Brief (in support of plaintiff), *Meade v. Marlette Funding, LLC*, No. 17-cv-30376 (Denver District Court, Colo. 2018) (sole author)

- Amicus Brief (in support of plaintiff), *Meade v. Avant of Colorado, LLC*, No. 17-cv-30377 (Denver District Court, Colo. 2018) (sole author)

- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *English v. Trump*, United States Court of Appeals for the District of Columbia, (2018) (co-lead author; represented by Law Offices of Courtney Weiner)

- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *Lower East Side People's Federal Credit Union v. Trump*, United States District Court for Southern District of New York, No. 1:17-cv-09536 (S.D.N.Y. 2017) (co-lead author; represented by Law Offices of Courtney Weiner)

- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *English v. Trump*, United States District Court for District of Columbia, No. 1:17-cv-02534 (D.D.C. 2017) (co-lead author; represented by Law Offices of Courtney Weiner)

- Amicus Brief of Scholars of Behavioral Science and Economics in support of Respondents, *Masterpiece Cakeshop, Ltd., et al., v. Colorado Civil Rights Commission et al*, Supreme Court of the United States, No. 16-111 (co-author; represented by Allison Ehlert and Adam Hoffman)

- Amicus Brief (in support of appellant), *Expressions Hair Designs v. Schneiderman*, Supreme Court of the United States, No. 15-1391, Nov. 21, 2016 (lead author; co-counsel with Carl Cecere)

- Amicus Brief of Financial Regulation Scholars in support of petitioners at en banc rehearing, *CFPB v. PHH Corp.*, D. C. Circuit en banc, No. 15-1177, Mar. 31, 2016 (co-lead author; co-counsel with Michael Barr and Deepak Gupta)

- Amicus Brief of Scholars of Behavioral Economics (in support of certiorari petition), *Expressions Hair Designs v. Schneiderman*, Supreme Court of the United States, No. 15-1391, June 15, 2016 (lead author; represented by Allison Ehlert and Adam Hoffman)

- Amicus Brief (in support of respondents), *Bank of America v. Caulkett*, United States Supreme Court, 2015 (lead author; co-counsel with Michael Fitzgerald)

- Amicus Brief (supplemental), *Eaton v. Federal National Mortgage Association & Another*, Supreme Judicial Court of Massachusetts, No. 11041, Jan. 27, 2012 (sole author)

- Amicus Brief, *Eaton v. Federal National Mortgage Association & Another*, Supreme Judicial Court of

Massachusetts, No. 11041, Sept. 22, 2011 (sole author)

- Amicus Brief, *Residential Funding Co. v. Saurman*, No. 143178, Supreme Court of Michigan, Oct. 21, 2011 (co-author with John Pottow & Rebecca Tushnet)
- Amicus Brief, *Bevilacqua v. Rodriguez*, Supreme Judicial Court of Massachusetts, No. 10880, April 21, 2011 (lead author)
- Amicus Brief on Behalf of the Texas Hotel and Lodging Ass'n, *La Villita Motor Inns, J.V., v. Orix Capital Markets, LLC, et al.*, Supreme Court of Texas, No. 10-1001, Mar. 20, 2011 (lead author)

# Editorials and Blogging

- "Supreme threat," FTAlphaville, August 30, 2023
- "The Justice Department was right to object to Purdue's rotten deal," Letter to the Editor, WASH. POST, Aug. 28, 2023
- "The Solution to Biden's Student Loan Problems Is Right Before His Eyes," WASH. POST, July 18, 2023 (with John Brooks and Brian Galle)
- "The Debt Ceiling Is Unconstitutional—but Not for the Reason You Think," THE AMERICAN PROSPECT, May 22, 2023 (with Anna Gelpern and Stephen Lubben)
- "Dissecting the U.S. Public Debt Clause," FTAlphaville, May 10, 2023 (with Anna Gelpern and Stephen Lubben)
- "The Implications of LTL's Per-Debtor Analysis," Harvard Bankruptcy Roundtable Blog, Feb. 14, 2023
- "Johnson & Johnson Was Abusing the Bankruptcy System," Letter to the Editor, WALL ST. J., Feb. 9, 2023
- "The Texas Two-Step: A Different Look at Bankruptcy Code Section 548," Harvard Bankruptcy Roundtable Blog, Nov. 1, 2022 (with Judith Fitzgerald)
- "CFPB Opponents Are Playing with Fire," AMERICAN BANKER, Oct. 28, 2022
- "Looming Legal Issues in Cryptocurrency Bankruptcies," THE DEAL, July 19, 2022
- "Crypto Winter Arrives," THE DEAL, July 18, 2022
- "How Apple Locks Out the Competition with Its Digital Key," PROMARKETS, Jan. 12, 2022
- "A Better Way to Fix the Student Loan Problem," POLITICO, Jan. 12, 2022 (with John Brooks)
- "It's Time for Biden to Fire the FDIC Chief," POLITICO, Dec. 16, 2021
- "The Boy Scouts Are Abusing Bankruptcy," BLOOMBERGLAW, Nov. 16, 2021
- "Now is the time for bankruptcy venue reform," THE HILL, August 6, 2021 (with Joan Feeney, Steven Rhodes, and Jay Westbrook)
- "Consumers—not banks—should control access to personal financial data," THE HILL, July 6, 2021
- "Reform Our Bankruptcy Laws Before a Tsunami of Covid Debt Comes Due," CNBC, Jan. 11, 2021
- "Supersize the Supreme Court to Save It," The AMERICAN PROSPECT, October 12, 2020
- "In Case of Economic Emergency:  Break Glass," BOSTON GLOBE, July 5, 2020 (with Lindsay Owens and Ganesh Sitaraman)
- "Mortgage Market Déjà vu," THE AMERICAN PROSPECT, July 1, 2020 (with Susan Wachter)
- "How to Start Closing the Racial Wealth Gap," THE AMERICAN PROSPECT, June 17, 2020
- "How to Get Money to Small Businesses, Fast," N.Y. TIMES, Mar. 24, 2020 (with Satyam Khanna)
- "The Americans Joe Biden Left Behind on the Bankruptcy Bill," THE AMERICAN PROSPECT, Jan. 9, 2019

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Who Needs More Supreme Court Justices?  Democrats and Republicans Do," BLOOMBERGLAW, Apr. 2, 2019
- "Depoliticize the Supreme Court by Adding Two Dozen New Justices," THE HILL, Dec. 7, 2018
- "Treasury's Bankruptcy Plan Would Mean More, Not Fewer, Bailouts," AMERICAN BANKER, Feb. 23, 2018
- "Toys 'R' Us and the Rigged Economy," HUFFINGTON POST, Sept. 26, 2017
- "Fixing the Equifax Problem:  Public Utility Regulation of Credit Reporting," HUFFINGTON POST, Sept. 24, 2017
- "'Madden fix' bills are a recipe for predatory lending," AMERICAN BANKER, Aug. 25, 2017
- "Draining the Financial Swamp," WALL ST. JOURNAL, Mar. 21, 2017
- "What the CFPB 'Commission' Debate Is Really About," AMERICAN BANKER, Dec. 29, 2016
- "Glass-Steagall's Political Firewall," HUFFINGTON POST, Oct. 27, 2015
- "Where's the Proof that Durbin Failed Consumers?" AMERICAN BANKER, Oct. 22, 2015
- "Who's Afraid of a Republican CFPB?" AMERICAN BANKER, Oct. 16, 2015
- "Recalibrate the TIA for Today's Debt Markets," WALL ST. J. BANKRUPTCY BEAT, Sept. 30, 2015
- "The CFPB's Data Collection Should Be Applauded," AMERICAN BANKER, Aug. 17, 2015
- "Discharge Private Student Loans, But Federal Loans Have Safety Net," WALL ST. J. BANKRUPTCY BEAT, May 11, 2015
- "Eliminate Vendor Priority Claims," WALL ST. J. BANKRUPTCY BEAT, Dec. 3, 2014
- "Argentina and Distressed Investors," WALL ST. J. BANKRUPTCY BEAT, July 29, 2014
- "Mandatory Arbitration Offers Bargain-Basement Justice," AMERICAN BANKER, May 13, 2014
- "Outlook for Corporate Restructuring," WALL ST. J. BANKRUPTCY BEAT, Mar. 26, 2014
- "Postal Banking:  Maybe Not So Crazy After All," AMERICAN BANKER, Jan. 31, 2014
- Letter to the Editor, N.Y. TIMES, Nov. 1, 2013
- "Hands Off Detroit's Final Treasures!" SALON, Aug. 20, 2013.
- "Don't Take My Pension:  The Looming Public Worker Nightmare," SALON, Aug. 12, 2013.
- "Make the Banks Pay," SALON, Oct. 27, 2011.
- "Fed's Feeble Swipe Fee Rule Is an Unauthorized Sop to Big Banks," AMERICAN BANKER, July 8, 2011.
- "More Openness on Mortgages," N.Y. TIMES, Mar. 8, 2010.
- Letter to the Editor, WASHINGTON POST, July 6, 2010.
- Letter to the Editor, WASHINGTON TIMES, June 22, 2010.
- "Swipe Fee Reform Benefits Consumers and Businesses Large and Small," HUFFINGTON POST, June 18, 2010.
- "Rein in the Credit Card Games," DETROIT FREE-PRESS, Nov. 28, 2008 (reprinted as "Consumer Pay High Price for Credit Cards," SAN DIEGO UNION-TRIBUNE, Nov. 30, 2008) (reprinted as "Credit cards on Santa's naughty list," ATLANTA JOURNAL CONSTITUTION, Dec. 7, 2008).
- "Bailout Bill Must Include Help for Homeowners," WASHINGTON INDEPENDENT, Sept. 26, 2008.
- "The Card Industry Still Has a Chance to Reform," AMERICAN BANKER, Aug. 8, 2008.
- "The Flaws in the FHA Housing Bill", op-ed, WALL ST. JOURNAL, July 11, 2008.
- Letter to the Editor, WALL ST. JOURNAL, April 3, 2008.
- "Complex Pricing of Credit Cards Should be Simplified," op-ed, CHICAGO TRIBUNE, Dec. 27, 2007
- "Conglomerate Master" guest blogger on The Conglomerate, 2010-2011
- Guest blogger, PrawfsBlawg, May 2008

- Guest blogger, Warren Reports at TPM Café, Jan. 2007
- Blogger, Credit Slips, <u>www.creditslips.org</u>, Dec. 31, 2007-present

## PRESENTATIONS AND PANELS

### 2023
- Comments on David Schleicher's *In a Bad State: Responding to State and Local Budget Crises*, Wharton School, University of Pennsylvania, May 24, 2023 (commentator)
- The Panic of 2023, University of Illinois Law School, Apr. 24, 2023 (guest lecturer)
- "Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Apr. 24, 2023 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, Apr. 21, 2023 (presenter)
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Apr. 19, 2023 (presenter)

- "Russia Sanctions and Payment Card Networks," Georgetown University Law Center, Mar. 21, 2023 (guest lecturer)
- "Cryptocurrency Regulation: Market Structure" Berkeley Law Center for Law and Business Conference, Feb. 8, 2023
- "Cryptocurrency and Bankruptcy," Corporate Restructuring and Insolvency Seminar, January 20, 2023 (presenter)

### 2022
- "Cryptocurrency and Bankruptcy," Fordham Law School, Nov. 14, 2022
- "The Good, the Bad, and the Ugly of Blockchain, Crypto, and Web3," Berkeley Center for Law and Business webinar, Sept. 23, 2022
- Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, July 21, 2022 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, July 19, 2022 (presenter)
- "US Consumer Finance Regulation," JPMorgan Chase Institute, July 18, 2022
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, July 14, 2022 (presenter)
- "The Stop Wall Street Looting Act," Harvard Law School, Apr. 18, 2022 (guest lecturer)
- Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Mar. 23, 2022 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, Mar. 16, 2022 (presenter)
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Mar. 14, 2022 (presenter)
- "Credit Derivatives 101," Gerson Lehrman Group webcast, Mar. 9, 2022 (presenter)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Russia Sanctions and Payment Card Networks," Georgetown University Law Center, Mar. 6, 2022 (guest lecturer)
- "The Fintech Trilemma," Federal Reserve Board conference on The Future of Financial Services | Data and Connectivity Symposium, Mar. 1, 2022 (presenter)
- "How Academia Influences Lawmaking," American Association of Law Schools Annual Meeting, Section on Creditors' and Debtors' Rights, Jan. 6, 2022 (presenter)

**2021**

- "If It Walks Like a Loan and Talks Like a Loan, Is It a Loan?" Consumer Federation of America Virtual Financial Services Conference, Dec. 8, 2021 (panelist)
- "The Legislative Landscape for Consumer Bankruptcy: Chapter 10, Student Loans and Beyond," American Bankruptcy Institute Consumer Practice Extravaganza, Nov. 3, 2021 (presenter)
- "State of the Settlements, Bellwethers, and Settlement Design Innovations," Georgetown University O'Neill Institute for National and Global Health Law and the Pew Charitable Trusts Opioid Summit, Sept. 25, 2021 (panelist)
- "Cryptocurrency Regulation," Capstone investor webinar, Sept. 29, 2021 (presenter)
- "Cryptocurrency Regulation," Raymond James investor webinar, Sept. 13, 2021 (presenter)
- "The Financial Inclusion Trilemma," Georgetown Law Faculty Workshop, July 13, 2021 (presenter)
- "Purdue's Poison Pill: The Breakdown of Chapter 11's Checks and Balances," Corporate Restructuring and Insolvency Seminar, June 15, 2021 (presenter)
- "Rethinking Bankruptcy Exceptionalism," Emerging Scholars Conference, University of Chicago, May 25, 2021 (commentator on paper by Jonathan Seymour)
- "Conglomerates, Conflicts of Interest, and Consumer Protection," Arthur Wilmarth Celebration Conference, May 24, 2021 (panelist)
- "Addressing Poverty and Financial Distress in the Jewish Community," Jewish Federation of Greater Washington Board Meeting, Apr. 28, 2021 (panelist)
- "Contractual Inequality," Consumer Law Scholars Conference, UC Berkeley, Mar. 5, 2021 (commentator on paper by Manisha Padi)
- "Cryptocurrency, Blockchain, and Decentralized Finance," National Community Reinvestment Coalition Just Economy 2021 Conference, May 12, 2021 (panelist)
- Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Mar. 16, 2021 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, Mar. 10, 2021 (presenter)
- "Contractual Inequality," Consumer Law Scholars Conference, UC Berkeley, Mar. 5, 2021 (commentator on paper by Manisha Padi)
- "Bankruptcy 101:  Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Mar. 3, 2021 (presenter)
- "The Consumer Bankruptcy Reform Act of 2020," Brooklyn Law School, Feb. 4, 2021 (co-presenter)
- "The Great American Housing Bubble," Wharton Club of Boston, Jan. 28, 2021 (presenter)
- "The Coming Consumer Financial Cliff," Hebrew Free Loan Association Board Meeting, Jan. 11, 2021

**2020**

- "Attacking State Usury Law Evasions," National Consumer Law Center Consumer Rights Litigation Conference, Nov. 14, 2020 (panelist)

- Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Oct. 30, 2020 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, Oct. 28, 2020 (presenter)
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Oct. 26, 2020 (presenter)
- "Loan Sharks or Angel Fish? The Pros and Cons of Bank Partnerships and Interest Rate Exportation Rights," Columbia Law and Political Economy Society, Oct. 26, 2020 (panelist)
- "The Great American Housing Bubble," Harvard Club of New York, August 12, 2020 (presenter)
- "The New Usury: The Ability-to-Repay Revolution in Consumer Finance," Georgetown Law Faculty Workshop, June 17, 2020 (presenter)
- Bipartisan briefing on nonbank mortgage lending and servicing, House Financial Services Committee Staff, Apr. 16, 2020 (presenter)
- "The New Usury: The Ability-to-Repay Revolution in Consumer Finance," Consumer Law Scholars Conference, UC Berkeley, Mar. 6, 2020 (presenter)
- "Bankruptcy: Voidable Actions and Equitable Remedies," Gerson Lehrman Group webcast, Feb. 26, 2020 (presenter)
- Bankruptcy: Chapter 11 Operations and Governance," Gerson Lehrman Group webcast, Feb. 25, 2020 (presenter)
- Bankruptcy: Chapter 11 Plans," Gerson Lehrman Group webcast, Feb. 19, 2020 (presenter)
- Bankruptcy: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Feb. 18, 2020 (presenter)
- "Fintech Innovations?" American Association of Law Schools Annual Meeting, Jan. 5, 2020 (roundtable participant)
- "Reflections On and Lessons From 'Foreclosed,' a New Book by Professor Chris Odinet," American Association of Law Schools Annual Meeting, Jan. 4, 2020 (commentator)

**2019**

- "Debt Restructurings: Exchange Offers and Consent Solicitations," Gerson Lehrman Group webcast, Oct. 31, 2019 (presenter)
- Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Oct. 24, 2019 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, Oct. 17, 2019 (presenter)
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Oct. 3, 2019 (presenter)
- "Law and Macroeconomics," Georgetown Law and Macroeconomics Conference, Sept. 27, 2019 (presenter)
- "Opioid Bankruptcies: Further Developments," Capstone LLC, September 17, 2019 (presenter)
- "Credit Derivatives 101," Gerson Lehrman Group webcast, Sept. 11, 2019 (presenter)
- "Securitization 101," Gerson Lehrman Group webcast, Sept. 4, 2019 (presenter)
- "Opioid Bankruptcies," Capstone LLC, August 13, 2019 (presenter)
- "Abusive Acts and Practices," Consumer Financial Protection Bureau Symposium, June 25, 2019 (presenter)
- "Credit Derivatives 101," Gerson Lehrman Group webcast, April 2, 2019 (presenter)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Securitization 101," Gerson Lehrman Group webcast, March 26, 2019 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, March 12, 2019 (presenter)
- "The Fast and the Usurious:  Putting the Brakes on Auto Lending Abuses," University of Minnesota School of Law Faculty Workshop, Mar. 7, 2019 (presenter)
- "Public-Private Risk-Sharing in Financial Regulation," Boston College, Regulation and Markets Workshop, Feb. 19, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, March 5, 2019 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, February 26, 2019 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, February 13, 2019 (presenter)

**2018**
- "Get Rid of Multi-Member Commissions," American Constitution Society Convening on Reimagining the Regulatory State, Dec. 13, 2018 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, November 14, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, November 9, 2018 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, October 31, 2018 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 24, 2018 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, July 18, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, July 16, 2018 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, July 12, 2018 (presenter)
- "Law, Macroeconomics, and Norms," Georgetown University Law Center Summer Workshop, July 10, 2018 (presenter with Anna Gelpern)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, July 9, 2018 (presenter)
- "A Public Option for Bank Accounts (or Central Banking for All)", Vanderbilt Law Roundtable on Financial Transformation, June 1, 2018 (commentator)
- "Mortgage Risk Premia During the Housing Bubble," American Finance Association 2018 Annual Meeting, Washington D.C., June 1, 2018
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, March 26, 2019 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, March 19, 2018 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, March 12, 2018 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, March 5, 2018 (presenter)
- "The Fast and the Usurious:  Putting the Brakes on Auto Lending Abuses," Agnes N. Williams Research Chair Inaugural Lecture, Georgetown University Law Center, Feb. 21, 2018
- "Bankruptcy's Lorelei:  The Dangerous Allure of Financial Institutions Bankruptcy," Jay Westbrook Celebration Symposium, University of Texas School of Law, Feb. 3, 2017 (presenter)

**2017**

- "The New Restructuring?  Coercion and Opportunism in Debt Workouts," University of Pennsylvania Law Review Symposium, Oct. 20, 2017 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, November 1, 2017 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, October 25, 2017 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, October 18, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 11, 2017 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, June 15, 2017 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, June 8, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, June 1, 2017 (presenter)
- "Bankruptcy 202:  Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, February 7, 2017 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, January 31, 2017 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, January 24, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, January 17, 2017 (presenter)

**2016**

- "The New Restructuring?  Coercion and Opportunism in Debt Workouts," University of Pennsylvania Institute of Law and Economics Fall Corporate Roundtable, December 9, 2016 (co-presenter)
- "FinTech Charters," U.S. PIRG/National Council of LaRaza FinTech/Big Data Conference, December 6, 2016
- Roundtable on Housing Finance Reform, Bipartisan Policy Center, December 5, 2016 (participant)
- "The New Restructuring?  Coercion and Opportunism in Debt Workouts," Georgetown University Law Center Faculty Workshop, Nov. 8, 2016 (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, October 20, 2016 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, October 13, 2016 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 6, 2016 (presenter)
- "Pandora's Digital Box," Merchant Advisory Group Webinar, July 27, 2016  (presenter)
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, June 16, 2016 (presenter)
- "Bankruptcy 102:  Bankruptcy Basics," Gerson Lehrman Group webcast, Jun 9, 2016 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, June 2, 2016 (presenter)
- "One Dollar, One Vote," Wharton School, University of Pennsylvania, April 21, 2016
- "Minority Creditors' Rights under the Trust Indenture Act and Syndicated Loan Agreements", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Gifting Revisited", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Multi-Debtor Issues in Chapter 11", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016

- "Empty and Indirect Creditor Issues in Restructuring", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Developments in Fraudulent Transfer Law", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "State and Federal Law of Corporate Governance", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Bankruptcy 201:  Chapter 11 Restructuring," Gerson Lehrman Group webcast, Feb. 18, 2016 (presenter)
- "Bankruptcy 101:  Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Feb. 11, 2016 (presenter)

**2015**

- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Aug. 17, 2015 (presenter)
- "The Puzzle of Payments Security:  Fitting the Pieces Together to Protect the Retail Payments System," Federal Reserve Bank of Kansas City, June 25-26, 2015 (presenter)
- "Foreclosure Activity:  Legal Framework and the Impact on Borrowers and Lenders," Urban Institute, June 9, 2015 (respondent)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, June 2, 2015 (presenter)
- "Mortgage Servicing:  Contracts, Technology and Incentives," Consumer Financial Protection Bureau, Enforcement Division, Washington DC, April 21, 2015 (presenter)
- "Politics of the Bailouts," Financial Crisis Seminar, University of California, Irvine, Mar. 11, 2015 (presenter)
- "Clearinghouses and the Bankruptcy Treatment of Financial Contracts," Brooklyn Law School, Symposium on the Treatment of Financial Contracts in Bankruptcy and Bank Resolution, Feb. 27, 2015 (presenter)
- "Second-Liens and the Leverage Option," Georgetown University Law Center Faculty Workshop, Jan. 29, 2015 (presenter)

**2014**

- "Safe Banking," Duke University School of Law Faculty Workshop, Dec. 11, 2014 (presenter)
- ABI-Brooklyn Law School Junior Scholars Bankruptcy Workshop, Nov. 21-22, 2014 (commentator)
- "Safe Banking," University of Virginia Law School Law & Economics Workshop, Nov. 13, 2014 (presenter)
- "Safe Banking," University of Maryland School of Law Faculty Workshop, Oct. 23, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Oct. 16, 2014 (presenter)
- "Safe Banking," Georgetown University Law Center Faculty Workshop, Sept. 23, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Anchorage Capital, New York, Sept. 18, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, July 29, 2014 (presenter)
- "Financial Services and the Post Office," Pew Charitable Trusts, Washington, D.C., July 16, 2014 (panelist)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "The $10 Trillion Dollar Question:  Reforming Housing Finance Markets," American Law Institute Young Scholar's Medalist Conference, Washington, DC, June 10, 2014 (convener)
- "Why Teach Consumer Finance", American Association of Law Schools Mid-Year Meeting, Washington DC, June 9, 2014, panel on "Modern Financial Regulatory Approaches"
- "Perspectives on the CFPB," Financial Services Roundtable's 4th Annual Consumer Program, May 14, 2014, Washington, DC (panelist)
- "Short-Term Debt Markets," Institute for Law and Economics Corporate Roundtable, University of Pennsylvania Law School, May 2, 2014 (panelist)
- "What Should/Shouldn't Be in the Fine Print?", Making The Fine Print Fair, April 4, 2014, Washington, DC (moderator)
- "Behavioral Economics:  The End of the First Wave," Georgetown University Faculty Retreat, Feb. 19, 2014 (presenter)

## 2013

- "Mortgage Servicing", Consumer Financial Protection Bureau Legal Division Speaker Series, Dec. 11, 2013
- "The Politics of Financial Regulation and the Regulation of Financial Politics," Georgetown University Law Center Faculty Workshop, Nov. 12, 2013
- "The Politics of Financial Regulation and the Regulation of Financial Politics," Fordham University Law School Faculty Workshop, Nov. 7, 2013
- "The Disclosure Paradox," Americans for Financial Reform Conference on Transparency in Financial Regulation, Washington DC, Oct. 11, 2013.
- "Financing Housing:  GSE Reform and Sensible Mortgage Lending, CQ Roll Call Forum in partnership with the National Association of Home Builders, Washington, DC, Sept. 17, 2013 (panelist)
- CFPB Conference on Mobile Payments and Financial Inclusion, Sept. 12, 2013 (panelist)
- "Legal Leverage," Law and Society Association Annual Meeting, June 1, 2013
- "Legal Leverage," American Law Institute Annual Meeting, May 21, 2013
- "Bankruptcy Law and the Cost of Credit: The Impact of Cramdown on Mortgage Interest Rates," Harvard Law School Law and Economics Workshop, April 9, 2013
- "Duties to Serve after the Fall," Harvard Joint Center for Housing Studies, April 2, 2013

## 2012

- "The Paper Chase:  Securitization, Foreclosures, and the Uncertainty of Mortgage Title," Harvard Law Faculty Workshop, Nov. 12, 2012
- "Community Responses to the Foreclosure Crisis," Harvard Law School, Nov. 9, 2012 (panelist)
- Cornell Junior Scholars Financial Regulation Workshop, Sept. 29, 2012 (commentator)
- "American Financial Regulation," Cornell Law School Faculty Workshop, Sept. 28, 2012
- "A Transactional Genealogy of Scandal," Georgetown University Law Center Faculty Workshop, July 19, 2012
- "RTC 2.0," Pew Housing Conference, Washington, DC, June 20, 2012
- "Opportunities and Challenges for Businesses and Consumers."  FTC Mobile Payments Workshop, Washington, DC, April 26, 2012
- "A Theory of American Financial Regulation," University of Minnesota School of Law, Minneapolis, MN, April 23, 2012

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "A Theory of American Financial Regulation," Georgetown University Law Center Faculty Workshop, April 19, 2012
- Consumer and Investor Protection, George Washington University Law School C-LEAF Conference, Mar. 2, 2012 (panelist)
- "Mortgage Notes and the Uniform Commercial Code," American Ass'n of Law Schools Annual Convention, Washington, DC, Jan. 5, 2012 (panelist)

## 2011

- "The Consumer Financial Protection Bureau," World Bank, Washington, DC, Nov. 17, 2011 (panelist)
- "Mortgage Servicing Litigation," AmeriCatalyst Conference, Austin Texas, Nov. 2011
- "Modification of Mortgages in Bankruptcy," John Marshall School of Law, Chicago, IL, Oct. 20, 2011
- "Financial institutions in the new regulatory environment: Opportunities, constraints and global challenges," Georgetown McDonough School of Business, Washington, DC, Sept. 22, 2011 (panelist)
- "The Public Option in Housing Finance," Univ. Pennsylvania Law School Conference on Regulatory Breakdown, Sept. 2011
- "Mortgage Servicing," National Association of Business Economists webinar, July 7, 2011
- "Servicing Litigation," AmeriCatalyst webinar, June 23, 2011
- "State Bankruptcy," Stanford Law School, Palo Alto, CA, May 13, 2011
- "In Defense of Bailouts," C-LEAF Junior Scholars Workshop, April 1, 2011
- Durbin Amendment, PYMNTS Conference, Washington, DC, Mar. 29, 2011 (panel)
- "State Bankruptcy," American College of Bankruptcy, Washington, DC, March 19, 2011
- "Behavioral Economics and the Consumer Financial Protection Bureau," GMU National Attorneys General Education Program, Arlington, VA, March 11, 2011
- "The Dodd-Frank Act and the Financial Crisis Inquiry Commission Report," GMU National Attorneys General Education Program, Arlington, VA, March 10, 2011
- The Big-Bankruptcy Empirical Research Agenda, Conference, UCLA Law School, Los Angeles, California, February, 11 2011 (presenter)
- Treatment of Derivatives and Other Financial Contracts in Insolvency, World Bank Insolvency and Debtor/Creditor Regime Task Force Meeting, January 11, 2011 (presenter)
- Asset Sales in Bankruptcy, American Association of Law Schools Annual Convention, San Francisco, California, January 7, 2011 (moderator)
- Credit Cards and College Students, American Association of Law Schools Annual Convention, San Francisco, California, January 7, 2011 (panelist)
- "Explaining the Housing Bubble," American Association of Law Schools Annual Convention, San Francisco, California, January 6, 2011

## 2010

- "Explaining the Housing Bubble," Tel Aviv University Law School, Law and Economics Workshop, Tel Aviv, Israel, Nov. 29, 2010
- "Modification of Mortgages in Bankruptcy," American University Washington College of Law, Washington, D.C., Nov. 11, 2010
- "The Uncertain Value Proposition in Mobile Commerce," Mobile Commerce Conference, University of Washington Law School, Seattle, October 29, 2010

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Robosigning, Putbacks, and Failed Loan Modification Programs," Federal Reserve System & Federal Deposit Insurance Corporation Conference on Mortgages and the Future of Housing Finance, Arlington, VA, Oct. 25, 2010
- "Why We Need Bankruptcy More Than Ever," American College of Bankruptcy, Washington, D.C., Oct. 22, 2010 (moderator)
- "Explaining the Housing Bubble," Georgetown University Law School Legal Scholarship Workshop, Washington, D.C., Oct. 20, 2010
- "In Defense of Bailouts," University of Pennsylvania School of Law, Philadelphia, Pennsylvania, Oct. 18, 2010
- "What Have They Done?" American Enterprise Institute, Washington, D.C. Oct. 14, 2010 (panelist)
- AmeriCatalyst, Inside Out:  Rebuilding the U.S. Housing Finance System, Austin, Texas, Sept. 14, 2010 (moderator)
- AmeriCatalyst, Inside Out:  Rebuilding the U.S. Housing Finance System, Austin, Texas, Sept. 13, 2010 (panelist)
- "Financial Data Privacy in the United States," U.S. State Department Foreign Press Center, Washington, D.C., June 21, 2010
- "Information Failures in the U.S. Mortgage Crisis," Tobin Project Workshop, Washington, D.C., June 8, 2010
- "Information Failures in the U.S. Mortgage Crisis," Federal Reserve Bank of Philadelphia, May 14, 2010
- "Too Big to Fail," American Bankruptcy Institute Great Debates, ABI Annual Convention, Washington, D.C., April 30, 2010
- "In Defense of Bailouts," Georgetown University Law Center Faculty Workshop, Washington, D.C., April 14, 2010
- Practicing Law Institute, Consumer Financial Services Institute, Chicago, Apr. 8, 2010 (panelist)
- "Private Disordering?  Payment Card Fraud Liability Rules," Symposium on Data Security and Data Privacy in the Payment System, Brooklyn Law School, Mar. 19, 2010
- The New Regulatory Landscape, Filene Research Institute, National Credit Union Executive Conference, Feb. 23, 2010 (keynote)
- "Private Label Securitization," University of Pennsylvania Wharton School, Philadelphia, Pennsylvania, Feb. 22, 2010
- Practicing Law Institute, Consumer Financial Services Institute, New York, Feb. 18, 2010 (panelist)

**2009**

- The Consumer Financial Protection Agency, Consumer Federation of America Financial Services Conference, Washington, D.C., Dec. 3, 2009 (panelist)
- "Conceptual Challenges in Access to Credit versus Regulation" Conference on Consumer Finance Post-Apartheid:  The South African Experience, University of Connecticut School of Law, Nov. 21 (moderator)
- "The Disclosure Paradox," University of Connecticut School of Law, Nov. 21, 2009
- The Consumer Financial Protection Agency, American Enterprise Institute, Washington, D.C., Nov. 18, 2009 (panelist)
- "Mortgage Workouts," University of Pennsylvania Law School, Philadelphia, Pennsylvania, Nov. 17, 2009

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Too Big to Fail," American Bankruptcy Institution Legislative Symposium, Washington, D.C., Nov. 17, 2009 (panelist)
- "Role of Central Banks in Payment System Regulation," Federal Reserve Bank of Kansas City, November, 2009
- Workshop on Behavioral and Institutional Research and Financial Services Regulatory Reform, Penn Law School, Philadelphia, Pennsylvania, Nov. 6, 2009 (moderator)
- "The Consumer Financial Protection Agency," Women in Housing Finance, Washington, D.C., Oct. 29, 2009 (panelist)
- The Consumer Financial Protection Agency, Symposium: Regulatory Reform at the Crossroads: What Is the Right Response to the Financial Crisis?, George Washington University Law School, Washington, D.C., October 23, 2009 (panelist)
- "Consumer Credit Reform Legislation," American Bankruptcy Institute Midwest Consumer Bankruptcy Conference, Chicago, Illinois (October 2009) (keynote address)
- "DIP Financing," American Bankruptcy Institute-University of Missouri Kansas City Bankruptcy Conference, Kansas City, Missouri (October 2009) (panelist)
- "Making Home Affordable?," American Bankruptcy Institute-University of Missouri Kansas City Bankruptcy Conference, Kansas City, Missouri (October 2009) (keynote address)
- "Current Issues in Chapter 11," American Bankruptcy Institute Northeast Bankruptcy Conference, Bretton Woods, New Hampshire (July 2009) (panelist)
- "Consumer Protection in Financial Transactions," ABA Section on Antitrust, Consumer Protection Conference, Georgetown University Law Center (June 2009) (panelist)
- "Frankenstein Contracts," Stanford-Yale Junior Faculty Forum, Palo Alto, California (May 30, 2009)
- "Who Pays for Payments," Federal Reserve Bank of Chicago, May 15, 2009
- "The Financial Crisis and Administrative Law," Georgetown University Law Center White Tablecloth Faculty Luncheon, May 2009
- "The Financial Crisis," Georgetown University Law Center Board of Visitors Annual Meeting, Santa Fe, NM, April 4, 2009
- "Bankruptcy Claims Trading," Symposium, Brooklyn Law School & Brooklyn Journal of Corporate, Financial and Commercial Law (February 27, 2009)
- "Modification of Mortgages in Bankruptcy," International Monetary Fund, (January 23, 2009)
- "Real Estate Transactions in Troubled Times," Joint Extended Program of the AALS Section on Real Estate Transactions and the AALS Section on Creditors' and Debtors' Rights, American Association of Law Schools Annual Convention (January 10, 2009)
- "Hydraulic Regulation," AALS Section on Financial Institutions and Consumer Financial Services. American Association of Law Schools Annual Convention (January 9, 2009)

## 2008

- "Mortgage Loss Mitigation," Pennsylvania Bar Institution Real Estate Institute, Philadelphia, PA, (Dec. 5, 2008) (panelist)
- "The Impact of the Subprime Meltdown," Commercial Law League of America and National Conference of Bankruptcy Judges (Nov. 11, 2008) (panelist)
- "Foreclosure Externalities," Conference on "The Public Aspects of Private Property," Georgetown University Law Center (Nov. 7-8, 2008)
- "United States Banking Regulation," Presentation to Great Wall Asset Management Corporation (Chinese government agency responsible for non-performing bank assets), Georgetown University, Oct. 30, 2008)

- "Equal Rights Under Law," Response to Professor Li Xia Feng, Georgetown University-Chinese Central Party School Conference, Washington, D.C., (Oct. 21, 2008)
- "Wall Street to Main Street:  Bail Out and Restructuring," ABA 2008 Administrative Law Conference, Washington, D.C. (Oct. 17, 2008) (panelist)
- "The Subprime Mortgage Crisis:  A Systemic View," National Conference of Bankruptcy Judges Annual Convention (September 25, 2008) (panelist)
- "Lehman Brothers' Bankruptcy," Student Bar Association, Georgetown University Law Center (Sept. 17, 2008)
- "Hydraulic Regulation:  Regulating Credit Markets Upstream," Georgetown University Law Center Faculty Workshop (Sept. 16, 2008)
- Panel on "Mounting Household Debt, Lending Practices, and Legislative and Regulatory Responses," Federal Reserve Bank of Cleveland 2008 Community Development Policy Summit (June 11, 2008)
- "Hydraulic Regulation:  Regulating Markets Upstream" University of Connecticut School of Law Junior Workshop on Banking and Consumer Financial Services Law (May 28, 2008)
- Panel on "Credit Card Regulation" Conference on Consumer Credit Protection Sponsored by the Federalist Society, the Financial Services Roundtable, and the Consumer Bankers Association, National Press Club, Washington, D.C., (May 20, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," American Law and Economics Association Annual Convention, (May 16, 2008)
- Panel on "Emerging Privacy Issues between the US and the EU - Bridging the Transatlantic Gap," Conference at Georgetown University Law Center (April 28, 2008)
- Panel on "Bankruptcy Law in Indonesia" at *Indonesia: Current Legal Reform*, Conference sponsored by the United States-Indonesia Society, International Law Institute, and the Millennium Challenge Corporation (a United States government corporation) (April 22, 2008)
- Panel on "Subprime Mortgage Lending," Paul Robeson Conference, Columbia Law School (April 18, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," University of Virginia School of Law Faculty Workshop (April 11, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," Board of Governors of the Federal Reserve, Research and Statistics Workshop (March 25, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," Georgetown University Faculty Workshop (March 18, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," Harvard-University of Texas Conference on Commercial Realities (Feb. 29, 2008)

## 2007 and prior
- Commentator, Conglomerate Third Annual Junior Scholars' Workshop (June 24, 2007)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Cornell Law School (Dec. 18, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Georgetown University Law Center (Dec. 4, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," The Ohio State University Moritz College of Law (Nov. 28, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Cardozo Law School (Nov. 21, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Washington University in St. Louis Law School (Nov. 20, 2006)

53

Case 2:22-cv-08775-RGK-SK   Document 51-1   Filed 09/27/23   Page 56 of 61   Page ID #:681
*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- "Priceless?  The Costs of Credit Card Merchant Restraints," Northwestern University Law School (Nov. 14, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," American University Washington College of Law (Nov. 9, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Brooklyn Law School (Nov. 1, 2006)
- "Priceless?  The Costs of Credit Card Merchant Restraints," Emory Law School (Oct. 18, 2006)
- "Finding <u>Nemo</u>:  Rediscovering the Virtues of Negotiability in the Wake of <u>Enron</u>," New York Law School (Sept. 8, 2006)
- "Finding <u>Nemo</u>:  Rediscovering the Virtues of Negotiability in the Wake of <u>Enron</u>," Conglomerate Second Annual Junior Scholars' Workshop (July 10, 2006), *at* http://www.theconglomerate.org/junior_scholars_workshop/index.html

## COURSES TAUGHT

**Bankruptcy:**  2008(s); 2008(sum); 2008(f); 2009 (sum); 2010(s)

**Contracts:**  2009(f); 2011(f); 2012(f-Harvard Law School)

**Commercial Finance/Secured Credit:**  2009(s); 2013(f)

**Consumer Finance:**  2011(s); 2012(s); 2013(s-Harvard Law School); 2014(s), 2017(s); 2018(s); 2019(s), 2021(s), 2023(f)

**Financial Restructuring:**  2011(s); 2012(s); 2013(s-Harvard Law School); 2014(s); 2016(s), 2016(f); 2017(f); 2019(s), 2020(s), 2020(f), 2021(f); 2023(s), 2024(s)

**Law of Money Seminar:**  2016(s), 2021(s)

**Payment Systems and Financial Transactions**:  2008(sum—FTC); 2008(f); 2023(s)

**Payment Systems: Law, Technology, and Policy**: 2023(f)

**Regulation of Financial Institutions:**  2018(f)

**Sales and Leases:** 2017(s); 2018(s)

**Structured Finance (Securitization & Derivatives):**  2010(s)

## SCHOOL SERVICE

- Academic Standards Committee (2021(f))
- Admissions Committee (2022-23)
- Appointments Committee (2018-19; 2013-14; 2011-12, chair; 2009-10)
- Faculty Workshop Committee (2016(s), chair; 2017(f), chair)
- Fellows and Teaching Careers Committee (2019-20)
- Finance Committee (2010-11)
- Financial Aid Committee (2013-2014)
- Rank and Tenure Committee (2020-21)
- Tax Appointments Committee (2013-14; chair, 2010-11)
- Technology Committee (2016-17)
- Legal Profession Committee (2008-2009; 2007-2008)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## PROFESSIONAL SERVICE AND ACTIVITIES

- DC Bar Pro Bono Center, Bankruptcy Clinic trainer (2021)
- Jewish Federation of Greater Washington Anti-Poverty Initiative (2021)
- Biden for President, Policy Volunteer Coordinator—Consumer Protection and Consumer Credit (2020)
- Warren for President, Policy Volunteer Coordinator—Financial Regulation, Consumer Protection, and Bankruptcy (2019-2020)
- Federal Reserve Bank of Philadelphia, Supervisory Research Forum (2019-2020)
- Supreme Court Fellows Program, Academic Advisory Board (2018-19)
- Member, Mortgage Servicing Collaborative (convened by the Urban Institute) (2018)
- Federal Reserve Secure Payments Task Force (2015)
- Federal Reserve Faster Payments Task Force (2015)
- Consumer Financial Protection Bureau, statutory Consumer Advisory Board (2012-2015)
- Member, American Law Institute Advisory Group on UCC and Holder-in-Due-Course Policy.
- Member, American Law Institute Member's Consultative Group, Restatement on Law of Consumer Contracts
- Urban Institute, Housing Finance Policy Center, Academic Research Council
- Center for American Progress, Mortgage Finance Working Group
- Reporter, Advisory Committee on Multiple Debtor Cases, American Bankruptcy Institute Commission to Study the Reform of Chapter 11
- World Bank Insolvency and Debtor/Creditor Regime Task Force
- Fellow, Center for Law, Economics and Finance (C-LEAF) at George Washington University Law School
- Editorial Board, AMERICAN BANKRUPTCY INSTITUTE LAW REVIEW
- Manuscript reviewer for AMERICAN BANKRUPTCY LAW JOURNAL; Cambridge University Press; CITYSCAPE; Conference on Empirical Legal Studies; COLUMBIA LAW REVIEW; Cornell University Press; GEORGETOWN LAW JOURNAL; HOUSING POLICY DEBATE; JOURNAL OF EMPIRICAL LEGAL STUDIES; LAW & SOCIETY REVIEW; Netherlands Organization for Scientific Research; Oxford University Press; STANFORD LAW REVIEW, University of Chicago Press; YALE LAW JOURNAL; Yale University Press
- Area Organizer for Bankruptcy, American Law and Economics Association (2009)
- Executive Committee Member, AALS Section on Fin. Institutions & Consumer Fin. Services (2009)

## COURT ADMISSIONS

- Supreme Court of the United States (2015) (Bar # 294231)
- United States Court of Appeals for the Third Circuit (2006)
- United States District Court for the Southern District of New York (2006)
- United States District Court for the Eastern District of New York (2006)
- New York State Courts (2006)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

## APPENDIX C. DOCUMENTS RELIED UPON IN FORMULATING THE REPORT

**Pleadings and Court Rulings**

- Complaint
- Answer
- Order re Defendant's Motion to Dismiss

**Federal Statutes and Regulations**

- 12 U.S.C. § 85
- 12 U.S.C. § 1831d
- 15 U.S.C. § 636
- 15 U.S.C. § 1601
- 15 U.S.C. § 1603
- 15 U.S.C. § 1604
- 15 U.S.C. § 1605
- 15 U.S.C. § 1606
- 12 C.F.R. § 1026.4
- 12 C.F.R. § 1026.14
- 12 C.F.R. § 1026.22
- 12 C.F.R. § 1026, Appendices H and J
- 78 Fed. Reg. 79980 (Dec. 31, 2013).

**State Bills, Statutes, and Regulations and Other Regulatory Materials**

- Cal. DFPI, Final Statement of Reasons, PRO 01-18
- SB 1235
- Cal. Fin. Code §§ 22801 *et seq.*
- Cal. Code Reg. title 10, § 901 *et seq.*
- Cal. Senate Judiciary Committee, Report on SB 1235
- N.Y. Fin. Serv. L. §§ 801-812
- N.Y. Comp. Codes R. & Regs., tit. 23, part 600
- Utah Code §§ 7-27-101 to 7-27-301.
- Va. Code tit. 6.2, ch. 22.1
- 10 Va. Admin. Code §§ 5-240-10 to 5-240-40

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Consent Order, In the Matter of Commission of Fin. Protection & Innovation vs. Expansion Capital Group, LLC, No. 60DBO-44063 (Apr. 4, 2022)

- Consent Order, In the Matter of Commission of Fin. Protection & Innovation vs. Allup Finance LLC, No. 60DBO-77076 (Nov. 12, 2020)

- OP 7236 CFLL (Letter Declining to Issue Interpretive Opinion, Apr. 29, 2013)

- OP 7222 CFLL (Interpretive Opinion, Jan. 17, 2013)

**Comment Letters on CFDL Rulemaking**

- Rapid Advance Comment Letter to DBO on Proposed Rulemaking for Commercial Financing Disclosures [undated]

- SBFA Comment Letter to DBO on Proposed Rulemaking for Commercial Financing Disclosures, dated Jan. 19, 2019

- American Factoring Association and International Factoring Association, Comment on Proposed Rulemaking/Commercial Financing Disclosure Regulations (PRO 01-18), Nov. 22, 2021, *at* https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/12/American-Factoring-Association-11.22.21.pdf

**Judicial Decisions**

- Nat'l Bank v. Johnson, 104 U.S. 271 (1881)

- Evans v. Nat'l Bank of Savannah, 251 U.S. 108 (1919)

- Daniel v. First Nat'l Bank of Birmingham, 227 F.2d 353 (5th Cir. 1955), *reh'g denied with opinion*, 228 F.2d 803 (5th Cir. 1956)

- West Pico Furniture Co. v. Pac. Fin. Loans (West Pico), 2 Cal.3d 594 (1970).

- CapCall, LLC v. Foster (*In re* Shoot The Moon, LLC), 635 B.R. 797 (Bankr. D. Mont. 2021)

- Davis v. Richmond Capital Group LLC, 194 A.D.3d 516 (N.Y. App. Div. 1st Dept. 2021)

- Lateral Recovery LLC v. Capital Merchant Services, LLC, 2022 U.S. Dist. LEXIS 181044 (S.D.N.Y. Sep. 30, 2022)

- Fleetwood Services v. Ram Capital Funding LLC, *2022* U.S. Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022), *aff'd*, Fleetwood Servs., LLC v. Richmond Capital Grp. LLC, 2023 U.S. App. LEXIS 14241 (2d Cir. 2023)

**Discovery Production**

- SBFA 0027-0042 (Forward Financing Future Receipts Sale Agreement)

- SBFA 00084-00096 (Rapid Finance Business Line of Credit)

- SBFA 0097-0106 (Rapid Finance Future Receivables Sales)

- SBFA 00573-00584 (Rapid Finance Business Loan)

- SBFA 00627-00649 (Kapitus LLC Forward Purchase Agreement (Fixed))

- SBFA 00838-00859 (Kapitus LLC Forward Purchase Agreement (Credit Card delivery)

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- SBFA 00860-00881 (Kapitus LLC Forward Purchase Agreement (Variable ACH delivery)
- SBFA 00882-00902 (Kapitus LLC Loan)
- SBFA 00903-00923 (Kapitus LLC New Deal Underwriting Policy Manual)
- SBFA 01078-01095 (Rapid Finance Underwriting Manual)


## MCA Provider Websites and SEC filings

- What Is Revenue-Based Financing? *Why It's Different*, at https://whatisrevenuebasedfinancing.com/why-its-different/ (last viewed Sept. 20, 2022, at 9:20am)
- eCapital, *Invoice Factoring vs. Merchant Cash Advances: Choosing the Right Funding Solution*, at https://ecapital.com/blog/invoice-factoring-vs-merchant-cash-advances-choosing-the-right-funding-solution/ (last viewed Sept. 20, 2022, at 9:12am)
- Forward Financing, *Merchant Cash Advances vs. Business Loans — What's the Difference?* , Sept. 13, 2023, *at* https://www.forwardfinancing.com/2023/09/13/merchant-cash-advances-vs-business-loans-whats-the-difference/ (last viewed Sept. 20, 2022, at 9:09am)
- Kapitus, *Financing Your Business with a Merchant Cash Advance,* at https://kapitus.com/guide/financing-your-business-with-a-merchant-cash-advance/ (last viewed Sept. 20, 2022, at 9:09am)
- Kapitus, *Financing Your Small Business With a Merchant Cash Advance*, *at* https://kapitus.com/wp-content/uploads/2019/11/MCA_eGuide.pdf
- Knight Capital Funding, Future Receivables Sale Agreement, dated August, 8, 2019, *at* https://www.sec.gov/Archives/edgar/data/1300938/000118518519001167/ex_155737.htm
- LG Funding LLC, Standard Merchant Cash Advance Agreement, dated April 12, 2022, *at* https://www.sec.gov/Archives/edgar/data/895665/000149315222010141/ex10-52.htm.
- Rapid Finance, https://www.rapidfinance.com/financing-solutions/merchant-cash-advance/ (last viewed Sept. 20, 2022, at 9:09am)


## Other Sources

- Cal. Dept. of Ins., *FAQ on business interruption insurance and other issues affecting California small businesses*, at https://www.insurance.ca.gov/01-consumers/140-catastrophes/FAQ-on-Business-Interruption-Insurance.cfm.
- CFPB, *My payday lender said my loan would cost 15 percent but my loan documents say the annual percentage rate (APR) is almost 400 percent. What is an APR on a payday loan and how should I use it?*, Jan. 17, 2022, *at* https://www.consumerfinance.gov/ask-cfpb/my-payday-lender-said-my-loan-would-cost-15-percent-but-my-loan-documents-say-the-annual-percentage-rate-apr-is-almost-400-percent-what-is-an-apr-on-a-payday-loan-and-how-should-i-use-it-en-1625/
- Thomas A. Durkin, *Consumers and Credit Disclosures: Credit Cards and Credit Insurance*, FED. RES. BULL. 203 (April 2002)
- Fed. Reserve Sy., *Small Business Credit Survey: 2022 Report on Employer Firms*
- Fed. Reserve Sys., *Small Business Credit Survey, 2023 Report on Employer Firms*

*CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER*

- Adam J. Levitin, *Spurious Pedigree of the "Valid-When-Made" Doctrine*, 71 DUKE L.J. ONLINE 87 (2022)

- Michael A. Mora, *"I'm Ruined": Litigation Trend Takes Aim at Merchant Cash Advance Industry*, N.Y.L.J., Sept. 7, 2022

- NAT'L CONS. L. CENTER, *TRUTH IN LENDING*, § 6.2.3 (11th ed. 2023)

- Jacob H. Nemon & Jeffrey S. Boxer, *Merchant Cash Advance Litigation Is Getting Wilder*, N.Y.L.J., July 2, 2021

- Jordan Stevens, *Comment, The Merchant Cash Advance Industry May Have a Few Bad Apples, But That Does Not Mean It's Time to Empty the Barrel*, 49 TEX. TECH L. REV. 501 (2017)

- Elizabeth Renuart & Diane E. Thompson, *The Truth, The Whole Truth, and Nothing but the Truth: Fulfilling the Promise of Truth in Lending*, 25 YALE J. ON REG. 181 (2008)

- Dock Treece, *Personal Guaranties and Business Loans*, BUS. DAILY NEWS, Feb. 21, 2023, *at* https://www.businessnewsdaily.com/16467-personal-guarantee.html