ROB BONTA
Attorney General of California
LISA W. CHAO
MICHAEL D. GOWE
Supervising Deputy Attorneys General
DOUGLAS J. BETETA (SBN: 260377)
RACHEL J. YOO (SBN: 293598)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6622
 Fax:  (916) 731-2128
 E-mail:  Douglas.Beteta@doj.ca.gov
          Rachel.Yoo@doj.ca.gov
*Attorneys for Defendant*
*Clothilde Hewlett, solely in her official capacity as*
*Commissioner of the California Department of*
*Financial Protection and Innovation*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **SMALL BUSINESS FINANCE ASSOCIATION,**<br><br>Plaintiff,<br><br>v.<br><br>**CLOTHILDE HEWLETT, solely in her official capacity as commissioner of the California Department of Financial Protection and Innovation,**<br><br>Defendant. | Case No.: 2:22-cv-08775-RGK-SK<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFF**<br><br>Date:  October 30, 2023<br>Time:  9:00 a.m.<br>Courtroom:  850<br>Judge:  Hon. R. Gary Klausner<br>Trial Date:  December 12, 2023<br>Action Filed: December 2, 2022 |

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 30, 2023, at 9:00 a.m., or as soon

thereafter as the matter may be heard in Courtroom 850 of the above-entitled court

1   located at 255 East Temple Street, Los Angeles, CA 90012, defendant Clothilde

2   Hewlett, solely in her official capacity as Commissioner of the California

3   Department of Financial Protection and Innovation (the Department) will, and

4   hereby does, move this Court under Federal Rule of Civil Procedure 56 and Local

5   Rule 56 to enter judgment in favor of the Department and against Plaintiff Small

6   Business Finance Association (SBFA) with respect to each and every claim for

7   relief stated in SBFA's complaint.

8        PLEASE TAKE FURTHER NOTICE that, alternatively, the Department

9   hereby moves the Court for partial summary judgment as to each of the following

10  issues:

11       Issue No. 1: The Department is entitled to summary judgment as to SBFA's

12  first claim for relief on violations of the First Amendment because SBFA lacks

13  standing to assert an as-applied First Amendment challenge to Cal. Code Regs. tit.

14  10, § 900, et seq. (the Regulations).

15       Issue No. 2: The Department is entitled to summary judgment as to SBFA's

16  first claim for relief on violations of the First Amendment with respect to sales-

17  based financing because SBFA lacks standing to assert an as-applied First

18  Amendment challenge to the Regulations with respect to sales-based financing.

19       Issue No. 3: The Department is entitled to summary judgment as to SBFA's

20  first claim for relief on violations of the First Amendment with respect to sales-

21  based financing because the disclosures required by the Regulations as applied to

22  the sales-based financing of SBFA's members are purely factual, noncontroversial,

23  and neither unjustified nor unduly burdensome.

24       Issue No. 4: The Department is entitled to summary judgment as to SBFA's

25  first claim for relief on violations of the First Amendment with respect to open-end

26  credit because the disclosures required by the Regulations as applied to the open-

27  end credit of SBFA's members are purely factual, noncontroversial, and neither

28  unjustified nor unduly burdensome.

1    Issue No. 5: The Department is entitled to summary judgment as to SBFA's

2    second claim for relief on preemption by the Truth in Lending Act (TILA) because

3    the Consumer Financial Protection Bureau has made a dispositive determination

4    that they are not preempted by TILA and because the Regulations are not

5    inconsistent with TILA.

6        This Motion is based on this Notice of Motion and the attached

7    Memorandum of Points and Authorities; the concurrently filed declaration of

8    Charles Carriere and declaration of Rachel Yoo and the exhibits appended thereto;

9    any other evidence received in connection with the hearing on this motion; all

10   matters of record in the Court's file in this action; and such other evidence and

11   written or oral argument as the Court may wish to consider and direct the parties to

12   submit.

13       This Motion is made following the conference of counsel pursuant to Local

14   Rule 7-3, which took place on September 15, 2023.

15

16   Dated:  September 27, 2023                    ROB BONTA
                                                   Attorney General of California
17                                                 LISA W. CHAO
                                                   MICHAEL D. GOWE
18                                                 Supervising Deputy Attorneys General

19                                                 /s/ Rachel J. Yoo

20                                                 Rachel J. Yoo
                                                   Douglas J. Beteta
21                                                 Deputy Attorneys General

22                                                 *Attorneys for Defendant Clothilde*
                                                   *Hewlett, solely in her official*
23                                                 *capacity as Commissioner of the*
                                                   *California Department of Financial*
24                                                 *Protection and Innovation*

25

26

27

28

1  ROB BONTA
   Attorney General of California
2  LISA W. CHAO
   MICHAEL D. GOWE
3  Supervising Deputy Attorneys General
   DOUGLAS J. BETETA (SBN: 260377)
4  RACHEL J. YOO (SBN: 293598)
   Deputy Attorneys General
5    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
6    Telephone:  (213) 269-6622
     Fax:  (916) 731-2128
7    E-mail:  Douglas.Beteta@doj.ca.gov
              Rachel.Yoo@doj.ca.gov
8  *Attorneys for Defendant*
   *Clothilde Hewlett, solely in her official capacity as*
9  *Commissioner of the California Department of*
   *Financial Protection and Innovation*
10

11           IN THE UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                     WESTERN DIVISION

14

15

16  | **SMALL BUSINESS FINANCE ASSOCIATION,** | Case No.: 2:22-cv-08775-RGK-SK |
    |---|---|

**SMALL BUSINESS FINANCE ASSOCIATION,**

                                    Plaintiff,

        v.

**CLOTHILDE HEWLETT, solely in her official capacity as commissioner of the California Department of Financial Protection and Innovation,**

                                    Defendant.

Case No.: 2:22-cv-08775-RGK-SK

**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFF**

Date:          October 30, 2023
Time:          9:00 a.m.
Courtroom:     850
Judge:         Hon. R. Gary Klausner
Trial Date:    December 12, 2023
Action Filed:  December 2, 2022

1

## TABLE OF CONTENTS

2

Page

3  Memorandum of Points and Authorities ................................................................. 1

4      I.      Introduction ................................................................................................. 1

       II.     Statement of Facts ...................................................................................... 2
5
               A.      SBFA Members' Financing Products........................................ 2
6
               B.      The Regulations ........................................................................... 4
7
               C.      SBFA's Lawsuit ........................................................................... 5
8      III.    Argument...................................................................................................... 5

9              A.      SBFA Lacks Standing to Bring an As-Applied Challenge ........ 5

10             B.      The Regulations Satisfy *Zauderer* as a Matter of Law .............. 7

11                     1.      The Required Disclosures Are Purely Factual ................. 7

                               a.      The Regulations' definition Aligns with Both
11                                     Federal and State Law.......................................... 8

12                             b.      The Terms Required by the Regulations
                                       Comport with Basic English and SBFA's
13                                     Own Use................................................................. 8

14                             c.      The Metrics Required by the Regulations
                                       Are Readily Available on the Face of
15                                     Contracts and SBFA Members Use Them for
                                       Internal Projections ............................................ 10
16                             d.      The Required Disclosures Are Purely Factual
                                       Because SBFA Members' Sales-Based
17                                     Financing Products Are Akin to Loans............... 11

18                             e.      The Regulations' Treatment of Open-End
                                       Credit Is Purely Factual Because It Provides
19                                     Realistic Estimates ............................................. 14

20                     2.      The Required Disclosures Are Noncontroversial
                               Because They Are Based on Transparent
21                             Assumptions and Figures Found on Contracts .............. 15

                       3.      The Required Disclosures Are Neither Unjustified
22                             nor Unduly Burdensome Because They Are Brief
                               and Allow Lenders to Provide Additional
23                             Information..................................................................... 17

24             C.      The Regulations Are Not Preempted by TILA Because
                       They Are Not Inconsistent with TILA .................................... 18
25
       IV.    Conclusion ................................................................................................ 20
26
Certificate of Compliance........................................................................................ 21

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3  CASES

4  *Am. Beverage Ass'n v. City & Cnty. of San Francisco*

5      916 F.3d 749 (9th Cir. 2019) ........................................................*passim*

6  *California Chamber of Com. v. Becerra*

7      529 F.Supp.3d 1099 (E.D. Cal. 2021) ................................................ 16

8  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*

9      467 U.S. 837 (1984) .................................................................. 19, 20

10  *Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l*
    *Planning Agency*

11      365 F. Supp. 2d 1146 (D. Nev. 2005) ................................................. 7

12  *Concord Boat Corp. v. Brunswick Corp.*

13      207 F.3d 1039 (8th Cir. 2000) ........................................................ 10

14  *CTIA - The Wireless Ass'n v. City of Berkeley, California*

15      928 F.3d 832 (9th Cir. 2019) .................................................... 15, 17

16  *Ford Motor Credit Co. v. Milhollin*

17      444 U.S. 555 (1980) .................................................................... 19

18  *Free Speech Coal., Inc. v. AG of the United States*

19      974 F.3d 408 (3d Cir. 2020) ............................................................ 6

20  *Hoye v. City of Oakland*
        653 F.3d 835 (9th Cir. 2011) ............................................................ 6

21

22  *Hunt v. Washington State Apple Advert. Comm'n*
        432 U.S. 333 (1977) ..................................................................... 6

23  *Ibanez v. Fla. Dep't of Bus. & Prof'l Regul., Bd. of Acct.*

24      512 U.S. 136 (1994) .................................................................... 18

25  *In re Hero Loan Litig.*

26      No. ED CV 16-02478-AB, 2017 U.S. Dist. LEXIS 111771 (C.D.

27      Cal. July 17, 2017).................................................................... 19

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Jimeno v. Mobil Oil Corp.*
   66 F.3d 1514 (9th Cir. 1995) .................................................................. 20

*Lujan v. Def. of Wildlife*
   504 U.S. 555 (1992) ............................................................................... 5

*Milavetz, Gallop & Milavetz, P.A. v. U.S.*
   559 U.S. 229 (2010) ............................................................................... 7

*Nat'l Inst. of Fam. And Life Advoc. v. Becerra*
   138 S. Ct. 2361 (2018) ......................................................................... 15

*Nationwide Biweekly Admin., Inc. v. Owen*
   873 F.3d 716 (9th Cir. 2017) ...................................................... 8, 9, 18

*West Pico Furniture Co. v. Pac. Fin. Loans*
   2 Cal.3d 594 (1970) .............................................................................. 11

*Zauderer v. Off. of Disciplinary Counsel*
   471 U.S. 626 (1985) ........................................................................*passim*

**STATUTES**

United States Code, Title 15
   § 1602(i) ............................................................................................... 20
   § 1604(h) ............................................................................................... 19
   § 1610(a)(1) .......................................................................................... 19

California Financial Code
   § 22500 ................................................................................................... 8
   § 22800 ................................................................................................... 4
   § 22800(d)(1) ........................................................................................ 20

Truth in Lending Act (TILA) ...................................................................*passim*

Uniform Commercial Code
   Article 9 ................................................................................................. 13

**TABLE OF AUTHORITIES**
(continued)

Page

REGULATIONS

California Code of Regulations, Title 10
§ 900 ........................................................................................................ 2
§ 901(a)(8) ......................................................................................... 4, 18
§ 910 ........................................................................................................ 4
§ 911 .................................................................................................. 4, 15
§ 911(a)(2) ......................................................................................... 4, 15
§ 914 ........................................................................................................ 4
§ 914 (a)(3)(A) ................................................................................ 10, 11
§ 914 (a)(3)(C) ...................................................................................... 11
§ 914(a)(3)(D) ......................................................................................... 8
§ 914 (a)(6)(A) ................................................................................ 10, 11
§ 914 (a)(8)(A) ................................................................................ 10, 11
§ 914 (a)(8)(C) ...................................................................................... 11
§ 943(a)(1) ............................................................................................ 15
§ 943(a)(2) .............................................................................................. 8

Code of Federal Regulations, Title 12
§ 1026.2(a)(21) ..................................................................................... 14
§ 1026.4(b)(1) ......................................................................................... 8
§ 1026.6(b)(2)(1) ................................................................................... 14

Truth in Lending; Determination of Effect on State Laws (California,
    New York, Utah, and Virginia)
    88 Fed. Reg. 19214 (Mar. 31, 2023) ................................................ 19

CONSTITUTIONAL PROVISIONS

United States Constitution
    First Amendment ........................................................................ 1, 5, 7, 15

OTHER AUTHORITIES

Thomas F. Segalla et al., *A First Look at the Coverage Implications of
    Hydraulic Fracturing*; Westlaw Journal Insurance Coverage, 22
    No. 34 WJINSC 1, June 1, 2012 ...................................................... 14

iv

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I.   INTRODUCTION

3      In 2018, the California legislature passed Senate Bill-1235 to address the rise

4  of predatory online lenders.  Under the guise of easy and fast funding, they often

5  bury or fail to disclose important terms.  Small businesses, when faced with an

6  urgent need for capital, may unwittingly sign contracts with them only to find

7  themselves in further financial hardship and even bankruptcy.  The Regulations aim

8  to protect them.  They enable small businesses to fairly compare the costs of varied

9  financing products such as closed-end credit, open-end credit, and sales-based

10  financing, by using time-tested, familiar metrics like APR, finance charge, payment

11  amount, and payment term.  The Regulations also account for unique characteristics

12  of sales-based financing and provide that certain disclosures are only "estimates"

13  along with statements such as "APR is not an interest rate" and "This financing

14  does not have a fixed payment schedule and there is no minimum payment

15  amount."  Despite such safeguards, SBFA alleges that the Regulations violate its

16  members' First Amendment rights and accuses the Regulations of misleading and

17  confusing their customers.

18      SBFA's challenges fail.  It lacks associational standing because inconsistent

19  financing terms its members offer necessitate fact-intensive, individualized analysis

20  to determine the effects of the Regulations on each member.  Furthermore, the

21  Regulations satisfy *Zauderer*.  They are based on figures found on the face of the

22  contracts and accurately describe the cost of the financing, and thus are factual.

23  Also, it is not controversial to employ uniform disclosure metrics for both sales-

24  based financing and closed-end credit because SBFA members' sales-based

25  financing closely resembles closed-end credit, which is identical to traditional loan

26  products.  Indeed, SBFA itself has "colloquially" referred to sales-based financing

27  as loans.  Furthermore, as indicated by the Consumer Financial Protection Bureau's

28

(CFPB) dispositive determination, the Regulations are not preempted by the Truth in Lending Act (TILA) because they are not inconsistent with TILA.

## II.   STATEMENT OF FACTS

Effective December 9, 2022, lenders offering financing of $500,000 or less to California businesses are required to provide uniform disclosures, Cal. Code Regs. tit. 10, § 900 et seq. (the Regulations).  The Regulations are designed to protect vulnerable small businesses that, often lacking access to traditional bank loans, turn to the Internet to find non-traditional and complex financing products to help keep their businesses afloat.  (SUF 1.)  These products include sales-based financing, closed-end credit, and open-end credit, which are offered by SBFA members.

### A.   SBFA Members' Financing Products

In most sales-based financing, a borrower (i.e., the business) "sells" a portion of its future sales receipts to a lender in exchange for a lump sum advance.  (SUF 2.)  The lender charges the borrower a "discount," which is the difference between the sold future receivables and the advanced amount.  (SUF 3.)  The discount is fixed and does not grow over the term of the financing.  (SUF 4.)  In addition, the lender often deducts an up-front fee from the advanced amount.  (SUF 5.)  The borrower then pays the lender a certain percentage of its sales from a designated account, approved by the lender, on a daily or weekly basis until the borrower pays back the advanced amount plus the "discount."  (SUF 6.)  There are two types of delivery mechanism in sales-based financing transactions: fixed payment and variable payment.  A fixed payment contract specifies both a fixed percentage and fixed payment amount that the lender collects.  (SUF 7.)  Because the fixed payment amount is a dollar estimate of the fixed percentage based on past sales, the contract allows the borrower to seek adjustments, often called true-ups, when the fixed payment amount exceeds the contracted fixed percentage.  (SUF 8.)  To seek a true-up, the borrower is required to prove the decrease in sales by collecting and submitting months of bank statements, all while continuing to make daily or weekly

payments.  (SUF 9.)  The contract is usually silent as to how quickly the lender must respond to the borrower's request, and whether to make an adjustment is within the sole discretion of the lender.  (SUF 10.)  Oftentimes the lender limits an adjustment to once a month or forfeits the borrower's right to ask for an adjustment unless it receives a timely request.  (SUF 11.)  Some lender also requires a showing of 20% or more decrease in sales. (SUF 12.)  Adjustments are usually temporary and the borrower must continue to prove its decrease in sales as often as every 14 days.  (SUF 13.)  When the borrower fails to submit supporting documents, the percentage returns to the original.  (SUF 14.)

Unlike a fixed payment contract, a variable payment contract does not specify a fixed payment amount and instead only states a fixed percentage.  (SUF 15.)  The borrower is required to give the lender almost real-time access to a designated account where its sales receipts accumulate, which allows the lender to take the exact agreed-upon percentage, without the need of any adjustment, on a daily or weekly basis.  (SUF 16.)  Many sales-based financing contracts allow prepayment and often encourage it by offering a prepayment discount.  (SUF 17.)  SBFA offered three of its members for discovery.  They are Rapid Finance (Rapid), Forward Financing (Forward), and Kapitus.  Both Forward and Kapitus offer fixed payment contracts while Rapid provides variable payment contracts only.

Sales-based financing contracts contain extensive representations, warranties, and covenants where the borrower promises, among other things, that it will not cause any diversion of its sales receipts from the account where the lender monitors and takes payments.  (SUF 18.)  If it does so, the borrower is considered in breach and the lender is entitled to various contractual remedies such as monetary damages, a default fee, an accelerated payment schedule where the full outstanding amount becomes due immediately, and a personal guarantee by the owner.  (SUF 19.)  Some lenders take security interests in any and all future receipts the borrower

has and will ever have as well as the owner's personal property and deem the borrower in breach on all contracts with the lender that are not current.  (SUF 20.)

Closed-end credit is identical to a traditional loan where the borrower makes regular payments on a daily or weekly basis with interest until the principal and interest are paid off.  (SUF 21.)  Open-end credit is a line of credit where the borrower gets approved up to a credit limit and is free to withdraw and pay back within that limit as it chooses.  (SUF 22.)  Rapid offers both closed-end and open-end credit and Kapitus provides close-end credit only.  Forward offers neither.

## B.   The Regulations

The Regulations implemented Senate Bill-1235, codified in California Financial Code § 22800 et seq., and mandate the following disclosures for sales-based financing transactions: (1) Funding Provided, (2) Estimated Annual Percentage Rate (APR), (3) Finance Charge, (4) Estimated Total Payment Amount, (5) Estimated Monthly Cost (if necessary), (6) Estimated Payment, (7) Payment Terms, (8) Estimated Term, and (9) Prepayment.  Cal. Code Regs. tit. 10, § 914. For open-end credit transactions, lenders are required to disclose: (1) Funding Provided, (2) APR, (3) Estimated Finance Charge, (4) Estimated Total Payments, (5) Average Monthly Cost (if necessary), (6) Estimated Payment, (7) Draw Period, (8) Term, and (9) Prepayment.  *Id*. § 911.  In extending an open-end credit offer, lenders are required to assume that the borrower will make an initial draw of its full approved credit limit, that the borrower will choose to make only minimum monthly payments, and that the borrower will not make any subsequent draws.  *Id*. § 911(a)(2).  These assumptions must be conspicuously disclosed on the top of the open-end disclosure form.  *Id*.  For closed-end credit transactions, lenders are required to disclose: (1) Funding Provided, (2) APR, (3) Finance Charge, (4) (Estimated) Total Payment Amount, (5) (Initial) Payment, (6) Term, and (7) Prepayment.  *Id*. § 910.  The required disclosures are designed to fit on one or two pages.  *Id*. § 901(a)(8).  The Regulations only prescribe what is stated in the

4

disclosure forms themselves; lenders are free to provide additional information outside the disclosure form.  (SUF 60.)

### C.   SBFA's Lawsuit

SBFA contends that the required disclosures violate its members' First Amendment rights because the disclosures force them to make misleading and inaccurate statements in the form of compelled disclosures.  It claims that the regulations "cram open-end credit [and sales-based financing] into a closed-end credit box, even though they are very different types of financing."  (Compl., ¶ 36; Dkt. 1.)  SBFA argues that certain terms and metrics in the Regulations as well as the assumptions made for open-end credit indicate that the product being offered is a loan.  (*Id.*, ¶¶ 27, 35.)  SBFA further contends that the Regulations are preempted by TILA because the Regulations modify the TILA-defined term "finance charge." (*Id.*, ¶ 53.)  SBFA also argues that the Regulations' use of the closed-end APR calculation under TILA for open-end credit renders the Regulations inconsistent with, and thus preempted by, TILA.  (*Id.*, ¶ 35.)

SBFA argues that the required disclosures harm its members' "competitive position in the market place" because they make its members' products appear "more expensive."  (*Id.*, ¶ 41.)  As a result, SBFA continues, small businesses will be "discouraged" from borrowing money from its members.  (*Id.*)  Furthermore, SBFA suggests that the differing definitions of "finance charge" between TILA and the Regulation, as well as inconsistent use of APR, will cause confusion to businesses and "frustrate" TILA's purpose.  (*Id.* ¶ 51.)

## III.  ARGUMENT

### A.   SBFA Lacks Standing to Bring an As-Applied Challenge

SBFA asks the Court to declare "that the Regulations violate the First Amendment as applied to SBFA's members."  (*Id.* at 32:17-18.)  The party invoking federal jurisdiction bears the burden of establishing standing.  *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992).  One of the elements of association

5

standing is that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Applying *Zauderer*, which is the applicable constitution standard to analyze SBFA's as-applied challenge to the Regulations, individual members' participation is necessary to determine whether the Regulations are "factual" as applied to each of SBFA's members financing products. *Am. Beverage Ass'n v. City & Cnty. of San Francisco* (*Am. Beverage*), 916 F.3d 749, 756 (9th Cir. 2019). Thus, SBFA lacks standing.

The Third Circuit twice rejected the as-applied challenge of two associations of adult film industry members that brought First Amendment challenges to regulations aimed at curbing child pornography for lack of standing. *Free Speech Coal., Inc. v. AG of the United States*, 974 F.3d 408, 421 (3d Cir. 2020). The court reasoned that "[g]iven the diversity of circumstances presented by the [associations'] membership," facts and effects of the regulations at issue "for one association member 'will not necessarily be so' for another." *Id.* at 422. Furthermore, the court expressly rejected the associations' attempt to present their claim as "a collective one on behalf of the 'entire … industry'" because "[g]eneralized statements" cannot "replace the individualized inquiry required." *Id.* at 421. *See also Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (An as-applied challenge requires the participation of individual members because it challenges "the application of the statutes to a specific factual circumstance.").

The Third Circuit's reasoning applies with equal force in this case. SBFA's challenge to the Regulations' application to its members' financing products requires an analysis of each of its members' agreements and practices. But SBFA resisted such discovery every step of the way. The need to analyze each of the agreements is confirmed by the agreements the Department was able to obtain, belonging to six of SBFA's members, and they show that the members' agreements and practices vary widely. For example, SBFA alleges that the cost of sales-based

financing is not based upon a fee but a discount (Compl., ¶ 29, Dkt. 1), and yet "the majority of members" charge up-front fees in addition to a discount.  (SUF 5.)  Similarly, the need to disclose "reasonably anticipated true-ups" is of no consequence to members who do not offer true-ups, such as Rapid and Rewards Network.  (SUF 23.)  The same can be said about the Regulations' prepayment disclosures because prepayment is not a "foreign" concept as prepayment terms are common.  (Compl., ¶ 26, SUF 17.)  In short, as further detailed below, each step of the *Zauderer* analysis requires a detailed analysis of each members' contracts and practices and thus, SBFA lacks standing to bring an as-applied challenge to the Regulations on behalf of its members.  *See Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning Agency*, 365 F. Supp. 2d 1146, 1164-65 (D. Nev. 2005) (rejecting "associational standing to bring an as-applied takings challenge because of the ad hoc, fact-specific legal test to be applied").

### B.   The Regulations Satisfy *Zauderer* as a Matter of Law

The Supreme Court's decision in *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626 (1985) "provides the appropriate framework to analyze a First Amendment claim involving compelled commercial speech." *Am. Beverage*, 916 F.3d at 756.  The *Zauderer* test "contains three inquiries: whether the [compelled speech] is (1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome." *Id.*  It also governs an as-applied challenge to commercial speech that imposes disclosure requirements. *Milavetz, Gallop & Milavetz, P.A. v. U.S.*, 559 U.S. 229, 230 (2010).[1]  The Regulations satisfy all three elements.

### 1.   The Required Disclosures Are Purely Factual

The required disclosures are purely factual because they are based on figures and terms appearing on the face of the contracts and conspicuously state that they

---

[1] SBFA conceded that *Zauderer* is an appropriate standard in evaluating its First Amended challenges to the Regulations despite its allegation that the Regulations are subject to strict scrutiny.  (Opp. To Mtn. to Dismiss, Dkt. 19, p. 3:21-23; Compl., ¶ 59.)

are "estimates."   Furthermore, there is no evidence that any actual customer has been misled by the disclosures.  (SUF 36, 64.) The Regulations essentially ask lenders to distill their agreements to common financial terms that borrowers are more likely to understand than the varying, inconsistent terms employed in lender contracts.  The required terms are not misleading and SBFA's attempts to show otherwise fail.

### a.   The Regulations' definition Aligns with Both Federal and State Law

The "finance charge" defined by the Regulations includes any "discount taken on the face value of the accounts receivable."  Cal Code Regs. tit. 10, § 943(a)(2).  The Regulations' definition of the "finance charge" aligns not only with TILA, which encompass "any amount payable under [a] discount system of additional charges", 12 C.F.R. § 1026.4(b)(1), but also California Financial Code, which expressly include "discounts."  Cal. Fin. Code § 22500.  Nevertheless, SBFA alleges that the Regulations erroneously imply that the cost of sales-based financing is based on fees, when in fact, it is based on a discount.  (Compl., ¶ 29.)  A discount is part of the finance charge, and thus, the required statement that "The cost of financing is based on fees charged by [financer]…" is purely factual and not misleading.  Cal. Code Regs. tit. 10, § 914(a)(3)(D).

### b.   The Terms Required by the Regulations Comport with Basic English and SBFA's Own Use

SBFA takes issue with various terms required by the Regulations, such as "payment" and "owe."  But these terms are not misleading as used in the disclosures when given their ordinary dictionary meaning.  Tellingly, SBFA's members use these terms throughout their own contracts.

In *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716 (9th Cir. 2017), the court rejected a mortgage refinancing company's characterization that certain statutes, which required the company to disclose that its solicitations were not

8

authorized by lenders, were misleading. *Id*. at 733.  The court reasoned that there is "[no] meaningful difference" between the word "authorized" required by the statutes and the word "approved" found in the company's disclaimer. *Id*. at 734.

Just like *Owen*, there is no meaningful difference between the terms SBFA challenges and those it suggests.  SBFA contends that the word "payment" indicates that the product is a loan while the word "remittance" does not, and thus, all references to "payment" should be replaced by "remittance."  (SUF 24.) Likewise, SBFA alleges that "owe" implies "an absolute payment obligation" whereas "due" can be used in any product.  (SUF 25.)  When asked about the basis of such implications, the representative of Kapitus testified that "it's sort of basic English."  (SUF 26.)  But "basic English" as defined by a dictionary shows otherwise.  "Pay" means "to discharge a debt or obligation" and "remit" means "to send (money) to a person or place especially in payment of a demand, account, or draft." (SUF 27-28.)  When customers "pay" SBFA's member, they discharge their obligation by "sending money."  Likewise, "owe" means "to be under obligation to pay or repay in return for something received"; the word does not connote the existence of an absolute obligation to pay.  (SUF 29.)  "Due" is defined as "owed or owing as a debt."  (SUF 30.)  In short, there is no meaningful distinction between "payment" and "remittance" or between "owe" and "due."

Another term SBFA objects to is "Estimated Total Payment Amount." (Compl., ¶ 30).  It argues "Expected Total Remittance" is a correct term because the word "estimate" connotes that the delivered amount would be within certain ranges whereas the word "expected" suggest an exact amount.  (SUF 32.)  But, as SBFA admitted, there is no guarantee that customers will pay back the entire amount owed (SUF 33) and such failure could happen anytime.  Thus, the amount SBFA's members might receive is always an "estimate," which is defined as "a rough or approximate calculation", even though they may "expect" to receive the full amount.  Tellingly, SBFA members use the challenged words in their own

1  contracts.  (SUF 31, 35.)  Jeremy Brown, executive chairman of SBFA, had a word
2  to describe SBFA's allegations: It's all "word salad."  (Brown Depo., p. 138:22.)
3      Considering that there is no meaningful distinction between the challenged
4  and suggested alternatives, it is not surprising that SBFA has no admissible
5  evidence to show the alleged customer confusion arising from the required
6  disclosures.  (Compl., ¶ 41.)  To the contrary, multiple SBFA's members stated that
7  not a single customer has complained of or expressed confusion about the
8  Regulations.  (SUF 36.)  Likewise, SBFA's expert's survey is of no avail.  As
9  discovery in this action has shown, the required disclosures are invariably presented
10  to customers with the underlying contracts, but none of the participants in SBFA's
11  survey received the disclosures with the underlying contract.  (SUF 64.)
12  Accordingly, SBFA's surveys did "not apply the specific facts of this case" and
13  thus cannot show confusion.  *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d
14  1039, 1056 (8th Cir. 2000) ("If a party believes that an expert opinion has not
15  considered all of the relevant facts, an objection to its admission is appropriate.").

16              **c.    The Metrics Required by the Regulations Are Readily**
                       **Available on the Face of Contracts and SBFA**
17                     **Members Use Them for Internal Projections**

18      The Regulations require disclosures of "Estimated APR," "Estimated
19  Payment," and "Estimated Term."  Cal. Code Regs. tit. 10, §§ 914 (a)(3)(A),
20  (a)(6)(A), (a)(8)(A).  These disclosures are easily ascertained and calculable from
21  the face of the contracts.  Indeed, SBFA members routinely calculate them to
22  project receipts from their customers.  Nevertheless, SBFA argues that, in sales-
23  based financing, there is no fixed payment amount and no term, which are two
24  factors necessary to compute an APR, and thus, an APR cannot be accurately
25  calculated.  (Compl., ¶¶ 21, 23, Dkt. 1.)
26      SBFA members' contracts, however, directly contradict these allegations.
27  Most, if not all, fixed payment sales-based financing contracts have a specific daily
28  or weekly payment amount.  (SUF 7.)  For example, in Forward's contract where

the daily payment amount is $240, it would take 100 days for Forward to collect the $24,000 "Amount Sold." (SUF 37.) Accordingly, Forward can readily figure out the payment term (100 days) and the payment amount it specifies on the face of its contract ($240), which enables Forward to calculate the APR. Even under variable payment contracts, such as Rapid's, an estimated term can be calculated based on the specific percentage owed and Rapid commonly estimates payment terms for its own internal projections and analyses. (SUF 38.) Furthermore, the Regulations account for possibly changes in payment due to true-ups and expressly state that the disclosed payment, term, and APR are "estimates." 10 Cal. Code Regs. tit. 10, §§ 914 (a)(3)(A), (a)(6)(A), (a)(8)(A). The Regulations also explicitly require the following statements: "Since your actual income may vary from our estimate, your effective APR may also vary"; "This is our estimate of how long it will take to collect." *Id*. §§ 914 (a)(3)(C), (a)(8)(C). Thus, the Regulations are purely factual.

        **d.    The Required Disclosures Are Purely Factual Because SBFA Members' Sales-Based Financing Products Are Akin to Loans**

     "This is not a loan"—this is the phrase that can be found in almost all sales-based financing contracts. According to SBFA, differentiating sales-based financing from loans is a major "value proposition" and thus, is the biggest selling point. (Compl., ¶ 12, Dkt. 1.) The problem with SBFA's position, however, is that its members' sales-based financing contracts resemble loans in that they are designed to and operate to guarantee payments from borrowers regardless of whether borrowers generate income. *See e.g., West Pico Furniture Co. v. Pac. Fin. Loans*, 2 Cal.3d 594, 605 (1970) (the fact that the "risk of nonpayment" was borne by the seller indicates that the transaction was a loan, not sales of future receivable). Given the nature of SBFA's members sales-based financing products, disclosures that are appropriate for loans are similarly appropriate for SBFA's sales-based financing products and thus, are purely factual.

SBFA claims that what separates sales-based financing from loans is flexible payments: A borrower "may be in full compliance with [its] agreement but has made no 'payments' for weeks" because the borrower's payment "obligation is entirely contingent on generating the applicable receivables." (Compl., ¶¶ 19, 21, pp. 11:21-22, 12:7-8, Dkt. 1.) A review of available contracts, however, shows that such flexible payments for fixed payment contracts are a near impossibility.

A Forward contract illustrates what a borrower needs to do in order to pay less while still complying with the contract. There, a borrower sold its future receipts of $24,000 to Forward in exchange for $16,000. (SUF 39.) It agreed to pay 16% of its monthly receipts, which Forward estimated to be $240 per every business day. (*Id*.) Assuming 20 business days per month, the borrower will pay the agreed $24,000 in five months ($240 x 20 days x 5 months). But if sales lag and the borrower needs to lower the monthly percentage (and daily payment), it needs to collect "three months" bank statements to show its decrease in sales. (*Id*.) The contract is silent as to how quickly Forward must make a decision, and even if Forward finds the adjustment is warranted, it only makes a temporary adjustment "for 14 days." (*Id*.) The adjusted percentage "revert[s] back" unless the borrower continues to submit its bank statements "every 14 days." (*Id*.) While collecting its three months' worth bank statements to reduce its payments, the borrower has to pay $14,400 ($240 x 20 days x 3 months), which is 90% of the total payback amount. To make matters worse, if the borrower does not have enough money to pay Forward because it used its sales receipt for other, necessary business costs, such as payroll, or blocks Forward's debit to pay its employee, the borrower is in breach. "Customer will not take any action to reduce … prevent the deposit of all Future Receipts into the Approved Account." (SUF 40.) Once the borrower breaches the contract, it triggers a whole host of remedies Forward can seek including $2,500 in "liquidated damages" and a collection action as well as a personal guarantee against the owner. (SUF 41.)

1    Forward is not alone in making the adjustment process near impossible and

2    having built-in terms that guarantee its recovery against slowly declining

3    businesses.  Kapitus limits a reconciliation to "once every 30 days" regardless of

4    whether the payment is due daily or weekly.  (SUF 42.)  With such a limit, it would

5    not take long before a borrower might be forced to divert income to make other

6    necessary payments.  And just like Forward, Kapitus considers any such action as a

7    breach: "Seller will not … permit any event to occur that could cause diversion of

8    any of Seller's receipts."  (SUF 43.)  The remedies Kapitus built in to its sales-

9    based financing contracts are identical to remedies it has against its loan borrowers.

10   Upon breach, the outstanding amount is accelerated and "become due and payable

11   in full immediately."  (SUF 44.)  The business owner becomes personally liable to

12   Kapitus.  (*Id*.)  In addition, Kapitus can enforce its security interest in all collateral,

13   which includes all receivables, inventory, equipment, intangibles, investment, cash,

14   and UCC Article 9 items "whether now or thereafter owned or acquired by [the

15   borrower] and wherever located, and all proceeds of them" not just the receivables

16   Kapitus purportedly bought.  (SUF 45.)  Furthermore, Kapitus records a UCC

17   statement against both its loan and sales-based financing borrowers and the

18   collateral it takes against both borrowers is identical.  (SUF 46.)  Its contracts also

19   contain a "cross-default" provision when a borrower breaches one contract with

20   Kapitus, it is automatically deemed to have breached any other contract with

21   Kapitus, even if it is fully complying with it.  (SUF 47.)  Kapitus admits that it is "a

22   common condition" that "[m]ost lenders have."  (SUF 48.)  According to Kapitus, it

23   is a lender when it enters a loan transaction, but it is not a lender when it signs a

24   sales-based financing contract.  (SUF 49.)  But the Federal Reserve Board's study

25   shows that small business owners "view [sales-based financing] companies … as

26   lenders."  (SUF 50.)  Notably, even SBFA's own website states that "Our members

27   have developed efficient lending platforms."  (SUF 51.)  When queried, one of

28   SBFA's 30(b)(6) witnesses stated that the website was using "lending" "in a

13

colloquial sense." (SUF 52.)  Thus, colloquially, it is not misleading to refer to sales-based financing as a loan product.

Finally, Kapitus requires all borrowers to obtain business interruption insurance.  (SUF 53.)  Business interruption insurance replaces business income lost due to certain events, such as a fire or a natural disaster.  Thomas F. Segalla et al., *A First Look at the Coverage Implications of Hydraulic Fracturing*, Westlaw Journal Insurance Coverage, 22 No. 34 WJINSC 1, June 1, 2012, at 4.  When the borrower suffers loss in non-ordinary course, Kapitus is ensured to collect payment as "a loss payee and additional insured." (SUF 53.)  Accordingly, Kapitus is armed with tools that guarantee its recovery whether borrowers' businesses are slowly declining or go out of business in non-ordinary course.  Previously, the Department determined that such recourse option suggests that a transaction is a loan.  (SUF 65.)  Given the guaranteed recovery mechanism built in sales-based financing, it is purely factual for the Regulations to state borrowers "owe" to lenders and to apply disclosure metrics commonly used for loans to sales-based financing products.

### e.  The Regulations' Treatment of Open-End Credit Is Purely Factual Because It Provides Realistic Estimates

The purpose of Senate Bill-1235 is to "help small businesses better understand the terms and costs of the financing available to them in the commercial financing market." (SUF 1.)  One type of cost that frequently escapes calculations is an initial draw fee in open-end credit.  In calculating APR in open-end credit transactions, TILA takes into account "each periodic rate," 12 C.F.R. § 1026.6(b)(2)(i), but a periodic rate "does not include initial one-time transaction charges." *Id*. § 1026.2(a)(21) (official interpretation).  Thus, an initial draw fee is often hidden and a small business does not find out about it until after it decides to draw from the approved line of credit.  The Regulations uncloaked the initial draw fee and made it part of the finance charge, Cal. Code Regs. tit. 10, § 943(a)(1), which leads to providing a more realistic estimated cost of open-end financing.

The Regulations further the objective of Senate Bill-1235 by opting for a uniform disclosure under a single hypothetical transaction—drawing the full amount at the outset and paying only minimum payments. *Id*. § 911(a)(2). Such assumptions obviate the need for lenders to speculate how borrowers will use the credit in providing disclosures, and at the same time, allow borrowers to see the full costs of open-end credit and readily compare financing options. SBFA challenges these assumptions arguing that they "effectively destroy the value of offering an open-end product and do not reflect reality." (Compl., ¶ 35.) But nowhere do Regulations require a statement that customers must use open-end credit in this way. Cal. Code Regs. tit. 10, § 911. Instead, they clearly state the assumptions under which they were made and illustrate how a business can estimate the costs of open-end credit. Critically, there is no admissible evidence that actual customers have been misled by the disclosures for open-end credit. (SUF 36, 64.) Thus, the disclosures for open-end credit are factual.

### 2. The Required Disclosures Are Noncontroversial Because They Are Based on Transparent Assumptions and Figures Found on Contracts

The second inquiry under *Zauderer* is whether the compelled speech is noncontroversial. *Am. Beverage*, 916 F.3d at 756. The Regulations merely require disclosures of estimates based on a transparent set of assumptions and figures found on the contracts. Therefore, they are purely factual and thus, noncontroversial. A finding that disclosures are factual necessarily leads to a finding that they are not controversial. *CTIA - The Wireless Ass'n v. City of Berkeley, California (CITA)*, 928 F.3d 832, 848 (9th Cir. 2019). A statement is not controversial for First Amendment purposes simply because an industry advocacy group believes it casts the industry's products in a bad light. *Id*. at 845. SBFA's self-serving views on certain terms and disagreements with the metrics chosen by the Department do not rise to the level of heated political controversy like abortion, *Nat'l Inst. of Fam. And Life Advoc. v. Becerra*, 138 S. Ct. 2361, 2372 (2018), or amount to taking a

15

1    position regarding matters of legitimate scientific debate.  *California Chamber of*
2    *Com. v. Becerra,* 529 F. Supp. 3d 1099, 1117 (E.D. Cal. 2021).  Like in *Zauderer*
3    itself, the Department "has attempted only to prescribe what shall be orthodox in
4    commercial [financing disclosure required by the Regulations], and its prescription
5    has taken the form of a requirement that [lenders] include in [their disclosures]
6    purely factual and uncontroversial information *about the terms* [of their products]."
7    *Zauderer*, 471 U.S. at 651 (emphasis added).

8                                                       * * *

9           According to the Federal Reserve's study published in 2018, more than half
10   of participant-small businesses "expressed dissatisfaction" with online lenders, and
11   one of the major sources of the complaints was the lack of consistency across
12   products which "ma[de] it difficult for small business owners to estimate [the cost]
13   of the financing and to compare products."  (SUF 54.)  According to the study,
14   small businesses "didn't necessarily know—or care—about technical distinctions
15   between traditional loans and other credit products, such as [sales-based
16   financing]."  (*Id*.)  They simply wanted disclosures containing terms that are
17   "familiar to them; that is, discussed in a manner typically used for traditional credit
18   products" in a "standardized" form that includes "all costs (that is, no hidden fees)."
19   (*Id*.)  When asked what information was important, they chose "APR, repayment
20   amount, frequency of payments, and prepayment penalties."  (*Id*.) The vast majority
21   also wanted information early on even though "actual [figures] may vary" because
22   such information would allow them "to compare options and to make decisions on
23   whether to apply."  (*Id*.)

24          The required disclosures epitomize what small businesses have longed for.
25   The Regulations employed all four metrics cited by the small businesses in the
26   Federal Reserve's study.  (SUF 55.)  Those are metrics commonly found in
27   traditional loan products and thus, are familiar to most people.  Consistent with the
28   survey participants' complaints, some of SBFA members' contracts executed prior

to the Regulations do not show these metrics and some continue to not disclose them. (SUF 56.) Furthermore, the Regulations standardized the disclosures forms, thereby enabling small businesses to navigate complex financing transactions and comparison-shop diverse financing options. The state of California has a strong interest in protecting all Californians, including owners of small businesses, from deceptive lending practices and ensuring that financial services and products available in California are fair and not misleading. Under *Zauderer*, such government interests are sufficient to justify compelled commercial speech. *CITA*, 928 F.3d 832, 844 (9th Cir. 2019) (holding that "*Zauderer* requires that compelled disclosure further some substantial—that is, more than trivial—government interest").

Among the required disclosure metrics, the APR disclosure is the linchpin of the Regulations and the key that enables borrowers to fairly compare different financing products. It calculates the cost of the financing "over a one-year period" irrespective of the duration of financing products, and thus, allows an "apples-to-apples" comparison across-the-board. (SUF 57.) Because APR is a reliable and effective measure of the cost of the financing, CFPB recommends borrowers to use it in comparing financing options: "You don't need to worry about the math. Just keep in mind that the APR does matter because it provides a shorthand way for you to compare the cost of two or more loans." (SUF 58.) Thus, the Regulations empower borrowers and enable them to comparison-shop by mandating the same disclosure metrics regardless of types of financing products, and are not controversial.

### 3. The Required Disclosures Are Neither Unjustified nor Unduly Burdensome Because They Are Brief and Allow Lenders to Provide Additional Information

The final inquiry under *Zauderer* is whether the disclosures are "unjustified or unduly burdensome." *Am. Beverage*, 916 F.3d at 756. A disclosure is "unduly burdensome" when the burden "effectively rules out" the speech it accompanies.

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regul., Bd. of Acct.*, 512 U.S. 136, 146 (1994). Courts have considered whether the required disclosures are proportionate. In *Owen*, the court upheld the disclosure requirement because it is "relatively brief disclosures" in letters that "span one to two full pages of text." *Owen*, 873 F.3d at 734. On the other hand, the court in *American Beverage* struck down an ordinance requiring a health warning to occupy 20% of the advertisement. *Am. Beverage*, 916 F.3d at 757. The required disclosures here are similar to the one in *Owen*. The length of lenders' contracts vary from 10 pages to 21 pages, and the required disclosures occupy at most 2 pages. (SUF 59.) In fact, the Regulations expressly prohibit "unnecessarily extend[ing]" the disclosures "onto multiple pages." Cal. Code Regs. tit. 10, § 901(a)(8). Furthermore, there is no restriction as to what lenders may provide or state in addition to the required disclosures. (SUF 60.)

During the rulemaking process, the Department determined that complying with the Regulations would not be excessively expense and Microsoft Excel provides an affordable means to calculate APRs pursuant to the Regulations. (SUF 61.) On the other hand, SBFA has failed to substantiate its claim that the cost of complying with the Regulations is unduly burdensome. One member expressly admitted that the cost of providing disclosures does not outweigh the benefits of doing business in California. (SUF 62.) To date, SBFA has failed to state what their members' costs of compliance have been or to otherwise show that those costs are out of line with their operating costs. (SUF 63.) "All mandatory disclosures impose some burden on commercial speech," *Owen*, 873 F.3d at 734, but there is no evidence that Regulations-required disclosures are unduly burdensome.

### C.   The Regulations Are Not Preempted by TILA Because They Are Not Inconsistent with TILA

After a notice and comment period, CFPB determined that "the State commercial financing disclosure laws of California [and other states] are not preempted by TILA." Truth in Lending; Determination of Effect on State Laws

(California, New York, Utah, and Virginia), 88 Fed. Reg. 19214, 19214 (Mar. 31, 2023) (to be codified at 12 C.F.R. pt. 1026).  The CFPB's determination is the product of careful analysis of public comments and addresses all arguments SBFA has raised in this litigation.  The Court should defer to CFPB's determination and grant summary judgment on SBFA's preemption claim.  "Businesses' understanding of credit available to them for business purposes … is not a purpose of TILA and has been left to the states to address. [Thus,] [i]t is *not appropriate* to use TILA preemption to override States' judgments regarding how best to disclose information to businesses, which is not part of TILA's purposes."  *Id*. at 19218 (emphasis added).

"[N]oting that Congress has given the regulatory agency especially broad authority in interpreting TILA, and in light of the 'highly technical' nature of TILA, the Supreme Court has held that the CFPB's official staff interpretations are due a high level of deference: '[u]nless *demonstrably irrational*, [] staff opinions construing the Act or Regulation [Z] [are] dispositive . . .."  *In re Hero Loan Litig.*, No. ED CV 16-02478-AB (KKx), 2017 U.S. Dist. LEXIS 111771, at *13 (C.D. Cal. July 17, 2017) (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980)).  Indeed, Congress expressly delegated the preemption determination to CFPB.  15 U.S.C. § 1610(a)(1) ("Upon its own motion or upon the request of any creditor, State, or other interested party…, the Bureau shall determine whether any such inconsistency [requiring preemption] exists"); *see also* 15 U.S.C. 1604(h).  In addition, CFPB's determination is subject to *Chevron* deference.  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  Under *Chevron*, "[i]f the intent of Congress is clear . . . the court . . . must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  "If, however, the court determines Congress has not directly addressed the precise question at issue, [and] if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

1   *Id.* at 843.  CFPB's determination is based on permissible construction of the
2   statute and thus, is entitled to *Chevron* deference.

3        The Court's order denying the Department's motion to dismiss (Dkt. No. 27)
4   held that SBFA sufficiently alleged facts to support conflict preemption while
5   disposing of express and field preemption.  SBFA has failed to substantiate its
6   claim that the alleged conflict between TILA and the Regulations causes consumer
7   confusion (SUF 36, 64) and thus, it cannot carry its burden of establishing
8   preemption.  *Jimeno v. Mobil Oil Corp.*, 66 F.3d 1514, 1526 n. 6 (9th Cir. 1995)
9   (holding that the party contending preemption bears the burden of establishing it).
10  More fundamentally, it is a legal impossibility for small businesses to compare
11  products subject to TILA with products that are not subject to TILA because TILA
12  disclosures apply to transactions "primarily for personal, family, or household
13  purposes", 15 U.S.C. § 1602(i), whereas the Regulations-required disclosures apply
14  to transactions that are "primarily for other than personal, family, or household
15  purposes."  Cal. Fin. Code, § 22800(d)(1).  Because of the differing primary-
16  purpose standards, there would not be a transaction where both TILA and
17  California disclosures are required.  Thus, this Court should conclude that the
18  Regulations are not preempted by TILA.

19  **IV.  CONCLUSION**

20        For the foregoing reasons, the Court should grant the Department's motion
21  and enter judgment in the Department's favor on all of SBFA's claims.

22

23  Dated:  September 27, 2023        OFFICE OF THE CALIFORNIA ATTORNEY GENERAL

24                                    */s/ Rachel J. Yoo*

25                                    Rachel J. Yoo
                                      Douglas J. Beteta
26                                    Deputy Attorneys General

27                                    *Attorneys for Defendant*

28

1

**CERTIFICATE OF COMPLIANCE**

2      The undersigned, counsel of record for defendant Clothilde Hewlett, solely in

3  her official capacity as Commissioner of the California Department of Financial

4  Protection and Innovation, certifies that this brief contains 6525 words, which

5  complies with the word limit of L.R. 11-6.1

6

7     Dated:  September 27, 2023                     ROB BONTA
                                                       Attorney General of California
8                                                      LISA W. CHAO
                                                       MICHAEL D. GOWE
9                                                      Supervising Deputy Attorneys General

10                                                     */s/ Rachel J. Yoo*

11                                                     Rachel J. Yoo
                                                       Douglas J. Beteta
12                                                     Deputy Attorney General

13                                                     *Attorneys for Defendant Clothilde*
                                                       *Hewlett, solely in her official*
14                                                     *capacity as Commissioner of the*
                                                       *California Department of Financial*
15                                                     *Protection and Innovation*

16

17

18

19

20

21

22

23

24

25

26

27

28