BENJAMIN H. BRODSKY *(Admitted Pro Hac Vice)*
Email: bbrodsky@bfwlegal.com
PHILIP T. MERENDA *(Admitted Pro Hac Vice)*
Email: phil@bfwlegal.com
BRODSKY FOTIU-WOJTOWICZ, PLLC
200 SE 1ST St., Suite 400
Miami, FL 33131
Telephone: 305.503.5054
Facsimile: 786.749.7644

PAUL A. LEVIN (CA State Bar No. 229077)
Email: paul@markmigdal.com
LAUREN M. GIBBS (CA State Bar No. 251569)
Email: lauren@markmigdal.com
MARK MIGDAL &HAYDEN
11150 Santa Monica Blvd., Suite 1670
Los Angeles, CA 90025
Telephone: 305.374.0440

*Attorneys for Plaintiff* SMALL BUSINESS FINANCE ASSOCIATION

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| SMALL BUSINESS FINANCE ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>CLOTHILDE HEWLETT, solely in her official capacity as Commissioner of the California Department of Financial Protection and Innovation,<br><br>Defendant. | Case No. 22-cv-08775-RGK-PLA<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION IN LIMINE TO EXCLUDE EXPERT REPORT AND TESTIMONY OF BARBRA KINGSLEY**<br><br>Hearing Date: October 30, 2023<br>Time: 9:00 a.m.<br>Judge: Hon. R. Gary Klausner<br>Courtroom: 850<br>Complaint Filed: December 2, 2022<br>Trial Date: December 12, 2023 |

PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION IN LIMINE
TO EXCLUDE REPORT AND TESTIMONY OF BARBRA KINGSLEY

Plaintiff Small Business Finance Association ("SBFA" or "Plaintiff") respectfully submits this Memorandum of Law in Opposition to the Motion in Limine No. 1 to Exclude Report and Testimony of Barbra Kingsley (the "Motion," ECF No. 64) filed by Defendant Clothilde Hewlett, solely in her official capacity as Commissioner of the California Department of Financial Protection and Innovation ("DFPI" or "Defendant").

The Motion should be denied because Defendant's technical criticisms of Dr. Kinglsey's survey are wrong under generally accepted surveying principles and, regardless, they go to the weight of Dr. Kinglsey's opinion testimony not its admissibility. Further, notwithstanding Defendant's efforts to misstate her clear opinions, Dr. Kingsley's expert testimony is plainly relevant to the issues of whether (1) the disclosures at issue in this case compel purely factual (as opposed to misleading or confusing) speech and (2) small businesses viewing the disclosures understand that the Regulations use identical terms but ascribe different means to those used in consumer financing, such that the Regulations are preempted by TILA.

**I.   Dr. Kingsley's Survey Report and Opinion**

For over 25 years, Barbra Kingsley, Ph.D., has been providing consulting and targeted research on the use of clear language and effective design in written communications to enhance reader comprehension and to help readers make appropriate, informed decisions. (ECF 64-2 at 2.) As part of her work, Dr. Kingsley designs and conducts survey research to evaluate how well consumers react to, understand, and behave using information that is given to them. (*Id.*) Her company has developed nationally-used disclosures, including the TILA-RESPA Integrated Disclosures (TRID) for the Consumer Financial Protection Bureau; the Financial Privacy Notice for the Federal Trade Commission and a consortium of other financial regulatory agencies; and the HIPAA notice of privacy practices for the Department of Health and Human Services. (*Id.* at 3.) Dr. Kingsley's company

also developed the Uniform Residential Loan Application and is developing a Uniform Residential Appraisal Report for Fannie Mae and Freddie Mac. (*Id.*)

Dr. Kingsley's assignment in this case was to conduct research and form an opinion on the effectiveness of the disclosures mandated by the Regulations as measured by the level to which small business owners in California understand the features of three different financing options as those options are presented using the Disclosures. (*Id.* at 5-6.) Based on her survey, Dr. Kingsley found that the Disclosures do not effectively or consistently communicate key financing terms and features across different financing options. (*Id.* at 6.) Moreover, the Disclosures generate confusion and a distorted understanding of financing options on the part of small business owners as evidenced by the data collected. (*Id.*)

The study used generally accepted procedures for the design and analysis of surveys. (*Id.*) The survey used an experimental between-subjects design—a frequently-used methodology for determining how people use and understand information—in which participants were assigned to three different groups that correspond to different conditions. (*Id.* at 6-7.) Each group was exposed to the Disclosures under one of three different conditions, each representing a different type of financing offer. (*Id.* at 7.) Group 1 (80 participants) was exposed to a Disclosure for a closed-end credit, which is a fixed-term loan. (*Id.*) Group 1 served as the control, as it provided the least complex and most familiar financing features. Group 2 (80 participants) was exposed to an open-end credit offer, which is a line of credit. (*Id.*) Group 3 (78 participants) was exposed to a sales-based financing offer. (*Id.*)

Dr. Kinglsey sampled from the relevant population—small business owners in the State of California—using specialized business panels that were validated through third-party technology and proprietary digital fingerprinting. (*Id.* at 9-10.) She then further qualified the survey participants by requiring that they indicate they had sought business financing in the past or planned to seek business financing

in the next six months. (*Id.* at 10.)

The survey itself followed generally accepted procedures for the design of questionnaires used in research for litigation, including (1) double-blind procedures; (2) accurate and representative stimuli; (3) neutrally worded survey questions that are not leading or biased and represent issues germane to the case, (4) procedures that reduce error and guessing and to reduce order effects. (*Id.* at 11.) The stimuli were facsimiles of disclosure forms that matched disclosure forms used in actual financing offers. (*Id.* at 11-12.) The stimuli shown to each group were identical in form, other than representing different types of financing. (*Id.*)

The survey questions asked participants to identify various key features of the financing offer, as shown in the disclosure stimuli, such as the total amount of financing they would receive, how this financing would be provided (i.e., through a lump sum or over time), how they would repay the financing (through fixed or variable payments), how the financing was structured (i.e., fees, interest, both, or neither), and how the APR for the financing compared to the APR for a consumer loan subject to TILA. (*Id.* at 12-13.) Before answering the survey questions, participants were shown the disclosure on the screen. After answering each question, participants were given the option to view the disclosure again. (*Id.* at 14.) After the surveys were completed, Dr. Kingsley performed another round of quality control and validation to ensure the integrity of the data. (*Id.*) She then compiled the data as well as the qualitative responses to the disclosure stimuli provided by the participants. (*Id.* at 14-15.)

After performing a statistical analysis of the results (*id.* at 16-21), Dr. Kingsley concluded that, based on participant total scores, the disclosures were not effective in conveying the features of any financing – even the least complex – in such a way that a strong majority of participants could answer evaluative questions correctly and accurately. (*Id.* at 22.) With respect to open-end credit, participants in that group performed significantly worse than the control group in answering

questions on almost every feature of financing. (*Id.* at 23.) The low level of overall correct responses indicates significant confusion by recipients of open-end credit disclosures, likely a result of the assumptions that are required to be used. (*Id.*) The pattern of responses suggests that, notwithstanding the disclaimer at the top of the disclosure form, participants took away the misleading conclusion that the offered financing is a lump sum, fixed-rate loan rather than a line of credit that can be used over time. (*Id.*) Dr. Kinglsey concluded that the disclosures miscommunicate key financing features of open-end credit and is ineffective at explaining this form of financing to small business owners. (*Id.*)

As to sales-based financing disclosures, Dr. Kinglsey concluded that recipients do not understand the nature or terms of the transaction being represented. (*Id.* at 23-24.) Only 12.8% of recipients of the compelled disclosures for sales-based financing understood that the transaction being represented was the purchase and sale of future receipts. (*Id.* at 23.) Over 35% thought the transaction being represented was a loan and the recipients frequently misidentified the APR as an interest rate. (*Id.*) Compared to recipients of the control group, for close-end credit, recipients of the sales-based financing disclosures performed significantly worse when asked to identify how funding is provided (in one lump sum rather than over time); performed significantly worse when asked to identify the nature of repayment (variable and based on business performance, rather than fixed); and demonstrated that they had an irreconcilable misunderstand regarding how the financing works by answering that the amount of payments are fixed but the term is variable. (*Id.* at 23-24.) Dr. Kinglsey also concluded that the disclosures do not provide an effective description of the structure of sale-based financing, leading to misunderstanding in Group 3 of how the financing is paid. (*Id.* at 24.)

Based on the findings of this test, Dr. Kinglsey concluded that the disclosures do not effectively communicate key financing terms and features across different types of financing offers, particularly as to sales-based financing and open-end

credit. (*Id.* at 25.) Moreover, she concluded the disclosures create confusion about, and a distorted understanding of, both open-end credit and sales-based financing, because these terms and features are not communicated effectively. (*Id.*)

Finally, Dr. Kinglsey concluded that all groups were unable to accurately differentiate the finance charge and APR of an offer subject to the regulations from an offer subject to TILA. (*Id.*)

## II. Standard for Application of *Daubert* to Survey Opinions

In the Ninth Circuit, surveys are admissible under *Daubert*[1] if they are relevant, conducted according to accepted principles, and set upon a proper foundation for admissibility. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001). *See also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997) (internal quotation omitted) ("as long as [surveys] are conducted according to accepted principles, survey evidence should ordinarily be found sufficiently reliable under *Daubert*").

"Treatment of surveys" in the context of *Daubert* "is a two-step process." *Clicks Billiards*, 251 F.3d at 1263. The first question – whether the survey is admissible – requires determining whether the survey "is relevant and conducted according to accepted principles." *Id*. (citing *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997). That question is "determined by the judge." Id.

"Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility." *Id.* (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 840 (9th Cir. 2001)). *See also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037–38 (9th Cir. 2010) (reversing district court's exclusion of survey expert's opinion, even where survey

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)

failed to replicate real world conditions, may have been suggestive, and quite possibly produced counterintuitive results); *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988) ("Technical inadequacies in the survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility."); *Stuhlbarg*, 240 F.3d at 840 ("Technical unreliability goes to the weight accorded a survey, not its admissibility.").

### III. The Survey—and the Use of the Control—Was Conducted Pursuant to Accepted Principles.

Defendant argues that the survey should be excluded because Dr. Kingsley's use of Group 1 (recipients of the closed-end credit disclosure) as a control was improper.

As an initial matter, as noted above, the Ninth Circuit has repeatedly and unequivocally stated that quibbles about technical aspects of the survey—such as the survey design and methodology—go to weight not admissibility. *Clicks Billiards*, 251 F.3d at 1263; *Fortune Dynamic*, 618 F.3d at 1037–38; *Volpe*, 858 at 480. To that end, the use of a supposedly inappropriate control group is not grounds for excluding a survey opinion. *Billfloat Inc. v. Collins Cash Inc.*, No. 20-CV-09325-EMC, 2022 WL 2158970, at *8 (N.D. Cal. June 15, 2022); *Orgain, Inc. v. N. Innovations Holding Corp.*, No. 818CV01253JLSADS, 2022 WL 2189648, at *4 (C.D. Cal. Jan. 28, 2022); *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. C 10-00544 JW, 2011 WL 5417090, at *5 (N.D. Cal. Oct. 27, 2011); *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, No. SACV04-725CJC(EX), 2006 WL 5187497, at *4 (C.D. Cal. Mar. 2, 2006).[2]

Moreover, Defendant's rebuttal expert, Dr. Melissa Pittaoulis, **does not**

---

[2] Defendant cites *Cytosport, Inc. v. Vital Pharm., Inc.*, 894 F. Supp. 2d 1285, 1291 (E.D. Cal. 2012) for the proposition that the **lack** of a control is grounds for excluding a survey. Those are not the facts here.

testify in her declaration in support of the Motion that Dr. Kingsley's survey was not performed according to accepted principles. Instead, she contends that the use of the Group 1 as the control group was inappropriate because "the differences she observes between Group 1 and Groups 2 and 3 could simply be a reflection of small business owners having more familiarity and experience with closed-end loans than open-end credit or sales-based financing." (ECF No. 64-3 at ¶ 16.) These are classic critiques of methodology and conclusions, which do not provide a basis for excluding Dr. Kingsley's opinion as a matter of law.

In all events, Dr. Pittaoulis' critique is well off the mark. "In designing a control group study, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." Shari Seidman Diamond, Reference Guide on Survey Research, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 229, 258 (Federal Judicial Center ed., 2d ed. 2000). The availability of the closed-end credit disclosure thus presented a uniquely appropriate control. Because the compelled disclosures under the Regulations are designed to present variables in different ways while using a uniform form, Dr. Kingsley was able to elegantly achieve something quite difficult to do in research: hold constant the design and format, which are important elements in the framing of the information, yet still explore the characteristic under investigation (i.e., method of financing, payment amount, finance charge, finance structure, payment frequency, and term) which have variance across financing products.

And, critically, Dr. Pittaoulis fails to elucidate what an appropriate control would look like here or explain why an alternative would not introduce its own set of problems. She testifies that, if done her way, "the control group would be shown information about the financing features that consumers would have received absent the Disclosure requirements." (ECF No. 64-3 at ¶ 15.) But the inquiry in this case is not whether stating identical information in different forms makes a

difference in customer comprehension—it is whether the information itself is misleading. Dr. Kingsley's survey tests that perfectly by setting Groups 2 and 3 against a baseline control from which she can determine whether the average small business owner understands what she is seeing when shown an open-end credit or sales-based financing disclosure.

Separately, comparing the prescribed disclosure form with another form containing "the same financing features" would introduce numerous confounding variables that arise when information is not presented in a consistent manner. For example, a bullet list of financing features would not replicate the complexity of a disclosure and could skew the results significantly. Two different formats of disclosure would only raise questions as to whether individuals were responding to the information itself or how it was presented. It would certainly do nothing to strengthen the study design.

Finally, Dr. Pittaoulis' overarching critique—that Dr. Kingsley's conclusion could be based on customers having more familiarity with closed-end loan products than lines of credit or sales-based financing—is fundamentally at odds with the very purpose of the Regulations, which is to provide decipherable information to small business owners to make "apples to apples" comparison across different types of products. If the disclosures make customers think that, for sales-based financing and open-end credit, they are looking at a baseball rather than an apple—which is what Dr. Kingsley's survey shows—the disclosures are a failure.[3] As Dr. Kingsley will testify, the true test of a disclosure is not simply the conveying of simple, familiar concepts but the demystifying of complex, unfamiliar ones. If a disclosure

---

[3] Indeed, Defendant makes the rather remarkable statement that California small business owners' apprehension of the disclosures for sales-based financing or open-end credit should less than their apprehension of close-end credit disclosures. Again, if the disclosures do not provide "apples to apples" comparability between products, they are definitionally misleading.

fails to achieve clarity in the latter, as here, it signals deep-rooted inadequacies.

But, again, regardless, this is for the Court to determine after hearing the testimony of each of the survey experts, which will be subject to cross-examination from which these issues can be examined fully and decided.

## IV. Dr. Kingsley's Opinion Testimony Is Relevant.

Defendant next argues that Dr. Kingsley's opinions do not concern whether the disclosures are misleading, and therefore, irrelevant to the question of whether they satisfy *Zauderer*'s "purely factual" requirement of compelled commercial speech. That is incorrect. Dr. Kinglsey's report states unequivocally that customers are misled (and confused) by the disclosures. The evidence she gathered conclusively shows that customers **do not understand** the financial products they are being offered **based on the disclosures**. What could be more compelling evidence that the disclosures are misleading and cause confusion where, for example, a recipient of a disclosure for a line of credit product believes that she is required to take all the financing up front in a lump sum rather than over time. (ECF No. 64-2 at 23.) Defendant appears to be cherry-picking Dr. Kinglsey's report to make it appear she did not reach the conclusions of customer confusion that she plainly did. And, notably, Defendant does not address the relevance of Dr. Kingsley's opinions that small business owners do not realize that the "APR" stated in the disclosures is different than the "APR" under TILA. These opinions go squarely to Plaintiff's TILA preemption claim.

Within this same section of the Motion, Defendant lodges another criticism of Dr. Kingsley's methodology, arguing that the survey participants may have been confused because she showed them sample disclosures but not hypothetical contracts that would accompany the disclosures. According to Defendant, this means the customers may have been "left guessing at the purpose of the disclosure." (ECF 64 at 14.) This is, once again, a question of weight, not admissibility. And, once again, it is misplaced. As an initial matter, it is unclear

PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION IN LIMINE
TO EXCLUDE REPORT AND TESTIMONY OF BARBRA KINGSLEY

why, in the context of this case, small business owners need to understand the purpose of the disclosure. They need to be able to understand the product being described therein, which they did not because Defendant forces providers to fundamentally misstate the nature of their products.

In addition, the idea that a small business customer would not be able to understand the disclosure without also cross-referencing the underlying contract is a head scratcher. What is the reason for giving the disclosure, then? Moreover, Defendant's criticism once again invites more problems than it solves. If participants had access to the underlying contract, it would be impossible to isolate whether their answers (correct or incorrect) come from their reading and understanding of the disclosure or their reading and understanding of the contract. In short, adding the contract to the stimulus would have introduced significant noise, making it difficult to pinpoint whether any observed confusion stemmed from the disclosure or the contract. In all events, these are matters to be dealt with through examination of Dr. Kingsley and Dr. Pittaoulis at trial.

For the reasons stated above, Dr. Kingsley opinion testimony is relevant and amissible. The Motion should be denied.

Dated: October 6, 2023

                                        Respectfully submitted,

                                        BRODSKY FOTIU-WOJTOWICZ, PLLC

                                        /s/ *Benjamin H. Brodsky*
                                        Benjamin Brodsky
                                        Phil Merenda

                                        *Attorneys for Plaintiff Small Business Finance Association*

PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION IN LIMINE
TO EXCLUDE REPORT AND TESTIMONY OF BARBRA KINGSLEY